## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| **Chelsey Nelson Photography LLC,** and **Chelsey Nelson**, | |
| Plaintiffs, | |
| v. | |
| **Louisville/Jefferson County Metro Government; Louisville Metro Human Relations Commission-Enforcement; Louisville Metro Human Relations Commission-Advocacy; Kendall Boyd,** in his official capacity as Executive Director of the Louisville Metro Human Relations Commission-Enforcement**; and Marie Dever, Kevin Delahanty, Charles Lanier, Sr., Laila Ramey, William Sutter, Ibrahim Syed, and Leonard Thomas,** in their official capacities as members of the Louisville Metro Human Relations Commission-Enforcement, | Case No. ____3:19-CV-851-JRW____  <br><br><br> **Verified Complaint** |
| Defendants. | |

## **Introduction**

Plaintiff Chelsey Nelson is a young entrepreneur pursuing her dream of doing what she loves for a living—creating photographs and blog posts to tell uplifting stories about the world around us. Since 2016, Chelsey has run her own photography studio where she photographs, edits photographs, and writes blogs to positively depict certain subjects, such as weddings. Like other commissioned artists, Chelsey selects her projects and uses her skills to tell particular stories and to promote particular values. While Chelsey works with clients of all beliefs and backgrounds, she just can't accept requests to promote certain subjects for anyone—such as photographing content that is obscene or demeaning to others.

But for Louisville, that freedom goes too far. Invoking its public accommodation law (Metro Ordinance § 92.05), Louisville is using the threat of limitless damages, compliance reports, posting of notices, and court orders to force Chelsey to create photographs for, blog about, and participate in solemn ceremonies she disagrees with—same-sex wedding ceremonies. For Chelsey to  photograph and write positively about only the events she wants, to attend and celebrate only the religious ceremonies she wants, to speak only the messages about marriage she wants, Louisville considers that illegal discrimination, i.e. a denial of service based on sexual orientation. Metro Ordinance § 92.05(A).

And to make matters worse, Louisville even makes it illegal for Chelsey to explain *on her studio's own website* why she only believes in marriage between a man and a woman or why she only accepts requests consistent with this view. Louisville considers such "communications" as indications that services will be denied or that someone's patronage would be "objectionable, unwelcome, unacceptable, or undesirable" because of sexual orientation. Metro Ordinance § 92.05(B).

Louisville just has it wrong. Chelsey can speak the messages she wants, can write the words she wants, can post the online content she wants, and can photograph and positively depict the events she wants without discriminating against anyone. Chelsey works with and serves clients regardless of who they are, including those in the LGBT community. She just cannot promote every message or celebrate every event asked of her. In our pluralistic society, where we disagree about so many topics, speakers typically have the freedom to choose what they say and what they celebrate. We don't force LGBT web designers to create content condemning same-sex marriage for a church. Or force Muslim printers to design anti-Islam flyers for a synagogue. The First Amendment protects these speakers' freedom. Louisville should not take the same freedom away from Chelsey just because she wants to speak in favor of one particular view on marriage.

Yet Chelsey faces this precise scenario. She has seen how governments in Kentucky and across the country have used laws like Louisville's to punish creative professionals with beliefs like hers. She knows the severe penalties for violating Louisville's law and how the law makes it illegal for her to operate her studio the way she wants—to publish certain statements on her studio's web and social media sites and to photograph and blog to promote only those events consistent with her faith. She knows she cannot effectively operate, promote, or expand her business with the threat of this law looming over her. For Chelsey, the choice is simple yet stark—violate the law, forsake her faith, or close her business.

These options are unacceptable. So Chelsey has chosen the only practical option left: file this civil rights lawsuit to clarify and protect her freedoms under the First and Fourteenth Amendments and the Kentucky Religious Freedom Restoration Act—the freedoms to live out her faith, to speak her views, and to pursue her dream of running her photography studio. Chelsey wants these same

3

freedoms for others, even those who disagree with her. Chelsey merely seeks the same freedom as well.

## Jurisdiction and Venue

1.      This civil rights action raises federal questions under the United States Constitution—specifically, the First and Fourteenth Amendments—and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

2.      This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

4.      This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201-02 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343 and 42 U.S.C. § 1983; and costs and attorneys' fees under 42 U.S.C. § 1988 and Federal Rule of Civil Procedure 54.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b) and 28 U.S.C. § 97 because all events giving rise to the claims occur within the Western District of Kentucky's Louisville Division and all Defendants reside there.

## Plaintiffs

6.      Plaintiff Chelsey Nelson is a citizen of the United States and resides in Louisville, Kentucky.

7.      Chelsey is the only owner and member of Chelsey Nelson Photography LLC.

8.      Plaintiff Chelsey Nelson Photography LLC is a for-profit limited liability corporation organized under Kentucky law.

9.      Chelsey Nelson Photography LLC's principal place of business is located in Louisville, Kentucky.

**Defendants**

10.    Defendant Louisville/Jefferson County Metro Government is a municipal corporation authorized under Kentucky law with the power to sue and be sued, to appoint members to the Louisville Metro Human Relations Commission-Enforcement and the Louisville Metro Human Relations Commission-Advocacy, *see* Lou. Metro Am. Ord. No. 157-2003, §§ 32.760(A)-(B); 32.761(A), and to enact and enforce the ordinance challenged in this lawsuit, *see* K.R.S. §§ 67C.103(13); 67C.105(5).

11.    Defendant Louisville Metro Human Relations Commission-Enforcement is an administrative agency within the Louisville/Jefferson County Metro Government with the power to administer and enforce the ordinance challenged in this lawsuit.[1] *See* Lou. Metro Am. Ord. No. 157-2003, § 32.760.

12.    Defendant Louisville Metro Human Relations Commission-Advocacy is an administrative agency within the Louisville/Jefferson County Metro Government with the power to interpret the ordinance challenged in this lawsuit and to eliminate discriminatory practices.[2] *See* Lou. Metro Am. Ord. No. 157-2003, § 32.761.

13.    Defendant Kendall Boyd is the Executive Director of the Enforcement Commission and the Advocacy Commission.[3]

14.    Executive Director Boyd has the authority to administer and enforce the ordinance challenged in this lawsuit. *See* Lou. Metro Am. Ord. No. 193-2004, §§ 92.08-92.10.

---

[1] The remainder of this complaint refers to the Louisville Metro Human Relations Commission-Enforcement as the "Enforcement Commission."

[2] The remainder of this complaint refers to the Louisville Metro Human Relations Commission-Advocacy as the "Advocacy Commission."

[3] Unless context indicates otherwise, the remainder of this complaint refers to the Enforcement Commission and the Advocacy Commission jointly as the "Commission."

15.     Executive Director Boyd is named as a defendant in his official capacity only.

16.     Defendants Marie Dever, Kevin Delahanty, Charles Lanier, Sr., Laila Ramey, William Sutter, Ibrahim Syed, and Leonard Thomas are commissioners on the Enforcement Commission.[4]

17.     The Commissioners have the authority to administer and enforce the ordinance challenged in this lawsuit. *See* Lou. Metro Am. Ord. No. 193-2004, §§ 92.08-92.10.

18.     The Commissioners are named as defendants in their official capacities only.

19.     Defendants reside in the Western District of Kentucky's Louisville Division.

## **Factual Background**

Chelsey Nelson follows Jesus and discovers her passion for positive storytelling

20.     Chelsey is a follower of Jesus.

21.     Chelsey became a Christian when she was about five or six years old and accepted the truth of the Gospel.

22.     Chelsey is currently affiliated with the Southern Baptist Convention, a Christian denomination with millions of adherents in the United States.

23.     As a Christian and Southern Baptist, Chelsey believes that God has revealed His will in the Bible, that God created people to love Him more than everything else, that people have loved other things more than God, and that everyone needs forgiveness offered through God's son, Jesus. (Isaiah 43:21; Romans 1:23; Romans 6:23; Colossians 1:16; 2 Timothy 3:16).[5]

---

[4] Unless context indicates otherwise, the remainder of this complaint refers to the seven individual Defendant Commissioners on the Enforcement Commission as the "Commissioners."

[5] All Bible citations reference the English Standard Version.

24.   Chelsey's religious beliefs shape every aspect of her life, including her identity, her relationships, and her understanding of creation, truth, morality, purity, beauty, and excellence.

25.   Chelsey's religious beliefs also shape her business, her art, and her creativity.

26.   Chelsey is a commissioned photographer, editor, and blogger.

27.   Chelsey loves using photographs and words to tell stories that positively depict creation, truth, purity, beauty, and excellence. (Philippians 4:8)

28.   Chelsey believes God gave her the passion to do this at a young age.

29.   When she was seven, Chelsey and her family stayed at a friend's house after a tornado damaged Chelsey's home.

30.   At that friend's house, Chelsey looked through her host family's photo albums and saw the blessings of their everyday moments and joy during their special events, like vacations.

31.   This activity helped Chelsey connect with her host family, grasp the greater value of people over things, and process the temporary loss of her home.

32.    Chelsey eventually received her first camera right before a church mission trip in high school and fell in love with photography.

