IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| **Chelsey Nelson Photography LLC,** and **Chelsey Nelson**, | |
| Plaintiffs, | |
| v. | |
| **Louisville/Jefferson County Metro Government**; **Louisville Metro Human Relations Commission-Enforcement; Louisville Metro Human Relations Commission-Advocacy; Kendall Boyd**, in his official capacity as Executive Director of the Louisville Metro Human Relations Commission-Enforcement; and **Marie Dever**, **Kevin Delahanty**, **Charles Lanier**, **Sr.**, **Laila Ramey**, **William Sutter**, **Ibrahim Syed**, and **Leonard Thomas**, in their official capacities as members of the Louisville Metro Human Relations Commission-Enforcement, | Case No. 3:19-CV-851-JRW <br><br><br> **Plaintiffs' Brief in Support of Their Preliminary Injunction Motion** |
| Defendants. | |

# TABLE OF CONTENTS

Index of Authorities ...................................................................................................iii

Introduction and Summary of the Facts....................................................................... 1

Argument ....................................................................................................................... 4

I.    The Accommodations Provision violates the First Amendment because it compels Chelsey to speak and infringes her editorial freedom. ................... 4

    A.    Chelsey engages in protected speech......................................................... 5

        1.    Chelsey's wedding celebration services are protected speech. ................................................................................... 5

        2.    Chelsey's boutique editing services are protected speech............ 8

    B.    The Accommodations Provision compels Chelsey to speak. ................... 9

    C.    The Accommodations Provision compels Chelsey to speak messages she disagrees with. ................................................................. 12

    D.    Compelling Chelsey to speak creates a dangerous and limitless principle. ................................................................................................. 15

II.    The Accommodations Provision violates the First Amendment because it compels Chelsey to speak based on content and viewpoint........................ 16

III.    The Publication Provision violates the First Amendment because it restricts Chelsey's speech based on content and viewpoint. .......................... 17

IV.    The Accommodations Provision violates the First Amendment because it compels Chelsey to participate in and celebrate religious ceremonies she disagrees with.......................................................................................... 19

V.    The Accommodation and Publication Provisions fail strict scrutiny.............. 21

VI.    The Unwelcome Clause facially violates the First and Fourteenth Amendments because it is overbroad, vague, and allows unbridled discretion. .................................................................................................... 24

Conclusion................................................................................................................... 25

# Index of Authorities

## Cases

*Anderson v. City of Hermosa Beach,*
  621 F.3d 1051 (9th Cir. 2010) .............................................................. 6

*Anderson v. Laird,*
  466 F.2d 283 (D.C. Cir. 1972) ............................................................ 20

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) ........................................................................... 22

*Axson-Flynn v. Johnson,*
  356 F.3d 1277 (10th Cir. 2004) .......................................................... 21

*Bays v. City of Fairborn,*
  668 F.3d 814 (6th Cir. 2012) ................................................................ 4

*Bery v. City of New York,*
  97 F.3d 689 (2d Cir. 1996) ................................................................... 6

*Bible Believers v. Wayne County, Michigan,*
  805 F.3d 228 (6th Cir. 2015) ........................................................ 16, 18

*Boy Scouts of America v. Dale,*
  530 U.S. 640 (2000) ..................................................................... 14, 22

*Brown v. Entertainment Merchants Association,*
  564 U.S. 786 (2011) ........................................................................... 22

*Brush & Nib Studio, LC v. City of Phoenix,*
  448 P.3d 890 (Ariz. 2019) ............................................................ *passim*

*Brush & Nib Studio, LC v. City of Phoenix,*
  418 P.3d 426 (Ariz. Ct. App. 2018) ............................................... 24, 25

*Buehrle v. City of Key West,*
  813 F.3d 973 (11th Cir. 2015) .............................................................. 8

*Campbell v. Robb,*
  162 F. App'x 460 (6th Cir. 2006) ....................................................... 18

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ........................................................................... 21

*City of Cleveland v. Nation of Islam*,
    922 F. Supp. 56 (N.D. Ohio 1995) ................................................. 11

*Claybrooks v. American Broadcasting Companies, Inc.*,
    898 F. Supp. 2d 986 (M.D. Tenn. 2012) ...................................... 6, 11

*Cockrel v. Shelby County School District*,
    270 F.3d 1036 (6th Cir. 2001) ...................................................... 12

*Cressman v. Thompson*,
    798 F.3d 938 (10th Cir. 2015) ........................................................ 5

*Employment Division, Department of Human Resources of Oregon v. Smith*,
    494 U.S. 872 (1990) ...................................................................... 21

*ETW Corp. v. Jireh Publishing, Inc.*,
    332 F.3d 915 (6th Cir. 2003) .................................................. 5, 6, 8

*Forsyth County v. Nationalist Movement*,
    505 U.S. 123 (1992) ...................................................................... 25

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ................................................................. 21, 22

*Groswirt v. Columbus Dispatch*,
    238 F.3d 421 (6th Cir. 2000) ........................................................ 10

*Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*,
    515 U.S. 557 (1995) ................................................................*passim*

*Janus v. American Federation of State, County, & Municipal Employees, Council 31*,
    138 S. Ct. 2448 (2018) .................................................................. 14

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ..................................... 4, 5, 6, 12

*Johari v. Ohio State Lantern*,
    76 F.3d 379 (6th Cir. 1996) .......................................................... 10

*Kaahumanu v. Hawaii*,
    682 F.3d 789 (9th Cir. 2012) ................................................... 20, 21

*Kaplan v. California*,
    413 U.S. 115 (1973) .................................................................... 6, 7

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ....................................................................... 24

*Lee v. Weisman,*
    505 U.S. 577 (1992) ............................................................. 19, 20, 21

*Lexington-Fayette Urban County Human Rights Commission v.*
    *Hands on Originals,*
    ___ S.W.3d ___, 2019 WL 5677638 (Ky. Oct. 31, 2019) ................................ 9, 10

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
    138 S. Ct. 1719 (2018) ....................................................... 19, 20

*Matal v. Tam,*
    137 S. Ct. 1744 (2017) ................................................................... 19

*McGlone v. Metropolitan Government of Nashville,*
    749 F. App'x 402 (6th Cir. 2018) ....................................................... 19

*Miami Herald Publishing Co. v. Tornillo,*
    418 U.S. 241 (1974) .................................................................... 4, 6

*Miami Valley Fair Housing Center, Inc. v. Connor Group,*
    725 F.3d 571 (6th Cir. 2013) ........................................................... 25

*Miller v. City of Cincinnati,*
    622 F.3d 524 (6th Cir. 2010) ............................................................ 4

