# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| Chelsey Nelson Photography LLC, and Chelsey Nelson, | |
| Plaintiffs, | |
| v. | Case No. 3:19-CV-851-JRW |
| Louisville/Jefferson County Metro Government, et al., | |
| Defendants. | |

---

## BRIEF OF FAITH LEADERS AND RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS AS *AMICI CURIAE* SUPPORTING DEFENDANTS' MOTION TO DISMISS

---

RICHARD B. KATSKEE*
KENNETH D. UPTON, JR.*
CARMEN N. GREEN*
PATRICK GRUBEL*
  Americans United for Separation
    of Church and State
  1310 L Street NW, Suite 200
  Washington, DC 20005
  (202) 466-3234
  *katskee@au.org*
  *upton@au.org*
  *longoriagreen@au.org*
  *grubel@au.org*

DAVID TACHAU
KATHERINE LACY CROSBY
  Tachau Meek PLC
  101 S. Fifth Street, Suite 3600
  PNC Tower
  Louisville, KY 40202-3120
  (502) 238-9900
  *dtachau@tachaulaw.com*
  *kcrosby@tachaulaw.com*

*Pro hac vice* motions forthcoming.

*Counsel for* Amici Curiae

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. ii

Identity and Interests of *Amici Curiae* ................................... 1

Introduction and Summary of Argument ................................. 1

Argument ................................................................................... 2

I.   The Religion Clauses Neither Authorize Nor Allow The
     Exemption That Plaintiffs Seek. ...................................... 2

     A.   The Free Exercise Clause does not authorize the requested
          exemption. ............................................................... 2

     B.   The Establishment Clause forbids the requested exemption. ........... 6

          1.   Nelson LLC has not alleged an Establishment Clause
               violation. ......................................................... 7

          2.   Religious exemptions that materially harm
               nonbeneficiaries violate the Establishment Clause. ............. 10

II.  Antidiscrimination Laws Protect Religious Freedom. ........... 12

Conclusion .............................................................................. 14

Appendix of *Amici Curiae* ..................................................... 1a

**TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ...................................................................11

*Braunfeld v. Brown,*
    366 U.S. 599 (1961) ...................................................................11

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
    508 U.S. 520 (1993) ...............................................................*passim*

*County of Allegheny v. ACLU Greater Pittsburgh Chapter,*
    492 U.S. 573 (1989) .....................................................................7

*Cutter v. Wilkinson,*
    544 U.S. 709 (2005) ...................................................................11

*Emp't Div. v. Smith,*
    494 U.S. 872 (1990) ...............................................................*passim*

*Epperson v. Arkansas,*
    393 U.S. 97 (1968) .......................................................................6

*Estate of Thornton v. Caldor, Inc.,*
    472 U.S. 703 (1985) ...........................................................1, 7, 10

*Fields v. City of Tulsa,*
    753 F.3d 1000 (10th Cir. 2014) ..................................................8

*Hernandez v. C.I.R.,*
    490 U.S. 680 (1989) .....................................................................9

*Khedr v. IHOP Restaurants, LLC,*
    197 F. Supp. 3d 384 (D. Conn. 2016) .......................................12

*Kissinger v. Bd. of Trs. of Ohio State Univ.,*
    5 F.3d 177 (6th Cir. 1993) ..........................................................6

*Larson v. Valente,*
    456 U.S. 228 (1982) .....................................................................9

*Lee v. Weisman,*
    505 U.S. 577 (1992) ..................................................................6, 7

## TABLE OF AUTHORITIES—continued

**Page(s)**

*McCreary County v. ACLU of Ky.*,
    545 U.S. 844 (2005) .................................................................. 6

*McGowan v. Maryland*,
    366 U.S. 420 (2005) .................................................................. 9

*New Doe Child #1 v. Congress of the U.S.*,
    891 F.3d 578 (6th Cir. 2018) ..................................................... 4

*Paletz v. Adaya*,
    No. B247184, 2014 WL 7402324
    (Cal. Ct. App. Dec. 29, 2014) .................................................. 12

*Reynolds v. United States*,
    98 U.S. 145 (1878) .................................................................... 2

*Sabri v. United States*,
    541 U.S. 600 (2004) ................................................................ 11

*Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*,
    788 F.3d 580 (6th Cir. 2015) ................................................. 7, 8

*Stormans, Inc. v. Selecky*,
    586 F.3d 1109 (9th Cir. 2009) .................................................. 4

*Texas Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) ............................................................... 10, 11

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) .................................................................. 7

*United States v. Lee*,
    455 U.S. 252 (1982) ............................................................. 5, 11

