## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY

CHELSEY NELSON PHOTOGRAPHY, LLC          )
AND CHELSEY NELSON                       )
        Plaintiffs,                     )
                                        )
     v.                                  )
                                        )    Civil Action No. 3:19-cv-00851-JRW
LOUISVILLE/JEFFERSON COUNTY METRO        )
GOVERNMENT, *et al.*,                    )
                                        )
        Defendants.                     )
_____)

### THE UNITED STATES' STATEMENT OF INTEREST
### IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

The United States of America respectfully files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C. § 517. The United States is committed to protecting the freedoms guaranteed by the First Amendment, which include both the right to "the free exercise" of religion and "the freedom of speech." U.S. Const. amend. I. These freedoms lie at the heart of a free society and are the "effectual guardian of every other right." Virginia Resolutions (Dec. 21, 1798), *in* 5 The Founders Constitution 135, 136 (Philip B. Kurland & Ralph Lerner, eds., 1987). The United States has a substantial interest in the preservation of its citizens' rights to free expression and the free exercise of religion. The United States also has a substantial interest in the application of such rights in the context of the ordinance here, which shares certain features with federal public accommodations laws, including Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a *et seq.*, and Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 *et seq.*

## INTRODUCTION

The central question presented in this case is whether the government can compel a wedding photographer to photograph, provide photography editing services for, and blog about weddings of which she does not approve, and does not wish to photograph or to promote. The answer is no. The Supreme Court has made plain that the government cannot "[c]ompel[] individuals to mouth support for views they find objectionable." *Janus* v. *Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018). Just last year, in fact, the Eighth Circuit held that Minnesota could not force wedding videographers to film weddings that they did not wish to film. *Telescope Media Grp.* v. *Lucero*, 936 F.3d 740, 750-758 (8th Cir. 2019). The same principle applies here.

## BACKGROUND

Chelsey Nelson owns and operates a photography studio in Louisville, Kentucky. Through her work, she seeks to "tell positive stories through photography, editing and writing about weddings," and believes that "marriage between a man and a woman is a gift from God that should be treasured and celebrated." ECF 3-2, ¶ 58. Ms. Nelson has a practice of "declin[ing] requests for wedding celebration and boutique editing services if the request required [her] to use [her] artistic talents to promote or positively portray anything immoral, dishonorable to God, or contrary to [her] religious beliefs." *Id.* ¶ 200. She thus will not provide wedding celebration services—including photography and blogging—or editing services for certain types of weddings, including same-sex weddings. *Id.* ¶¶ 200-218.

Ms. Nelson fears that her belief structure will result in the Defendants' taking enforcement action against her for violating Louisville-Jefferson County Metro Government Ordinance § 92.05 (the "Metro Ordinance"), which prohibits discrimination in public

2

accommodations based on, *inter alia*, sexual orientation.  ECF 1, ¶¶ 214-16.  While Ms. Nelson will provide her services to any individual regardless of sexual orientation, she will not provide her services for same-sex weddings.  ECF 3-1, 2.  In this lawsuit, Defendants have acknowledged that they construe a refusal to provide services for same-sex weddings that a professional would provide for weddings between a man and a woman to be "plainly discriminatory" under the Ordinance.  ECF 15-1, 10.

## SUMMARY OF ARGUMENT

The Metro Ordinance implicates two strands of doctrine interpreting the Free Speech Clause of the First Amendment.  On the one hand, the Supreme Court has repeatedly held that the "freedom of speech prohibits the government from telling people what they must say." *Agency for Int'l Dev.* v. *Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013) (citation omitted).  On the other hand, the Supreme Court has made clear that content-neutral laws targeting discriminatory conduct ordinarily do not violate the First Amendment. *See R.A.V.* v. *City of St. Paul*, 505 U.S. 377, 390 (1992).

Although those two First Amendment principles typically operate in separate spheres, the Supreme Court was forced to reconcile them in *Hurley* v. *Irish-American Gay, Lesbian & Bisexual Group of Boston, Inc.*, 515 U.S. 557 (1995).  In that case, the Supreme Court explained that public accommodations laws aimed at discriminatory conduct "are well within the State's usual power to enact." *Id.* at 572.  But in the "peculiar" circumstances where the application of such a law would alter "speech itself" in the context of an expressive event (there, a parade), the First Amendment prevents the law's enforcement. *Id.* at 572-573. *Hurley* illustrates that an application of a public accommodations law that fundamentally alters expression and interferes with an expressive event triggers heightened scrutiny,

notwithstanding the law's facial content-neutrality.  *See Masterpiece Cakeshop, Ltd.* v.

*Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1741 (2018) (Thomas, J., concurring in part

and concurring in the judgment) ("When a public accommodations law 'ha[s] the effect of

declaring . . . speech itself to be the public accommodation,' the First Amendment applies

with full force") (quoting *Hurley*, 515 U.S. at 573).  In the view of the United States, a

comparable First Amendment intrusion occurs where a public accommodations law compels

someone to create expression connected with a ceremony or other expressive activity.  Such

applications of a public accommodations law exact as great a First Amendment toll as the

application in *Hurley.*

The application of the Metro Ordinance to Ms. Nelson involves the requisite degree

of compulsion.  The ordinance, as construed by Defendants, compels Ms. Nelson to

photograph, edit, and promote on her blog a wedding for a same-sex couple if she would do

the same for an opposite-sex couple.  But photography is an expressive art form.  A wedding

photographer makes numerous artistic and viewpoint-based judgments through the choice of

subjects, composition, lighting, and other factors to convey meaning and ideas through

photography and editing.  Ms. Nelson also engages in expression by promoting the weddings

she photographs through her blog.  And a wedding itself is an expressive event.  Weddings

are sacred rites in the religious realm and profoundly symbolic ceremonies in the secular one.

It is in the very nature of wedding photography that a photographer who is earnestly pursuing

her craft in a professional manner will use her artistic talents and skills to celebrate and

honor the union.

At least two Justices of the Supreme Court have similarly concluded that the "creation

of custom wedding cakes is expressive."  *See Masterpiece Cakeshop*, 138 S. Ct. at 1743

(Thomas, J., concurring in part and concurring in the judgment) ("The use of [the baker's] artistic talents to create a well-recognized symbol that celebrates the beginning of a marriage clearly communicates a message").  And although the Supreme Court as a whole did not reach the question in *Masterpiece Cakeshop*, 138 S. Ct. at 1728, the Eighth Circuit has since held that custom wedding videos "are, in a word, speech" because they serve as a "medium for the communication of ideas about marriage" and are the subject of "editorial control and judgment." *Telescope Media Grp.*, 936 F.3d at 751 (internal quotation marks omitted).  Ms. Nelson's custom wedding photography, editing services, and blog posts are similarly protected forms of expression.

Forcing Ms. Nelson to create expression for and to participate in a ceremony that violates her sincerely held religious beliefs invades her First Amendment rights in a manner akin to the governmental intrusion in *Hurley*.  Defendants have not offered, and could not reasonably offer, a sufficient justification for that compulsion here.  As a result, the First Amendment bars the application of the Metro Ordinance to Plaintiffs.  Plaintiffs have thus demonstrated a likelihood of success on the merits.[1]

---

[1]    The United States does not take a position on the parties' arguments as to the other preliminary-injunction factors, standing, the First Amendment's Religion Clauses, or vagueness doctrine.

**ARGUMENT**

**THE FIRST AMENDMENT'S FREE SPEECH CLAUSE BARS THE APPLICATION OF THE METRO ORDINANCE TO CHELSEY NELSON**

**A.  A Public Accommodations Law Receives Heightened Scrutiny Where It Compels Expression As Part Of An Expressive Event**

> **1.  Public accommodations laws ordinarily do not require First Amendment scrutiny**

This case involves two competing interests:  an individual's right to speak or remain silent according to the dictates of his or her conscience, and the government's interest in combating discrimination in commercial transactions.  Both interests are undeniably important.  And both interests generally coexist without difficulty.

On one side of the balance, the First Amendment of the Constitution, applicable to the States under the Fourteenth Amendment, protects "the freedom of speech."  U.S. Const. amend. I.  That "term necessarily compris[es] the decision of both what to say and what *not* to say."  *Riley* v. *National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-797 (1988). The Supreme Court thus has long held that it is "a basic First Amendment principle that 'freedom of speech prohibits the government from telling people what they must say.'" *Agency for Int'l Dev.*, 570 U.S. at 213 (quoting *Rumsfeld* v. *Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (*FAIR*)).  "At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence."  *Id.* (quoting *Turner Broad. Sys., Inc.* v. *FCC*, 512 U.S. 622, 641 (1994)).