33.   After college, Chelsey searched for a creative outlet while working to pay her bills.

34.   Chelsey eventually discovered the blogosphere and became captivated by blogs which combined photographs and written text to tell compelling stories about people and their lives.

35.   To satisfy her desire to tell stories, Chelsey launched her own personal website (https://www.chelseynelson.com/) in February 2015, and added her blog in April that year.

36.   For her blog, Chelsey photographed personally significant things (like holiday events, gatherings with friends, interior designs, and even food), arranged those

photographs, and posted them on her blog and added written text telling stories of her experiences.

37.     Eventually, Chelsey decided to start her own photography studio which would allow her to create and tell positive stories to a broader audience.

38.     From the outset, Chelsey wanted to focus on telling positive stories about weddings because weddings are such significant and joyous events and because she believes marriage is a gift from God that should be treasured and celebrated.

39.     To achieve her goal of starting her studio, Chelsey began pursuing formal and informal business education by watching webinars and meeting with entrepreneurs.

<u>Chelsey starts Chelsey Nelson Photography</u>

40.     After learning as much as she could about running a business, Chelsey decided it was time to begin her dream of running her own photography studio.

41.     Chelsey launched Chelsey Nelson Photography in May 2016.

42.     Chelsey transitioned her personal website, including her blog, into Chelsey Nelson Photography's business website.

43.     In spring 2016, Chelsey also began promoting Chelsey Nelson Photography on her Instagram account (<u>https://www.instagram.com/mrs.chelseynelson/</u>) and Pinterest account (<u>https://www.pinterest.com/mrschelseynelson/</u>).

44.     Chelsey also created a Facebook page for her business (<u>https://www.facebook.com/chelseynelsonphotography/</u>).

45.     Chelsey's social media accounts and business website promote her beliefs, messages, and services to the general public.

46.     Chelsey Nelson Photography solicits and receives requests for its services from the general public through her professional contacts, her website, and her other social media sites.

47.     Chelsey operated Chelsey Nelson Photography as a sole proprietorship until 2019.

48.     In October 2019, Chelsey turned her photography studio into a Limited Liability Company to gain the benefits of this corporate form.

49.     Chelsey changed her studio's name from Chelsey Nelson Photography to Chelsey Nelson Photography LLC to comply with Kentucky state law.

50.     Chelsey has also adopted an operating agreement for Chelsey Nelson Photography LLC to codify her business's core beliefs, practices, and policies.

51.     Chelsey Nelson Photography LLC abides by its operating agreement.

52.     As this operating agreement specifies, the purpose of Chelsey Nelson Photograph LLC is to tell "positive stories about what is true and what is right, what is lovely and what is pure, what is excellent and what is praiseworthy."

53.     Despite changing Chelsey Nelson Photography's corporate form in 2019, Chelsey has always operated her business in accordance with the same beliefs, practices, and policies.[6]

Chelsey Nelson Photography offers positive storytelling services

54.     Chelsey Nelson Photography is a for-profit photography studio that provides positive storytelling services to clients on a commission basis.

55.     Chelsey is the sole owner and member and the only employed photographer, editor, and blogger for Chelsey Nelson Photography.

56.     Chelsey Nelson Photography offers two types of storytelling services: (1) wedding celebration services, and (2) boutique editing services.

57.     Chelsey's wedding celebration services portray engaged and married couples, marriages, and weddings in a positive and uplifting way.

---

[6] Unless context indicates otherwise, the remainder of this complaint refers to Chelsey Nelson Photography LLC as "Chelsey Nelson Photography" and to all plaintiffs collectively as "Chelsey."

58.    Chelsey would not accept a request to portray engaged and married couples, marriages, or weddings in a negative way.

59.    Chelsey Nelson Photography does not currently accept requests from the general public to personally photograph any subject matter except weddings.

60.    Chelsey Nelson Photography's wedding celebration services involve three parts.

61.    First, Chelsey takes photographs of a client's engagement or wedding while attending the engagement session or attending and participating in the wedding, including the ceremony.

62.    Second, Chelsey edits the photographs that she has taken of a client's engagement or wedding.

63.    Third, Chelsey posts some of those finalized photographs of the client's engagement or wedding on her blog, arranges those photographs to document the engagement or wedding, and writes encouraging messages to her clients and to the public about her clients' engagement or wedding alongside the photographs.

64.    Chelsey's blog is an integral part of her business and her wedding celebration services because it allows her to promote her photography studio, her style, and her personality to clients and the general public and allows her to publicly honor and encourage her clients, to celebrate their marriage, and to share the joy of marriage between a man and a woman with as many people as possible.

65.    Chelsey also continues to post personal stories and pictures on her blog, along with posts about her clients' engagements and weddings.

66.    Each component of Chelsey's wedding celebration services, separately and in combination, promotes and celebrates marriages between one man and one woman.

67.    Besides wedding celebration services, Chelsey Nelson Photography also offers boutique editing services.

68.     These boutique editing services involve wedding and commercial photographers taking their own photographs, providing those photographs to Chelsey, and then commissioning Chelsey to artistically edit those photographs.

69.     After Chelsey edits these photographs, she returns them to the photographers who in turn provide them to their own clients.

70.     As to boutique editing services for weddings, Chelsey edits the photographs she receives to portray engaged and married couples, marriages, and weddings in a positive and uplifting way.

71.     As to boutique editing services for commercial photographers, Chelsey edits the photographs she receives in a way to portray the portrait or commercial subjects in a positive and appealing manner.

72.     For example, Chelsey often edits photographs for small businesses, such as yoga studios or eye lash companies.

73.     The small businesses use Chelsey's edited photographs to promote and brand their business.

74.     Everything Chelsey creates and provides is created custom for each client.

Chelsey's faith motivates her positive storytelling, particularly about marriage

75.     Chelsey's faith animates why and how she operates her photography studio.

76.     Chelsey believes that God created humans to reflect Him by working, that God is sovereign over her work, and that God ordered Christians to honor Him in their work. (Genesis 1:26-28; Genesis 2:15; Psalm 115:11; Proverbs 16:9; Colossians 3:17; Colossians 3:23-24; 1 Corinthians 10:31).

77.     Because of these beliefs, Chelsey cannot separate her religious identity into private and work areas but must honor and serve God in her work. (1 Corinthians 10:31; 2 Corinthians 5:14-15; Colossians 3:17; 1 Peter 4:11).

78.    One way that Chelsey honors God is how she interacts with current and potential clients.

79.    Chelsey seeks to fulfill the biblical command to love her neighbor by being honest with current and prospective clients and the public, including by explaining the types of stories she will and will not tell.

80.    Out of respect for her clients and their time, Chelsey will not lie to them about what her studio will create, and Chelsey tries to avoid giving any false impression about what her studio will and will not create.

81.    Another way Chelsey honors God is by what she creates, promotes, and participates in.

82.    Chelsey believes God was the very first artist—that He created the world from nothing (Genesis 1:1), artistically shaped the world from what He created (Genesis 1:2-5), and reviewed, delighted in, and proclaimed His work as "very good," (Genesis 1:31).

83.    Chelsey believes that God has created, called, and equipped some people to create artistic and aesthetically pleasing artwork for their vocations. (Genesis 4:21; Exodus 31:1-11; 35:30-36:1; Psalm 33:2-3).

84.    Chelsey believes that God has equipped and called her to use her creative talents to create beautiful artwork.

85.    In fact, Chelsey believes that all art —including hers—should glorify God by reflecting and promoting what is true, noble, right, pure, lovely, admirable, excellent, and praiseworthy. (Philippians 4:8).

86.    For this reason, in everything Chelsey Nelson Photography creates—whether through photographs or words—Chelsey seeks to positively depict or promote that which is true, noble, right, pure, lovely, admirable, excellent, and praiseworthy, as defined by her religious beliefs.

12

87.   It would violate Chelsey's religious beliefs to create, promote, participate in, or positively depict something that her religious beliefs denounced.

88.   The same principles apply to Chelsey's services related to weddings.

89.   Chelsey believes that God designed marriage as a gift to people of all faiths, races, and backgrounds and that God ordained marriage to be a covenant between one man and one woman so that this relationship would point people to the special relationship between God and His bride, the church. (Genesis 1:27-28; Genesis 2:24; Matthew 19:3-9; Ephesians 5:22-33; 1 Corinthians 7:10-16).

90.   Chelsey's views on marriage come from her personal interpretation of the Bible and the denominational teachings of the Southern Baptist Convention and her church, Clifton Baptist Church.

91.   Because Chelsey believes that God has called her to positively depict that which honors Him and that biblically defined marriage honors God, Chelsey desires to positively depict such marriages and weddings in what she photographs, edits, and posts.

92.   Specifically, Chelsey believes that by positively depicting the beauty, commitment, intimacy, and love embodied in engagements, weddings, and marriages between one man and one woman, Chelsey can promote God's design for marriage both to her clients, to their friends, and to the public.

93.   Chelsey believes that by capturing and conveying engagements, weddings, and marriages between one man and one woman, she can show the beauty and joy of marriage as God intends it and she can convince her clients, their friends, and the public that this type of marriage should be pursued and valued.