*National Institute of Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) .................................................................. 16

*New York State Club Association, Inc. v. City of New York,*
    487 U.S. 1 (1988) ...................................................................... 14

*Obergefell v. Hodges,*
    135 S. Ct. 2584 (2015) ................................................................. 20

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
    475 U.S. 1 (1986) ................................................................... 5, 17

*Packingham v. North Carolina,*
    137 S. Ct. 1730 (2017) ................................................................ 7, 8

*Prater v. City of Burnside,*
    289 F.3d 417 (6th Cir. 2002) ........................................................... 21

*Reed v. Town of Gilbert,*
    135 S. Ct. 2218 (2015) ................................................................ 21, 23

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 781 (1988) ............................................................. 4, 12, 16

*Rosenberger v. Rector & Visitors of University of Virginia,*
    515 U.S. 819 (1995) ...................................................................... 19

*Saxe v. State College Area School District,*
    240 F.3d 200 (3d Cir. 2001) ......................................................... 25

*Sistrunk v. City of Strongsville,*
    99 F.3d 194 (6th Cir. 1996) ...................................................... 4, 14

*Telescope Media Group v. Lucero,*
    936 F.3d 740 (8th Cir. 2019) ................................................*passim*

*Thomas v. Bright,*
    937 F.3d 721 (6th Cir. 2019) ....................................................... 18

*Turner Broadcasting Systems, Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ...................................................................... 17

*Turner v. Safley,*
    482 U.S. 78 (1987) ........................................................................ 20

*United States v. Stevens,*
    559 U.S. 460 (2010) ...................................................................... 24

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ...................................................................... 24

*World Peace Movement of America v. Newspaper Agency Corp.,*
    879 P.2d 253 (Utah 1994) ............................................................ 15

## Statutes, Codes, and Ordinances

42 U.S.C. § 2000a(b) ............................................................................ 23

Ann Arbor, Michigan Code of Ordinances § 9:151 ...................... 16

Florida Stat. § 760.02(11) .................................................................. 23

Lansing, Michigan Code of Ordinances § 297.02  .................... 16

Lansing, Michigan Code of Ordinances § 297.04 ........................ 16

Louisville, Kentucky Metro Amended Ordinance § 92.05(A)........................... 9, 12, 23

Louisville, Kentucky Metro Amended Ordinance § 92.05(B)......................... 18, 19, 24

Louisville, Kentucky Metro Amended Ordinance § 92.05(C)..................................... 23

Louisville, Kentucky Metro Amended Ordinance § 92.08(B).................................... 11

Louisville, Kentucky Metro Amended Ordinance § 92.12(B).................................... 11

K.R.S. § 344.230(3) ................................................................................................ 11

Madison, Wisconsin Code of Ordinances § 39.03(2) ................................................. 16

Madison, Wisconsin Code of Ordinances § 39.03 (5) ................................................ 16

Mississippi Code Ann. § 11-62-5(5)(a).................................................................... 23

South Carolina Code Ann. § 45-9-10(B)................................................................... 23

Seattle, Washington Mun. Code § 14.06.020(L) ....................................................... 16

Seattle, Washington Mun. Code § 14.06.030(B) ....................................................... 16

**Regulations**

29 C.F.R. § 1604.2 ................................................................................................. 23

**Other Authorities**

Brief for the United States as Amicus Curiae Supporting Pet'rs,
*Masterpiece Cakeshop, Ltd.*, 138 S. Ct. 1719 (2018) (No. 16-111).................. 23

Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for
Discriminatory Rejection of Noncommercial Ad in Its Publication,*
The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7................. 15

### Introduction and Summary of the Facts

Plaintiff Chelsey Nelson is a talented photographer, editor, and blogger trying to live out her dream of running her own photography studio. Chelsey creates photographs for and blogs about weddings and businesses for her clients regardless of who they are. She simply cannot create works conveying certain messages, such as sexist blogs or obscene photographs. But through its public accommodation law, Louisville is trying to force Chelsey to participate in and to promote (through her photographs and blogs) a solemn ceremony she objects to—same-sex wedding ceremonies. In so doing, Louisville coerces speech and punishes dissent. No matter one's view on marriage, everyone loses when bureaucrats can force citizens to participate in religious ceremonies they oppose or to speak messages they disagree with. For countless other subjects, speakers freely select what they say all the time. Chelsey merely asks for the same freedom for the subject of marriage—and for a preliminary injunction to protect this freedom going forward.

Chelsey started Chelsey Nelson Photography, LLC (a for-profit photography studio) to fulfill her passion for storytelling and to publicly promote images and ideas she values. Verified Complaint (VC) ¶¶ 27-28, 37-41.[1] Chelsey intends each photograph she takes, edits, or blogs about to reflect what she believes to be true and right, lovely and pure, and excellent and praiseworthy. *Id.* at ¶¶ 27, 85-86.

To achieve this goal, Chelsey provides "wedding celebration services" where she photographs, edits, and blogs about clients' engagements and weddings, as well as attends and participates in those wedding ceremonies. *Id.* at ¶¶ 56-66. She also provides "boutique editing services" where she edits other photographers' photographs of weddings and other content. *Id.* at ¶¶ 67-73.

---

[1] Plaintiffs are referenced collectively as "Chelsey" unless context indicates otherwise.

Throughout her photography, editing, and blogging, Chelsey uses her artistic judgment to take photographs, edit those photographs, and to write blog comments to tell positive stories about marriages between one man and one woman, to convey the beauty of such marriages, and to present the subject of her photographs in the best light possible. *See, e.g.*, *id.* at ¶¶ 131-134, 137-138, 142-151, 175-182. Each of these artistic expressions—photographing, editing, and blogging—is designed to tell uplifting stories about marriage or some commercial subjects. *See, e.g.*, *id.* at ¶¶ 57-58, 69-71, 168.

What Chelsey considers beautiful and praiseworthy comes from her Christian beliefs. *Id.* at ¶¶ 20-27. For example, Chelsey's boutique editing services always depict the photograph's subjects favorably because she believes God declared His creation to be "very good." *Id.* at ¶¶ 82, 178. Chelsey also believes that God designed marriage to be a union of one man and one woman. *See, e.g.*, *id.* at ¶ 89. Chelsey desires to capture the beauty and joy of these marriages to celebrate God's design for marriage and to convince her clients, their friends, and the public that this type of marriage should be pursued and valued. *Id.* at ¶ 92-95.