*Ward v. Polite*,
    667 F.3d 727 (6th Cir. 2012) ..................................................... 4

## Statutes, Rules, and Regulations

LOUISVILLE/JEFFERSON COUNTY METRO, KY.,
    ORDINANCES ch. 92 (2019) .................................................. 5, 6

**TABLE OF AUTHORITIES—continued**

**Page(s)**

**Other Authorities**

Complaint, *Fatihah v. Neal*,
   No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016)................................12

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

*Amici* are 55 faith leaders from Kentucky and 13 religious and civil-rights organizations united in the belief that our Nation's fundamental promises of equal treatment and respect should never be eroded through the cooption of the language of religious liberty. A full list of *amici* is in the Appendix.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The challenged Metro ordinance ensures that LGBTQ people do not suffer the degradation of public discrimination when they seek to buy goods and services that are available to everyone else. While such governmental efforts to prevent discrimination may sometimes offend others' religious beliefs, in a diverse nation where all manner of beliefs are represented, disagreement between religion and law is inevitable. Hence, the Supreme Court has delineated how courts should resolve these conflicts. *See Emp't Div. v. Smith*, 494 U.S. 872 (1990); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993).

Metro's ordinance fully meets those settled constitutional requirements: It is neutral and generally applicable, reflecting no discriminatory intent toward religion. And it easily satisfies rational-basis review—the appropriate test under Supreme Court precedent—by protecting marginalized people. Indeed, far from forbidding the ordinance, the Establishment Clause bars the religious exemption demanded by Plaintiffs (collectively, "Nelson LLC") because it would result in unconstitutional harm to others. *See, e.g.*, *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709–10 (1985).

1

Finally, antidiscrimination laws extend essential protections to religious persons. An exemption from Metro's equal-treatment requirements would undermine the protections from discrimination on the basis of religion embodied in the law, ultimately doing great harm to religious liberty itself.

## ARGUMENT

### I. THE RELIGION CLAUSES NEITHER AUTHORIZE NOR ALLOW THE EXEMPTION THAT PLAINTIFFS SEEK.

Religious freedom is a constitutionally protected value of the highest order. The Free Exercise and Establishment Clauses work in tandem to secure the rights to believe, or not, and to worship, or not, according to the dictates of individual conscience. But the guarantee of religious freedom is not, and never has been, a license to discriminate against others.

Yet Nelson LLC asserts that the First Amendment entitles it to an exemption from a neutral, generally applicable ordinance so that it may discriminate against customers who do not conform to certain religious views. Neither Religion Clause requires such an exemption; and the Establishment Clause outright forbids it.

### A. The Free Exercise Clause does not authorize the requested exemption.

Though government cannot forbid a religious practice *because* it is religious (*Lukumi*, 508 U.S. at 532–33), religiously based disagreement with the law does not excuse noncompliance. "To permit this would be to make the professed doctrines of religious belief superior to the law of the land, . . . permit[ting] every citizen to become a law unto himself." *Smith*, 494 U.S. at 879 (quoting *Reynolds v. United States*, 98 U.S. 145, 166–67 (1878)).

The Supreme Court has therefore adopted two tiers of review for free-exercise claims: Laws that are neutral and generally applicable need satisfy only rational-basis review, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. In contrast, laws lacking neutrality or general applicability—i.e., ones that intentionally discriminate against religion—receive strict scrutiny. *Id.* at 531–32. As the challenged ordinance easily meets the neutrality and general-applicability requirements, Nelson LLC's religious motivations cannot excuse noncompliance. Any free-exercise claim thus fails as a matter of law.

*a.* The neutrality requirement prohibits laws that "infringe upon or restrict practices *because of* their religious motivation." *Lukumi*, 508 U.S. at 533 (emphasis added). Discriminatory intent may be apparent on the face of the law, or it may be revealed through the law's practical effects. *See id.* at 533–34. But litigants who rely on a law's effects to prove impermissible religious targeting, as Nelson LLC seeks to do here, bear the burden to show that the law, beyond simply affecting them, "disclose[s] animosity to" them or was "gerrymandered with care to proscribe" their religious conduct *qua* religious conduct. *See id.* at 542.

Nelson LLC alleges no facts that make that showing. Its allegations instead boil down to a single contention—that it is unconstitutionally targeted by the antidiscrimination rule because the law's requirements happen to be counter to certain of Nelson LLC's religious beliefs. Compl. ¶¶ 347–50, 352. But as a matter of law, the mere conflict between a religious belief and a legal requirement does not amount to impermissible religious targeting. *See Smith*, 494 U.S. at 879. Rather, such

3

incidental conflict is an unavoidable result of how law operates. *Cf. id.* at 888–89. Thus, a free-exercise claim based on that allegation alone cannot survive.