The prohibition on content-based laws that compel expression protects against a variety of potential government intrusions.  The government may not compel the dissemination of its own preferred message, whether through words or conduct.  *See Wooley*

v. *Maynard*, 430 U.S. 705 (1977) ("Live Free or Die" motto on state license plates); *W. Va. State Bd. of Educ.* v. *Barnette*, 319 U.S. 624 (1943) (salute to the American flag).  Nor may it compel one private speaker to disseminate the message of another private speaker.  *See Pacific Gas & Elec. Co.* v. *Pub. Utils. Comm'n*, 475 U.S. 1 (1986); *Miami Herald Publ'g Co.* v. *Tornillo*, 418 U.S. 241 (1974).  As the Supreme Court has explained, "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts."  *Maynard*, 430 U.S. at 714.

Just as the government may not compel the *dissemination* of expression, it equally may not compel the *creation* of expression.  "[F]reedom of speech 'includes both the right to speak freely and the right to refrain from speaking at all.'"  *Janus*, 138 S. Ct. at 2463 (quoting *Maynard*, 430 U.S. at 714).  "When speech is compelled . . . individuals are coerced into betraying their convictions."  *Id.* at 2464.  "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning," *id.*, and for this reason, the government may not enact content-based laws commanding a speaker to engage in protected expression:  An artist cannot be forced to paint, a musician cannot be forced to play, and a poet cannot be forced to write.  *See Hurley*, 515 U.S. at 569 (remarking that painting, music, and poetry are "unquestionably shielded" under the First Amendment); *see also Nat'l Endowment for the Arts* v. *Finley*, 524 U.S. 569, 602 (1998) (Souter, J., dissenting) ("It goes without saying that artistic expression lies within . . . First Amendment protection.").

This freedom from compulsion "is powerful medicine in a society as diverse and populous as ours."  *Cohen* v. *California*, 403 U.S. 15, 24 (1971).  It puts "the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such

7

freedom will ultimately produce a more capable citizenry and more perfect polity and in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Id.*

On the other side of the balance, federal and state governments have long employed content-neutral public accommodations laws to combat discrimination in commerce. "At common law, innkeepers, smiths, and others who made profession of a public employment, were prohibited from refusing, without good reason, to serve a customer." *Hurley*, 515 U.S. at 571 (citation and internal quotation marks omitted). But the common-law duty to serve did not protect particular groups targeted for discrimination, and so "proved insufficient in many instances." *Romer* v. *Evans*, 517 U.S. 620, 627-628 (1996). Many States thus acted "to counter discrimination by enacting detailed statutory schemes." *Id.* at 628; *see Heart of Atlanta Motel, Inc.* v. *United States*, 379 U.S. 241, 259 & n.8 (1964) (noting that, by 1964, more than half of States had enacted public accommodations laws). Over time, States expanded their statutes to cover more types of businesses and more groups that they concluded have been targeted for discrimination. *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 & n.2 (2000).

Congress also enacted a federal public accommodations law as part of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241. Title II of the Civil Rights Act provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a). Shortly after Title II was enacted, the Supreme Court affirmed its constitutionality under Congress's Commerce

8

Clause authority.  *See Heart of Atlanta Motel*, 379 U.S. at 261-262.  It explained that Title II prohibits discrimination in "enterprises having a direct and substantial relation to the interstate flow of goods and people," *id.* at 250-251, and that the legislative record before Congress was "replete with evidence of the burdens that discrimination by race or color places upon interstate commerce."  *Id.* at 252.

For the most part, individual First Amendment rights have coexisted comfortably with federal and state public accommodations laws.  That is because those laws focus on discriminatory conduct rather than on the content of expression.  Under ordinary circumstances, content-neutral laws that regulate conduct rather than speech receive no First Amendment scrutiny, even where they have "incidental" effects on speech.  *FAIR*, 547 U.S. at 62.  Thus, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."  *Id.* (quoting *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)).

In circumstances where a content-neutral law directly restrains expressive conduct, however, the law is subject to limited First Amendment scrutiny.  *See FAIR*, 547 U.S. at 65-66; *United States* v. *O'Brien*, 391 U.S. 367, 376-377 (1968).  Under the *O'Brien* framework, a government regulation of expressive conduct is permissible so long as the regulation is "unrelated to the suppression of free expression," falls within the government's power to enact, advances a substantial governmental interest, and is no greater than necessary to further that interest.  391 U.S. at 377; *see, e.g.*, *Clark* v. *Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (upholding camping prohibition not targeted at demonstrators).