94.   In fact, Chelsey's desire to convey this message has only increased over time as she has seen our culture normalize and promote views of marriage that are inconsistent with lifelong unions between one man and one woman.

13

95.    Chelsey hopes to counteract this cultural narrative by telling positive stories about marriage as God intended it.

<u>Chelsey tells positive stories about and actively participates in weddings</u>

96.    Chelsey solicits requests for her wedding celebration services from Chelsey Nelson Photography's website and social media site and from professional contacts.

97.    For example, Chelsey has a contact form on her studio's website where anyone in the general public can submit a request for Chelsey's services.

98.    Once Chelsey receives a request, she evaluates that request and decides whether she can potentially fulfill it.

99.    At this point, Chelsey seeks to personally connect with prospective clients by conducting an initial consultation with them, typically at her home.

100.   Whenever possible, Chelsey does this consultation at her home so that she can invite the clients into her life, get to know them better, and let the clients learn about her.

101.   Chelsey does not inquire about her prospective clients' race, religion, disability, sexual orientation, gender identity, or any other classification.

102.   If Chelsey and the prospective client decide to move forward, the client must sign a customized version of Chelsey Nelson Photography's form service agreement.

103.   This service agreement specifies the terms and processes by which Chelsey provides her wedding celebration services.

104.   Among other things, this agreement specifies that Chelsey "exercises and reserves the right to exercise complete and ultimate editorial judgment and control over all aspects of her services, including photography, editing, blogging, social media promotion, and all other Services …."

14

105.    The agreement also specifies that Chelsey's clients may use her photographs "for personal use and for public use so long as Client provides Photographer with attribution each time Client uses Photographer's property publicly …."

106.    Once commissioned to provide wedding celebration services, Chelsey photographs an engagement session and the wedding day, including the wedding preparation, ceremony, and reception.

107.    Chelsey has never provided her wedding celebration services for only an engagement session or only a wedding or only a part of a wedding.

108.    Chelsey considers photographing the engagement, wedding, and reception as vital, and bundles these three types of photographs together because it enables Chelsey to tell a more complete story about the couple's marriage.

109.    Chelsey seeks to and does photograph the engagement session in a way that captures the engaged couple's love for each other, the joy and excitement about their upcoming marriage, and the beauty of their relationship.

110.    She does this by, for example, directing the couple to pose in ways that elicit the joy and romance of the couple's engagement and anticipation of marriage.

111.    After each engagement session, Chelsey edits the photographs, posts a sampling of the photographs on her blog, and writes about the engagement on her blog.

112.    As the wedding day approaches, Chelsey sends the couple a questionnaire asking about schedules, special details of the wedding, and sensitive family situations.

113.    This information helps Chelsey to capture meaningful moments to the couple and to serve them on their wedding day.

114.    On the wedding day, Chelsey is personally excited for the couple and the marriage she is about to witness because of her beliefs about God's design for marriage.

115.   Typically, Chelsey spends around eight hours photographing a client's wedding.

116.   Chelsey arrives early to photograph the wedding venue, its surroundings, and its unique qualities to capture the anticipation before the wedding ceremony.

117.   Before the wedding ceremony, Chelsey photographs details of the wedding (like the wedding dress), the bride and groom getting dressed, the bride and groom getting dressed, the "first look" between the bride and groom, and the bridal party.

118.   While Chelsey photographs some organic interactions, she heavily choreographs most of the wedding party photographs.

119.   For example, Chelsey directs members of the wedding party on how to stand, where to position themselves, how to interact with each other, and what demeanor to display.

120.   After these wedding party photographs, Chelsey typically photographs the bride and groom's extended family in a similarly choreographed way.

121.   As guests begin to arrive, Chelsey interacts with them, greets them, encourages them, and shares in their joy over the upcoming ceremony.

122.   Chelsey personally attends the wedding ceremony of every wedding she photographs.

123.   At every wedding Chelsey has photographed, there have been prayers, a procession, a homily, an exchange of vows, an officiant, and a pronouncement of marriage.

124.   When Chelsey photographs a wedding, she personally participates in the ceremony and helps promote and celebrate the couple.

125.   For example, Chelsey takes photographs through the wedding ceremony, including photographs of the couple kissing before the attendees.

126.   Chelsey also participates in the ceremony itself.

127.   For example, Chelsey often sits with the rest of the audience in a seat

reserved for her in the aisle of a middle row so that she can photograph the wedding processional.

128.   As a member of the audience, Chelsey typically sings along with any songs played at the ceremony, stands when the bride enters, stands when requested by the officiant, bows her head and prays when the officiant prays, and says "Amen" after the prayers.

129.   In these ways, Chelsey acts as a witness before God and before those assembled as the bride and groom commit their lives to each other, exchange rings, are pronounced as man and wife, and share their first kiss as a married couple.

130.   After the ceremony, Chelsey photographs the wedding reception's most special moments.

131.   Soon after the wedding, Chelsey begins to edit the wedding photographs to prepare them for the couple and for her blog.

132.   During this editing process, Chelsey initially reviews each photograph and discards any that do not meet her artistic or moral standards, such as photographs that are out of focus or inadvertently contain sensitive content.

133.   Chelsey also reviews and edits each photograph to ensure that it fits within the overall celebratory story Chelsey seeks to communicate about the couple's marriage.

134.   Chelsey follows this same editing process to edit engagement photographs.

135.   The day after the wedding, Chelsey sends the bride and groom a few "sneak peek" photographs so that they can share these photographs with their family, friends, and on social media.

136.   Within two weeks of an engagement session or wedding, Chelsey posts a sampling of the photographs on her blog.

137.   Chelsey carefully chooses which edited photographs to post on her blog, decides how to arrange those photographs on the blog, and selects what words to

write so that she can most effectively celebrate the engagement or wedding, encourage the couple, and communicate her views on marriage to the couple and to the general public.

138.   Posting wedding photographs and text about weddings on her blog allows Chelsey to connect with and show appreciation to her wedding clients and to publicly tell uplifting stories about the couple and the beauty of marriage between a man and a woman in ways more powerful than through photography or words alone.

139.   Within six weeks of the wedding, Chelsey delivers the edited photographs to her clients by placing them in a password-protected online gallery which displays Chelsey Nelson Photography's name.

140.   Chelsey also gives her clients the option of purchasing a glass keepsake box containing up to fifty archival quality wedding photographs.

141.   Chelsey selects which photographs to include in the glass keepsake box with input from her clients.

142.   For all of Chelsey's wedding celebration services, Chelsey's clients rely on her aesthetic vision and ability to tell compelling and positive stories about their wedding and engagement.

143.   For most editorial decisions made during her wedding celebration services, Chelsey makes these decisions without any input from clients, including how to take individual photographs, how to edit individual photographs, what to post on Chelsey's blog, and how to arrange photographs on the online gallery.

144.   For all other editorial decisions made during her wedding celebration services, Chelsey receives some suggestions from clients and collaborates with them about those suggestions.

145.   Typically, Chelsey's clients defer to her advice and suggestions.

146.   For example, Chelsey's clients sometimes have a general idea of one or two photographs they want taken or a style they want used or poses they want depicted and offer suggestions about these things.

147.   Chelsey then takes these suggestions, offers her own guidance, and blends the clients' suggestions into her own aesthetic vision so that the final work effectively tells a positive story about marriage, the wedding, and the couple.

148.   But even when Chelsey's clients make their suggestions, they still rely heavily on Chelsey's artistic and editorial judgments about what and how to photograph, how to edit photographs, how to blog, and how to tell the positive story about their wedding.

149.   For all of Chelsey's wedding celebration services, Chelsey has ultimate editorial judgment and control over the photographs she takes, the photographs she edits, and the content of her blog, and she always retains discretion to reject any client suggestion if she deems it improper.

150.   For all of Chelsey's wedding celebration services, Chelsey makes numerous artistic and editorial judgments to tell a positive story about each couple, to celebrate their engagement or marriage, and to convey the beauty and goodness of engagements and marriages between one man and one woman.

151.   Each component of Chelsey's wedding celebration services—her photography, editing, and blogging—separately and in combination, is expressive in nature, as it involves either text, images, symbols, or other modes of expression.

152.   Chelsey associates herself with her wedding celebration services in many ways.

153.   For example, Chelsey posts some of the photographs she takes on her blog, her blog is hosted on Chelsey Nelson Photography's website, each blog post is tagged "Chelsey Nelson," Chelsey's clients and their friends access their engagement and wedding photographs through an online gallery which contains

19

Chelsey's name, and  Chelsey's service agreement requires her clients to attribute any engagement and wedding photographs taken by Chelsey to Chelsey anytime the clients post, print, or in any way publish these photographs publicly.

154.    Chelsey also selects and posts some of the photographs on her Instagram or Facebook pages with her commentary where Chelsey's name, picture, and Chelsey Nelson Photography's logo appear sporadically.

Chelsey's boutique editing services tell positive stories about marriage and other subjects

155.    In addition to providing wedding celebration services, Chelsey Nelson Photography also provides boutique editing services.

156.    Chelsey solicits and receives inquiries for her boutique editing services from photographers from the general public, typically through referrals from clients or her professional network.