Because Chelsey cannot separate her beliefs and vocation, she seeks to honor God in what she creates, promotes, and participates in. *Id.* at ¶¶ 77, 85-86. Likewise, Chelsey cannot create, promote, or participate in anything that dishonors God. *Id.* at ¶ 184. So Chelsey will not create works that demean others, condone racism, or contradict biblical principles. *Id.* Likewise, she will not promote all messages about marriage or participate in all wedding ceremonies, such as Game of Thrones-themed ones. *Id.* at ¶ 206. Nor will she photograph or blog to positively depict or participate in same-sex weddings. *Id.* at ¶¶ 191-192, 207. Of course, Chelsey is happy to serve those in the LGBT community. *Id.* at ¶¶ 201-204. She just cannot promote certain messages or participate in certain religious ceremonies for anyone, no matter their status. *Id.* at ¶ 208. And Chelsey wants to be honest with

prospective clients and explain why she cannot promote anything that violates her beliefs by posting about her beliefs on her studio's website. *Id.* at ¶¶ 79-80, 250-260.

But Louisville's law forbids all of this. The law regulates public accommodations—i.e., businesses like Chelsey's studio that offer services to the public—in two ways that affect Chelsey. *Id.*at ¶ 216-219. First, the Accommodations Provision (§ 92.05(A)) forbids businesses from denying someone "the full and equal enjoyment" of goods, services, and accommodations on the ground of "sexual orientation." *Id.* at ¶ 220. This forces Chelsey to tell positive stories about and to personally participate in ceremonies celebrating same-sex marriage because she will do the same for opposite-sex weddings. *Id.* at ¶¶ 221-223.

Second, the Publication Provision (§ 92.05(B)) makes it illegal for businesses to "publish" or "display" a "communication" which "indicates" that (A) "services" will be "denied" on account of someone's "sexual orientation" (the Denial Clause) or (B) someone's "patronage of, or presence at" a business is "objectionable, unwelcome, unacceptable, or undesirable" because of "sexual orientation" (the Unwelcome Clause). *Id.* at ¶ 247-248. This prohibits Chelsey from publishing her desired statements about why she will create stories for and participate in weddings between a man and a woman but not for same-sex weddings. *Id.* at ¶¶ 252-261. Worse still, the vaguely worded Unwelcome Clause forbids Chelsey from even discussing her beliefs about marriage on her studio's website because someone might take that message as unwelcoming. *See id.* at ¶¶ 249, 259.

Violating these provisions exposes Chelsey to severe penalties including an injunction requiring her to photograph, blog about, and participate in ceremonies she disagrees with; posting a notice dictated by Louisville; sending compliance reports to Louisville; and paying uncapped damages "for humiliation and embarrassment." *Id.* at ¶ 297.

In these ways, Louisville's law overrides Chelsey's editorial freedom, coerces her religious beliefs, and violates her First and Fourteenth Amendment rights. Chelsey seeks a preliminary injunction to stop these ongoing, irreparable injuries.

## Argument

When evaluating preliminary injunction requests, courts typically evaluate the likelihood of success on the merits, irreparable harm to plaintiffs absent an injunction, whether an injunction will cause substantial third-party harm, and whether an injunction will serve the public interest. *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010). But in this case, likelihood of success is the "crucial inquiry" because First Amendment violations always cause irreparable harm and stopping these violations benefits everyone. *Bays v. City of Fairborn*, 668 F.3d 814, 819, 825 (6th Cir. 2012) (citation omitted); *Miller*, 622 F.3d at 540. Chelsey satisfies this "crucial" element many times over because Louisville's law violates the First and Fourteenth Amendments in multiple ways, as explained below.

## I.   The Accommodations Provision violates the First Amendment because it compels Chelsey to speak and infringes her editorial freedom.

The "First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what *not* to say." *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988). This means a speaker has "the autonomy to choose the content of his own message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bost.*, 515 U.S. 557, 573 (1995); *see also Sistrunk v. City of Strongsville*, 99 F.3d 194, 200 (6th Cir. 1996) (affirming speaker's right to exercise "autonomy over the content of its own message"). Central to this autonomy is a speaker's freedom to exercise "editorial control and judgment" over her message. *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974); *see also Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 437 (S.D.N.Y. 2014) ("[A]s a

4

general matter, the Government may not interfere with the editorial judgments of private speakers on issues of public concern ....").

But Louisville violates these principles by compelling Chelsey's speech. A compelled speech claim has three elements: (A) speech, (B) the government compels, (C) and the speaker objects to. *See Hurley*, 515 U.S. at 572-73 (applying elements); *Cressman v. Thompson*, 798 F.3d 938, 951 (10th Cir. 2015) (identifying elements). Chelsey satisfies each element and that triggers strict scrutiny. *See Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.* (*PG&E*), 475 U.S. 1, 19 (1986) (plurality) (applying strict scrutiny to law compelling speech).

### A. Chelsey engages in protected speech.

Chelsey tells positive and uplifting stories about opposite-sex marriage and other subjects through her (1) wedding celebration and (2) boutique editing services. In doing so, Chelsey engages in protected speech involving "written or spoken words" and "other mediums of expression" like "photographs." *ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003).

### 1. Chelsey's wedding celebration services are protected speech.

For her wedding celebration services, Chelsey promotes and celebrates marriages between one man and one woman by (i) photographing a couples' engagement or wedding; (ii) then editing those photographs; and (iii) then posting those edited photographs on her blog or studio's website with text encouraging and celebrating their marriage. VC ¶¶ 60-64. Each aspect of this unified process helps communicate a celebratory message about marriage between one man and one woman. *Id.* at ¶ 66. And for each aspect, Chelsey exercises editorial discretion about what and how to photograph, to edit, and, to post on her blog. *See* Decl. of Chelsey Nelson in Supp. of Pls.' Mot. for Prelim. Inj. (Decl.) ¶¶ 93-143; Appendix (App.) at

5

33, 41 (wedding celebration and boutique editing services contracts explaining Chelsey's ultimate editorial discretion).

_Photography_: Chelsey's photographs are protected speech because they "always communicate some idea or concept." *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996); *see also Kaplan v. California*, 413 U.S. 115, 119-20 (1973) ("[P]ictures, films, paintings, drawings, and engravings … have First Amendment protection ...."); *ETW Corp.*, 332 F.3d at 924 (noting "photographs" are speech); *see also* App. at 118-283 (for examples of those photographs).