Hence, the fundamental premise of free-exercise doctrine is that, to obtain heightened review, it is not enough for claimants simply to show a burden on their religious exercise. "[P]ublic authorities may enforce neutral and generally applicable rules . . . even if they burden faith-based conduct in the process." *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012). And "the incidental effect of [religious] suppression is permissible under the Free Exercise Clause absent restrictive intent." *New Doe Child #1 v. Congress of the U.S.*, 891 F.3d 578, 592 (6th Cir. 2018).

Accordingly, Metro may regulate religiously motivated conduct if it is "a legitimate concern of government for reasons quite apart from [religious] discrimination." *Lukumi*, 508 U.S. at 535. That is true even if one religion is disproportionately affected. *See, e.g.*, *id.* at 531 ("[A] law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a *particular religious practice*." (emphasis added)); *Smith*, 494 U.S. at 879–80; *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1131 (9th Cir. 2009) ("The Free Exercise Clause is not violated even though a group motivated by religious reasons may be more likely to engage in the proscribed conduct.").

If Nelson LLC were correct that a religion is impermissibly targeted whenever it is affected (or affected more than others) by an otherwise neutral and generally applicable law, then *Smith* would have come out the opposite way. And *Lukumi* would be superfluous, because any person whose religion promoted an activity that the

4

government regulated would be entitled to strict judicial scrutiny regardless of whether there was religious targeting. *Cf. Lukumi*, 508 U.S. at 531–32. Moreover, Nelson LLC's proffered approach, if accepted, would "open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind"—from drug laws to traffic laws. *See Smith*, 494 U.S. at 888–89. But the Supreme Court has flatly rejected that approach: "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)).

*b.* The challenged ordinance likewise satisfies the closely related requirement of general applicability: Government, "in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief." *Lukumi*, 508 U.S. at 543. Thus, a law may not regulate religious conduct while failing to regulate "nonreligious conduct that endangers [governmental] interests in a similar or greater degree." *See id.* at 543–44.

The challenged ordinance's purpose is to eliminate discrimination in public accommodations based on certain protected characteristics, including sexual orientation. It achieves that end by prohibiting all public accommodations from discriminating against customers on those grounds. The ordinance is thus generally applicable because it applies uniformly, regardless of any business-owner's beliefs, motivations, or religious (or nonreligious) affiliations.

5

Nelson LLC erroneously asserts that categorical carve-outs in *other* antidiscrimination provisions in Metro's Ordinances renders *this* provision not generally applicable. *See* Compl. ¶¶ 261–68. Section 92.05(A) bars discrimination by all public accommodations "on the ground of . . . sexual orientation" (among others). It lists no exceptions; and Nelson has not identified a single example of a public accommodation covered by § 92.05(A) that is allowed, by law, to discriminate on the grounds listed. *See Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 179 (6th Cir. 1993) (curriculum requirement was generally applicable because it applied to all students). Whether entirely different provisions dealing with housing discrimination (§§ 92.03, 92.04), employment discrimination (§§ 92.06, 92.07), or sex discrimination in restrooms and dormitory-style housing (§ 92.05(C)) contemplate exceptions is of no moment.

The pertinent legal question here is whether Metro has decided "that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542–43. Yet there is no allegation that Metro has singled out for regulation only those public accommodations that discriminate for religious reasons while ignoring those that discriminate for secular ones, or that Metro has otherwise treated Nelson LLC differently from other covered entities. Thus, the plaintiffs' free-exercise claim cannot survive.

### B.   The Establishment Clause forbids the requested exemption.

The Religion Clauses "mandate[] governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). That neutrality requirement forbids the government both to "coerce anyone to

support or participate in religion or its exercise" (*Lee v. Weisman*, 505 U.S. 577, 587 (1992)), and to impose the costs or burdens of one person's religious exercise on others (*see Estate of Thornton*, 472 U.S. at 709–10).

In keeping with constitutional requirements, the challenged ordinance neither requires participation in religious exercise nor favors some religions over others. But granting Nelson LLC's requested exemption—when doing so would harm nonbeneficiaries—*would* violate the Establishment Clause.

### 1.     *Nelson LLC has not alleged an Establishment Clause violation.*

Nelson LLC argues that § 92.05(A) violates the Establishment Clause in two ways: 1) it coerces Nelson LLC to participate in religious activity at weddings of same-sex couples, and 2) it impermissibly favors religious denominations that do not discriminate against customers on the basis of sexual orientation. Compl. ¶¶ 361–63. Both assertions are wrong.