Public accommodations laws generally do not regulate the content of expression but rather the discriminatory provision of goods or services—an act that is not itself protected under the First Amendment's Free Speech Clause. *See R.A.V.*, 505 U.S. at 390 ("Where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory idea or philosophy."). In the majority of their applications, then, public accommodations laws either do not trigger any First Amendment scrutiny or survive *O'Brien* scrutiny. To the extent that such laws have incidental effects on speech, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 567 (2011). And to the extent that such laws directly restrict expressive conduct, they do so for reasons that, consistent with *O'Brien*, are "unrelated to the suppression of free expression." 391 U.S. at 377. Therefore, as the Supreme Court has explained, most applications of a public accommodations statute fall "well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination." *Hurley*, 515 U.S. at 572.

### 2. *A content-neutral law may trigger heightened scrutiny where it compels expression as part of an expressive event*

Although content-neutral laws aimed at conduct ordinarily receive limited (if any) First Amendment scrutiny, that is not so where the application of an otherwise neutral law would alter the content of "speech itself." *Hurley*, 515 U.S. at 573. In that circumstance, the Supreme Court has employed heightened scrutiny, even if the government's interest in regulation does not relate to the communicative nature of the expression. *See id.* at 575-577; *Dale*, 530 U.S. at 659.

10

In *Hurley*, the Supreme Court considered the application of a Massachusetts public accommodations law to an annual St. Patrick's Day parade organized by a private entity. 515 U.S. at 560-562.  The Supreme Judicial Court of Massachusetts held that the organizers' exclusion of a group of gay, lesbian, and bisexual descendants of Irish immigrants from the parade constituted discrimination on account of sexual orientation and thus violated the state public accommodations law.  *Id.* at 563-564.  It also concluded that requiring the group's inclusion in the parade would have only an "incidental" effect on First Amendment rights. *Id.* at 563.  The Supreme Court reversed.  *Id.* at 581.  It acknowledged that the law "does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds."  *Id.* at 572. But the law had nevertheless been "applied in a peculiar way" to "essentially requir[e]" the parade organizers "to alter the expressive content of their parade."  *Id.* at 572-573.  The Supreme Court thus refused to apply the lower level of scrutiny generally applicable to content-neutral statutes that do not target speech.  *See id.* at 577-580; *see also Dale*, 530 U.S. at 659 (noting that *Hurley* had "applied traditional First Amendment analysis").

In *Dale*, the Supreme Court reaffirmed *Hurley*'s approach in the context of an expressive association.  The Supreme Court explained that the typical enforcement of a state public accommodations law "would not materially interfere with the ideas" that an expressive organization seeks to communicate.  530 U.S. at 657.  If, however, the law "directly and immediately affects associational rights," heightened scrutiny is appropriate. *Id.* at 659.  Together, *Hurley* and *Dale* teach that where a law does not merely have an incidental effect on speech but rather alters speech itself, the government fundamentally

interferes with protected expression. Compelled speech is no less fundamental an interference. *See Agency for Int'l Dev.*, 570 U.S. at 212-13. In either situation, even a content-neutral regulation of conduct may receive heightened scrutiny.

The Supreme Court did not establish in *Hurley* and *Dale* a comprehensive framework for evaluating when applying the nondiscrimination provision of a public accommodations law represents a sufficiently serious intrusion on expressive activity to merit heightened scrutiny. But, at a minimum, where a law imposes the same type of First Amendment burden at issue in those two decisions, the same heightened scrutiny applies. Thus, where an application of a law alters "expressive content" in the context of an expressive event or association, heightened scrutiny is appropriate. *Hurley*, 515 U.S. at 572-573. In the context of compelled speech, heightened scrutiny is likewise appropriate where a law compels someone to create expression for a particular person or entity and to participate, literally or figuratively, in a ceremony or other expressive event.