157.    Chelsey also has a contact form on her studio's website where anyone from the general public can submit a request for her boutique editing services.

158.    Chelsey can receive requests for and provide boutique editing services for clients located anywhere in the country.

159.    Once Chelsey decides that she can potentially fulfill this request, she conducts an initial consultation with that photographer.

160.    During this consultation, Chelsey meets with the photographer and discusses the editing project, including the photographs' subject matter and design, the photographer's stylistic preferences, and Chelsey's artistic vision for the project.

161.    Chelsey also explains her studio's policies, pricing, and packages during this time.

162.    Chelsey also asks the prospective client to fill out a questionnaire about the scope of the services requested.

163.   Chelsey does not inquire about her prospective clients' race, religion, disability, sexual orientation, gender identity, or any other classification.

164.   If Chelsey decides she can provide her boutique editing services to the client in a manner consistent with her artistic and religious judgments, and if a prospective client wants to hire Chelsey, the client must sign a customized version of Chelsey Nelson Photography's form editing service agreement.

165.   Among other things, this agreement specifies that Chelsey will use her "artistic judgment and exercise [her] editorial and artistic discretion when providing Services for Client, which may not include strict adherence to Client's suggestions" and Chelsey "shall have ultimate editorial judgment and control regarding the aesthetic judgment and artistic quality of the Services."

166.   Chelsey works closely and collaborates with her boutique editing clients to present the subject matter of the photographs in the most positive light possible.

167.   Most requests for Chelsey's boutique editing services come from wedding photographers who want their wedding photographs edited.

168.   Chelsey would not fulfill a request for boutique editing services that portray engaged and married couples, marriages, weddings, or other subjects in a negative way.

169.   Chelsey has never received and would not fulfill a request for boutique editing services for only a few photographs of a wedding.

170.   Chelsey has only received requests for boutique editing services for weddings seeking editing services for between approximately 800 and 3,000 photographs covering the entire wedding, including the wedding ceremony.

171.   When providing boutique editing services for weddings, Chelsey never interacts with the married couple.

172.   Chelsey only interacts with the photographer who photographed the wedding.

173.    Once Chelsey agrees to work with a photographer, the photographer provides Chelsey with the smart previews of raw digital file of the photographs already taken.

174.    Chelsey then edits the photographs to enhance the image based on Chelsey's artistic ability and judgment and the photographer client's general stylistic preferences.

175.    Chelsey's process for editing photographs for her boutique editing service is materially similar to her editing process for photographs she takes herself for wedding celebration services. *See supra*, ¶¶ 131-133.

176.    The primary difference between editing for boutique editing services and wedding celebration services is that for the former Chelsey considers the style of her photographer client in addition to other factors.

177.    While providing boutique editing services for weddings, Chelsey makes numerous artistic and editorial judgments to tell a positive story about each couple, about their marriage, and to convey the beauty and goodness of and marriages between one man and one woman.

178.    While providing boutique editing services for small businesses, Chelsey makes numerous artistic and editorial judgments to enhance the beauty of the image's subject or to more accurately reflect the nature of the business and to convey the business in the most positive light possible.

179.    For example, Chelsey's editing judgments could include sharpening the image of the company's logo to enable it to pop out from the background, adjusting the white balance to brighten the image, and adjusting color hues to make the colors more vibrant.

180.    While Chelsey collaborates with client photographers during the boutique editing process, in that Chelsey works with photographer clients to meet their

expectations and general style preferences, Chelsey's clients still rely on her aesthetic vision and ability to tell compelling stories through her editing.

181.    Chelsey has ultimate editorial judgment and control over how she edits the photographs and she always retains discretion to reject any client suggestion if she deems it improper.

182.    Chelsey's boutique editing services is expressive in nature, as it always produces images that positively depict a wedding, marriage, wedding celebration, or other subject matter.

Chelsey cannot tell certain stories or participate in certain ceremonies

183.    Not only do Chelsey's artistic and religious beliefs dictate what she does and says, these beliefs dictate what Chelsey Nelson Photography cannot do or say.

184.    Chelsey believes that she cannot rejoice in, condone, participate in, positively portray, or promote anything dishonorable to God. (Isaiah 5:20; Ephesians 5:1-14; 1 Timothy 5:22; 1 Corinthians 10:1-22; 2 Corinthians 6:14-18).

185.    For this reason, Chelsey only accepts requests for services which are consistent with her editorial, artistic, and religious judgment.

186.    This discretion is standard practice for commissioned photographers and other artists who decline to create content that violates or compromises their beliefs in some way based on their editorial and artistic judgment.

187.    Chelsey would therefore decline requests for her wedding celebration and boutique editing services if the request required her to use her artistic talents to promote or positively portray anything immoral, dishonorable to God, or contrary to her religious beliefs or required her to participate in anything contrary to her religious beliefs.

188.    For example, Chelsey will decline any request for services that demean others, devalue God's creation, condone racism, sexually objectify someone,

celebrate pornography or obscenity, praise vulgarity, or contradict biblical principles.

189.    Chelsey would therefore not photograph people engaging in sexually explicit acts or edit photographs of businesses that seek to profit off the objectification of women.

190.    Likewise, because Chelsey believes that God created marriage to be an exclusive covenant between one man and one woman (Matthew 19:3-9; Hebrews 13:4; 1 Corinthians 6:9-20), Chelsey cannot tell stories promoting or celebrating any wedding or marriage not between one man and one woman, such as same-sex marriage, polygamous marriage, or open marriage.

191.    Chelsey would decline any request for wedding celebration services or boutique editing services for a same-sex wedding, polygamous wedding, or an open marriage wedding because creating artwork promoting these events would violate Chelsey's religious and artistic beliefs, promote activities contrary to her beliefs, express messages contradicting her beliefs, and express messages contradicting messages that Chelsey wants to and does promote elsewhere.

192.    Chelsey would also decline such requests because she believes she should not participate in any ceremony that contradicts her religious beliefs. *See supra*, ¶¶ 184, 187.

193.    Chelsey believes all wedding ceremonies—regardless of whether she shares the faith of the couple—are innately religious events where all those who willingly attend necessarily participate in the ceremony by publicly celebrating, solemnizing, and supporting the beginning of an institution (marriage) created by God.

194.    Chelsey attends and actively participates in all weddings she photographs. *See supra*, ¶¶ 122-129.

195.   Whenever Chelsey attends a wedding, she feels subtle coercive peer pressure from the officiant, the couple, and other wedding guests to participate in the rhythms of the ceremony.

196.   When attending a wedding, there is no real alternative to avoid participating in the ceremony or to avoid the appearance of participation.

197.   Chelsey would therefore decline any request for her wedding celebration services for a same-sex wedding, polygamous wedding, or an open marriage wedding because these services require her to attend, participate in, and celebrate a ceremony that violates her religious beliefs.

198.   In particular, Chelsey believes it would be especially offensive to participate in a same-sex wedding, polygamous wedding, or an open marriage wedding where she would feel coerced to bow her head in prayer or listen to the prayer, respond or listen to readings from religious texts like the Bible or the Tanakh, or remain silent during the pronouncement of the couple.

199.   Anytime Chelsey receives a request that she cannot fulfill because of a conflict with her religious beliefs, she would do her best to refer that request to another artist who could assist the prospective client.

200.   Although Chelsey cannot provide certain wedding celebration services or boutique editing services, Chelsey is willing to work with people regardless of their race, religion, disability, sexual orientation, gender identity, or any other classification.

201.   For example, Chelsey will happily work with and provide her wedding celebration services for a wedding between a homosexual man and a woman so long as the marriage is the exclusive union of that one man and one woman.

202.   Likewise, Chelsey will happily work with and provide her wedding celebration services for a wedding between a bisexual woman and a man so long as the marriage is the exclusive union of that one woman and one man.

25

203.   Chelsey will also happily work with and provide her boutique editing services for LGBT photographers so long as the photographs themselves do not violate Chelsey's religious beliefs.

204.   Likewise, Chelsey will happily work with and provide her boutique editing services to small businesses that are owned and operated by LGBT persons so long as the photographs themselves do not violate Chelsey's religious beliefs.

205.   Conversely, Chelsey will not accept every request for wedding celebration or boutique editing services for weddings between one man and one woman.

206.   For example, because Chelsey believes that marriage is a joyous, uplifting, and solemn occasion that should be celebrated and venerated, she would decline requests to create or edit photographs for certain types of themed engagements or weddings between one man and one woman, like themes involving zombies or the Game of Thrones.

207.   Chelsey would also decline requests for boutique editing services for a same-sex wedding, polygamous wedding, or an open marriage wedding, whether that request came from a heterosexual, homosexual, or bisexual photographer.

208.   When evaluating whether any request for her wedding celebration or boutique editing services is consistent with her religious beliefs, Chelsey considers, and it is her policy and practice to consider, the message conveyed by the requested services and whether these services require her to participate in a ceremony she objects to, not the identity of who requests these services.

Louisville's law threatens Chelsey's storytelling and livelihood

209.   Chelsey desires to operate her business consistent with her religious beliefs and to expand her business to perform wedding celebration services for more weddings and to provide boutique editing services for more photographers.