_Editing:_ Chelsey's edits to her photographs are also protected speech. Because her editing is "inextricably intertwined" with her photographs, her editing process is protected much like "the processes of writing words down on paper, painting a picture, and playing an instrument are purely expressive activities entitled to full First Amendment protection." *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1062 (9th Cir. 2010) (tattooing process protected under First Amendment). Courts protect this expressive process because the process is necessary to produce the final expressive work. *Id.*

That is why the First Amendment protects both (1) a newspaper's editing process *and* the publication itself; (2) a television show's cast selection process *and* the show itself; and (3) a company's search engine selection process *and* the search engine's results. *See Tornillo*, 418 U.S. at 258 (1974) (newspapers); *Claybrooks v. Am. Broad. Cos., Inc.*, 898 F. Supp. 2d 986, 999 (M.D. Tenn. 2012) (cast selection); *Baidu.co Inc.,* 10 F. Supp. 3d at 437-38 (search engine). Whether for writers or photographers, the First Amendment protects first drafts, final drafts, and steps in between. So too in the wedding context. The Eighth Circuit recently concluded that a film studio's "positioning a camera, setting up microphones, and clicking and dragging files on a computer" deserve protection when they produce a wedding film.

6

*Telescope Media Grp. v. Lucero* (*TMG*), 936 F.3d 740, 752 (8th Cir. 2019). The same is true here.

But pictures speak louder than words. Contrast Chelsey, who describes her style as "light, bright, and airy" creating a "timeless and romantic quality" with the photographer of We Choose the Moon Photography, who describes her style as "a little more modern, alternative, dark, moody, radder … than the rest." Decl. ¶¶ 335-44; App. at 412, 497-98. The resulting differences in the message, mood, and emotional impact are stark. *Compare* Chelsey's photographs (left) *with* We Choose the Moon Photography's photographs (right):

 

 

*Blog Posts:* Chelsey's blog posts include text, words, and images to communicate a message about marriage. Decl. ¶¶ 126-43; App. at 284-301. As such, they are protected speech. *See Kaplan*, 413 U.S. at 119-20 ("[P]rinted word[s] have First Amendment protection …."); *Packingham v. North Carolina,* 137 S. Ct. 1730,

1735-36 (2017) ("[S]ocial media users employ [websites] to engage in ... First Amendment activity ....").

### 2. Chelsey's boutique editing services are protected speech.

Chelsey's boutique editing services also convey positive messages about the content of the photograph, including wedding photographs between one man and one woman. VC ¶¶ 177-78. As noted above, the First Amendment protects Chelsey when she edits photographs she has taken. *See supra*, § I(A)(1). But it also protects Chelsey when she edits photographs taken by someone else.

Although Chelsey receives the first draft of these photos from another photographer, Chelsey still uses her editorial skill and judgment to transform the photograph into a positive and polished image. The First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication" for protection. *Hurley*, 515 U.S. at 570. Speakers often collaborate with others. *Id.* (cable operators and newspapers are protected even though they edit content "originally produced by others"); *Buehrle v. City of Key West*, 813 F.3d 973, 977 (11th Cir. 2015) ("[A]rtistic expression frequently encompasses a sequence of acts by different parties, often in relation to the same piece of work."); *ETW Corp.*, 332 F.3d at 925 (protecting "[p]ublishers disseminating the work of others who create expressive materials"). So long as speakers exercise their own editorial discretion, that is enough. *TMG*, 936 F.3d at 751 ("Even if their customers have some say over the finished product … the [filmmakers] retain ultimate editorial judgment and control.").

And Chelsey certainly does, both contractually, *see* App. at 30-43 (Chelsey's wedding celebration and boutique editing services contracts), and in practice as seen in the photograph before (left) and after (right) Chelsey edited it:



The editorial change is significant. *See* Decl. ¶¶ 167-74; App. at 273-83.

**B.  The Accommodations Provision compels Chelsey to speak.**

Because Chelsey speaks through her wedding celebration and boutique editing services, Louisville compels her to speak and infringes her editorial judgment when compelling these services.

The Accommodations Provision makes it illegal for public accommodations to "deny an individual the full and equal enjoyment of" goods, services, and accommodations "on the ground of … sexual orientation." Metro Ordinance § 92.05(A). When applied to Chelsey's photography and blogging though, this provision forces Chelsey to create photographs and blogs for same-sex weddings because she already does the same for opposite-sex weddings. Louisville considers anything else to be illegal sexual-orientation discrimination. *See id.*; *see also TMG*, 936 F.3d at 748-49 (Minnesota adopting same interpretation of similar law); *Brush & Nib Studio, LC v. City of Phoenix* (*Brush & Nib*), 448 P.3d 890, 898-900 (Ariz. 2019) (Phoenix adopting similar interpretation of similar law); *Lexington-Fayette Urban Cty. Human Rights Comm'n v. Hands on Originals*, ___ S.W.3d ___, 2019 WL 5677638, at *2 (Ky. Oct. 31, 2019) (Lexington-Fayette Urban County adopting similar interpretation of similar law).

In so doing, the Accommodations Provision strips Chelsey of her editorial control over her speech. As long as Louisville forces Chelsey to create and publish words and photographs she does not want to, she no longer controls what she says. The government does. That is compelled speech.

The Supreme Court already said so in *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995). There, a pro-LGBT group tried to use a public accommodation law to force parade organizers to admit that group into the organizer's parade. *Id.* at 561. But this "peculiar" application unconstitutionally compelled speech because it "had the effect of declaring the sponsors' speech itself [the parade] to be the public accommodation" and thereby infringed a speaker's "autonomy to choose the content of his own message." *Id.* at 572-73.

Likewise, the Eighth Circuit applied *Hurley* to say Minnesota's public accommodation law compelled speech by forcing a film studio to create wedding films celebrating same-sex weddings. *TMG*, 936 F.3d at 752-53. And the Arizona Supreme Court, citing *TMG* and *Hurley*, concluded Phoenix's public accommodation law unconstitutionally required an art studio to create wedding invitations celebrating same-sex weddings. *Brush & Nib,* 448 P.3d at 904, 913-14.[2] *Cf. Hands on Originals*, 2019 WL 5677638, at *7 (Buckingham, J., concurring) (public accommodation law could not force printer to print shirts promoting LGBT festival).

Courts within the Sixth Circuit agree with this analysis. The Sixth Circuit has repeatedly ruled that anti-discrimination laws cannot force newspapers to publish articles they disagree with. *Groswirt v. Columbus Dispatch*, 238 F.3d 421, *2 (6th Cir. 2000) (unpublished); *Johari v. Ohio State Lantern*, 76 F.3d 379, *1 (6th Cir. 1996) (unpublished). And district courts in this Circuit—citing *Hurley*—have ruled that anti-discrimination laws cannot force television studios to alter their

---

[2] *Brush & Nib* is relevant here because the court considered "First Amendment jurisprudence" when analyzing the state law claims. 448 P.3d at 903.