*a.* "It is an elemental First Amendment principle that government may not coerce its citizens 'to support or participate in any religion or its exercise.'" *Town of Greece v. Galloway*, 572 U.S. 565, 586 (2014) (plurality opinion) (quoting *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 659 (1989) (Kennedy, J., concurring)). Whether a law coerces religious exercise, however, is an objective question for the courts. *See, e.g.*, *Weisman*, 505 U.S. at 592–94 (making fact-specific determination that prayer at public-elementary-school event was coercive); *Town of Greece*, 572 U.S. at 588–89 (plurality) (rejecting plaintiffs' argument that official prayers were coercive based on Court's interpretation of factual record); *Smith v.*

7

*Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 589 (6th Cir. 2015). A plaintiff's subjective feelings, standing alone, are legally insufficient.

Nelson LLC contends that Chelsey Nelson "actively participates" in religious ceremonies at the weddings that she photographs by sitting in the audience, singing, standing when the bride enters or when the officiant requests the audience to stand, bowing her head during prayers, and saying "Amen" after prayers. *See* Compl. ¶¶ 124–28, 193–94. But the challenged ordinance requires none of this—it requires only that she photograph the wedding, the service that she offers to the public. Merely being present while others engage in religious activity does not, standing alone, constitute legal coercion to join the religious practice. *See Fields v. City of Tulsa*, 753 F.3d 1000, 1010–12 (10th Cir. 2014) (no Establishment Clause violation where police officer was ordered to attend an event hosted by an Islamic community center when attending such events, hosted by both secular and religious organizations, was a regular aspect of his duties). It would take voluntary additional acts not required by the ordinance to create even the barest appearance of participation in any religious exercise by Nelson LLC. Indeed, Nelson LLC can and presumably already does make clear that its photographer is not a participant in religious activity by having her continue to take photographs—as she is being paid to do—while those activities take place.

That Nelson LLC subjectively believes that the ordinance coerces religious activity because all weddings "are innately religious events where all those who willingly attend necessarily participate" (Compl. ¶ 193), does not make it so. Rather, the Court itself must decide, from an objective viewpoint, whether the legal

requirement to provide wedding-related services on an equal basis coerces individuals to engage in religious exercise at each and every client's wedding. From an objective viewpoint, Nelson LLC is no more being hired to participate in prayers or religious activity with which it disagrees when it is hired for a same-sex wedding than when it is hired for a Hindu, Jewish, or Sikh wedding. To state the obvious: a photographer is being hired to take pictures—not to join in the couple's faith practice.

*b.* Nor does the ordinance create an unconstitutional preference for certain religious denominations.

When a law discriminates between denominations, it "must be invalidated unless it is justified by a compelling governmental interest." *Larson v. Valente*, 456 U.S. 228, 247 (1982); *Lukumi*, 508 U.S. at 533. Nelson LLC has not plausibly alleged or argued that the challenged ordinance suffers from that constitutional defect. Facially, the ordinance makes no explicit distinctions among religious beliefs. And as for Nelson LLC's argument that the ordinance creates a de facto preference for business-owners whose religious beliefs do not call for discrimination against LGBTQ people (Compl. ¶ 363), an incidental agreement between the government's secular aims and others' religious beliefs does not give rise to an Establishment Clause claim any more than an incidental disagreement gives rise to a free-exercise claim: "[A] statute primarily having a secular effect does not violate the Establishment Clause merely because it 'happens to coincide or harmonize with the tenets of some or all religions.'" *Hernandez v. C.I.R.*, 490 U.S. 680, 696 (1989) (quoting *McGowan v. Maryland*, 366 U.S. 420, 442 (1961)).

Were the Court to adopt Nelson LLC's reasoning, any law would be subject to strict scrutiny if a plaintiff could identify a religious sect whose beliefs overlapped with the law's otherwise permissible secular aims. Government could not function under that standard; it is the converse of the same untenable position forcefully rejected by the Supreme Court in *Smith* and *Lukumi. See supra* Part I.A. (a law with a permissible secular purpose that disproportionately burdens some religions does not violate First Amendment). Nelson LLC cannot launder a failed free-exercise claim through the Establishment Clause and obtain a different result. The complaint fails to allege a violation of either Religion Clause.

### 2. *Religious exemptions that materially harm nonbeneficiaries violate the Establishment Clause.*

*a.* While the rights to believe, or not, and to practice one's faith, or not, are sacrosanct, they do not extend to imposing the costs and burdens of one's beliefs on others. Under the Establishment Clause, the government cannot favor the religious beliefs of some at the expense of the rights and well-being of others. If religious exemptions from general laws detrimentally affect nonbeneficiaries, they amount to unconstitutional preferences for the benefited religious beliefs and their adherents.