The Supreme Court's decisions in *Hurley* and *Dale* illustrate one category of compelled participation. In each case, a state public accommodations law would have forced an expressive event (the parade in *Hurley*) or group (the Boy Scouts in *Dale*) to permit unwanted individuals or entities to participate. The Supreme Court rejected such a result, explaining that the government may not compel an unwilling expressive group or event to admit speakers at odds with its message. *See Hurley*, 515 U.S. at 572-575; *Dale*, 530 U.S. at 655-656. The converse is also true: The government may not compel an unwilling speaker to *join* a group or event at odds with his or her religious or moral beliefs. Either version of government compulsion violates the fundamental "principle of autonomy to control one's own speech." *Hurley*, 515 U.S. at 574; *cf. Lee* v. *Weisman*, 505 U.S. 577, 592 (1992)

12

(describing, in the free-exercise context, the government's "duty to guard and respect that sphere of inviolable conscience and belief which is the mark of a free people").

Under this analysis, relatively few applications of public accommodations laws will be subject to heightened scrutiny. Most commercial transactions will not involve requiring an unwilling speaker to participate in someone else's expressive activity. But where public accommodations laws do intrude on expression in this way, they are subject to heightened scrutiny.

### B. As Applied To Chelsey Nelson, The Metro Ordinance Is Subject To, And Fails To Satisfy, Heightened First Amendment Scrutiny

Under the analysis set forth above, the Metro Ordinance violates the First Amendment as applied to Ms. Nelson. The application of the ordinance to Ms. Nelson triggers heightened scrutiny because it compels her to engage in speech as part of an expressive event. Defendants cannot satisfy such scrutiny because they lack a sufficient state interest to justify their intrusion on "the core principle of speaker's autonomy." *Hurley*, 515 U.S. at 575.

### 1. *The application of the Metro Ordinance to Chelsey Nelson triggers heightened scrutiny*

This case falls within the set of applications of content-neutral laws that merit heightened scrutiny. Defendants construe the Metro Ordinance to bar professionals from declining to provide services for same-sex weddings that they provide for weddings between a man and a woman. ECF 15-1, 10 (rejecting Ms. Nelson's argument that she does not discriminate because she will serve all persons without regard to sexual orientation but will not photograph same-sex weddings, calling this "plainly discriminatory" under the ordinance). Defendants' interpretation thus requires Ms. Nelson to engage in the inherently communicative activity of photographing same-sex weddings, since she provides those

services for opposite-sex weddings.  Likewise, Defendants' interpretation would require Ms. Nelson to provide editing and blogging services for same-sex weddings, since the Metro Ordinance is written broadly to extend to all "services, facilities, privileges, [and] advantages" based on protected classifications.  Metro Ordinance § 92.05(A).  The law thus forces Ms. Nelson to lend her art and expression, through her photography, editing, and blogging, to the important wedding ritual—a profoundly expressive, and often religious or sacred, event.

Photography—and particularly the bespoke wedding photography in which Ms. Nelson engages—is inherently expressive.  As described in her declaration, Ms. Nelson "mak[es] decisions about what and how to photograph and about what to instruct people to do so that [she] can effectively photograph the beauty, truth, joy, and goodness of marriage and tell a positive story about the couple's marriage."  ECF 3-2, ¶ 107.  Through choices of subject, lighting, framing, aperture and shutter speed, and other photographic techniques, she "alter[s] the message and mood of a photograph."  *Id.* ¶¶ 108-109.  She also makes judgments in compiling and editing the photos to ensure that they fit "within the overall story [she] seeks to communicate about the couple's marriage."  *Id.* ¶ 116.  Finally, she creates blogs about the weddings she photographs as "an integral part" of her wedding services, *id.* ¶ 127, in order to "publicly honor and encourage the couple, to celebrate their marriage, to publicly tell uplifting stories about the couple and the beauty of marriage in ways more powerful than through photography or words alone, and to share the joy of marriage between a man and a woman with as many people as possible."  *Id.* ¶ 130.

Binding Supreme Court and Sixth Circuit precedent confirms that expressive photography, like Ms. Nelson's, is protected by the First Amendment.  "[T]he Constitution looks

14

beyond written or spoken words as mediums of expression." *Hurley*, 515 U.S. at 569.

"[P]ictures, films, paintings, drawings, and engravings" are protected by the First Amendment.

*Kaplan* v. *California*, 413 U.S. 115, 119-120 (1973); *see also Masterpiece Cakeshop*, 138 S. Ct.

at 1742 (Thomas, J. concurring in part and concurring in the judgment) ("[C]reating and

designing custom wedding cakes—is expressive."); *ETW Corp.* v. *Jireh Publ'g, Inc.*, 332 F.3d

915, 924 (6th Cir. 2003) ("The protection of the First Amendment is not limited to written or

spoken words, but includes other mediums of expression, including music, pictures, films,

photographs, paintings, drawings, engravings, prints, and sculptures.").