210.   Chelsey began researching how she could effectively grow her business.

211.   But during this process, Chelsey learned about Louisville-Jefferson County Metro Amended Ordinance Number 193-2004 ("Louisville's law" or "the law").

212.   Chelsey also saw news reports about other creative professionals in Kentucky and across the country being sued and threatened with severe penalties for declining to celebrate or participate in same-sex wedding ceremonies.

213.   As Chelsey learned more about Louisville's law, she realized that it affected her business, restricted what she could post on her studio's website and social media sites, restrained what she could directly tell prospective clients, and limited what storytelling services she could provide.

214.   Louisville's law prohibits discrimination in employment, housing, and places of public accommodation "because of race, color, religion, national origin, familial status, age, disability, sex, gender identity, or sexual orientation." Metro Ordinance § 92.01.

215.   The law defines "discrimination" as "[a]ny direct or indirect act or practice of exclusion, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person or persons, or the aiding, abetting, inciting, coercing, or compelling thereof made unlawful under this chapter." Metro Ordinance § 92.02.

216.   The law defines a "place of public accommodation" in part as "[a]ny place, store or establishment, either licensed or unlicensed, which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public …." Metro Ordinance § 92.02.

217.   Chelsey Nelson Photography is an establishment which supplies goods and services to the general public through its wedding celebration and boutique editing services.

218.   Chelsey Nelson Photography also solicits and accepts the patronage of the general public through its website and social media sites.

27

219. Chelsey Nelson Photography is therefore a place of public accommodation under and subject to Louisville's law. *See* Metro Ordinance § 92.02 (defining place of public accommodation).

220. Louisville's law § 92.05(A) (the "Accommodations Provision") provides in part "it is an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, … on the ground of … sexual orientation …." Metro Ordinance § 92.05(A).

221. The Accommodations Provision makes it unlawful for Chelsey to exclusively offer wedding celebration or boutique editing services that promote weddings between one man and one woman or to decline requests for wedding celebration or boutique editing services that promote same-sex weddings because Chelsey offers these services to promote weddings between one man and one woman.

222. The Accommodations Provision also makes it unlawful for Chelsey to offer or provide any wedding celebration service or boutique editing service to promote same-sex weddings that amounts to less than the "full and equal" service she provides for marriages between a man and a woman.

223. Because Chelsey creates positive stories about marriages between a man and a woman, and attends and participates in marriages between a man and a woman, the Accommodations Provision requires her to create positive stories about same-sex marriage and attend and participate in those ceremonies.

224. But providing wedding celebration or boutique editing services for same-sex weddings would require Chelsey to promote messages that violate her religious beliefs or require her to participate in religious ceremonies that violate her religious beliefs, something she cannot do. *See supra*, ¶¶ 190-198, 207-208.

225. Providing wedding celebration and boutique editing services for same-sex weddings would also undercut Chelsey's message (expressed elsewhere in her

photographs, blog, and Chelsey Nelson Photography's website and social media sites) celebrating marriage between one man and one woman; harm Chelsey's reputation among her past and prospective clients; and adversely affect Chelsey's ability to share biblical truths with others.

226.   Louisville's law also conditions Chelsey's ability to promote her desired religious beliefs on marriage on her studio's website and social media sites and her blog on her willingness to express viewpoints that violate her religious beliefs.

227.   The Accommodations Provision forces Chelsey to decide between continuing to offer wedding celebration services and boutique editing services exclusively for marriages between a man and a woman under the constant threat of prosecution under the law or leaving the wedding industry altogether.

228.   But Chelsey cannot practically leave the wedding industry and still operate her business.

229.   Chelsey only provides wedding celebration services for weddings.

230.   And the vast majority of her requests for boutique editing services seek edited photographs of weddings.

231.   If Chelsey stopped providing wedding celebration and boutique editing services for weddings, she would lose eighty-nine percent of Chelsey Nelson Photography's income.

232.   Likewise, Chelsey does not want to leave the wedding industry because she is motivated by her religious beliefs to provide wedding celebration and boutique editing services for weddings so that she can positively depict marriage between one man and one woman and celebrate those marriages publicly.

233.   Chelsey could not afford to create high quality digital photographs, to edit those photographs, to save those photographs, and to publish those photographs online for many projects without charging a commission.

29

234.   If Chelsey did not charge a commission for her services, she would have to close Chelsey Nelson Photography altogether for financial reasons.

235.   Louisville's law also hinders Chelsey's ability to make business planning and market decisions and to expand her business.

236.   For example, Chelsey has tried to avoid punishment under Louisville's law by limiting the promotion of Chelsey Nelson Photography in social media and throughout her professional network.

237.   Chelsey no longer responds to professional opportunities posted in an online professional photography group because she previously received an inquiry that she understood would have likely required her to provide boutique editing services for a same-sex wedding.

238.   Chelsey also wants to begin advertising Chelsey Nelson Photography outside her studio's website and social media sites to grow her business.

239.   But she is refraining from doing so because of the law.

240.   Chelsey has therefore lost and is currently losing the opportunity to grow her business for fear of attracting objectionable requests and violating Louisville's law.

241.   If not for the Accommodations Provision, Chelsey would more actively promote Chelsey Nelson Photography by publishing more often on Instagram and her blog, by connecting with other photographers on Instagram through the use of more strategic hashtags, and by directly contacting members of her professional network.

242.   Chelsey faces a credible threat and substantial risk that she will receive requests to provide wedding celebration and boutique editing services for same-sex weddings, likely leading to prosecution under Louisville's law.

243.   For instance, Louisville has the 11th highest rate of people who identify as lesbian, gay, bisexual, or transgender among the fifty largest metropolitan areas in

the United States. *See* https://wfpl.org/louisville-ranks-11th-among-major-u-s-cities-lgbt-population-gallup-poll-says/.

244.   Likewise, according to the Williams Institute, Jefferson County has more than twice as many same-sex couples as any other county in Kentucky. *See* https://williamsinstitute.law.ucla.edu/visualization/lgbt-stats/?topic=SS&area=21111#density.

245.   Louisville's law also hinders Chelsey's ability to explain on her studio's website, social media sites, and directly to prospective clients her religious beliefs about marriage and what services her studio provides.

246.   Louisville's law § 92.05(B) (the "Publication Provision") does so through two clauses.[7]

247.   First, the Publication Provision's Denial Clause makes it "an unlawful practice for a person, directly or indirectly, to publish, circulate, issue, display, or mail, or cause to be published, circulated, issued, displayed, or mailed, a written, printed, oral or visual communication, notice, or advertisement, which indicates that the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation … will be refused, withheld, or denied an individual on account of his [or her] … sexual orientation …." Metro Ordinance § 92.05(B).

248.   Second, the Publication Provision's Unwelcome Clause makes it "an unlawful practice for a person, directly or indirectly, to publish, circulate, issue, display, or mail, or cause to be published, circulated, issued, displayed, or mailed, a written, printed, oral or visual communication, notice, or advertisement, which indicates … that patronage of, or presence at, a place of public accommodation, … of an individual, on account of his [or her] … sexual orientation … is objectionable, unwelcome, unacceptable, or undesirable." Metro Ordinance § 92.05(B).

---

[7] For ease of reference, the Complaint names the two clauses the Denial Clause and the Unwelcome Clause.

31

249.  The law does not define "objectionable," "unwelcome," "unacceptable," or "undesirable."

250.  Because Chelsey is motivated by her religious beliefs to be upfront and honest with clients, potential clients, and the public (*see supra*, ¶¶ 79-80), Chelsey desires to avoid giving any false impression about what Chelsey Nelson Photography will and will not create.

251.  And because Chelsey is religiously motivated to promote marriage between one man and one woman (*see supra*, ¶¶ 75-95), Chelsey desires to explain on the studio's website, the studio's social media sites, and directly to prospective clients why her studio promotes such marriages.

252.  To that end, Chelsey desires to post belief statements about her wedding celebration and her boutique editing services on Chelsey Nelson Photography's website.

253.  A true and correct copy of the belief statement for her wedding celebration services is attached to this complaint as Exhibit 1.

254.  A true and correct copy of this belief statement for her boutique editing services is attached to this complaint as Exhibit 2.

255.  Likewise, Chelsey desires to make materially similar statements on her studio's social media sites and directly to prospective clients when called upon to explain her services.

256.  If Chelsey posted either of her desired statements (Exhibits 1 and 2) or materially similar statements on Chelsey Nelson Photography's website or social media sites or made materially similar statements directly to prospective clients, she would violate the Denial Clause in Louisville's law.

257.  If Chelsey posted either of her desired statements (Exhibits 1 and 2) or materially similar statements on Chelsey Nelson Photography's website or social

mediate sites or made materially similar statements directly to prospective clients, she would violate the Unwelcome Clause in Louisville's law.

258.   Because of the Denial and Unwelcome Clauses, Chelsey has not and will not post her desired statements (Exhibits 1 and 2) or materially similar statements on her studio's website or social media sites or make materially similar statements directly to prospective clients.

259.   If not for Louisville's Denial Clause and Unwelcome Clause, Chelsey would immediately post the statements in Exhibits 1 and 2 or materially similar statements on her studio's website.