10

television show content or force orators to alter their speech content. *Claybrooks*, 898 F. Supp. 2d at 999; *City of Cleveland v. Nation of Islam*, 922 F. Supp. 56, 59 (N.D. Ohio 1995).

All these cases stand for the same principle: governments may not apply anti-discrimination laws to alter someone's message. But Louisville's public accommodation law does exactly that. It applies to Chelsey's photography, editing, and blogging and forces Chelsey to photograph, edit, and blog about something she does not want to (same-sex weddings) or face stiff penalties like damages, injunctions, and compliance reports. Metro Ordinance §§ 92.08(B)(8)(a) (incorporating remedies of K.R.S. §§ 344.230(3)(d), (e), (h)), 92.12(B). That compels speech in an egregious way. *Cf. TMG*, 936 F.3d at 754 n.4 (contrasting compelled publication with more "troubling" scenario where law forced filmmakers to "use their own creative skills to speak in a way they find morally objectionable").

To be sure, the Accommodations Provision does not mention photography, editing, or blogging in its text; it facially regulates conduct. But that doesn't matter. The public accommodations law in *Hurley* did "not, on its face, target speech or discriminate on the basis of its content"; its "focal point" was stopping "the act of discriminating." 515 U.S. at 572. But the law still compelled speech because its "application … had the effect of" compelling speech. *Id.* at 573. *Hurley* instructs courts to look beyond a law's text or purpose to whether it applies to speech. *Id.* at 572; *see also TMG*, 936 F.3d at 752, 758 (making this point); *Brush & Nib*, 448 P.3d at 913-14 (same). And here the law does.

Nor can Louisville avoid this conclusion by attributing Chelsey's speech to her clients. *See TMG*, 936 F.3d at 773-76 (Kelly, J., dissenting) (for this argument). Chelsey is no mere mechanical conduit. She's a creator. She constantly exercises editorial judgment to tell a positive story about marriage between a man and woman—from deciding what content to capture, which angles to use, which

11

photographs to discard, how to edit an image, and what congratulatory text to write. *See, e.g.*, Decl. ¶¶ 85-174; *see also Cockrel v. Shelby Cty. Sch. Dist.*, 270 F.3d 1036, 1049 (6th Cir. 2001) ("teacher's selection of a speaker for an in-class presentation" is protected speech).

Like a commissioned biographer, Chelsey might tell stories *about* someone else to earn a living. But she is still the one telling the story. She is still the one producing the speech. If officials could compel Chelsey to speak because she speaks about and receives payment from others, then officials could compel every commissioned writer, lawyer, publisher, painter, printer, graphic designer, advertising firm, newspaper, and internet company to speak *any message*. That is not the law. *See Hurley*, 515 U.S. at 573, 575 (rejecting conduit argument because parade organizers "choose the content" of their speech and are "more than a passive receptacle" for someone else's message); *TMG*, 936 F.3d at 753 (rejecting conduit argument for film studio); *Baidu.com,* 10 F. Supp. 3d at 437 (rejecting conduit argument for internet company's search engine); *Brush & Nib*, 448 P.3d at 911-12 (rejecting conduit argument for art studio); *see also Riley*, 487 U.S. at 794 n.8 (law could not compel professional fundraiser to speak on charity's behalf because fundraiser had "independent First Amendment interest in [its] speech….").

### C. The Accommodations Provision compels Chelsey to speak messages she disagrees with.

Not only does the Accommodations Provision compel Chelsey to speak, it also forces her to convey messages she strongly disagrees with.

Remember, the Accommodations Provision requires businesses to provide "*full and equal* enjoyment" of services regardless of sexual orientation. Metro Ordinance § 92.05(A) (emphasis added). For Louisville, this means Chelsey must offer the exact same services for same-sex weddings (full and equal enjoyment) as for opposite-sex weddings. *See TMG*, 936 F.3d at 748-49, 750 n.2 (adopting same

interpretation of public accommodations law); *id.* at 769-70 (Kelly, J., dissenting) (same).

But Chelsey only creates photographs and blogs that portray weddings and marriage in a positive light. VC ¶¶ 57-58, 70-71, 223. That means the Accommodations Provision requires Chelsey to create photographs and blogs depicting same-sex marriages in a positive light since she does the same for opposite-sex marriages. Practically, this compulsion not only changes the formal content in Chelsey's photographs and blogs—from celebrating "Jack and Jill" to "Jack and Jim"—it changes the very meaning of those photographs and blogs—from celebrating biblical marriage (left) to celebrating same-sex marriage (right).







The change in content, meaning, purpose, and effect could not be clearer. *See TMG*, 936 F.3d at 752-53 (requiring studio to create films conveying "the same

'positive' message" about same-sex weddings as opposite-sex weddings is compelled speech); *Sistrunk*, 99 F.3d at 198 (governments cannot require speaker "to *include* discordant speakers in its expressive activity"); *Brush & Nib*, 448 P.3d at 909 (explaining how even one name change "clearly *does* alter the overall expressive content of [studio's] wedding invitations."). *See* Decl. ¶¶ 329-30. *Compare* App. at 118-272 *with* App. at 431-80.

Nor should this burden be underestimated. "Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command, and in most contexts, any such effort would be universally condemned." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). Indeed, "[f]orcing free and independent individuals to endorse ideas they find objectionable is *always demeaning*...." *Id.* at 2464 (emphasis added).

And it is *ideas* that Chelsey objects to expressing, not to individuals. *See* VC ¶ 208. Chelsey serves clients regardless of their status. *Id.* She simply does not convey certain messages for anyone. This explains why Chelsey happily serves those in the LGBT community in countless contexts and declines to convey some wedding messages even when asked by opposite-sex couples. *See* VC ¶¶ 201-04; Decl. ¶¶ 200-17. Whether the topic is vulgarity, the environment, religion, or marriage, Chelsey decides whether to create speech based on the message requested, not the person requesting. VC ¶ 208.

The Supreme Court drew the same distinction in *Hurley* when it allowed parade organizers to decline parade access to a "message it disfavored" (i.e., the "unqualified social acceptance of gays and lesbians") because they did not exclude "homosexuals as such…" from the parade. 515 U.S. at 572, 574-75; *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 653 (2000) (affirming same distinction in *Hurley*); *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 13 (1988) (distinguishing club that excludes members who reject club's views from club

14

excluding members based on status); *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 258 (Utah 1994) (newspaper did not discriminate based on status when declining to print religious advertisement because "it was the message itself that [the newspaper] rejected, not its proponents").