Thus, in *Estate of Thornton v. Caldor,* the Supreme Court invalidated a law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a Sabbath." 472 U.S. at 709. The "unyielding weighting in favor of Sabbath observers over all other interests" had a "primary effect that impermissibly advance[d] a particular religious practice." *Id.* at 710; *see also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (invalidating sales-tax

exemption for religious periodicals because it "burden[ed] nonbeneficiaries by increasing their tax bills") (plurality opinion).[1] Hence, a religious accommodation "must be measured so that it does not override other significant interests" (*Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)), and must not "impose substantial burdens on nonbeneficiaries" (*Texas Monthly*, 489 U.S. at 18 n.8 (plurality opinion)).

*b.* The religious exemption requested here would allow Nelson LLC—and by extension, all other public accommodations with religious motivations—to discriminatorily refuse service to customers because of their sexual orientation or any other protected characteristics.[2] LGBTQ people and members of other vulnerable groups would then suffer social, psychological, and physical harms. When such harms

---

[1]   Free-exercise jurisprudence reflects this same principle. *See, e.g.*, *Lee*, 455 U.S. at 261 (rejecting an Amish employer's request for an exemption from social-security taxes because it would "operate[ ] to impose the employer's religious faith on the employees"); *Braunfeld v. Brown*, 366 U.S. 599, 608–09 (1961) (rejecting exemption from Sunday-closing laws because it would have provided Jewish businesses with "an economic advantage over their competitors who must remain closed on that day").

[2]   Although purporting to make both facial and as-applied religious freedom challenges, Nelson LLC fails to advance any colorable argument that "no application of the [ordinance] would be constitutional." *Sabri v. United States*, 541 U.S. 600, 609 (2004).

As to Nelson LLC's as-applied challenge, under which Plaintiffs must demonstrate that the ordinance, even though generally constitutional, operates unconstitutionally as to them or because of their particular circumstances, Defendants correctly flag the question of ripeness (Defs.' Mem. Supp. Mot. to Dismiss 9), which requires the Court to evaluate the fitness of these issues for judicial decision—i.e., whether further factual development is required—and the hardship to the parties of withholding judicial consideration. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). Fitness for decision is particularly important here, where the constitutionality of the requested religious exemption depends, in part, on whether nonbeneficiaries will bear the burden of the exemption. Absent an actual complaint before the Louisville Metro Human Relations Commission—and there is none before the Commission now—the Court lacks the factual context in which to conduct this analysis.

would flow from a religious exemption, the exemption itself is constitutionally forbidden.

## II.   ANTIDISCRIMINATION LAWS PROTECT RELIGIOUS FREEDOM.

Far from offending religious freedom, public-accommodations laws like the challenged ordinance advance the strong governmental interests in preventing discrimination of all kinds, including discrimination based on religion. The religious freedom of all is therefore threatened, not served, by efforts to use the First Amendment to license discrimination.

The case law shows—and the experiences of *amici* confirm—that disfavor toward, unequal treatment of, and denials of service to members of minority faiths and nonbelievers are all too common. And religious discrimination, like other forms of discrimination, may be, and often is, premised on the discriminator's religious views or motivations.[3] Thus, if the Religion Clauses were construed to grant businesses a license to violate antidiscrimination laws whenever they cite a religious motivation to discriminate, religiously based biases would receive governmental sanction. And people of minority faiths would be among the principal victims of the ensuing discrimination.

---

[3] *See Paletz v. Adaya*, No. B247184, 2014 WL 7402324 at *1–3 (Cal. Ct. App. Dec. 29, 2014) (hotel owner in California closed a poolside event hosted by Jewish group due to anti-Semitism). *Accord Khedr v. IHOP Restaurants, LLC*, 197 F. Supp. 3d 384, 385–86 (D. Conn. 2016) (restaurant refused service to Muslim family because of their faith); Complaint ¶¶ 24, 32, 34, *Fatihah v. Neal*, No. 6:16-cv-00058-KEW (E.D. Okla. Feb. 17, 2016), https://tinyurl.com/ycgey871 (alleging that gun-range owners posted sign declaring facility a "MUSLIM FREE ESTABLISHMENT," armed themselves with handguns when a Muslim man wanted to use the facility, and accused him of wanting to murder them because "'[his] Sharia law' required" it).