The Metro Ordinance not only requires Ms. Nelson to create expression, but also compels

her to celebrate and promote a ceremony that is deeply expressive in both religious and secular

traditions.  The Supreme Court has described marriage as a union of "transcendent importance,"

"sacred to those who live by their religions" and providing "unique fulfillment to those who find

meaning in the secular realm."  *Obergefell* v. *Hodges*, 135 S. Ct. 2584, 2594 (2015).  A wedding

celebration, which marks the beginning of that union, is imbued with expression.  "Wedding

ceremonies convey important messages about the couple, their beliefs, and their relationship to

each other and to their community," with "[t]he core of the message" being "a celebration of

marriage and the uniting of two people in a committed long-term relationship."  *Kaahumanu* v.

*Hawaii*, 682 F.3d 789, 799 (9th Cir. 2012).  That is one reason why a musician hired to perform

a love song at a wedding ceremony, for example, would reasonably be perceived as, at a

minimum, not opposing the marriage.

Likewise, wedding photographers like Ms. Nelson necessarily use their artistic and

expressive skills to tell the story of a wedding in a positive and celebratory manner.  A

photographer who did not endeavor to tell the wedding story in a positive and celebratory

manner through her work would not be doing the job she was hired to do.  *See Telescope Media Grp.*, 936 F.3d at 753 (noting the "implausibility . . . that any same-sex couple would request a video condemning their marriage.").  Indeed, Ms. Nelson's blog posts explicitly promote this celebratory message through statements such as "I left the day feeling grateful that I got to spend it with them and their families to celebrate their marriage"; "I couldn't help but absorb and feel" the bride's "pure joy; and "I hope you enjoy this peek into the best day of their lives as much as I enjoyed capturing it."  ECF No. 3-2 ¶ 140.  Yet under the Metro Ordinance, Ms. Nelson would be compelled to publicly declare through her art and on her blog that she likewise "enjoyed" or was "grateful" to celebrate a same-sex wedding.

By "coerc[ing]" Ms. Nelson "into betraying [her] convictions," *Janus*, 138 S. Ct. at 2464, and compelling her to engage in expression promoting and celebrating a ceremony in violation of her conscience, Defendants infringe upon the fundamental "principle of autonomy to control one's own speech."  *Hurley*, 515 U.S. at 574; *accord Masterpiece Cakeshop*, 138 S. Ct. at 1744 (Thomas, J., concurring); *Telescope Media Grp.*, 936 F.3d at 753.

### 2.   *Rumsfeld* v. *FAIR* does not require a lower level of scrutiny here than in *Hurley*

Defendants urge that Ms. Nelson is no different from the law schools in *Rumsfeld* v. *FAIR*, see ECF 15-1, 14-18, which sought to restrict military recruiting on their campuses based on their objection to Congress's then-existing policy regarding gays and lesbians in the military.  The federal statute at issue in *FAIR* required that law schools afford equal access to military and nonmilitary recruiters, if the institution received certain federal funds.  547 U.S. at 51.  The Supreme Court held that such equal treatment did not send any message indicating the school's agreement with military policies.  There was a clear distinction "between speech a school sponsors and speech the school permits because legally required to

16

do so." *Id.* at 65.  In addition, the schools could easily publicize their criticism of the military's policies.  *Id.*

Neither feature is present here.  When Ms. Nelson photographs a wedding or writes about the wedding on her blog, there is no clear line between her speech and that of her clients.  She is not merely tolerating someone else's message on her property; she uses her artistic and expressive skills to craft a celebratory story about a wedding and a marriage. Based on her work, observers would reasonably attribute to Ms. Nelson a message of celebration and endorsement.  The same could not be said of the law schools in *FAIR*.  *See id.* at 62.

Moreover, unlike the law schools in *FAIR*, Ms. Nelson has no effective way to disavow the message that could reasonably be attributed to her.  Whereas the law schools in *FAIR* could easily register their disagreement with the congressional policy at issue in that case, it would be untenable for a wedding photographer like Ms. Nelson to signal to weddings guests and those who view her wedding albums that she is not supportive of a particular wedding.  In any event, the Metro Ordinance appears to prohibit such disclaimers. *See* Metro Ordinance § 92.05(B) ("It is an unlawful practice for a person . . . to . . . issue . . . a written, printed, oral or visual communication . . . which indicates . . . that patronage of . . . a place of public accommodation . . . of an individual, on account of his . . . sexual orientation . . . is objectionable, unwelcome, unacceptable, or undesirable.").