260.   For example, a materially similar statement to Exhibit 1 would be one identical to Exhibit 1 except that it would also specify that Chelsey cannot attend or participate in same-sex wedding ceremonies that included communion, prayers, scriptural readings, or where officiants ask the audience if anyone objects to the marriage about to be announced.

261.   Although Louisville's law restricts Chelsey's desired activities, it does not apply to other businesses in many situations.

262.   For example, the Accommodations Provision does not forbid public accommodations from denying full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation on the basis of sex. *See* Metro Ordinance § 92.05(A).

263.   Louisville's law § 92.05(C) (the "Sex Discrimination Provision"), however, does prohibit "deny[ing] an individual, because of sex, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a restaurant, hotel, motel, or any facility supported directly or indirectly by government funds." Metro Ordinance § 92.05(C).

264.   But this Sex Discrimination Provision does not apply to restaurants, hotels, and motels when they establish separate restrooms, shower rooms, bath houses and

"similar facilities which are in their nature distinctly private" for males and females. Metro Ordinance § 92.05(C)(1)(a).

265.   This Sex Discrimination Provision also does not apply to the YMCA, the YWCA, and "similar type dormitory lodging facilities." Metro Ordinance § 92.05(C)(1)(b).

266.   And this Sex Discrimination Provision does not apply to "[h]ospitals, nursing homes, penal or similar facilities, to require that men and women be in the same room." Metro Ordinance § 92.05(C)(1)(d).

267.   Louisville's law also prohibits certain practices regarding sexual orientation in the areas of housing and employment.

268.   Yet the law exempts some activities done by religious organizations, associations, and institutions if done on the basis of sexual orientation but not on the basis of other protected classifications. *See* Metro Ordinance §§ 92.04(A)(3), 92.07(A)(2)-(3), (B).

Louisville actively enforces its law

269.   The Louisville/Jefferson County Metro Government created the Enforcement Commission to enforce Louisville's law. Lou. Metro Am. Ord. No. 157-2003, § 32.760(A).

270.   The Enforcement Commission is composed of seven members. Lou. Metro Am. Ord. No. 157-2003, § 32.760(B).

271.   Each of the Commissioners is a member of the Enforcement Commission.

272.   The Louisville/Jefferson County Metro Government created the Advocacy Commission to interpret Louisville's law, educate the public regarding economic, social, religious, ethnic, and social groups issues, and eliminate discriminatory practices. Lou. Metro Am. Ord. No. 157-2003, § 32.761(B).

273.    The Advocacy Commission is composed of ten members. Lou. Metro Am. Ord. No. 157-2003, § 32.761(A).

274.    The Executive Director runs the Commission. Metro Ordinance § 92.02 (defining "Executive Director"). *See* https://louisvilleky.gov/news/mayor-fischer-names-kendall-boyd-new-director-louisville-metro-human-relations-commission.

275.    Executive Director Boyd therefore leads the Commission.

276.    The Enforcement Commission is responsible for administering and enforcing Louisville's law and has "full operating responsibility for carrying out" its provisions. Metro Ordinance § 92.08(A).

277.    Louisville's law empowers any "person" to file complaints against public accommodations for unlawful practices—including violations of the Accommodations Provision and the Publication Provision—with the Commission. Metro Ordinance § 92.09(A).

278.    The law defines "person" as "an individual and any group of one or more natural persons, such as, but not limited to, … partnerships, associations, corporations, [and] unincorporated organizations …." Metro Ordinance § 92.02.

279.    Commissioners who have "reason to believe an unlawful practice has occurred"—including violations of the Accommodations Provision and the Publication Provision—may also file a complaint without ever receiving a complaint from an aggrieved person. Metro Ordinance § 92.09(A).

280.    The Enforcement Commission may also accept complaints referred to it by the Kentucky Human Rights Commission, the United States Equal Employment Opportunity Commission, and the United States Department of Housing and Urban Development. Metro Ordinance § 92.09(C).

281.    After receiving a complaint, the Commissioners have the power to conciliate the dispute or begin investigating the complaint. Metro Ordinance §§ 92.08(B)(4), 92.09(D).

282.   The fear of being investigated for an alleged violation of the Accommodations Provision or the Publication Provision has also caused Chelsey to refrain from advertising Chelsey Nelson Photography and growing her business as she desires and has caused her to lose business opportunities for fear of attracting a complaint to the Commission. *See supra*, ¶¶ 235-242.

283.   Likewise, the fear of being investigated for an alleged violation of the Publication Provision has caused Chelsey to refrain from posting either of her desired statements (Exhibits 1 and 2) or materially similar statements on her studio's website or social media sites or directly to prospective clients. *See supra*, ¶¶ 250-260.

284.   Within one hundred days of receiving a complaint, and if the complaint has not been resolved, the Commissioners must "render a final investigative written report detailing documentary and witness evidence to the Executive Director." Metro Ordinance § 92.09(D).

285.   Within thirty days of receiving the Commissioners' final investigative report, the Executive Director must determine "whether there is reasonable cause to believe that an unlawful practice has been committed." Metro Ordinance § 92.09(E).

286.   If the Executive Director determines there is such reasonable cause, he or she has the authority to conciliate the dispute. Metro Ordinance § 92.09(D), (E)(2).

287.   If a dispute involving a finding of reasonable cause is not resolved within forty-five days after determining that reasonable cause exists, the Enforcement Commission must set the complaint for a hearing before a Hearing Officer. Metro Ordinance § 92.09(E)(4).

288.   The Hearing Officer is employed by the Commission. Metro Ordinance § 92.01 (defining Hearing Officer).

289.   Before a hearing, the Enforcement Commission or its designated representatives may "request access to the premises, records and documents

36

relevant to the complaint and shall have the right to examine, photograph, and copy evidence." Metro Ordinance § 92.09(H).

290.    The Enforcement Commission may apply to the Jefferson County Circuit Court for an order requiring "access, examination, photographing, or copying of records or documents relative to the complaint." Metro Ordinance § 92.09(H).

291.    The Enforcement Commission may "file an action in the Jefferson Circuit Court seeking appropriate temporary relief against the respondent" pending the outcome of the hearing. Metro Ordinance § 92.09(J).

292.    The Enforcement Commission may also file an action in Jefferson Circuit Court "to prevent any change of position between the complaint(s) and the respondent(s) or to prevent the questions presented to the Human Relations Commission – Enforcement from becoming moot." Metro Ordinance § 92.09(K).

293.    At the hearing, the Enforcement Commission supports the complaint, and may prosecute the complaint through a designated attorney. Metro Ordinance § 92.10(B).

294.    The Enforcement Commission may "[c]ompel the attendance of witnesses and the production of evidence before it by subpoena issued by the Jefferson Circuit Court." Metro Ordinance § 92.08(B)(5).

295.    Appeals from the decisions of the Hearing Officer are heard by the Enforcement Commission. Metro Ordinance § 92.13.

296.    The Enforcement Commission has significant powers upon a finding that a place of public accommodation has violated the Metro Ordinance. Metro Ordinance §§ 92.08, 92.12.

297.    These powers include the authority to

- order a public accommodation "to cease and desist from the prohibited discriminatory practice or practices." Metro Ordinance § 92.12(B);

- take affirmative action. Metro Ordinance § 92.08(B)(8);

37

- force a public accommodation to provide the requested service to the complaining person. Metro Ordinance § 92.08(B)(8)(a) (incorporating remedies of K.R.S. § 344.230(3)(d));

- require a public accommodation to report its manner of compliance. Metro Ordinance § 92.08(B)(8)(a) (incorporating remedies of K.R.S. § 344.230(3)(e));

- compel a public accommodation to post "notices in conspicuous places in the respondent's place of business in form prescribed by the commission." Metro Ordinance § 92.08(B)(8)(a) (incorporating remedies of K.R.S. § 344.230(3)(f));

- order a public accommodation to compensate the complainant "for humiliation and embarrassment" and "other costs actually incurred by the complainant as a direct result of the unlawful practice." Metro Ordinance § 92.08(B)(8)(a) (incorporating remedies of K.R.S. § 344.230(3)(h)); and

- "publish or cause to be published the names of persons who have been determined to have engaged in an unlawful practice." Metro Ordinance § 92.08(B)(8)(a) (incorporating remedies of K.R.S. § 344.230(4)).

298.   The law does not specify the content of the notices that the Enforcement Commission can require businesses to post.

299.   The Enforcement Commission may also seek temporary and permanent relief in Jefferson Circuit Court. Metro Ordinance § 92.08(B)(8)(b).

300.   The Enforcement Commission has authority to enforce its orders in Jefferson Circuit Court. Metro Ordinance §§ 92.08(B)(11), 92.09(L).

301.   Louisville's law also permits any person to file complaints of an unlawful practice against places of public accommodations directly in Jefferson Circuit Court without first filing a complaint with the Commission. Metro Ordinance § 92.09(A).

302.   A person who bypasses the Enforcement Commission and files directly in Jefferson Circuit Court may recover damages, costs, and attorney's fees if the court

finds an unlawful practice occurred. *See* Metro Ordinance § 92.09(A) (incorporating remedies of K.R.S. 344.450).