In this respect, Chelsey is no different from atheist calligraphers who serve Christians but cannot write tracts celebrating Easter for a church (or anyone else) or LGBT writers who serve Muslims but cannot write flyers condemning same-sex marriage for a Mosque (or anyone else). When speakers decline to speak "based on *message*, not *status*," that decision is protected. *Brush & Nib*, 448 P.3d at 910. That principle protects others. It should protect Chelsey too. *Id.* at 911 (art studio could decline to create same-sex wedding invitations because decision was "based on neither a customer's sexual orientation nor the sexual conduct that defines certain customers as a class").

### D. Compelling Chelsey to speak creates a dangerous and limitless principle.

The principles that protect Chelsey do not just protect her. They protect speakers of all views. But if Louisville can force Chelsey to speak a message about marriage she disagrees with, it can compel other commissioned speakers to speak messages they disagree with. For example, it could require a gay tattoo designer to ink a tattoo on someone's arm declaring "Homosexuality is an abomination. Leviticus 18:22" or force an LGBT t-shirt design company to print a t-shirt critical of the LGBTQ community. *See* Decl. ¶¶ 319-27 (noting tattoo studio and t-shirt company that promote the LGBTQ community). Or it could force a progressive bar association to publish statements promoting Israel.[3]

---

[3] Eugene Volokh, *Court Allows Lawsuit Against Ideological Group for Discriminatory Rejection of Noncommercial Ad in Its Publication*, The Volokh Conspiracy (March 19, 2018), https://bit.ly/2VVZeH7.

In fact, if Louisville can compel Chelsey to speak, nothing stops Louisville from adding "political beliefs" as a protected class to its law tomorrow and then forcing speakers to convey political messages they disagree with, such as forcing a Democratic speechwriter to write speeches supporting Republican politicians. Public accommodation laws in Michigan and elsewhere already do exactly this.[4] *See also TMG*, 936 F.3d at 756 (making this point).

As these examples show, compelled speech protections transcend this particular case and this particular debate. These freedoms should apply to all. Otherwise, these freedoms turn on the views favored by those who happen to hold office, whether in Louisville, Frankfort, or Washington, D.C. In our pluralistic society, giving speakers that freedom is the better course—for everyone.

## II.   The Accommodations Provision violates the First Amendment because it compels Chelsey to speak based on content and viewpoint.

Chelsey satisfies the three-part test for compelled speech, but the Accommodations Provision goes even further and compels her speech based on content and viewpoint. This too triggers strict scrutiny. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) (en banc) (applying strict scrutiny to content and viewpoint-based regulations).

The Accommodations Provision's application is content and viewpoint based in three ways. First, by compelling Chelsey to communicate a message she disagrees with—celebrating same-sex marriage—the Accommodations Provision "necessarily alters the content" of Chelsey's desired speech and constitutes "a content-based regulation of speech." *Riley*, 487 U.S. at 795; *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (same); *Brush &*

---

[4] *See, e.g.*, Ann Arbor, Mich. Code of Ordinances § 9:151; Lansing, Mich. Code of Ordinances §§ 297.02, .04. *See also* Madison, Wisc. Code of Ordinances §§ 39.03(2), (5); Seattle, Wash. Mun. Code §§ 14.06.020(L), .030(B).

*Nib*, 448 P.3d at 912-14 (forcing art studio to create invitations celebrating same-sex weddings was content-based compulsion).

Second, the Accommodations Provision only compels Chelsey to speak because she creates particular content. If Chelsey created stories favoring Louisville basketball, the law would not compel her to tell stories favoring same-sex marriage. Chelsey must create the latter only because she creates speech celebrating opposite-sex marriage. In this way, the law's application is triggered by the content of Chelsey's prior speech. *See PG&E*, 475 U.S. at 13-14 (law regulates content if "it [is] triggered by a particular category of ... speech" or "condition[s] [access] on any particular expression" conveyed by speaker earlier); *TMG*, 936 F.3d at 753 (forcing filmmakers to create same-sex wedding films was content-based application because it treated films on opposite-sex marriage "as a trigger for compelling them to talk about a topic they would rather avoid—same-sex marriages…").

Third, the Accommodations Provision awards access to Chelsey's expression only to particular views. If Chelsey creates stories promoting opposite-sex marriage, the law does not require her to tell *every* story requested of her. It only requires her to create photographs and blogs promoting same-sex marriage and to fulfill requests from those wanting to convey that view she opposes. *See PG&E*, 475 U.S. at 13 (law regulates content if it awards access "only to those who disagreed with the [speaker's] views"); *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 654 (1994) (law in *PG&E* content based because it "conferred benefits to speakers based on viewpoint, giving access only to a consumer group opposing the utility's practices."). Such a viewpoint-based application triggers strict scrutiny.

## III.   The Publication Provision violates the First Amendment because it restricts Chelsey's speech based on content and viewpoint.

Besides compelling speech, Louisville's law also restricts speech: the law's Publication Provision bans Chelsey from posting her desired statements on her

17

website or social media sites based on their content and viewpoint, thereby triggering strict scrutiny. *Bible Believers*, 805 F.3d at 248.

A law restricts speech based on content if it facially draws distinctions based on a speaker's message, if it cannot be justified without reference to speech's content, or if its application requires officials to evaluate a message's content to determine if a violation occurred. *Thomas v. Bright*, 937 F.3d 721, 729 & n.2 (6th Cir. 2019) (identifying tests for content-based restriction).

The two clauses in the Publication Provision fail each of these requirements. The Denial Clause facially prohibits "communication[s]" that "indicate[ ]" goods or services will be "denied an individual on account of" sexual orientation. Metro Ordinance § 92.05(B). And the Unwelcome Clause facially prohibits "communication[s]" that "indicate[ ]" someone's patronage or presence at a public accommodation "is objectionable, unwelcome, unacceptable, or undesirable" because of sexual orientation. *Id.* Both clauses ban speech based on what that speech says. Statements saying "no photographs of animals" are allowed; statements saying "no photographs of same-sex weddings" are forbidden. *See Campbell v. Robb*, 162 F. App'x 460, 468 (6th Cir. 2006) (publication ban in Fair Housing Act "is clearly a content-based speech regulation…"). *Cf. TMG*, 936 F.3d at 757 n.5 (state could not stop film studio from posting statement declining same-sex wedding films); *Brush & Nib*, 448 P.3d at 926 (same as to statement by art studio).