12

Though Nelson LLC limits its objection to photographing weddings that are not between one man and one woman (Compl. ¶ 200), there is no logical limit to the exemption that it seeks. Indeed, it asserts that Chelsey Nelson's "religious beliefs shape every aspect of her life, including her identity, her relationships, . . . her business, her art, and her creativity" (Compl. ¶¶ 24–25). The basic structure of the argument is that, because her religious beliefs are all-encompassing, she and the company she owns have a free-exercise right to opt out of all antidiscrimination laws. *See* Compl. ¶¶ 77–88, 197, 207–08.

That argument is as troubling as it is expansive. If accepted, it would also permit other religiously motivated denials of service. In the wedding context, suppose that an interfaith couple wished to marry, and in keeping with the religion of one partner, the couple planned to serve kosher food. But the only kosher caterer in town refused to prepare food for interfaith weddings based on its religious beliefs. Should the caterer have the right, even in the face of public-accommodations protections against religious discrimination, to force the couple to choose between forgoing a catered wedding reception, on the one hand, and violating the one partner's sincere beliefs through serving non-kosher food, on the other?

And what of the children who are part of a family that, in the opinion of any number of business owners, should not exist because the parents are of different faiths or were married within a faith that the merchants find contrary to their own religious beliefs? Might the children be denied a birthday cake or a party celebrating a bar or bat mitzvah?

13

More broadly, may the local movie theater refuse to sell a ticket to a boy in a yarmulke because his faith is at odds with that of the manager? May a restaurant deny service to a Muslim woman who wears a hijab, a Hindu woman who wears a sari, or a Sikh man who wears a turban? May the only grocer in town refuse to sell fruit to an unmarried pregnant woman? And what about the recently widowed Catholic whose Protestant spouse would have wanted a Protestant funeral? May she be barred from the Protestant funeral home on account of her faith, so that she is unable to say goodbye to her spouse in accordance with her beloved's faith?

If the Religion Clauses license religiously motivated denials of service to same-sex couples, as Nelson LLC contends, then they also sanction and authorize all other religiously motivated denials, including exclusions based on customers' faiths. One could be refused employment, thrown out of a hotel, or barred from purchasing a hamburger just for being the "wrong" religion. And no state or local authority or law could do anything to remedy the situation. Such a system would devastate religious freedom, not protect it.

## CONCLUSION

The Defendants' motion to dismiss should be granted.

14

Respectfully submitted,

/s/ *Katherine Lacy Crosby*

RICHARD B. KATSKEE                    DAVID TACHAU
KENNETH D. UPTON, JR.†                KATHERINE LACY CROSBY
CARMEN N. GREEN                         Tachau Meek PLC
PATRICK GRUBEL                          101 S. Fifth Street, Suite 3600
  Americans United for Separation       PNC TOWER
    of Church and State                 Louisville, KY 40202-3120
  1310 L Street NW, Suite 200           (502) 238-9900
  Washington, D.C. 20005                *dtachau@tachaulaw.com*
  (202) 466-3234                        *kcrosby@tachaulaw.com*
  *katskee@au.org*
  *upton@au.org*
  *longoriagreen@au.org*
  *grubel@au.org*

*Counsel for* Amici Curiae

Date:      January 23, 2020

---

† Admitted to practice in Texas and Oklahoma only. Supervised by Richard B.
Katskee, a member of the D.C. Bar.

## CERTIFICATE OF SERVICE

I certify that on January 23, 2020, the foregoing brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Katherine Lacy Crosby*

# APPENDIX OF *AMICI CURIAE*

## FAITH LEADERS

The individual *amici* are 55 faith leaders from Kentucky who represent a wide array of faiths and denominations. These faith leaders believe in a robust right of free exercise of religion that protects the right to believe and to practice one's faith but does not grant license to violate antidiscrimination laws.

- Rabbi David Ariel-Joel, Louisville, Kentucky.

- Sara Don Bailey, Minister Student Intern, First Christian Church (Disciples of Christ), Louisville, Kentucky.

- The Reverend David Mark Baridon, Central Presbyterian Church, Louisville, Kentucky.

- The Reverend Rebecca Barnes, Presbyterian Hunger Program, Louisville, Kentucky.

- William Biggs, Chaplain Resident, Baptist Health, Louisville, Kentucky.

- The Reverend Maurice Blanchard, Co-chair of the Affirming Network of the Cooperative Baptist Fellowship, Louisville, Kentucky.

- Alec Brock, Candidate for Ordination, Third Lutheran Church, Louisville, Kentucky.

- The Reverend Chris Cash, Senior Minister, First Christian Church (Disciples of Christ), Georgetown, Kentucky.

- Rabbi Beth Jacowitz Chottiner, Temple Shalom, Louisville, Kentucky.