Moreover, in *FAIR*, the law schools were not required to disseminate any message— either their own or someone else's.  *See* 547 U.S. at 60 (noting that the law does not "require[] them to say anything.").  Rather, they were simply required to provide space to military recruiters so that the recruiters could disseminate their own message.  *See id.* at 64

17

(explaining that "the schools are not speaking when they host interviews and recruiting receptions"); *Masterpiece Cakeshop*, 138 S. Ct. at 1745 (Thomas, J., concurring in part and concurring in the judgment) ("[*FAIR*] do[es] not suggest that the government can force speakers to alter their *own* message."). At most, the schools were forced to send or post details about recruitment, an obligation "plainly incidental to the [statute's] regulation of conduct." *FAIR*, 547 U.S. at 62. Here, by contrast, Ms. Nelson does not simply provide the means for same-sex couples to disseminate their own message about their marriage. Rather, the Metro Ordinance, as construed by the Defendants, requires her to disseminate the celebratory story of her clients' union. *See Maynard*, 430 U.S. at 717 (government's interest in disseminating message "cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message"); *Pacific Gas & Elec.*, 475 U.S. at 15 (government cannot force individual or entity "to assist in disseminating [a favored] speaker's message").

Finally, Defendants' expansive reading of *FAIR* has no stopping point. For example, depending on how courts construe the term "religion" in public accommodations laws such as the Metro Ordinance, such laws could purport to prohibit a gay musician who agrees to perform at the National Cathedral from declining to do so at the Westboro Baptist Church. Similarly, those jurisdictions that have enacted public accommodations laws "declar[ing] political affiliation or ideology to be a protected characteristic" could attempt to "force a Democratic speechwriter to provide the same services to a Republican, or it could require a professional entertainer to perform at rallies for both the Republican and Democratic candidates for the same office." *Telescope Media Grp.*, 936 F.3d at 756; *see*, *e.g.*, D.C. Code § 2-1402.31(a) ("political affiliation"); Madison, Wis., Mun. Code § 39.03(2) & (5) ("political beliefs"); Prince George's County, Md., County Code §§ 2-186, 2-220 ("political

opinion"); Seattle, Wash., Mun. Code §§ 14.06.020(L), 14.06.030(B) ("political ideology"). This Court should not lightly assume that in deciding *FAIR*, the Supreme Court conclusively held that all such scenarios are permitted under the First Amendment.

### 3. *That Ms. Nelson charges a fee for her services does not require a lower level of scrutiny*

Defendants suggest that the commercial nature of Ms. Nelson's activities—including the operation of her photography business as an LLC—somehow negates the expressive nature of those activities.  ECF 15-1, 12, 16.  "But [the Supreme Court] has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech." *Masterpiece Cakeshop*, 138 S. Ct. at 1745 (Thomas, J., concurring in part and concurring in the judgment); *Pacific Gas & Elec.*, 475 U.S. at 8, 16 (collecting cases); *Virginia Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) (proclaiming it "beyond serious dispute" that speech "is protected even though it is carried in a form that is 'sold' for profit.").  And the Supreme Court has also repeatedly afforded "commercial and corporate entities, including utility companies and newspapers," First Amendment protection, concluding that "they 'contribute to the discussion, debate, and the dissemination of information and ideas that the First Amendment seeks to foster' no less than individuals do." *Telescope Media Grp.*, 936 F.3d at 751-752 (quoting *Pacific Gas & Elec.*, 475 U.S. at 8).  Thus, Ms. Nelson's choice to operate her photography business through an LLC does not deprive her of First Amendment protection.