303.   The Enforcement Commission actively investigates complaints it receives for alleged violations of Louisville's law, which includes the Accommodations and Publication Provisions.

304.   Between 2010 and 2017, the Enforcement Commission received, investigated, and processed ninety-three complaints against places of public accommodation under Louisville's law.

305.   Some Commissioners have publicly exhibited their preference for views promoting same-sex marriage and their antagonism towards religious beliefs that only celebrate marriage between one man and one woman.

306.   For example, Dawn Wilson is a member of the Advocacy Commission. *See* https://louisvilleky.gov/government/human-relations-commission/human-relations-board-commissioners.

307.   Wilson pejoratively referred to Christian religious leaders who oppose same-sex marriage such as Franklin Graham, James Dobson, and Rick Warren as "pharisees."

308.   In an official Commission Newsletter, Wilson also described religious individuals who sought legal protection for their religious liberty as "the new face of discrimination in the digital age and it is just as prevalent and repugnant today as it ever was." *See* https://louisvilleky.gov/sites/default/files/human_relations/reports_publications/2013_hrc_spring_newsletter.pdf.

Louisville's law only bans stories the government disfavors

309.   Although Louisville's law prohibits Chelsey from promoting and celebrating her religious views about marriage by exclusively providing wedding celebration

services and boutique editing services for weddings involving one man and one woman, the law allows other photographers that also qualify as places of public accommodation to promote and celebrate their views supporting same-sex marriage.

310.   This distinction in treatment is based on the particular view that a photographer holds about marriage and the content that photographer expresses, both through the photographer's services and on the photographer's website.

311.   Many photographers in Louisville and across the State of Kentucky promote same-sex weddings on their websites by offering to photograph same-sex engagements and wedding ceremonies.

312.   For example, the following online directory lists 91 photographers in Louisville who will photograph same-sex weddings: https://www.weddingwire.com/c/ky-kentucky/louisville/wedding-photographers/10-vendors.html.

313.   Similarly, the following online directory lists 315 photographers in Kentucky who will photograph same-sex weddings: https://www.weddingwire.com/c/ky-kentucky/wedding-photographers/10-sca.html.

314.   Many of the Louisville-based photographers explicitly promote and celebrate same-sex marriage on their social media sites, blogs, and websites.

315.   For example, many Louisville-based photographers write statements on their websites or social media sites expressing their support for same-sex marriage, their willingness to photograph same-sex weddings, and their celebration of same-sex marriage.

316.   Many Louisville-based photographers also express their views supporting same-sex marriage by displaying photographs of same-sex weddings on their websites, blogs, and social media sites and by writing comments celebrating the couple, the wedding ceremony, and same-sex marriage.

317.   Upon information and belief, many other Louisville-based expressive businesses promote their views in favor of same-sex marriage through the platforms of their businesses and advertise their willingness to create expression celebrating such unions.

318.   Chelsey supports the rights of these photographers and expressive businesses to communicate their beliefs and conduct their business in a way that promotes those beliefs and to decline requests for expressive work that is inconsistent with the owners' beliefs.

319.   Chelsey simply wants to enjoy this same freedom.

## Legal Allegations

320.    Plaintiff Chelsey Nelson and Plaintiff Chelsey Nelson Photography are subject to and must comply with Louisville's Accommodations and Publication Provisions.

321.   These provisions violate Plaintiffs' constitutional rights, and chills and deters Plaintiffs from exercising their constitutional rights.

322.   These provisions also violate Plaintiffs' state statutory rights.

323.   As a direct and proximate result of the Defendants' violation of the Plaintiffs' constitutional and statutory rights, Plaintiffs have suffered and will suffer ongoing irreparable harm and economic injury (including lost business), entitling Plaintiffs to declaratory and injunctive relief as well as compensatory and nominal damages.

324.   Plaintiffs do not have an adequate monetary remedy or remedy at law for the loss of their constitutional rights.

325.   Unless the Defendants are enjoined, Plaintiffs will continue to suffer irreparable harm and economic injury.

First Cause of Action
First Amendment: Freedom of Speech, Association, and Press

326.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1-325 of this complaint.

327.   The First Amendment's Free Speech Clause protects Plaintiffs' ability to speak freely, create speech, publish speech, sell speech, distribute speech, and associate with others for expressive purposes.

328.   The First Amendment also protects Plaintiffs' ability to decline to speak, to exercise editorial control over their speech, to decline to create speech, to decline to publish speech, to decline to sell speech, to decline to distribute speech, and to decline to associate with others for expressive purposes.

329.   The First Amendment also protects Plaintiffs' right to be free from content and viewpoint discrimination, overbroad restrictions on speech, and vague laws allowing unbridled discretion by enforcement officials.

330.   Plaintiffs' wedding celebration and boutique editing services, and all activities associated with those services, are forms of protected speech and expressive association, and Plaintiffs publish their speech to the public.

331.   As applied to Plaintiffs, the Accommodations Provision compels speech Plaintiffs object to, interferes with their editorial judgment, compels them to sell, publish, and disseminate speech they object to, compels them to engage in expressive associations to convey messages they deem objectionable, and regulates speech and association, and publication based on content and viewpoint.

332.   As applied to Plaintiffs, the Accommodations Provision is a content-based and viewpoint-based regulation that bans, chills, and burdens Plaintiffs' desired speech, publication of speech, and association by requiring Plaintiffs to engage in objectionable speech, associations, and publishing if they wish to engage in the speech, associations, and publication of speech they desire.

42

333.   As applied to Plaintiffs, the Publication Provision's Denial Clause is a content-based and viewpoint-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and publication of that speech) on Chelsey Nelson Photography's website, on Chelsey Nelson Photography's social media sites, and directly to prospective clients, and that inhibits them from forming expressive associations they desire to form and avoiding expressive associations that would require them to convey objectionable messages.

334.   As applied to Plaintiffs, the Publication Provision's Unwelcome Clause is a content-based and viewpoint-based regulation that bans, chills, and burdens Plaintiffs' desired speech (and publication of that speech) on Chelsey Nelson Photography's website, on Chelsey Nelson Photography's social media sites, and directly to prospective clients, and that inhibits them from forming expressive associations they desire to form and avoiding expressive associations that would require them to convey objectionable messages, and that is vague and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the Unwelcome Clause.

335.   The Publication Provision's Unwelcome Clause is also facially unconstitutional because it is a content-based and viewpoint-based regulation that bans, chills, and burdens speech, association, and publication of speech.

336.   The Publication Provision's Unwelcome Clause is also facially unconstitutional because it is vague, overbroad, and allows Defendants unbridled discretion to evaluate speech and then discriminate based on content and viewpoint in determining whether to apply the Unwelcome Clause.

337.   Plaintiffs have not engaged in, and will not engage in, certain protected speech because of the Accommodations and Publication Provisions.

338.   If not for the Accommodations and Publication Provisions, Plaintiffs would immediately speak and publish their religiously motivated and required messages

43

about God's design for marriage and the reasons that they are unwilling to celebrate other views of marriage on Chelsey Nelson Photography's website, on Chelsey Nelson Photography's social media sites, and directly to prospective clients.

339.   If not for the Accommodations and Publication Provisions, Plaintiffs would immediately more actively advertise their services.

340.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' free speech, free association, and free press rights.

341.   Accordingly, as applied to Plaintiffs, the Accommodations and Publication Provisions violate the First Amendment's protections for free speech, free association, and free press.

342.   Accordingly, the Publication Provision's Unwelcome Clause facially violates the First Amendment's protections for free speech, free association, and free press.

Second Cause of Action<br>First Amendment: Free Exercise of Religion

343.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1-325 of this complaint.

344.   The First Amendment's Free Exercise Clause protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to not participate in religious exercises, to speak, to not speak, to associate, and to not associate in accordance with their religious beliefs.

345.   The First Amendment also protects Plaintiffs from having special disabilities imposed on the basis of stating disfavored religious views, being targeted for their religious beliefs, and being punished for exercising their religious beliefs.

346.   Plaintiffs exercise their religion under the First Amendment when they operate their business, honestly communicate with clients and prospective clients about what stories they can and cannot tell, participate in or do not participate in

44

wedding ceremonies, communicate positive stories about marriages between one man and one woman, and not communicate positives stories about marriages not between one man and one woman.

347.   As applied to Plaintiffs, the Accommodations and Publication Provisions substantially burden Plaintiffs' sincerely held religious beliefs by effectively requiring them to operate their expressive business in ways that violate their religious beliefs or to close their expressive business in violation of their religious beliefs, by stopping them from being honest with prospective clients and clients by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated and required speech, by compelling speech that they are religiously obligated to avoid, and by forcing their participation in an activity prohibited by their religious beliefs.

348.   The Accommodations and Publication Provisions do not force nonreligious persons and businesses to choose between these same options when they are faced with a request to promote messages or when they must decide how to explain why they decline to promote certain messages.

349.   The Accommodations and Publication Provisions impermissibly prefer some religious views over others by allowing those who own and operate public accommodations to express religious beliefs in favor of same-sex marriage but not allowing them to express religious beliefs against same-sex marriage.