The Provision's application turns on content too. Chelsey wants to post statements on her studio's website explaining her religious beliefs in marriage between a man and woman and her inability photograph or edit photographs for same-sex weddings. VC Exs. 1-2. But these statements violate the Denial Clause because they decline particular services (those celebrating same-sex weddings). And they violate the Unwelcome Clause because someone could take the studio's website statement in favor of opposite-sex marriage as indicating their "patronage" is

18

"objectionable, unwelcome, unacceptable, or undesirable." Metro Ordinance
§ 92.05(B). Once again, everything turns on the content of Chelsey's statements.
And officials must consider that content to apply the law.

In fact, the Publication Provision goes beyond content to regulate speech
based on viewpoint. Viewpoint discrimination occurs "[w]hen the government
targets not subject matter, but particular views taken by speakers on a subject."
*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Here, the Publication Provision allows Chelsey to post a statement on her
studio's site supporting marriage generally, supporting same-sex *and* opposite-sex
marriage, or indicating a willingness to create speech celebrating same-sex *and*
opposite-sex marriages. But she cannot express views supporting *only* opposite-sex
marriage. These restrictions favor particular views over others. That is viewpoint
discrimination. *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017) (registration ban on
just disparaging trademarks was viewpoint-based); *McGlone v. Metro. Gov't of
Nashville*, 749 F. App'x 402, 405 & n.1 (6th Cir. 2018) (restriction on speech against
just homosexuality was content and "likely" viewpoint based).

## IV.   The Accommodations Provision violates the First Amendment because it compels Chelsey to participate in and celebrate religious ceremonies she disagrees with.

Besides violating Chelsey's right to speak, Louisville's Accommodations
Provision also violates her right to religious exercise by compelling her to
participate in and attend religious ceremonies she objects to.

The First Amendment "guarantees at a minimum that a government may not
coerce anyone to support or participate in religion or its exercise…" *Lee v. Weisman*,
505 U.S. 577, 577 (1992). This principle comes from both the Establishment and
Free Exercise Clauses. *Id.* (grounding principle in former); *Masterpiece Cakeshop,*

*Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1727 (2018) (requiring clergy to perform same-sex wedding ceremonies violates latter).

Just as officials may not compel someone to attend or participate in chapel services (*Anderson v. Laird*, 466 F.2d 283, 284 (D.C. Cir. 1972) (per curiam)) or in other "group exercise [that] signifie[s]" participation in prayer (*Lee*, 505 U.S. at 593-94), they may not compel someone to attend or participate in wedding ceremonies. Like many, Chelsey considers all weddings to be religious ceremonies, events celebrating an institution created by God. VC ¶ 193; App. at 301, 386-400. Courts have recognized this unique quality of marriage and weddings. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2594 (2015) (noting "the transcendent importance of marriage" that is "sacred" to many); *Turner v. Safley*, 482 U.S. 78, 96 (1987) (admitting that "many religions recognize marriage as having spiritual significance…"); *Kaahumanu v. Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012) (couples "express their religious commitments and values in their wedding ceremony" and "include religious symbols and rituals in their wedding ceremonies").

But here, the Accommodations Provision requires Chelsey to treat same-sex weddings the same as opposite-sex wedding ceremonies when providing services. *See supra,* § I(C) (explaining "full and equal enjoyment" requirement). This in turn requires Chelsey to attend same-sex wedding ceremonies since she necessarily does that when photographing opposite-sex weddings. VC ¶¶ 121-29. It even requires Chelsey to actively participate in same-sex wedding ceremonies by serving as a witness, greeting guests, congratulating and directing the couple for photographs, and standing in recognition of the marriage—things she always does for opposite-sex weddings too. *Id.* at ¶¶ 114-29.

In fact, Louisville's Accommodations Provision even requires Chelsey to participate in religious activities at same-sex wedding ceremonies—staying silent at such ceremonies when officiants ask if anyone objects to the marriage or bowing her

head during communion, prayers, and scriptural readings. *Id.* at ¶¶ 198, 223. Because Chelsey will do all that at opposite-sex weddings, the Accommodations Provision requires the same at same-sex weddings. *See supra,* § I(C). But Chelsey cannot possibly do these things at same-sex wedding ceremonies—events devoted to celebrating same-sex marriage—without compromising her belief in celebrating marriage only between a man and woman. *See Lee*, 505 U.S. at 593 ("[T]he act of standing or remaining silent was an expression of participation in the rabbi's prayer. That was the very point of the religious exercise."); *Kaahumanu*, 682 F.3d at 799 ("The core of the message in a wedding is a celebration of marriage and the uniting of two people in a committed long-term relationship.").

Louisville's law also triggers strict scrutiny under the hybrid-rights doctrine. *Emp't Div., Dep't of Human Resources of Or. v. Smith*, 494 U.S. 872, 881-82 (1990) (applying strict scrutiny to "hybrid situation[s]" where free-exercise claim is linked with "other constitutional protections, such as freedom of speech."). Although the Sixth Circuit does not recognize this doctrine, *Prater v. City of Burnside,* 289 F.3d 417, 430 (6th Cir. 2002), other circuits do. *See TMG*, 936 F.3d at 759-60; *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004). Chelsey wishes to preserve this issue for appeal.

## V.   The Accommodation and Publication Provisions fail strict scrutiny.

Because Louisville's law violates Chelsey's constitutional rights, the law must pass strict scrutiny—"the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 509 (1997). To do so, Louisville must prove that applying its law to Chelsey is narrowly tailored to serve a compelling interest. *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Louisville can do neither.

As for a compelling interest, Louisville may assert a need to stop discrimination. But strict scrutiny "look[s] beyond broadly formulated interests" to

21

consider "the asserted harm of granting specific exemptions to particular ... claimants." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). In other words, Louisville must identify an "'actual problem' in need of solving" and then limit its restriction only as "necessary to the solution." *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 799 (2011).

Any interest in stopping discrimination dissolves when applied to Chelsey because she does not discriminate against anyone. She merely declines to convey messages she disagrees with. *See, e.g.*, VC ¶ 208. So Louisville can curb discriminatory conduct without compelling Chelsey to convey objectionable messages. Court after court agrees. Anti-discrimination laws do not serve even legitimate interests when they compel speech. *See Hurley*, 515 U.S. at 578 (public accommodation law had no "legitimate end" when applied "to require speakers to modify the content of their expression"); *TMG*, 936 F.3d at 755 ("regulating speech because it is discriminatory or offensive is not a compelling state interest"); *Brush & Nib*, 448 P.3d at 914-15 (same). *Cf. Boy Scouts of Am.*, 530 U.S. at 659 (public accommodation law's interests did "not justify" limiting "rights to freedom of expressive association). The same conclusion holds here.