- The Reverend Dr. Douglas H. Brown Clark, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- Dr. Steve Cook, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- The Reverend Dr. Shannon Craigo-Snell, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- The Reverend Jason Crosby, Crescent Hill Baptist Church, Louisville, Kentucky.

- The Reverend Perry Dixon, Associate Pastor, Highland Baptist Church, Louisville, Kentucky.

- The Reverend Sharon Felton, Faith Baptist Church, Georgetown, Kentucky.

- The Reverend Wayne A. Gnatuk, Presbyterian Church (USA), Lexington, Kentucky.

- Guthrie Graves-Fitzsimmons, The Resistance Prays, Louisville, Kentucky.

- The Reverend Nicole Hardin, Douglass Boulevard Christian Church, Louisville, Kentucky.

- The Reverend Dr. Carol Harston, Associate Pastor for Faith Formation and Congregational Engagement, Highland Baptist Church, Louisville, Kentucky.

- The Reverend Dr. Jean Hawxhurst, Fourth Avenue United Methodist Church, Louisville, Kentucky.

- The Reverend Jessa Henry, Jeff Street Baptist Community at Liberty, Louisville, Kentucky.

- The Reverend Dr. Peggy C. Hinds, Louisville, Kentucky.

- Cantor Sharon Hordes, Louisville, Kentucky.

- The Reverend Dr. Clifton Kirkpatrick, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- The Reverend Everdith Landrau, Presbyterian Church (USA), Louisville, Kentucky.

- The Reverend Benjamin Langley, Southern Baptist Convention, Louisville, Kentucky.

- The Reverend Dwain Lee, Presbyterian Church (USA), Louisville, Kentucky.

- Linette R. Lowe, Executive Director, Central Louisville Community Ministries, Louisville, Kentucky.

- The Reverend Michael Mansfield, Retired Elder, Kentucky Conference United Methodist Church, Frankfort, Kentucky.

- The Reverend Lauren Jones Mayfield, United Church of Christ, Louisville, Kentucky.

- The Reverend Megan McCarty, Highland Presbyterian Church, Louisville, Kentucky.

- Rabbi Laura H. Metzger, Louisville, Kentucky.

- Rabbi Stanley Miles, Louisville, Kentucky.

- The Reverend David K. Miller, Union College, Barbourville, Kentucky.

- The Reverend Sandra Moon, Presbyterian Church (USA), Louisville, Kentucky.

- The Reverend Dr. Donna T. Morton, Retired Elder, Kentucky Conference United Methodist Church, Louisville, Kentucky.

- The Reverend Dr. Debra J. Mumford, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- Dr. Amy Plantinga Pauw, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- The Reverend Dr. Derek Penwell, Douglass Boulevard Christian Church, Louisville, Kentucky.

- The Reverend Dr. Alton B. Pollard III, President, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- Rabbi Gaylia R. Rooks, Louisville, Kentucky.

- The Reverend Dr. David R. Sawyer, Presbyterian Church (USA), Louisville, Kentucky.

- The Reverend Tamara Schmidt, Chaplain, Eastern Kentucky Veterans Center, Hazard, Kentucky.

- The Reverend Gilbert L. Schroerlucke, Retired Elder, Fourth Avenue United Methodist Church, Louisville, Kentucky.

- Josh Scott, Lead Pastor, GracePointe Church (located in Nashville, Tennessee), Bowling Green, Kentucky.

- The Reverend David A. Shirey, Senior Minister, Central Christian Church (Disciples of Christ), Lexington, Kentucky.

- Elder Traci Simmons, Grace Community Covenant Church, Louisville, Kentucky.

- The Reverend Caitlin Simpson, Christian Church (Disciples of Christ), Louisville, Kentucky.

- Rabbi Dr. Nadia Siritsky, Louisville, Kentucky.

- Rabbi Robert Slosberg, Louisville, Kentucky.

- The Reverend Beth Seeger Troy, Clinical Director, Louisville Seminary Counseling Center, Louisville, Kentucky.

- Daniel Van Beek, Student Body President, Louisville Presbyterian Theological Seminary, Louisville, Kentucky.

- Rabbi Michael Wolk, Louisville, Kentucky.

- The Reverend Nachia M. Woods, Ralph Avenue AME Church, Louisville, Kentucky.

- The Reverend Greg Wright, Plymouth Congregational United Church of Christ, Louisville, Kentucky.