If anything, Ms. Nelson's choices with respect to her business confirm her entitlement to such protection.  For example, Ms. Nelson has averred that she would forgo the opportunity to earn a profit by providing her services if she were asked to "use [her] artistic talents to promote or positively portray anything immoral, dishonorable to God, or contrary

to [her] religious beliefs," including, for example, "a cosplay superhero-themed wedding between a man and a woman, certain 'trash-the-dress' photographs, or certain other themed engagement sessions or weddings."  ECF 3-2, ¶¶ 200-01; *see also id.* ¶ 210 (zombie-themed wedding); ¶ 214 (Game of Thrones-themed wedding).  Ms. Nelson's commitment to forgo profit to exercise editorial control over the messages she conveys through her photography and editing services provides "still more evidence" that her conduct is expressive.  *See Masterpiece Cakeshop*, 138 S. Ct. at 1745 (Thomas, J., concurring in part and concurring in the judgment).

### 4.  *Defendants cannot satisfy heightened scrutiny*

Because the Metro Ordinance would compel Ms. Nelson to engage in undesirable expressive activity, it is subject to heightened scrutiny.  *See Hurley*, 515 U.S. at 572-73, 575-77.

In *Hurley*, Massachusetts asserted the same interest present here: "ensur[ing] by statute for gays and lesbians desiring to make use of public accommodations . . . that accepting the usual terms of service, they will not be turned away merely on the proprietor's exercise of personal preference."  515 U.S. at 578.  The Supreme Court held that such an interest does not permit a State to compel individuals "to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own."  *Id.*; *cf. Dale*, 530 U.S. at 657 (noting that the Supreme Court had upheld the application of public accommodations laws only when doing so "would not materially interfere with the ideas that the organization sought to express.").  "As the Supreme Court has explained, even if the government may prohibit 'the *act* of discriminating against individuals in the provision of publicly available goods, privileges, and services,' it may not

'declar[e] [another's] speech itself to be [a] public accommodation' or grant 'protected individuals . . . the right to participate in [another's] speech.'" *Telescope Media Grp.*, 936 F.3d at 755 (quoting *Hurley*, 515 U.S. at 572-73).  Where a law trenches on First Amendment rights in the manner that the Metro Ordinance does here, it cannot survive heightened scrutiny.  *See Dale*, 530 U.S. at 657-659.

That is not to say that every application of a public accommodations law to protected expression will violate the Constitution.  In particular, laws targeting race-based discrimination may survive heightened First Amendment scrutiny.  As the Supreme Court has observed, "racial bias" is "a familiar and recurring evil" that poses "unique historical, constitutional, and institutional concerns." *Peña-Rodriguez* v. *Colorado*, 137 S. Ct. 855, 868 (2017).  As such, "eradicating racial discrimination" in the private sphere is the most "compelling" of interests.  *Bob Jones Univ.* v. *United States*, 461 U.S. 574, 604 (1983).  A State's "fundamental, overriding interest" in eliminating private racial discrimination— conduct that "violates deeply and widely accepted views of elementary justice"—may justify even those applications of a public accommodations law that infringe on First Amendment freedoms.  *Id.* at 592, 604.

The Supreme Court has not similarly held that classifications based on sexual orientation are subject to strict scrutiny or that eradicating private individuals' opposition to same-sex marriage is a uniquely compelling interest.  To the contrary, the Court has recognized that opposition to same-sex marriage "long has been held—and continues to be held—in good faith by reasonable and sincere people," and that "[m]any who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises." *Obergefell*, 135 S. Ct. at 2594, 2602; *see also id.* at 2607

21

(emphasizing First Amendment protections for religious objectors); *Masterpiece Cakeshop*, 138 S. Ct. at 1729; *id.* at 1727 ("[T]he religious and philosophical objections to gay marriage are protected views and in some instances protected forms of expression."). Defendants have not advanced a sufficient governmental interest to override Ms. Nelson's weighty First Amendment interest in declining to create the expression at issue here.

## CONCLUSION

The Court should find that Plaintiffs have demonstrated a likelihood of success on the merits.


Dated: February 27, 2020

<div style="margin-left: 40%;">

Respectfully submitted,

ERIC S. DREIBAND
Assistant Attorney General

ELLIOTT M. DAVIS
Acting Principal Deputy
  Assistant Attorney General

/s/ Eric W. Treene
ERIC W. TREENE
Special Counsel
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC  20530
Phone: (202) 514-2228
Email: Eric.Treene@usdoj.gov

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY, that this 27th day of February, 2020, the foregoing United States' Statement of Interest was electronically filed with the Clerk of Court using the CM-ECF system, which will send a notice of electronic filing to all counsel of record.

<div align="center">

_____/s/ Eric W. Treene_____
Eric W. Treene

</div>