350.   The Accommodations and Publication Provisions are not facially or operationally neutral or generally applicable, are hostile towards religion, target and show favoritism towards certain religious beliefs, and impose special disabilities on Plaintiffs due to their religious beliefs.

351.   The Accommodations and Publication Provisions, as applied to Plaintiffs, are not neutral or generally applicable because they contain several categorical exemptions, yet Defendants refuse to grant a religious exemption to Plaintiffs.

352.   The Accommodations and Publication Provisions, as applied to Plaintiffs, are also not neutral or generally applicable because they do not punish religious beliefs of expressive business owners who approve of same-sex marriage, but they do punish expressive business owners whose religious beliefs only permit them to support marriages between one man and one woman.

353.   The Accommodations and Publication Provisions also violate Plaintiffs' free exercise rights under the hybrid rights doctrine because they implicate free exercise rights in conjunction with other constitutional protections, like the rights to free speech, association, free press, and due process.

354.   The Accommodations and Publication Provisions impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs.

355.   The Accommodations and Publication Provisions also impose severe penalties if Plaintiffs continue to operate their business according to their religious beliefs.

356.   If not for the Accommodations and Publication Provisions, Plaintiffs would immediately speak and publish their religiously motivated messages about God's design for marriage and the reasons that they are unwilling to celebrate other views of marriage on Chelsey Nelson Photography's website, on Chelsey Nelson Photography's social media sites, and directly to prospective clients.

357.   If not for the Accommodations and Publication Provisions, Plaintiffs would immediately and more actively advertise their services.

358.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by infringing on Plaintiffs' rights to freely exercise their religion.

359.   Accordingly, as applied to Plaintiffs, the Accommodations Provision and Publication Provision violate the First Amendment's protections to freely exercise their religion.

<u>Third Cause of Action</u>
<u>First Amendment: Establishment Clause</u>

360.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1-325 of this complaint.

361.   The First Amendment's Establishment Clause protects Plaintiffs' right to participate and to not participate in religious exercises in ways consistent with their religious beliefs.

362.   The Accommodations Provision forces Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs.

363.   The Accommodations Provision also grants denominational preferences by not requiring nonreligious persons and businesses, or religious persons and businesses whose religion supports same-sex marriage, to make the same choices Plaintiffs must make when they are faced with a request to promote messages or when they must decide how to explain why they decline to promote certain messages.

364.   Defendants do not serve any compelling or even valid interest in a narrowly tailored way by compelling Plaintiffs to participate in religious exercises contrary to their sincerely held religious beliefs or by favoring certain religious beliefs over Plaintiffs' beliefs.

365.   Accordingly, as applied to Plaintiffs, the Accommodations Provision violates the First Amendment's protections for not participating in religious exercises.

<u>Fourth Cause of Action</u>
<u>Fourteenth Amendment: Due Process</u>

366.   Plaintiffs repeat and reallege each allegation contained in paragraphs 1-325 of this complaint.

367.   The Fourteenth Amendment's Due Process Clause prohibits the government from censoring speech using vague standards that grant unbridled discretion to government officials to arbitrarily prohibit some speech and that fail to give

speakers sufficient notice regarding whether their desired speech violates Louisville's law.

368.    The Publication Provision's Unwelcome Clause prohibits any place of public accommodation from making "written, printed, oral or visual communication[s], notice[s], or advertisement[s]" indicating a person's "patronage of, or presence at," the place of public accommodation is "objectionable, unwelcome, unacceptable, or undesirable" because of the person's sexual orientation.

369.    Louisville's law nowhere defines "objectionable, unwelcome, unacceptable, or undesirable."

370.    Plaintiffs, Defendants, and third parties of ordinary intelligence cannot know what communications made on a public accommodation's website, made on a public accommodation's social media sites, or made directly to prospective clients indicate a person's "patronage of, or presence at" a place of public accommodation is "objectionable, unwelcome, unacceptable, or undesirable" and therefore cannot know what is prohibited by the Unwelcome Clause.

371.    Defendants can use this vagueness, and the unbridled discretion it provides, to apply the Unwelcome Clause in a way that discriminates against content, viewpoints, and actions Defendants disfavor.

372.    Accordingly, facially and as applied to Plaintiffs, the Publication Provision's Unwelcome Clause violates the Fourteenth Amendment's Due Process Clause.

Fifth Cause of Action
Kentucky's Religious Freedom Restoration Act K.R.S. § 446.350

373.    Plaintiffs repeat and reallege each allegation contained in paragraphs 1-325 of this complaint.

374.    Kentucky's Religious Freedom Restoration Act ("KRFRA") protects Plaintiffs' right to operate their business, to create expression, to not create expression, to participate in religious exercises, to not participate in religious exercises, to speak,

48

to not speak, to associate, and to not associate in accordance with their religious beliefs. K.R.S. § 446.350.

375.   Chelsey operates Chelsey Nelson Photography in accordance with her sincerely held religious beliefs.

376.   Plaintiffs act or refuse to act in a manner motivated by sincerely held religious beliefs within the meaning of KRFRA when they operate their business, honestly communicate with clients and prospective clients about what stories they can and cannot tell, participate in or do not participate in wedding ceremonies, communicate positive stories about marriages between one man and one woman, and not communicate positives stories about marriages not between one man and one woman.

377.   KRFRA prohibits the government from substantially burdening a sincerely held religious belief "unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest." K.R.S. § 446.350.

378.   As applied to Plaintiffs, the Accommodations and Publication Provisions substantially burden Plaintiffs' right to act or refuse to act in a manner motivated by sincerely held religious beliefs by effectively requiring them to operate their expressive business in ways that violate their religious beliefs or to close their expressive business in violation of their religious beliefs, by stopping them from being honest with prospective clients and clients, by barring them from stating what messages they will not express due to their religious beliefs, by preventing their religiously motivated speech, by compelling speech that they are religiously obligated to avoid, and by forcing their participation in an activity prohibited by their religious beliefs.

379.   The Accommodations and Publication Provisions substantially burden Plaintiffs' sincerely held religious beliefs by assessing severe penalties for violations and impose severe coercive pressure on Plaintiffs to change or violate their religious beliefs.

380.   Defendants do not use the least restrictive means to further any compelling or even valid interest by infringing on and substantially burdening Plaintiffs' freedom of religion.

381.   Accordingly, as applied to Plaintiffs, the Accommodations Provision and the Publication Provision violate their right to freely exercise their religion under KRFRA.

## Prayer for Relief

Plaintiffs respectfully ask this Court to enter judgment against Defendants and to provide the following relief:

1.   A preliminary injunction and permanent injunction to stop Defendants and any person acting in concert with them from:

   a. enforcing the Accommodations and Publication Provisions in Louisville's law as applied to Plaintiffs' constitutionally protected speech, association, free press, religious exercise rights, and their right to be free from the establishment of religion;

   b. enforcing the Publication Provision's Unwelcome Clause in Louisville's law facially; and

   c. enforcing the Accommodations and Publication Provisions in Louisville's law as applied to Plaintiffs' protected exercise of religion under KRFRA.

2.   A declaration that the Accommodations and Publication Provisions violate the United States Constitution's First Amendment protections for speech, for association, for press, for free exercise of religion, and against establishment of

religion and the Fourteenth Amendment protections for due process as applied to Plaintiffs' constitutionally protected activities;

3.    A declaration that the Publication Provision's Unwelcome Clause facially violates the United States Constitution's First Amendment protections for speech and press and the Fourteenth Amendment protections for due process;

4.    A declaration that the Accommodations and Publication Provisions violate the Kentucky Religious Freedom Restoration Act's protections as applied to Plaintiffs' exercise of religion;

5.    That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter here in controversy so that these declarations shall have the force and effect of a final judgment;

6.    That this Court retain jurisdiction of this matter for the purpose of enforcing its orders;

7.    That this Court award Plaintiffs' costs and expenses in this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;

8.    That this Court award nominal and compensatory damages to Plaintiffs;

9.    That this Court issue the requested injunctive relief without a condition of bond or other security required of Plaintiffs; and

10.   That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 19th day of November, 2019.

By:  s/ Joshua D. Hershberger

Jonathan A. Scruggs
AZ Bar No. 030505*
Katherine L. Anderson
AZ Bar No. 033104*
Bryan Neihart
CO Bar No. 47800*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone:  (480) 444-0020
jscruggs@adflegal.org
kanderson@adflegal.org
bneihart@adflegal.org

David A. Cortman
GA Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone:  (770) 339-0774
dcortman@ADFlegal.org

Joshua D. Hershberger
KY Bar No. 94421
**Hershberger Law Office**
P.O. Box 233
Hanover, IN 47243
Telephone: (812) 274-0441
josh@hlo.legal

ATTORNEYS FOR PLAINTIFFS

* Motions for *Pro Hac Vice* admission being filed concurrently

52

## Verification

I, Chelsey Nelson, a citizen of the United States and a resident of the State of Kentucky, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge.

Executed this __19th__ day of __November__, 2019, at __Louisville__, Kentucky

_Chelsey Nelson_

Chelsey Nelson