Louisville's interest also fails because other photographers are willing to photograph and participate in same-sex weddings. One online directory lists almost one hundred photographers in Louisville and over three hundred in Kentucky. VC ¶ 312-13. Many of these photographers openly celebrate same-sex marriage. *See id.* at ¶ 314; Decl. ¶¶ 256-310. With so many other photographers willing to celebrate same-sex weddings, forcing Chelsey to do so makes little sense.

To make matters worse for Louisville, compelling Chelsey lacks narrow tailoring: it is not "the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). For one thing, Louisville could interpret its law not to cover message-based objections. Courts around the

22

country already do this without problem. *See supra*, § I(B)-(C) (citing cases in Arizona, Utah, Eighth Circuit, and elsewhere). The federal government adopts this logic for its laws as well. *See, e.g.*, 29 C.F.R. § 1604.2 (interpreting Title VII to allow production studios to make classifications when "necessary for the purpose of authenticity or genuineness…e.g., [selecting] an actor or actress").

Next, Louisville could include a specific exemption for artists who speak about or participate in weddings. Mississippi already does that. Miss. Code Ann. § 11-62-5(5)(a). Or Louisville could track the federal public accommodations law and narrow its law to exclude expressive businesses. *See* 42 U.S.C. § 2000a(b) (defining public accommodations narrowly to apply to hotels, restaurants, theaters, and gas stations); Br. for the United States as Amicus Curiae Supporting Pet'rs at 22, *Masterpiece Cakeshop, Ltd.*, 138 S. Ct. 1719 (2018) (No. 16-111) (not every public accommodations law covers "artistic or commissioned-product businesses"). Many states already do this. *See, e.g.*, Fla. Stat. § 760.02(11); S.C. Code Ann. § 45-9-10(B).

In fact, Louisville *already* does this for sex-based classifications. *See* Metro Ordinance §§ 92.05(A), (C) (limiting sex-discrimination prohibition to restaurants, hotels, motels, and government-funded facilities). Louisville cannot explain why it allows other photographers to commit rank sex discrimination, but it must force Chelsey—who serves everyone regardless of status—to speak in favor of same-sex marriage. The under-inclusive scope of Louisville's law undermines any basis for compelling Chelsey. *See Reed*, 135 S. Ct. at 2232 (law "cannot be regarded as protecting an interest of the highest order … when it leaves appreciable damage to that supposedly vital interest unprohibited.") (cleaned-up).

## VI.  The Unwelcome Clause facially violates the First and Fourteenth Amendments because it is overbroad, vague, and allows unbridled discretion.

The Publication Provision's Unwelcome Clause prohibits speech that indicates someone's "patronage of" or "presence at" a public accommodation "is objectionable, unwelcome, unacceptable, or undesirable." Metro Ordinance § 92.05(B). This language is vague, overbroad, and grants unbridled discretion.

*Vagueness:* The Due Process Clause requires laws to give persons of ordinary intelligence an understanding of what the law allows and prohibits. *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). It also requires laws to provide "minimal guidelines to govern law enforcement." *Id.* at 358 (cleaned-up). A "more stringent vagueness" test applies to laws that regulate speech. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982).

The Unwelcome Clause fails this standard. The law does not define "objectionable, unwelcome, unacceptable, or undesirable." Nor is it obvious what these terms ban. A person could take any critical statement related to a protected class on a business's website as indicating they are unwelcome. For example, what if a business website said "Israel commits murder" or "Catholicism is wrong"? Does that indicate Jews or Catholics are unwelcome? What about Louisville Ballet's statement about a performance promoting pro-LGBTQ stories saying it "cannot and will not be bystanders to hatred and prejudice?" Decl. ¶¶ 316-318; App. at 489. Does this indicate religious persons who oppose same-sex marriage are "unwelcome"? The Unwelcome Clause gives no answers.

*Overbreadth:* For much the same reasons, the Unwelcome Clause is overbroad. A law is overbroad when a "substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010). Other courts have invalidated the Unwelcome Clause's problematic language as overbroad. *See Brush & Nib*

24

*Studio, LC v. City of Phoenix*, 418 P.3d 426, 442-43 (Ariz. Ct. App. 2018) (striking "unwelcome," "objectionable," "unacceptable," and "undesirable" language as overbroad); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 215 (3d Cir. 2001) (Alito, J.) (invalidating harassment policy on "any unwelcome verbal" conduct as overbroad). *Cf. Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.,* 725 F.3d 571, 577-78 (6th Cir. 2013) (ban on advertisements that "discourage" certain protected classes would be overbroad). This court should as well.

*Unbridled Discretion:* A law allows unbridled discretion if it (1) "delegate[s] overly broad … discretion to a government official" or (2) "allows arbitrary application," because "such discretion has the potential for becoming a means of suppressing a particular point of view." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). The Unwelcome Clause does both. Its broad and undefined terms allow officials to punish speech on business websites they dislike while allowing speech they support. This type of arbitrary power is unconstitutional.

## Conclusion

Louisville undermines everyone's freedom when it forces Chelsey to declare a view she opposes or to disobey a faith she holds dear. Because Louisville's public accommodation law compels Chelsey to speak, to participate in religious ceremonies, and to censor her own speech, Chelsey asks this Court to stop this irreparable harm and grant her preliminary injunction motion.

Respectfully submitted this 19th day of November, 2019.

By: _s/ Joshua D. Hershberger_

Jonathan A. Scruggs
AZ Bar No. 030505*
Katherine L. Anderson
AZ Bar No. 033104*
Bryan Neihart
CO Bar No. 47800*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
jscruggs@adflegal.org
kanderson@adflegal.org
bneihart@adflegal.org

David A. Cortman
GA Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Rd. NE
Ste. D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@ADFlegal.org

Joshua D. Hershberger
KY Bar No. 94421
**Hershberger Law Office**
P.O. Box 233
Hanover, IN 47243
Telephone: (812) 274-0441
josh@hlo.legal

ATTORNEYS FOR PLAINTIFFS

*Motions for *Pro Hac Vice* admission filed concurrently

26

## <u>Certificate of Service</u>

I hereby certify that on November 19, 2019, I electronically filed the foregoing document with the Clerk of Court via the CM/ECF system. The foregoing document will be served via private process server with the Summons and Complaint to all defendants.


By: <u> s/ Joshua D. Hershberger              </u>

     Joshua D. Hershberger
     KY Bar No. 94421
     **Hershberger Law Office**
     P.O. Box 233
     Hanover, IN 47243
     Telephone: (812) 274-0441
     josh@hlo.legal

     ATTORNEY FOR PLAINTIFFS