## RELIGIOUS AND CIVIL-RIGHTS ORGANIZATIONS

## Americans United for Separation of Church and State

Americans United for Separation of Church and State is a national, nonsectarian public-interest organization that is committed to preserving the constitutional principles of religious freedom and the separation of church and state. Americans United represents more than 125,000 members and supporters nationwide. Since its founding in 1947, Americans United has participated as a party, as counsel, or as an *amicus curiae* in the leading church–state cases decided by the U.S. Supreme Court and by the lower federal and state courts throughout the country. Americans United has long fought to uphold the guarantees of the First

Amendment and equal protection that government must not favor, disfavor, or punish based on religion or belief, and therefore that religious accommodations must not license maltreatment of, or otherwise detrimentally affect, innocent third parties.

**Bend the Arc: A Jewish Partnership for Justice**

Bend the Arc: A Jewish Partnership for Justice is the nation's leading progressive Jewish voice empowering Jewish Americans to advocate for the nation's most vulnerable. Bend the Arc mobilizes Jewish Americans beyond religious and institutional boundaries to create justice and opportunity for all through bold leadership development, innovative civic engagement, and robust progressive advocacy.

**Covenant Network of Presbyterians**

The Covenant Network of Presbyterians is a broad-based education and advocacy group of congregations, ministers, and members of the Presbyterian Church (U.S.A.) seeking to build a more just and inclusive church and society for LGBTQIA+ and all people.

**Interfaith Alliance Foundation**

Interfaith Alliance Foundation is a national nonprofit organization committed to promoting true religious freedom and strengthening the separation between religion and government. With members from over 75 faith traditions and of no faith, Interfaith Alliance promotes policies that protect personal belief, combat extremism, and ensure that all Americans are treated equally under law.

**Global Justice Institute, Metropolitan Community Churches**

The Global Justice Institute was founded to serve as the social-justice arm of Metropolitan Community Churches and was separately incorporated in 2011. GJI partners with people of faith and allies around the globe on projects and proposals that further social change and human rights.

**National Council of Jewish Women, Louisville Section**

The National Council of Jewish Women is a grassroots organization of volunteers and advocates who, inspired by Jewish values, strive for social justice by improving the quality of life for women, children, and families and by safeguarding individual rights and freedoms. NCJW believes that religious freedom is one of our nation's foundational tenets, enshrined in the First Amendment. The right to religious belief and expression and the guarantee that the government neither prefers religion over nonreligion nor favors particular faiths over others has allowed religion to thrive. Yet we do not think that an individual should be able to use religion as an excuse to justify discrimination against LGBTQ individuals. Specifically, we believe that refusing to take photographs of a same-sex couple misapplies the right to religious freedom. As a faith-based organization, our Jewish tradition calls on us to celebrate and to depend upon religious liberty as a protective shield, not as a weapon to be used to harm and denigrate others.

**Reconstructing Judaism**

Reconstructing Judaism is the central organization of the Reconstructionist movement. We train the next generation of rabbis, support and uplift congregations and *havurot*, and foster emerging expressions of Jewish life—helping to shape what

it means to be Jewish today and to imagine the Jewish future. There are over 100 Reconstructionist communities in the United States committed to Jewish learning, ethics, and social justice. Reconstructing Judaism believes both in the importance of the separation of church and state and that the equal rights of LGBTQ people must be preserved and protected.

**Reconstructionist Rabbinical Association**

The Reconstructionist Rabbinical Association is a 501(c)(3) organization that serves as the professional association of 340 Reconstructionist rabbis, the rabbinic voice of the Reconstructionist movement, and a Reconstructionist Jewish voice in the public sphere. Based on our understanding of Jewish teachings that every human being is created in the divine image, we have long advocated for public policies of inclusion, antidiscrimination, and equality.

**T'ruah**

T'ruah: The Rabbinic Call for Human Rights brings together rabbis and cantors from all streams of Judaism with all members of the Jewish community to act on the Jewish imperative to respect and advance the human rights of all people. T'ruah trains and mobilizes a network of 2,000 rabbis and cantors and their communities to bring Jewish values to life through strategic and meaningful action.

**Union for Reform Judaism, Central Conference of American Rabbis, Women of Reform Judaism, and Men of Reform Judaism**

The Union for Reform Judaism, whose nearly 850 congregations across North America include 1.5 million Reform Jews; the Central Conference of American Rabbis, whose membership includes more than 2,000 Reform rabbis; Women of Reform Judaism, which represents more than 65,000 women in nearly 500 women's

7a

groups in North America and around the world; and Men of Reform Judaism come to this issue out of our deep commitment to ensuring equality for all of God's children. We oppose discrimination against all individuals and are committed to equality, inclusion, and protection of people of all sexual orientations, gender identities and gender expressions, for the stamp of the Divine is present in each and every human being.