```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     CHELSEY NELSON              )
 4   PHOTOGRAPHY, LLC, ET AL     )
                                 )
 5          Plaintiff,           )    Case No. 3:19-CV-851
                                 )
 6   v.                          )
                                 )
 7   LOUISVILLE/JEFFERSON COUNTY )
     METRO GOVERNMENT, ET AL     )
 8                               )    August 7, 2020
            Defendant.           )    Louisville, Kentucky
 9

10                          *  *  *  *  *
11        TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
             BEFORE HONORABLE JUSTIN R. WALKER
12               UNITED STATES DISTRICT JUDGE
                            *  *  *  *  *
13
     APPEARANCES:
14
     For Plaintiff:          Bryan Neihart
15                           Jonathan A. Scruggs
                             Alliance Defending Freedom - Scottsdale
16                           15100 N. 90th Street
                             Scottsdale, AZ 85260
17
                             Joshua D. Hershberger
18                           Hershberger Law Office
                             P.O. Box 233
19                           Hanover, IN  47243

20
                         Rebecca S. Boyd, RMR, CRR
21                         Official Court Reporter
                           232 U.S. Courthouse
22                        Louisville, KY 40202
                             (502) 625-3777
23
     Proceedings recorded by mechanical stenography, transcript
24   produced by computer.

25
```

```
1    APPEARANCES (Continued):

2        For Defendant        David S. Kaplan
         Louisville/          Casey L. Hinkle
3        Jefferson County     Kaplan Johnson Abate & Bird, LLP
         Metro Government:    710 W. Main Street
4                             Suite 400
                              Louisville, KY  40202
5
                              Jason D. Fowler
6                             Jefferson County Attorney
                              531 Court Place
7                             Suite 900

8                             Louisville, KY  40202

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Begin proceedings in open court 10:17 a.m.)

2              THE COURT:  Okay.  We're on the record in Chelsey

3    Nelson Photography versus Louisville, 3:19-CV-851.  Let's start

4    with appearances.  For the plaintiff.  Begin with the plaintiff.

5              MR. NEIHART:  Starting off, thank you.  Good morning,

6    Your Honor.  My name is Bryan Neihart representing the

7    plaintiffs, Chelsey Nelson Photography, LLC and Chelsey Nelson.

8    With me at counsel's table and also representing the plaintiffs

9    are Jonathan Scruggs to my midmedial left and Joshua

10   Hershberger.

11             THE COURT:  And I think the document you filed said

12   somebody is going to talk about standing, and somebody is going

13   to talk about the merits?

14             MR. NEIHART:  Yes, Your Honor.  I'll be addressing the

15   standing argument and our position to Louisville's motion to

16   dismiss, and Mr. Scruggs will be arguing in support of the

17   preliminary injunction motion.

18             THE COURT:  Okay.  Very good.  And for the defendant.

19             MR. KAPLAN:  Good morning, Your Honor.  David Kaplan

20   for the Louisville/Jefferson County Metro defendants.  I have

21   with me here today Jason Fowler, an assistant county attorney

22   involved with enforcement, and my partner Casey Hinkle is to my

23   right as well.

24             THE COURT:  Okay.  Very good.  A couple of preliminary

25   things.  Somebody said something about a projector.  Whose side

1    is that?

2            MR. KAPLAN:  Your Honor, I had seen that there was a

3    projector set up, and I thought that, optionally, it might be

4    something that we would think about using.  Then later we were

5    informed that, you know, if it was needed, we'd need to do some

6    safety protocols with the disinfectant and so on, so we'll

7    really take the Court's lead there.  We don't have anything we

8    absolutely have to display.

9            THE COURT:  Okay.  I was going to basically say that.

10   That if you have something you absolutely do need to display,

11   then, by all means, let's do it, but, otherwise, there's a lot

12   of briefing, there is long appendices -- appendices, there is --

13   and we'll be here -- we'll chat -- we'll talk a long time today.

14   So I think it will be -- I think we'll have a thorough

15   examination of all the issues, even without that.

16       On the masks thing, if you -- if Mr. Kaplan, Neihart, am I

17   pronouncing that right?

18           MR. NEIHART:  That's correct, Your Honor, yes.

19           THE COURT:  And Mr. Scruggs, when you-all are speaking

20   or when it's your -- if you want to take your masks off, that's

21   fine with me if it's okay with the people who are within six

22   feet of you.  On the other hand, if you'd rather keep them on, I

23   understand, but it's whatever you're comfortable with there.

24       In terms of order, plaintiff has the burden on standing,

25   even though it's the defendant's motion to dismiss, and then

1  plaintiff has the burden on the merits with the preliminary

2  injunction.

3      However, I think it makes more sense to hear from the

4  defendants on standing first.  Let's -- you made the motion.

5  And then I'll hear from the plaintiffs on standing.  Then I'll

6  hear from the plaintiffs on the merits, and then I'll turn to

7  the defendants on the merits.

8      Do you have preliminary issues, Mr. Neihart?

9          MR. NEIHART:  No, Your Honor.

10         THE COURT:  Okay.  Mr. Kaplan.

11         MR. KAPLAN:  Thank you, Your Honor.  May it please the

12  Court.  With respect to standing, the parties have briefed

13  Article III standing and also cited a few cases in regards to

14  what's referred to as equitable standing, ripeness, prudential

15  standing.  I want to address both of those at the same time.

16     Before getting directly into the standing, I want to orient

17  a little bit about what they do or do not have standing to

18  challenge.  So what -- I'm going to ahead and remove my mask,

19  because Jason said that that would be okay with him.

20     So in this case, Your Honor, the challenges to the public

21  accommodations ordinance in Louisville, Jefferson County, that

22  is in effect within the boundaries of this jurisdiction, the one

23  that was passed in 2004 by a nineteen-to-six margin and has been

24  the law of this jurisdiction ever since.

25     That public -- public accommodations provision, for purposes

1    of this case, we'll follow their nomenclature.  So it's got a

2    what we'll call the public accommodations provision, which

3    mandates that any merchant who is classified as a place of a

4    public accommodation has to provide goods and services to

5    all-comers without regard to race, gender identity, sexual

6    orientation, religion, disability, and so forth.

7        Separate from that, we have what they've referred to in

8    their briefing as the publication provision, which is an

9    enforcement mechanism for the accommodations provision, and it's

10   got two components, but, in general, that provision has to do

11   with what someone who's covered by the publications -- public

12   accommodations ordinance cannot say, and, specifically, that

13   they cannot refuse to provide the services.

14       And the obvious purpose for that is that if you can deter

15   people from coming to your place of business in the first place

16   by telling them in advance, "We will refuse to provide this

17   service should you show up," you can circumvent the public

18   accommodations portion, 'cause you'll never have to refuse in

19   the first place if you can -- so you can see the connection

20   there.

21       So these are two separate mandates, which are separate and

22   distinct from one another, and they're challenging both of them,

23   but we assume that the Court has to separately analyze standing

24   with respect to both.

25       With respect to the public accommodations ordinance, it

1    seems to be undisputed, based on the pleadings, that Miss Nelson

2    has never actually been asked, by a same-sex couple, for her to

3    take pictures at their wedding.

4        There's an allegation in the complaint to the effect that

5    she has been afraid to advertise, because she's afraid that if

6    she does, she might be approached and have to say no, which

7    would subject her to liability.  It's sort of a subjective chill

8    kind of allegation.

9        And so the fact of the matter is, however, that she hasn't

10   been approached, so she hasn't had to have the conversation with

11   them where she has to choose whether to refuse or not to refuse

12   to provide the services, and, therefore, there's never been an

13   opportunity for a customer to complain, or for any other person,

14   for that matter, who learns about it to complain about the

15   refusal.

16           THE COURT:  Let me interrupt, because -- and this is

17   for both sides.  Assume I've read everything that you've

18   submitted.  So if there's something -- I'm going to ask some

19   questions.  I'm apologizing in advance for me interrupting

20   asking questions, but at the end of this, like I said, I'm not

21   in any hurry, so if there's more that we didn't cover through

22   the questions, then tell me, and I want to listen to everything

23   that both sides have to say.

24       My understanding of this standing question, based on Susan

25   B. Anthony, from the Supreme Court, and from Sixth Circuit

1    precedence, is that they have to show a credible threat of

2    prosecution.  They don't have to show that they were prosecuted

3    yet, and that's from the McKay v. Federspiel, which is a case

4    that the city relies on pretty heavily from the Sixth Circuit.

5        How do you show a credible threat of prosecution?  Well, you

6    have to show two things.  You have to show subjective chill,

7    which I take it to be pretty easy to show, because it's

8    subjective, but then you have to show some combination of four

9    factors.  So it's like you got to show two things, and the

10   second thing has four parts.

11       Maybe we should have had the visual aid, for my own benefit,

12   but how do you show some com -- what are the following factors

13   they have to show a combination of?  And McKay says this:

14       Number one:  A history of past enforcement against either

15   the plaintiffs or others.

16       Number two:  Enforcement warning letters regarding the

17   plaintiff's specific conduct.

18       Number three:  A provision in the ordinance that allows any

19   member -- any member of the public to initiate an enforcement

20   action.

21       And number four:  So they don't really list when they're

22   listing the numbers of factors, but then they come to it pretty

23   quickly, so I'm counting it as a forth.  A refusal to disavow

24   enforcement of the challenged conduct by the Government.

25       So some combination of the following factors:  History of

1    past enforcement, a warning letter to this plaintiff, a

2    provision that allows the public to sue or initiate enforcement

3    action, and refusal to disavow.

4        Let's start with the last one.  From your brief, Louisville

5    has not refused to disavow.

6              MR. KAPLAN:  That's correct.

7              THE COURT:  Okay.  And you're not refusing today to --

8    you're not disavowing -- you're not promising you'll never

9    enforce if --

10             MR. KAPLAN:  That's right.

11             THE COURT:  -- there's a violation by Chelsey Nelson?

12             MR. KAPLAN:  Right.

13             THE COURT:  Okay.  So by my count, when we do the

14   combination of the four factors, they're looking pretty strong

15   on three.  There's a history of past enforcement against others.

16   First factor's plaintiffs or others.  I think they allege that

17   there's been something like 93 enforcement actions in the past

18   decade or so, 2010 to 2017, I think.  You're looking like I'm

19   wrong on that.

20             MR. KAPLAN:  I think it's 173 since 2002, so about

21   ten/per year.

22             THE COURT:  Okay.  Enforcement warning letters

23   regarding the plaintiff's specific conduct, that you're strong

24   on that.  There's been no enforcement warning letters.  A

25   provision allowing any member of the public to initiate an

1    enforcement action, very strong on that, 'cause there is such a

2    provision in the fairness ordinance.  And the refusal to disavow

3    by the Government, they're strong on that.

4        So what do you say to the argument that the Sixth Circuit

5    says I'm supposed to look at four factors, and they're strong on

6    three of the four?  I'm supposed to look at some combination --

7    that's the Sixth Circuit's word.  Some combination of those four

8    factors, and they're strong on three of the four.

9            MR. KAPLAN:  Well, I'd go back to Susan B. Anthony

10   List and the fundamental requirement of injury, in fact, which

11   they can demonstrate if they can show a credible threat of

12   prosecution.  I think you're supposed to look at all of those

13   factors, Your Honor, but you also have to look at the big

14   picture.  Has there really been a credible threat of

15   prosecution?

16       I would concede that there have been ten complaints per

17   year, approximately, filed with respect to sexual orientation,

18   for enforcement purposes.  Only two have ever gone to hearing

19   over the eighteen-year period.  That's from the declaration of

20   Mr. Kendall Boyd that was attached to the reply in support of

21   the motion to dismiss.  So -- but those --

22           THE COURT:  Why only look at enforcement of sexual

23   orientation discrimination?  Why not look at all enforcement

24   under the public accommodations law?

25           MR. KAPLAN:  Well, I think the question is:  Would

1    Chelsey Nelson have -- feel that there is a credible threat of

2    enforcement with respect to the type of conduct that she

3    intends -- that she says she intends to engage in?  So I do

4    think that it would be appropriate to focus on sexual

5    orientation simply because that is the issue that Metro would be

6    investigating.

7         Is there evidence that -- and, again, this is entirely

8    speculative, at this point, with respect to the violation of the

9    accommodations ordinance, but is there evidence that she took

10   the actions that she took based on sexual orientation, which is

11   that specific classification.  But I don't -- I can't point to

12   any specific precedent that would require you to limit it

13   that -- in that fashion.

14             THE COURT:  And I don't necessarily disagree with you

15   on that.  It's just we're trying to figure out what -- is there

16   a credible threat of enforcement against this particular

17   photographer we're looking at, and --

18             MR. KAPLAN:  You're absolutely correct that the

19   ordinance allows any single person, whether they are grieved

20   directly or not, to file the complaint, which in Susan B.

21   Anthony List, the Thomas writing for the Court did focus on that

22   as being a very relevant factor.

23       But in Susan B. Anthony List, the Court also paid special

24   attention to what is, in my view, the most pertinent fact in

25   Susan B. Anthony List, which was that -- and you'll recall in

1    that case, a candidate for office had complained about false

2    statements being made by the Susan B. Anthony List indicating

3    that he had supported taxpayer-funded abortions based on his

4    support of the Affordable Care Act.

5        He filed a complaint.  The commission found probable cause

6    to sustain a violation.  He then dropped his complaint when he

7    lost the election.  Susan B. Anthony List -- and it appeared to

8    me the Court was very open to the idea that the lack of any

9    pending action was certainly a pertinent thing that the Court

10   needed to address.

11       And the way of addressing it was to say, "Look, Susan B.

12   Anthony List intends to say exactly the same thing about other

13   candidates who voted for the Affordable Care Act that they said

14   about the guy who filed the complaint."

15       Therefore, they, obviously have a very reasonable fear that

16   if they engage in exactly that same course of conduct, that they

17   will, again, be subject to a complaint and, again, be subject to

18   a probable cause determination.

19       I feel that was a very pertinent factor in Susan B. Anthony

20   List and, really, the overriding one, on my reading.  Now, the

21   other factors were important, and I can't deny that, certainly,

22   any member can step forward at any time and accuse her of having

23   violated -- now, certainly, they can't -- based on the record we

24   have right now, Your Honor, nobody could come forward right now

25   and say there's been any actionable conduct.

1    What she said she intends to do is -- what she wants to do

2    is publish Exhibits 1 and 2 to the complaint.  That's the only

3    thing that she said she absolutely wants to do right now.  And I

4    was going to put it up on the screen, but you've seen it.  There

5    is, you know, one sentence in paragraph three where she flat out

6    states, "I don't photograph same-sex weddings or ceremonies

7    celebrating an open marriage."

8    Everything else in here is just her belief statement, which

9    is protected, and she would not violate the ordinance by

10   communicating anything else in there.  But I think she plausibly

11   suggests that if she mailed that out to -- in a mass mailing or

12   posted it on her website, that a person -- some person finds out

13   about it could step forward and say, "You know what?  You

14   violated the denial clause explicitly."

15   So this is like Susan B. Anthony in that sense that there is

16   a -- it's a very specific thing that she said she intends to do,

17   and I think it's been pled that way on purpose, to crystallize

18   the issue, and Metro would -- I have to concede that would be a

19   violation of the denial ordinance.

20   So -- but I think when you start looking at the

21   accommodations provision, it becomes much more attenuated,

22   because there -- let's assume she sent out an adverti -- there's

23   a little bit of inconsistency in their complaint.  On the one

24   hand, they say she doesn't want to advertise, because she is

25   afraid gay couples might come forward and ask her.

1    Now, if she sends this advertisement out, that would deter,

2    you would think, most gay couples from approaching her, because

3    she said right there she doesn't want to do it.  But under the

4    hypothetical situation where she advertises like she indicated

5    she wants to, she's approached, there would be a conversation

6    with the couple to the effect that, "I believe marriage is a

7    special gift from God that represents Jesus Christ's love for

8    his church," and so on.  "Marriage is -- traditional marriage is

9    what I believe in."

10   If that couple, then, still wanted to go forward after

11   hearing that, knowing that the vendor is not enthusiastic about

12   the event that they want her to provide services at, and they

13   insisted on hiring her and paying good money for that service

14   that will be provided by the unenthusiastic person, then she

15   would have to do it.  And it would be interesting to have a

16   factual record, because that's relevant to equitable standing,

17   about what would happen from there.

18   We don't have that, but what I'm trying to illustrate is

19   that for standing purposes, there isn't a lot to go on with

20   respect to why she, right now, feels that she's under a credible

21   threat of being -- that if she takes the action she intends to

22   take, a credible threat rather than sort a remote scenario that

23   she's going to have to refuse a same-sex couple who has actually

24   asked her to perform the services.

25            THE COURT:  Well --

1      MR. KAPLAN:  I concede on the denial clause.  It's a

2  much stronger case for standing.

3      THE COURT:  Let me step back.  Ask just -- I interpret

4  your standing argument and their standing argument in lay terms

5  this way, and I think you both -- from a just general

6  principles, what-makes-sense perspective, I think you both have

7  a point to make.

8    I think I'm going to ask you what you think about their

9  point, and then I'm going to ask them what they think about your

10  point.  Maybe I'll turn to them after this answer, and then,

11  like I said, we can always circle back.

12    I interpret your point to be that Louisville had never heard

13  of Chelsey Nelson until this suit, and if she hadn't filed the

14  suit, Metro Louisville would probably still not have heard of

15  her, and pluralism is hard.  It's a good thing, but it's hard.

16    We've been trying to figure out for a couple centuries how

17  to be able to do what we have a right to do without getting in

18  the way of other people who have a right to do other things.

19  And one of the ways that it kind of should work is don't go

20  looking for a fight when you don't have to.

21    And so I think part of what Louisville's point is is Chelsey

22  Nelson probably could have just gone about photographing

23  opposite-sex weddings, and she would have been fine doing that.

24  Probably no same-sex couples would have asked her to photograph

25  their weddings.  We wouldn't be here.  Like, why go spoiling for

1  a fight?

2      I'm going to ask them in a second why that's wrong.  I think

3  their point is:  Why should you have to break the law in order

4  to find out if that law is constitutional.  Now, obviously, you

5  know, you can't just pick a law that has nothing to do with you

6  and ask for an advisory opinion about it, but if you're in a

7  business that is breaking the law or, absent the fairness

8  ordinance, would be doing what the fairness ordinance prohibits,

9  why should you have to break the law first, subject yourself to

10  the administrative process, possibly subject yourself to a civil

11  suit, which is allowed by a member of the public, all to find

12  out that the ordinance was unconstitutional as applied to you?

13      So what's your answer to that?  Then I'll ask them what

14  their answer is to you.

15          MR. KAPLAN:  My answer is that she's only proposing

16  right now to do one thing which would break the law, which is

17  the sentence in this advertisement.

18      So my reaction to what you're saying is absolutely true.

19  That what she could have done is send out Exhibit 1 and Exhibit

20  2 without this highlighted sentence and accomplish exactly the

21  same objective, which I believe is to -- in a respectful,

22  candid, and is worded in a humane way to say, "This is what I

23  believe, and so this is what you will get if you hire me to take

24  pictures at your wedding."

25      That would have avoided this dispute, but in order to get

1    standing, they have pled that the advertisement has to be

2    written this way.  It has to say not only what she positively

3    believes, but what she will refuse to do if asked.

4        That is the only hook that they have, really, for standing,

5    because if you send out this advertisement, you're not going to

6    get any takers, unless it's a masochistic person who wants to

7    make a point as much as the plaintiff.  So --

8            THE COURT:  But, I mean, you say that as if it's

9    unplausible, but, I mean, that's what happened in Masterpiece

10   Cakeshop.  It's what happened at Arlene's Flowers.  It's not --

11   it happens.

12           MR. KAPLAN:  So my reaction is no, you shouldn't --

13   the law in the Sixth Circuit and Susan B. Anthony List says that

14   there is no expectation that someone who wants to assert their

15   First -- protected First Amendment rights has to risk a severe

16   penalty, jail time, et cetera in order to prove -- to vindicate

17   their rights.

18       That they can file a preenforcement challenge and allege

19   sufficient facts which would satisfy in Article III court that

20   there's actually a real controversy here that warrants

21   adjudication.

22       So we would never expect Miss Nelson to have to, you know,

23   shoot first and, you know, ask for permission later, but, in

24   this case, there is an element of artificiality and manufacture.

25       So perhaps this sits better under prudential standing, which

1   is a little looser, which focuses on, under the Grace Community

2   Church case, the likelihood that the harm alleged will ever come

3   to pass.  Two, whether the factual record is sufficiently

4   developed to produce a fair adjudication on the merits.

5        And that factor is important, Your Honor, because I would

6   have loved to have asked Miss Nelson, "Why does the

7   advertisement have to be worded this way?"  Why -- I guess I'm

8   showing my hand here if we ever went into discovery, but why is

9   it necessary to express that in the negative?

10        But, in any event, we don't have a well-developed factual

11   record --

12             THE COURT:  I mean, it would be -- you would object --

13   you would find it illegal even if she expressed it in I'll say

14   the nonnegative, the positive, if she said, "I only photograph

15   opposite-sex weddings"?  That would be as objectionable --

16             MR. KAPLAN:  True.

17             THE COURT:  -- to Louisville --

18             MR. KAPLAN:  Yeah.  I was being imprecise.  I mean,

19   rather than expressing her positive views of the type of

20   marriage God approves of, and her being a devout adherent to it,

21   her version of Christianity, she does not want to participate in

22   a same-sex wedding or be present at one, that would be

23   absolutely fair game.  That's the society we live in.

24        You have no right to not be uncomfortable, whether you're

25   the same-sex couple or a devout Christian wedding photographer

1    with certain beliefs about traditional marriage, neither one has

2    a right not to be uncomfortable, but there is an element of

3    artificiality here in the sense that she -- I think the Court

4    can take judicial notice of the fact that a same-sex couple --

5    if she really wants to disseminate this advertisement,

6    presumably, she wants to do it widely.  And really -- you know,

7    because that's how she thinks she's going to get business.

8        She must presume that same-sex couples will see that and be

9    aware.  Now, if they still think she's so talented, I want to go

10   in and talk with her, maybe convince her to do the service, they

11   are going to have a conversation where she can -- there is an

12   article at appendix 386, Should I Attend a Homosexual Wedding by

13   Kevin DeYoung.

14       She could hand them that article, say, "This is what I

15   believe."  There would be a conversation, so there's an element

16   of artificiality in that they're stating --

17            THE COURT:  You think she --

18            MR. KAPLAN:  -- their case.

19            THE COURT:  You think she could do that without

20   violating the fairness ordinance?

21            MR. KAPLAN:  Yes, absolutely.  Absolutely.  You know,

22   we -- our position is a little different from other

23   jurisdiction.  This isn't like Telescope Media Group where

24   Minnesota said, "She has to positively depict this wedding

25   exactly the same as this wedding."

1          I mean, Metro prosecutes for violation of the denial

2     ordinance, which is, "I won't provide the service to you."

3     They're not going to prosecute a situation where the person

4     says, "You know, this will make me very uncomfortable because of

5     the belief system that I follow.  Do you still want to move

6     forward?  Because I will do it, as I'm legally required to do."

7          So absolutely, Your Honor, I do think their briefs -- it

8     foists a view upon Metro that it doesn't have, which is that she

9     is required to bow her head when the clergyman says, "Bow your

10    head," that she's required to kneel when he says, "Kneel," that

11    she can't express objections while she's at the wedding.

12              THE COURT:  But I would think for the sake of the

13    fairness ordinance having the teeth it's supposed to have when

14    applied to conduct that everyone agrees is not expressive, that

15    you violate the fairness ordinance if you say, "I'll provide you

16    the service, but I won't do it well."

17              MR. KAPLAN:  I'm not sure about that.  I don't think

18    that's -- I don't think that's correct.  I think it would be --

19    to be honest and say, "I am an excellent wedding photographer,

20    but because of my belief system, I'm going to be uncomfortable,

21    and I'll do my best, as I'm required to do, but the pictures

22    probably" --

23              THE COURT:  Well, that's --

24              MR. KAPLAN:  -- "won't be as good."

25              THE COURT:  So -- but it would be a violation of

1    fairness ordinance to say, like, "I'll provide you this service,

2    but I won't do my best"?

3         MR. KAPLAN:  I think if you said, "It's going to be

4    crappy," you're effectively denying the service.  So -- but,

5    again, we don't have a factual --

6         THE COURT:  I mean, I think so -- I agree, I think so

7    too, but let me turn to them on the standing thing.  If you

8    could start with what I think is kind of their larger point,

9    which is this is not Masterpiece Cakeshop where somebody went

10   into the cake shop, said, "I want a custom-made cake for a

11   same-sex marriage."  The baker said, "No," and somebody tried to

12   enforce -- tried to fine -- tried to fine the baker.

13      Same thing with Arlene's Flowers where somebody said, you

14   know, "Do the floral arrangements for the wedding."  The florist

15   said, "I can't, in good conscience, do that," and somebody

16   brought an enforcement action.  Like, I think Louisville thinks

17   that Chelsey Nelson picked this fight.  So can you address that?

18        MR. NEIHART:  Yes, Your Honor.  I think I'll start

19   with in paragraphs 212 and 213 indicates the reasons that Miss

20   Nelson filed this complaint, at least some of the reasons, and

21   there, Miss Nelson had been coming --

22        THE COURT:  Can you move your microphone a little

23   closer?  Thanks.

24        MR. NEIHART:  Is that better?  Okay.  In paragraphs

25   212 and 213 of the complaint, Miss Nelson has indicated at least

1  part of the reason why that she filed this complaint, which was

2  that she had noticed news reports of the Masterpiece case as

3  well as even just down the street in Lexington, Kentucky, where

4  a gay pride festival had requested that a well-known Christian

5  print shop create a t-shirt celebrating the gay pride festival.

6      And so, in this case, the standard is whether there is a

7  credible threat of enforcement, not whether there is an actual

8  enforcement or even a threatened enforcement or whether there's

9  been -- there's been history of enforcing against Miss Nelson.

10  This question is whether there's a credible threat of

11  enforcement.

12      And so far, from -- from seeking a fight in this case, Miss

13  Nelson has wanted to ensure that she can advertise as she wants

14  to, she -- that she can grow her business in the way that she

15  wants to, that she can run her business consistent with her

16  religious beliefs, and Miss Nelson cannot do that if there is a

17  law, as Louisville has explicitly stated in its briefing and

18  here today in court, that prohibits Miss Nelson from running her

19  business in this way.

20      And so the purpose of the preenforcement suit is to gain

21  clarity for her business so that she can continue to promote

22  messages that are important to her faith well into the future.

23          THE COURT:  But that's -- that, alone, is not what

24  courts do.  We don't issue advisory opinions just because some

25  clarity would be nice.  So why is there -- and it also can't be

1    the case that there's a credible threat of prosecution in

2    Louisville just because there was an aggressive enforcement

3    proceeding in Colorado.  So -- arguably.  I'm not putting this

4    on -- arguably.  So why is there a credible threat of

5    prosecution in this case?

6            MR. NEIHART:  Well, I think, as the Court pointed out,

7    one of the McKay factors is whether it makes it easy -- whether

8    there is some sort of thing of -- some sort of mechanism in the

9    statute that makes it easy to enforce the statute, and here, I

10   think there's two mechanisms that make Louisville's ordinance

11   specifically capable of enforcement.

12       One is that any person can file a complaint, and then the

13   other one is that the commission itself can file a complaint if

14   it has reason to be that an unlawful practice has occurred.  And

15   so, in this case, Louisville has stated that Miss Nelson would

16   violate the law if she posted her desired statements.  And so --

17   and, in fact, Louisville had stated that she has a strong

18   standing argument in that respect.

19       But this goes to the intertwinement argument that we make in

20   the response to the motion to dismiss, and that is that whether

21   Miss Nelson can post her statement does not depend on receiving

22   a third-party request.  Instead, it depends entirely on whether

23   posting the statement is constitutionally protected or whether

24   it's prohibited by the publication provision.

25       But in order to make that determination, the Court also

1    needs to evaluate the merits underlying the -- Miss Nelson's

2    claim to the accommodations provision.  Because whether she has

3    a constitutional right to decline to celebrate same-sex services

4    informs whether she has the intertwined constitutional right to

5    post a statement explaining that choice.

6        And so in Telescope Media Group and Brush & Nib, the Eighth

7    Circuit and the Arizona Supreme Court respectively found that to

8    be the case.

9            THE COURT:  So let me interrupt, and I think I

10   understood what you just said to be something that I think is

11   right.  If the accommodations provision can be constitutionally

12   applied to Chelsey Nelson Photography, then the publication

13   provision is constitutional?

14           MR. NEIHART:  Yes, that's correct.  That's correct,

15   because they're intertwined.  Now --

16           THE COURT:  So let me, then, ask about your facial

17   challenge to the publication provision, because you make a

18   vagueness, overbreadth argument -- well, let me just -- I'm

19   going to get there, but you would agree, I think, that most

20   public -- most applications of a public accommodations law, most

21   applications of an anti-discrimination law are constitutional?

22           MR. NEIHART:  Your Honor, that's correct.  I'll

23   leave --

24           THE COURT:  So, for example, like a Marriott hotel can

25   constitutionally be fined by the government if it says, "I won't

```
 1    rent a gay couple a room for the night," correct?

 2              MR. NEIHART:  Of course.

 3              THE COURT:  And McDonald's can be fined if they say to

 4    a gay couple, "I'm not going to sell you a hamburger"?

 5              MR. NEIHART:  Yes.

 6              THE COURT:  Correct?  Okay.  And the 1964 Civil Rights

 7    Act is constitutional as applied, at least for most -- most

 8    applications?

 9              MR. NEIHART:  Yes.

10              THE COURT:  So how is the publication provision

11    facially invalid if it's saying most vendors can't put up a sign

12    that says, "No gays and lesbians allowed," when, in fact, most

13    vendors can be fined for refusing to serve gay and lesbian

14    customers?

15              MR. SCRUGGS:  Your Honor, can I --

16              THE COURT:  Yeah.

17              MR. SCRUGGS:  -- jump in?

18              THE COURT:  That does go to merits.

19              MR. SCRUGGS:  Bit of a merits question.  I'm happy to

20    answer that, and I think to answer your question, first of all,

21    your premise is exactly right, that the Fair Housing Act, the

22    Title VII both have provisions similar to what we call the

23    denial clause.

24        So there are, essentially, two clauses in the publication

25    provision.  The denial clause, which we totally agree is
```

 1   facially constitutional, because it applies the constitution in

 2   the vast amount of situations.

 3       What we're seeking to facially invalidate, though, is what

 4   we call the unwelcome clause.  So -- and that's the only thing

 5   we're seeking to facially invalidate, and, in fact, I think the

 6   point you make actually supports our argument, in the sense that

 7   they are two separate provisions, so they must be doing two

 8   separate things.

 9       I mean, they are separate language.  We interpret -- you

10   know, we will interpret it that it's not superfluous, so that --

11           THE COURT:  And this is a canon of construction, but

12   it's not -- it is often not a dispositive canon, and the belt

13   and suspenders approach is not unusual.

14           MR. SCRUGGS:  I agree with that, Your Honor, but just

15   look at the plain language of what we're seeking to challenge is

16   that unwelcome, unacceptable, and, be specific, it's -- the only

17   part we're facially challenging is that -- a statement that

18   indicates that a person's presence at or patronage of a public

19   accommodation is unwelcome, unacceptable, undesirable, or

20   unwelcome.

21       And that's why the Brush & Nib court, even the appellate

22   court that ruled against Brush & Nib on the merits of their

23   underlying claim facially invalidated, that is one particular

24   language, because it was vague and overbroad.

25       So that's really the only part that we're seeking to

1    facially invalidate.  It's not the denial clause.  In a sense,

2    we would just ask the Court to sever that end -- that end

3    language, which, again, would allow the Court, would allow

4    Louisville to prosecute individuals who say, "I can't -- I'm not

5    going to provide this service."

6              THE COURT:  I mean, it sounds like you're saying

7    that -- let's take the Marriott hotel for an example.  The

8    Marriott hotel -- it's okay for Louisville to fine the Marriott

9    for putting up a sign that says, "We won't rent a room to a gay

10   couple," but it is unconstitutional, according to you, for the

11   Marriott to put up a sign that says, "We don't want to rent a

12   room to a gay couple."  That doesn't make sense.

13             MR. SCRUGGS:  Well, now, I think to go to the example

14   that Louisville -- I think we'd go to the example Louisville

15   came up with, in the sense of you can anticipate someone who's

16   struggling saying, you know, "I don't believe in same-sex

17   marriage.  I struggle with this.  I'll do your -- I'll

18   photograph your wedding, but I want you to know it violates my

19   beliefs, but I'm going to do it."

20       My reading of that unwelcome, undesirable language would

21   prohibit that, and it would prohibit even things broader than

22   that, Your Honor.  Just take the simple statement, you know,

23   Israel commits murder.  Does that indicate that someone's

24   presence or patronage is unwelcome because of their national

25   origin, for example?

1    I think it arguably could, because that language is vague

2  and taken in and overbroad.  Again, looking at some other courts

3  that have ruled that way.  And, really -- but, of course, I will

4  fully admit, Your Honor, that that's not our central claim here.

5         THE COURT:  And let's -- so let's go to the -- let's

6  get to the merits.

7         MR. SCRUGGS:  Absolutely.

8         THE COURT:  And start with the accommodation merits.

9  I'm going to go -- I did a little research on weddings.  It's

10  been 13 years since mine, but I remember some of it, and I did a

11  little research to see what else is out there.

12    I made a list of all of the vendors that an engaged couple

13  might hire, and I'm not going to do all of them, but I'm going

14  to go through a lot of them and try to apply the test that I

15  think you applied for when is conduct speech.

16    McDonald's selling hamburger, not speech.  Marriott renting

17  a room for the night, not speech.  But some -- marching in a

18  parade, speech.  Even though there's no words, speech.  So what

19  conduct is speech?

20    I think, under your test, the tailor for the tux, the

21  groom's tux, not speech.  The baker who makes a plain, generic

22  white cake that is already sitting in the window, not speech.

23  The chef for the reception, even if the chef is onsite, not

24  speech.  If I'm wrong, I need this:  Don't -- just make a note,

25  if you would, and then we'll circle back.  If I'm right, don't

1    make any notes.

2            MR. SCRUGGS:  Yeah.

3            THE COURT:  That's fine.  The chef, not speech.  The

4    blow-dry stylist for the bridal party, not speech.  The makeup

5    artist for the bridal party, even though it's an -- even though

6    it's an artist, not speech.  The manicurist for the wedding

7    party, not speech.  The floral -- the customized floral

8    arrangements for the wedding, speech.  A custom-made wedding

9    cake, speech.  Videography, speech.  Photography, speech.

10       Let me just stop there.  Am I wrong on anything so far?

11           MR. SCRUGGS:  No, Your Honor.  I think that's --

12           THE COURT:  Okay.

13           MR. SCRUGGS:  -- all accurate.

14           THE COURT:  So here's the ones that I think -- I'm not

15   sure under your test.  So I'll guess, and then, at the end, you

16   tell me which ones I guessed wrong on.

17       The wedding planner, speech.  The seller of wedding

18   insurance, which I didn't even know was a thing, but I guess if

19   you spend a bunch of money on a wedding, and then it doesn't

20   happen, you can get an insurance policy to cover against that.

21   The seller of wedding insurance, not speech.

22       The venue for the wedding -- and this is all assuming that

23   none of these vendors are churches, core religious institutions.

24   Okay.  The venue for the wedding, not speech.  A custom-designed

25   wedding dress, speech.  Custom-designed invitations, speech.

1    Generic stationery, not speech.  Calligrapher, speech.

2        The printer of stationery, let's say the equivalent of like

3    a FedEx office printer, but they mainly do -- anyway, I think

4    you would say speech.  The jeweler who sells the rings, not

5    speech.  At jeweler who inscribes the wedding date inside the

6    rings, speech.

7        A custom wedding vows writer, which, it turns out, is a

8    thing that you can -- who you can hire, speech.  The officiant,

9    again, nonreligious officiant, speech.  The waiters at the

10   reception, not speech.  The deejay, speech.  The dance

11   instructor for the wedding couple, teach them how to do their

12   first dance, speech.

13       The limo driver for the bride and groom leaving the wedding,

14   not speech.  The Uber driver for the wedding guests leaving, not

15   speech.  The travel agent for the honeymoon, not speech.  A

16   divorce attorney, speech.

17       Now, which ones was I wrong on?

18           MR. SCRUGGS:  All right.  It's quite the list, Your

19   Honor, and I appreciate it.  I think, for the most part, you're

20   generally right.  I want to, though -- some caveats that,

21   obviously, I think we can think of just bizarre and extreme

22   examples that could eliminate or include --

23           THE COURT:  I'm not asking about that.

24           MR. SCRUGGS:  Yes.  Okay.  But I think that's

25   generally right.  The ones I have kind of a mark on were the

1    jewel -- the jeweler making the rings.  Part of me wants to

2    consider is that like the wedding dress?  Is there something so

3    symbolic about the final product that it conveys a message?  I

4    think that's a much closer call, but I think -- and another one

5    I have a mark on was the FedEx office, one, where --

6              THE COURT:  You think maybe not speech for that?

7              MR. SCRUGGS:  Well, I think, you know, there is -- you

8    can argue that, at some point, it almost is like a common

9    carrier.

10             THE COURT:  What's the difference between the printer

11   of stationery and the printer of t-shirts with hands on?

12             MR. SCRUGGS:  And, Your Honor, I think that's exactly

13   the parallel.  Is it like a publisher printer or is it more like

14   a telegraph company or telephone company?  I think that is

15   protected, but I just mark it.

16             THE COURT:  Well, I'll share.  My mom had a stationery

17   shop for the first 20 years -- or for about 15 years of my life,

18   and a lot of the stationery that she would sell, they would --

19   she or an employee would drive over to a little shop called

20   Minuteman Press, and they would tell Minuteman Press exactly

21   what the invitation should say, you know, "Come to our wedding,"

22   you know, "Justin and Jason," and Minuteman Press would print

23   it.  So that's my hypothetical.  In that situation, is Minuteman

24   Press engaging in speech?

25             MR. SCRUGGS:  Yes, Your Honor.  I think that's right.

1   I was thinking of a different kind of FedEx context.  The other

2   one I think I marked is dance instructor.  You know, I think

3   dance is protected speech, but, you know, it's -- I think it

4   would be sending dancing cases, right, of -- from the Supreme

5   Court where it kind of creates its own kind of category, in a

6   sense, but I think, generally, your -- your definitional list is

7   correct.

8          THE COURT:  Okay.  Then let me ask.  Imagine that

9   we're on a small -- let's imagine we're on a military base where

10  they don't have any of this stuff, and it's kind of in the

11  middle of nowhere.  There's a small town nearby that has all of

12  these things, but there's only one, and that one person is

13  opposed to same-sex marriage.

14     If I understand your theory right, a gay couple, the gay

15  couple in the military who wants to get married can't -- in that

16  community, that small town near the military base, they can't

17  get a custom-made floral arrangement, custom-made cake,

18  videography, photography, a wedding planner, a custom-design

19  dress, the stationery printed, rings, maybe, they can't get, an

20  officiant, a deejay, and if they need an attorney, an attorney

21  related to the marriage.

22     First of all -- well, what do I do with that?

23         MR. SCRUGGS:  Yes, Your Honor.  It is, you know, in

24  some sense, a difficult question, but I think that it's that

25  monopoly question that the Supreme Court addressed in Tornillo,

1   in a sense.  That was the argument in Tornillo, that because of

2   the newspapers were a monopoly, and no one could access those

3   newspapers, we could force the newspapers to open up to allow

4   people to speak particular messages.

5       And the Supreme Court rejected that argument and said that

6   that monopoly interest doesn't override the speaker's interest

7   to control what they do or do not say.

8       I think more in practical terms, Your Honor, is that in our

9   connected society, someone could obtain those services, for the

10  most part, but I'll also say thankfully, Your Honor, it's not

11  really an issue, obviously, in this case, right?  Because I

12  think your question goes to the compelling interest analysis.

13  It is speech.  Does the government have a compelling interest?

14          THE COURT:  So maybe in that small town, the

15  government would survive the strict scrutiny analysis.  Is that

16  what you're saying?

17          MR. SCRUGGS:  I'd say perhaps, Your Honor.  I'm

18  hesitant, because of Tornillo, and because of the principles

19  that Tornillo addressed, but I would say it's a different

20  analysis is my point.  That here, where everyone can see

21  hundreds of photographers and bloggers who are willing to

22  photograph and --

23          THE COURT:  Can -- let's go back to Louisville for a

24  minute.  All of that list that you said is speech, can they all

25  put up a sign that says -- and now I'm quoting from Masterpiece,

1    in terms of what Masterpiece said, a sign that would impose a

2    serious stigma on gay persons?  Can they all, according to your

3    theory, put up a sign that says, "No goods or services will be

4    sold if they will be used for gay marriages"?

5              MR. SCRUGGS:  No, Your Honor.  I think our argument's

6    slightly different.  So -- and I think the language that

7    Masterpiece uses was precise.  No goods or services sold that

8    will be used.

9       Our client is saying she wanted to custom create from

10   scratch, you know, these blogs or photographs.  So that is, I

11   think, slightly different, and to go back to the Brush & Nib

12   example that came up there, where, in that situation, you have

13   to kind of custom verse off-the-shelf scenario, where the

14   calligraphers would sell things off the shelf.

15      It's -- the objection here is not to how the product will be

16   used down in the stream of commerce or misuse.  The objection

17   here is the custom creation.  So I think we have to make that

18   distinction, which is a bit different than what the Supreme

19   Court was worried about, and, in fact, you know, that was one of

20   the reasons I think the majority didn't reach the bigger

21   question.

22             THE COURT:  How does the test you just gave apply to

23   the jeweler who is just selling a gold ring?

24             MR. SCRUGGS:  Well, Your Honor, again, I was just

25   saying --

1          THE COURT:  It's not custom made.

2          MR. SCRUGGS:  Then if it's not custom, then we don't

3     view that as protected.

4          THE COURT:  Okay.

5          MR. SCRUGGS:  It's off the shelf, like the

6     off-the-shelf cake.

7          THE COURT:  And then let's -- let's do -- I mean, I

8     know you don't think this next hypothetical is fair, and I'm not

9     sure it's analogous either.  In fact, I think under Obergefell,

10    it's not analogous, but I do want to -- I do want you to have a

11    chance to answer it.

12       Chelsey Nelson, same website, same photography, same

13    services, same city, same everything else, except she says under

14    her religious beliefs, interracial marriages are wrong, and so

15    she won't photograph one.  What would I do with that case?

16         MR. SCRUGGS:  I think that would be different, Your

17    Honor, and I think we want to think about it in terms of the

18    objection is different, and the interest analysis is different.

19    So the --

20         THE COURT:  Walk me through all that, please.

21         MR. SCRUGGS:  Absolutely.  So the objection, I think I

22    would turn exactly, to contrast, Loving versus Obergefell,

23    right?  Loving said that objections to interracial marriage are

24    inherently based on invidious racial discrimination designed to

25    maintain white superiority.  That's a quote.  Versus we look at

1    Obergefell where it said that objections to same-sex marriage
2    are based on decent and honoris religious and philosophical
3    principles.
4        So we would say, Your Honor, that that objection to
5    interracial marriage is inherently a status-based objection, not
6    a message-based objection.  But even if we kind of take that
7    analysis, then you go to the second part I think is different,
8    which is the interest analysis, and I point the Court to the US
9    Supreme Court decision that the DOJ cited in their brief, which
10   is Pena-Rodriguez versus Colorado where it specifically said
11   racial bias is a unique constitutional harm or history or
12   tradition is different.
13       So I think the interest analysis would be much stronger for
14   the state, and I'd actually point the Court that I think
15   Louisville even agrees with us.  So if you look at their
16   ordinance, the city of Louisville's ordinance, in section, I
17   think is it 90 -- 92-6, subsection B, which is the employment
18   section, they have an exception for religious organizations that
19   only accepts religious organizations regarding sexual
20   orientation and gender identity but not for any other category.
21       So I think what that is almost telling is, you know, we do
22   treat this kind of racial objection differently.  The Government
23   has a much stronger interest in doing so.
24           THE COURT:  Let me ask some general -- some
25   big-picture questions again, and then I'm going to give

1   Louisville --

2            MR. SCRUGGS:  Well, oh go ahead, Your Honor.  I was

3   going to -- I do want to circle back slightly to your question

4   about kind of the list of different groups, and I think one of

5   the challenges is the challenge there is not so much the nature

6   of this case, it's the nature of the First Amendment, right?

7   Because in every First Amendment case, no matter what it is, the

8   Court's going to have to draw that conduct versus speech

9   analysis.

10       So let's say the Government put a ban on wedding rings, for

11  example.  I know that sounds strange, but the Court, in that

12  case, is going to have to analyze whether that's speech or

13  conduct, and for all of those things.

14       So I don't think it's necessarily the nature of this case

15  that makes those line drawings difficult.  The courts are --

16  have typically drawn those lines throughout just the nature of

17  the First Amendment.

18       So I just wanted to point that out, and that's why, when it

19  comes down, you know, I know the Court's, obviously, concerned

20  about the implications of its ruling, not just the facts of this

21  case, but I think everyone agrees that photographs and blogs are

22  protected speech.  And so that's what kind of makes this case

23  safer and easier, in some respects, drawing that conduct versus

24  speech line.  So I'm sorry.  I just wanted to make that point.

25            THE COURT:  No.  I mean, that would be a, I think,

1    convenient segue to turn back to Louisville.  Let's start there.

2    Speech does not have to have words, correct?

3              MR. KAPLAN:  I'm sorry?

4              THE COURT:  Speech does not have to have words?

5              MR. KAPLAN:  That's correct.  That's --

6              THE COURT:  Burning a flag -- burning a flag is --

7    burning a flag is speech.

8              MR. KAPLAN:  Burning a flag.

9              THE COURT:  But there's no words.

10             MR. KAPLAN:  Right.

11             THE COURT:  But as a general matter, art counts at

12   speech.  Artistic expression.

13             MR. KAPLAN:  The courts have tended to find that, yes.

14             THE COURT:  The Sixth Circuit and the Supreme Court

15   have both listed photography in the category of things they

16   count as art.  Sixth Circuit said in ETW Corporation, it talked

17   about protected mediums of expression, and it listed music,

18   pictures, films, photographs, paintings, drawings, engravings,

19   prints, and sculptures.

20       Supreme Court in Stevens, about a decade ago, talked about

21   protected visual and auditory depictions, and it listed

22   photographs, videos, and sound recordings as protected speech.

23       So you got a Sixth Circuit saying photographs are speech.

24   Supreme Court saying photographs are speech.  I guess by -- my

25   question to you is what do I do with that?

1    And maybe to be a little more specific, what's wrong with

2    this -- I don't think syllogism is exactly the right word, but

3    art is speech.  Photography is art.  You can't compel political

4    or religious speech, so you, therefore, can't compel

5    photography.  Political or religious photography.  Your turn.

6         MR. KAPLAN:  All right.  Thank you.  I'd love the

7    opportunity to talk about some of the other questions you asked,

8    but with respect to your question, yeah, it's an interesting

9    question.  Photography, clearly art in some cases.  Robert

10   Mapplethorpe, when he does a photograph, is clearly trying to

11   convey to an audience certain ideas.

12   I don't believe any of the cases from the Supreme Court of

13   the Sixth Circuit say that in all cases, a photo is art or even

14   inherently expressive.

15   The case that they cite in their brief, which is the one

16   that I read most closely, which is from the Second Circuit, I

17   assume it's similar to the ones you're citing, which is the

18   Barry versus City of New York, treated -- puts photographers

19   along with other artists, other visual artists, as being engaged

20   in speech.

21   So I do think the context of these cases is important.  I

22   want to back up and remind the Court that here, we're not

23   dealing with a regulation that regulates speech per se or that

24   burdens speech per se.  I think they've suggested that it could

25   be viewed as a viewpoint-biased or content-biased statute.

1   That's simply just inconsistent with our precedence.  It's not.

2        THE COURT:  Yeah, but what do you do with -- so I have

3   a quote from Hurley talking about public accommodations law.  It

4   said -- this was the Hurley v. -- the case in Massachusetts

5   about the St. Patrick's Day parade, and a gay rights group

6   wanted to march in a private organization's St. Patrick's Day

7   parade.

8        Normally, private organization can't discriminate against

9   gays and lesbians.  So it seemed that this private organization

10  was running afoul of the public accommodations law, and this was

11  1995.

12       Unanimous Supreme Court said yes, the private organization

13  is running afoul of the public accommodations law, but that

14  public accommodations law as applied here is a violation of the

15  First Amendment, because the First Amendment applies when the

16  effect of declaring someone's speech itself is the public

17  accommodation.  So how do you get past Hurley?

18       MR. KAPLAN:  Well, I'm glad you brought up Hurley,

19  Your Honor.  All the lower courts that have come out different

20  ways on this issue, they all cite Hurley, and they all cite

21  Rumsfeld, and I believe that to reach the right result in this

22  case, those are both unanimous decisions, we have to read those

23  decisions and decide what they really say, because someone's

24  reading those cases wrong.  There's no other way to explain

25  these lower courts coming out in different ways.

1      With respect to Hurley, I'm shocked that they cite Hurley to

2   support their position.  I'm shocked to see it as a precedent

3   that the plaintiffs would use supporting their position, and

4   here's why.

5      In that case, Massachusetts had a public accommodations

6   ordinance that included sexual orientation as a protected

7   classification.  They chose to apply that in a peculiar way, as

8   the Court notes, to say, okay, the south Boston war veterans,

9   who have been given, basically, plenary authority to decide who

10  is in this parade on St. Patty's Day.

11     They're also celebrating the expulsion of the British with

12  the guns of Ticonderoga, historically, but it's a parade that

13  the war veterans were given, basically, plenary authority to

14  decide who's in and who's out.

15     That process worked as normal.  A group called GLIB, a group

16  of gays and lesbians who wanted to express their identities as

17  Irish Americans in the parade, complained that this was a public

18  accommodation, and Massachusetts did an odd thing, which is to

19  say even though this is a private parade being organized by a

20  private parade sponsor, and has been for decades, nonetheless,

21  we're viewing this as a public accommodation.

22     Based on that premise, the Court quite rightfully ruled

23  unanimously that when you have an inherently expressive

24  activity, which is a parade, and the reason that's inherently

25  expressive is a group of people get together, they go down the

1    public thoroughfare.  There are people to their right, people to

2    their left.  They're clearly communicating a message to the

3    public, and it's a message of their choice.

4        The reason that the fairness ordinance couldn't be applied

5    to require them to include a unit of gay pride individuals was

6    that they were already speaking, and that was going to alter

7    their message.  Inherently, it was going to either dilute, alter

8    their message by allowing a unit of people who they did not want

9    to include to, basically, piggyback on their parade.

10       This couldn't be more of a different situation.  This isn't

11   Miss Nelson's parade.  If it's a parade at all she's attending,

12   it's somebody else's parade.  So I think quite rightfully,

13   rather than focusing on the medium, which is photography, and I

14   want to go down that path, because as a philosophy major, I like

15   to analyze, like, parse issues like that, but let's forget about

16   photography for a second and focus on the fact that, you know, I

17   gather from her complaint she feels like she's being compelled

18   to attend a religious ceremony and to express support for what's

19   going on there in a way that's inconsistent with her religious

20   beliefs.

21       She's using a camera.  Yes, that's the service, she's that

22   type of service provider, but she feels her speech is being

23   compelled.  But as you point out, she's one of many vendors.

24   Just like the caterer, the harp player, the tablecloth person,

25   she's collateral to a private event that's being held by private

1    individuals, and she's showing up to be paid and to provide a

2    service.

3        So the idea that, somehow analogous to Hurley, her message

4    is being highjacked or piggybacked on by an unwelcome speaker

5    who she doesn't agree with, it's really -- it's really quite the

6    opposite.  She's being, true, required to provide a particular

7    service at that wedding.

8        The disconnect, I think, for me, and why I think we should

9    view this more in a Rumsfeld -- I want to talk about Rumsfeld

10   really deeply.  But the disconnect is how can it be inferred

11   that she is any way endorsing what's going on at that ceremony,

12   wedding, from the fact that she's taking pictures at it?

13       I've got -- first of all, let's talk about photography,

14   because I thought you were right to focus on that.

15            THE COURT:  Let --

16            MR. KAPLAN:  Let's talk about photography.

17            THE COURT:  Well, I do want to get there, but I want

18   to follow up on the Hurley, the Rumsfeld v. FAIR, the photog --

19   and where photography fits.  Marching in a parade is speech.

20   That's what Hurley said, and I take it that's what you're -- and

21   you just said -- you said that, and that's why you think

22   Hurley -- it sounds like you're saying you think Hurley was

23   rightly decided.

24            MR. KAPLAN:  Correct.

25            THE COURT:  In Rumsfeld v. FAIR, the government was

1    forcing, incentivizing, whatever word you want to use, the law

2    school to provide space, physical space for job interviews with

3    the military.  And I guess I read that case to say an empty room

4    is not speech.  And, you know, some -- and at some law schools,

5    most of the on-campus interviews are actually in hotels, as you

6    know.

7        So Hurley says marching in a parade is speech.  Rumsfeld v.

8    FAIR says an empty hotel room is not speech.  They seem very

9    consistent to me.  They don't seem in conflict at all.  And then

10   that just leads to the question, well, okay.  Marching is

11   speech.  An empty hotel room is not speech.  Is photography

12   speech?

13       And it sounds like your argument on photography is it's

14   speech if it's good.  If it's Robert -- if it's Robert

15   Mapplethorpe, it's good.  If it's me taking a selfie and posting

16   it on Instagram, then it's not speech.  That -- you're shaking

17   your head like I'm not -- like I'm not capturing your test --

18           MR. KAPLAN:  Well, I'm going to --

19           THE COURT:  -- correctly.

20           MR. KAPLAN:  Actually, I think there's -- I think

21   we're on the same page.

22           THE COURT:  Okay.  So why -- I mean, it seems to me

23   very expressive for me to snap a selfie, put it on Instagram,

24   let people know, you know, where I was, how I was feeling.  It

25   seems to me, you know, a random bystander's photograph of police

1    brutality, for example, might not be professional photography

2    quality, but that's a photograph that -- taken on a phone and

3    posted on social media.  I think that photograph seems like

4    pretty -- pretty clearly speech to me.

5        And then, you know, I got -- at a wedding, like, why

6    don't -- why would I post a picture of my wedding day on my

7    desk?  It's to express something about myself.

8        Tell me why it has to be a talented photographer in order to

9    count -- in order for photography to count as speech.

10            MR. KAPLAN:  It doesn't need to be a talented

11   photographer to count as speech.  I do think that you cannot, in

12   the abstract, say that photography, that taking -- and the

13   reason we're using the term photography, which says more, I view

14   this as taking -- the abstract question is:  Is taking pictures

15   always inherently expressive conduct?  And I want to talk about

16   Rumsfeld more in a second, because Justice Roberts writing for

17   the Court talked about inherently expressive conduct.

18       There is the fact that photography can be expressive, and

19   there's also what is being expressed.  That has to be key to

20   what we're talking about.  It can't just be this medium is

21   expressive, ergo that means Chelsey Nelson is being forced to

22   express support for same-sex marriage.  That's another step

23   forward, but let's just focus on the issue of photography,

24   'cause I do think it's interesting.

25       Is -- before we talk about her specific pictures, is taking

1    pictures, in general, an inherently expressive activity?  And,

2    if so, what's being expressed?  I think in normal human

3    experience, we've all had the experience of people taking

4    pictures to record an event so they can remember it later, and

5    that that's their purpose.  It's -- they're not conceptualizing

6    themselves as personally expressing themselves when they snap a

7    picture.

8              THE COURT:  That's why people keep a journal or a

9    diary also.

10             MR. KAPLAN:  Right.

11             THE COURT:  I want you to address that, because --

12             MR. KAPLAN:  Right.  Well, sure, but, again, we need

13   to talk about what is the message that's being expressed.  I

14   mean, a picture can express 1,000 words, but which 1,000, and

15   who is deciding what's actually being -- being expressed?

16       So with photography, you've got visual artists.  You've got

17   my kids with their smart phones snapping pictures.  Their

18   purposes can be to remember something, to capture something to

19   show to a friend who wasn't there, to Grandma, who couldn't

20   attend the event.  It's a social thing.  You know, it's just

21   what you do on vacation.  You see the Eiffel Tower, "Oh, I got

22   to take a picture of that."

23       Now, you can call all of that expression, but that starts to

24   really generalize overly much about what's actually going on in

25   these different cases.

1    Another reason you take a picture is to get paid, because

2    you're an -- she's clearly a good photographer.  The pictures

3    are pretty.  So she provides a technical skill, like a skilled

4    trade, that results in, you know, some pretty, very attractive

5    pictures.

6        But let's look at this picture, Your Honor.  So here is a

7    man and a woman.  He's not in a tux, but he's in a suit.  She's

8    in a wedding dress.  She's holding flowers.  It's outside.

9    There's an old house in the background.  So -- this is at

10   appendix 182.

11       If you show this picture to somebody on the street, would

12   they automatically say, "You know what" -- well, actually, let's

13   change it.  Let's change it.  Let's assume that there were

14   either two -- same picture, but two men or two women walking.

15   All right?

16       If you handed this picture to somebody on the street, would

17   they automatically say, "You know what?  That photographer must

18   really support gay marriage"?  Maybe somebody would say that.  I

19   doubt it.  They might say, "Well, what this is expressing is you

20   should get married outside."  Or, "What this is expressing is

21   that it's quaint to have an old house on the grounds."  Or,

22   "Don't wear a tuxedo, wear a more casual, hip suit instead of

23   a -- instead of a tux."

24            THE COURT:  But Mr. --

25            MR. KAPLAN:  Or --

1          THE COURT:  -- Kaplan, Justice Souter for the

2    unanimous court in Hurley addressed that exact point.  He said

3    even if the message is hard to understand, it doesn't mean that

4    the art is not speech, and he gave the example of a Jackson

5    Pollock painting.  Everyone in this room might disagree about

6    what that Jackson Pollock painting is expressing, but I would

7    hope we would all agree that it's speech.

8          MR. KAPLAN:  But, Your Honor, she is not alleging that

9    she's being just required to express something.  Her allegation

10   is that if I -- 'cause let's remember what she's being required

11   to do, and what she's not being required to do.

12      She is required to offer same-sex couples the same wedding

13   photography services she's willing to provide to opposite-sex

14   couples.  Okay.  That's undisputed.  This requires her to take

15   and edit pictures.  This requires her to attend the wedding.

16   Unless she can send a drone in to take the pictures, she's going

17   to have to be present.

18      She's not required to participate in the ceremonies like the

19   gay rights unit in the parade situation.  She's not there to be

20   part of a parade.  She is there as a service provider to provide

21   a service for pay.  She is not required to bow her head to pray

22   or to withhold any objections, and with respect to the blog,

23   she's -- if that's really part of her bundle of services that

24   she absolutely has to provide, she does have to blog afterwards,

25   but the ordinance in no way regulates what she has to say in her

1    blog.

2         So really what we're talking about is being forced to take

3    and edit pictures.  You can define that as having expressive

4    qualities to it or being, in some way, artistic, but I think

5    that gets away from the fundamental allegation, which is

6    compelled speech.  In Hurley, the parade sponsors, the south

7    Boston war veterans were being required to support and host a

8    foreign message that they felt was altering their message.

9         In this case, it's not as if Chelsey Nelson's already

10   talking about her loyalty to traditional marriage or having a

11   private event that somebody else wants to highjack.  She is not

12   there to express herself, she's there to -- because her conduct

13   is being regulated, she's required to show up and take pictures.

14             THE COURT:  Well, Mr. Kaplan, wouldn't you say that

15   her job is to create -- to create a product that sell -- create,

16   I think -- wouldn't you say it's to create art that celebrates

17   the wedding?

18             MR. KAPLAN:  I don't believe so.  I think it's her

19   interpretation.  I don't believe an objective observer would

20   look at this and say that her job is to celebrate the wedding.

21   She is a --

22             THE COURT:  Would you want to -- would you want to

23   hire a wedding photographer whose services did not celebrate

24   your wedding?

25             MR. KAPLAN:  Well, I'm celebrating my wedding, and I'm

1    hiring somebody, along with many other service providers, to

2    play, you know, a significant but not over -- overly important

3    role.  So --

4            THE COURT:  Spoken like the groom.

5            MR. KAPLAN:  Exactly.  Well, can I -- Your Honor,

6    would you permit me to shift the focus to Rumsfeld for just a

7    moment?

8            THE COURT:  Sure.

9            MR. KAPLAN:  Because I do think that going down this

10   speech rabbit hole, and what -- how speechy is a certain medium

11   of expression, and what exactly is being communicated.  As you

12   point out with your hypos to the other side, it's a lot of work

13   for judges to figure out what counts as speech.

14       I'd like to refocus it.  There's a different interpretation

15   of this situation, which is that, as has been the case for many

16   years, Louisville, Jefferson -- at the federal, state, and local

17   level, Louisville, Jefferson County has chosen to regulate

18   conduct.  They have chosen to prohibit discrimination in

19   offering goods and services to the general public.

20       So let's talk about Rumsfeld.  I have a little bit of a

21   different interpretation of Rumsfeld.  I think it's on point, in

22   this case, for our side.  I think it's -- I think it's hard to

23   distinguish.  Here's why.  And it was a unanimous opinion.

24       So the Solomon Act.  Okay.  What was the Solomon Act?  It's

25   a nondiscrimination statute.  Pure and simple.  It's a

1    nondiscrimination statute.  When law schools started objecting

2    to hosting military recruiters at law schools and forcing them

3    on to the undergraduate campuses to show how they felt about

4    don't ask, don't tell, the federal government stepped in and

5    said, "You know what?  If you want federal money, you can't

6    discriminate against military recruiters."

7        And the Court said they could have just directly mandated

8    that they host military recruiters.  They chose to make it a

9    condition for receiving federal funds.

10       And it was this -- it was a very similar nondiscrimination

11   statute.  It said if you provide a place for military recruiters

12   to talk to students to try to convince them to join the

13   military -- I'm sorry.  If you provide -- if you provide a place

14   for nonmilitary recruiters to -- whether it's Ford Motor Company

15   or Dow Chemical or IBM to try to convince students to join their

16   companies, and you facilitate that by sending e-mails and

17   posting fliers and make -- bringing the students and the

18   recruiters together, and posting what the recruiters are asking

19   you to post on those bulletin boards, if you do that for

20   nonmilitary recruiters, you must also do it for military

21   recruiters.

22       So you can't discriminate against military recruiters.

23   Whatever -- whatever is the best standard you're providing for

24   nonmilitary recruiters, you have to also provide it to military.

25   Very similar to Metro's ordinance in this case.

1      What Justice Roberts writing for the Court did, I think

2    correctly, is say, "Look, this is regulating conduct."  And I

3    understand the position of the law schools that they feel that

4    they are endorsing the military policy, and, specifically, don't

5    ask, don't tell, when they send e-mails and post fliers

6    announcing the presence of military recruiters, and thereby

7    making it more likely that students will join the military.  I

8    mean, they are being forced to participate in that process.

9    They are -- and I think the word used by -- in the Court was

10   facilitate or might have been a stronger word than that, but

11   that was assumed.

12      And where the Court came down was, you know, look, these

13   communications, these expressive acts, 'cause just as much as

14   the photo, we can say an e-mail is an expressive act, it's a

15   verbal.  A flier, let's say that the military recruiters said,

16   "Here, hang up this flier."  It's got a picture of an American

17   flag, and an eagle, some stars, a couple people in uniform

18   looking proud to be part of the American military, and

19   announcing the time and place of this interview.  "Post it."  I

20   think the law schools would have had to post it.

21          THE COURT:  But you couldn't make the law school

22   create it.

23          MR. KAPLAN:  So, you know, I don't know that Roberts

24   address -- I don't know that the Court actually addressed that.

25   Could they force them to print it out on their --

1              THE COURT:  If under Barnette, we can't make someone

2     salute the flag, I would surely think we can't make someone

3     create a flier that celebrates the military.

4              MR. KAPLAN:  Well --

5              THE COURT:  Under the First Amendment.

6              MR. KAPLAN:  -- I think it might -- I think there

7     could be a debate there, Your Honor, for this reason.  In

8     Barnette, West Virginia Board of Education vs. Barnette, the

9     Government mandated that students salute the flag and say the

10    pledge of allegiance.  It was a specific state-sponsored message

11    that they were being required to mouth, and that was -- they

12    were required to say exactly what the Government wanted them to

13    say.

14        Similarly, Wooley v. Maynard, you know, with the live free

15    or die model on the license plates, again, a state-sponsored

16    message was being jammed down their throat.

17        In this case, what's going on is the law schools are being

18    required to engage in conduct, to host military recruiters who

19    want to interview on campus.  Any communications that they are

20    sending is adjunct to that fundamental purpose.  It's

21    incidental.

22        I think Rumsfeld's hard to distinguish.  Now, your question

23    could they have been forced to design the flier, you know, that

24    wasn't addressed.  You know, the Court, instead, focused on the

25    fact that, like, look, it's undisputed that you're going to have

1    to help facilitate a message that you disagree with.  But the

2    Court didn't analyze that as speech, because the speech

3    components were subsidiary.  They were incidental to the

4    regulation of the conduct.

5        In the cases you're talking about and also Hurley, all we're

6    talking about is expression.  All we're talking about --

7            THE COURT:  I do think we're -- you and the

8    plaintiffs, you know, you don't agree on a lot, but I think you

9    both agree the Government can't compel speech.

10           MR. KAPLAN:  That's absolutely correct.

11           THE COURT:  And so then it just raises the question

12   what's speech.

13           MR. KAPLAN:  Well, exactly, and --

14           THE COURT:  And the question here is whether this

15   wedding photography is speech.

16           MR. KAPLAN:  And if it is, Your Honor, if -- under

17   Rumsfeld, if we're going to classify this with flag burning and

18   say okay.  This is conduct that has enough speech elements to be

19   considered to be inherently expressive, then we're going to

20   apply the O'Brien test, which I think would be fatal to their

21   case.

22       And in Rumsfeld, Justice Roberts writing for the Court said,

23   "Look, we disagree that this is really speech, even though

24   you're being required to engage in speech acts.  Maybe not

25   required to design the flier, but you're being required to be

1  part and parcel of disseminating a message you disagree with."

2      But if that is regulating -- if there's enough speech

3  elements to that regulation of conduct to trigger the First

4  Amendment, arguendo, then citing Albertini, all the Government

5  has to show is an important governmental interest, which with

6  Masterpiece Cakeshop, you know, they elevate nondiscrimination

7  against gays and lesbians about to the level of race.  I mean,

8  you know the quote, our society's come to the recognition gays

9  and gay couples cannot be treated as social outcasts and on and

10  on.

11      Clearly, Louisville/Jefferson County Metro has the

12  discretion to say we have a -- this is a compelling state

13  interest in this community.  So the issue becomes, under

14  O'Brien, if there's an important governmental interest which

15  would be in any way made less effective by not regulating,

16  completely different from strict scrutiny.  So if the purpose

17  would be impeded in any way, made less effective by not

18  regulating, then the First Amendment must give way.

19          THE COURT:  Right.  So they said that the wedding

20  venue is not speech.  That just seems very analogous to Rumsfeld

21  v. FAIR.  You want to have a facility that rents -- where you

22  rent space for weddings, you got to rent it to opposite-sex

23  couples and same-sex couples.  Because renting empty space is

24  not speech.

25      You want to run a law school where you provide space for job

1   interviews, you got to -- the government can make you allow

2   military job interviews along with nonmilitary job interviews.

3       The analogy between the Rumsfeld v. FAIR case and the

4   wedding venue case seems very strong.  The analogy between the

5   Rumsfeld v. FAIR case and the photography case here seems less

6   strong, because we can all agree that renting a wedding venue is

7   not speech, we can all agree that renting -- or providing a

8   facility for a job interview is not speech, but you two disagree

9   about whether photography is speech.

10      And so I think my job is to try to figure out, well, what is

11  photography most like?  Is it like a flag burning?  Is it like

12  renting a hotel room?  Is it like a custom-made wedding cake?

13  Is it like -- is it like the things that the courts call speech?

14  And so, you know, again, is it like music?  Is it like films?

15  Is it like paintings?  Is it like drawings?  Is it like

16  sculptures?

17          MR. KAPLAN:  But, Your Honor, that question can't

18  answered in the abstract.  You'd have to look at --

19          THE COURT:  Is wedding photography like it?  Yeah.

20          MR. KAPLAN:  Well, but also these pictures, that's

21  where I think the rubber hits the road, because the issue is not

22  whether photography, in general, can be artistic or if not,

23  quote, unquote, artistic, expressive.  The issue is what idea is

24  being fundamentally expressed, and is she being required by

25  being, essentially, forced to take pictures at a gay wedding, is

1  she being required to communicate a message of endorsement or
2  celebration of that?
3      That's where it's like Rumsfeld, because Rumsfeld -- and
4  Rumsfeld is -- the law school didn't just have to host.  They
5  didn't just say, "Here is a room.  We're out of it."  Their
6  administrative infrastructure was, to some degree, highjacked,
7  and they were required -- they became complicit --
8          THE COURT:  They were allowed -- and I remember,
9  because I was there.  They were allowed to send an e-mail to
10 every student saying, "We don't want the military on campus, and
11 we don't support the don't ask, don't tell policy."
12     Now, I think you would have to agree that Chelsey Nelson
13 will be in violation of the fairness ordinance if she said to a
14 gay couple, "I'll photograph your wedding, but I'm going to put
15 a caption on every picture that says I don't like what's going
16 on."
17         MR. KAPLAN:  That's true.  Well, I don't like -- yeah.
18 Well, that's a -- that's a hypothetical that's not faced here,
19 because it's undisputed --
20         THE COURT:  Gay -- same-sex marriage is wrong.
21         MR. KAPLAN:  She doesn't --
22         THE COURT:  And --
23         MR. KAPLAN:  -- put --
24         THE COURT:  -- if that were the caption.
25         MR. KAPLAN:  -- words on her pictures, so this is not

1    like Brush & Nib where they had to say the word "celebrate" over

2    and over, and there's many distinctions, but -- but, to your

3    point, she is -- I think this may be a misunderstanding.

4        Like the law schools in Rumsfeld, which as the Court pointed

5    out, it wasn't their refusal to host -- to allow military

6    recruiters to be on the law school campus, and to force them on

7    to the undergraduate campus that was expressing some clear

8    message.

9        No third-party observer would have said, "Okay.  They've

10   relegated them to the undergraduate campus.  They must really be

11   against don't ask, don't tell."  It was the speech that

12   accompanied --

13           THE COURT:  But as you'll -- the Court said that the

14   e-mail providing information about the venues was incidental to

15   the nonexpressive conduct.  Here, the photography is not

16   incidental to the photography.  The photography is the

17   photography.

18           MR. KAPLAN:  Well, but the photography is incidental

19   to the -- the photography is incidental to -- as you point out,

20   there are many different kinds of vendors that could be

21   classified as engaging in expressive conduct.

22       She is being required to take pictures at a same-sex wedding

23   if she's asked to do so by a same-sex couple.  She's not being

24   required to express any particular viewpoint about gay marriage.

25   That is something that she suggests in her complaint, but it's

1    implausible, because like the law schools in Rumsfeld, if she

2    wants to, at the wedding, she could elbow the person next to her

3    and say, "You know what?  I'm not comfortable with this."

4            THE COURT:  Really?  You think she could do that and

5    not violate the fairness ordinance?

6            MR. KAPLAN:  Absolutely.  Your Honor --

7            THE COURT:  I'm not sure that's the right reading of

8    the fairness ordinance.

9            MR. KAPLAN:  Well, but, Your Honor, the fairness

10   ordinance requires her to offer goods and services to the public

11   on the same terms and conditions she would provide them to

12   anybody else.  It doesn't say that she has to say or do anything

13   else, in particular.

14       So this is -- this is why the First Amendment is important,

15   Your Honor.  I mean, Louisville Metro Government can't force her

16   to say, "I'm here, and I'm happy, and I approve of gay

17   marriage."  Absolutely not.  The First Amendment is more robust

18   than that.

19       So this is where there's an element of unreality to this,

20   because getting back to why are we here, in the real world,

21   there would be a conversation that would occur where, from the

22   get-go, the people buying the service would understand who

23   they're dealing with and wouldn't hire her in the first place.

24       Now, if they did despite that, because they wanted to prove

25   a point, I mean, they would get possibly what they asked for,

```
 1   which is that she wouldn't have a smile on her face.  She
 2   wouldn't be standing up when it was time to stand up.  She
 3   wouldn't be kneeling when it's time to kneel.
 4            THE COURT:  She might be --
 5            MR. KAPLAN:  She might even --
 6            THE COURT:  -- bad --
 7            MR. KAPLAN:  -- express an objection to the gay
 8   wedding.
 9            THE COURT:  Yeah.  She would be badmouthing the
10   wedding --
11            MR. KAPLAN:  Yeah.  But that's why --
12            THE COURT:  -- at the wedding.
13            MR. KAPLAN:  -- this would never happen, that's the
14   point, but she'd have a right to do that, absolutely.  She's not
15   like the kids in Lee vs. Weisman where she's under some type of
16   peer pressure, and she's not going to be able to articulate her
17   views.
18            THE COURT:  I have to say that I think if you are a
19   wedding photographer who goes to opposite-sex weddings and takes
20   pictures without badmouthing the wedding, under the fairness
21   ordinance, you have to be a photographer who goes to a same-sex
22   wedding and takes pictures without badmouthing the wedding.
23            MR. KAPLAN:  That isn't what it -- how it reads, Your
24   Honor.  It regulates conduct only.  It doesn't regulate speech.
25   It requires her to provide any service that she provides to an
```

1    opposite-sex couple.

2         THE COURT:  I mean, I understand that that

3    interpretation could be helpful in the short term on the

4    judgment in this case, but that -- you have taken a lot of teeth

5    out of the fairness ordinance for nonexpressive conduct, and I'm

6    a little -- I'm not -- you know, your client's -- the mayor's

7    not here, but I'm not sure you would want an interpretation of

8    the fairness ordinance that is that toothless.

9         MR. KAPLAN:  Well, it's really not toothless, though,

10   because in the real world, in that situation, most wedding

11   photographers would comport themselves with dignity and respect

12   and wouldn't do that, but that doesn't mean she doesn't have a

13   right to express herself.  I don't think there's anything that

14   I've said that would surprise anybody in Louisville Metro or

15   not.

16      We're just talking about behavior that could possibly occur,

17   but given how the fairness ordinance actually works, if a person

18   in her position is approached and asked to provide wedding

19   photography services at a same-sex wedding, and then the normal

20   conversation that would take place in a pluralistic society

21   occurs which is, "Here's who I am.  We've met.  Here's the type

22   of photographer I am, it's not going to be a good fit for a

23   same-sex couple."

24      But if they decided to go forward, they would face the

25   consequences of that, which is they've hired someone who's not

1    happy to be there.  Now, we would be speculating about what

2    Chelsey Nelson would do in that situation.  She seems like a

3    very nice person.  So -- but, again, nothing in the ordinance

4    requires her to participate in a religious ceremony in any way,

5    shape, or form.

6              THE COURT:  Let me --

7              MR. KAPLAN:  And I just want to emphasize that, that,

8    yeah, I'm sure the mayor would not like to think that there are

9    going to be gay weddings happening all over town with wedding

10   photographers making a scene.

11             THE COURT:  It's not just the photographers.  I'm

12   talking about every -- every vendor, not just in a wedding

13   context, but, again, Marriott, Burger King, stationery shops,

14   every -- every place that we go, you know, the car wash, and

15   your interpretation of the fairness ordinance would say, yes,

16   they have to serve gay customers, but they're allowed to provide

17   a different service to gay customers than they are to

18   opposite --

19             MR. KAPLAN:  Not a -- not a different service.

20   They're allowed to say what they want to say unless they're

21   saying, "I won't provide you with the service."  That's what's

22   prohibited.  They're allowed to speak their minds.

23      You can imagine a restauranteur who grew up under Jim Crow

24   was inconvenienced by Title VII, felt like his message was being

25   squashed, who had to open up his restaurant to black people.  I

1    don't think there's anything that would have required him to

2    have a smile on his face when black customers come in there.  Or

3    I don't think there's anything that would have prevented him

4    from saying, "You know what?  I don't believe in mixed-race

5    marriages."

6            THE COURT:  You think the guy who ran Ollie's

7    Barbecue, which was the civil rights -- 1964 Civil Rights Act

8    case on the public accommodations, you think the guy who ran

9    Ollie's Barbecue would have been allowed, under the Civil Rights

10   Act, to serve white customers with a smile but serve all black

11   customers while -- while telling them, "I wish you weren't

12   here"?

13           MR. KAPLAN:  "I wish you weren't here" crosses the

14   line, I think, because under the -- under the unwelcome clause,

15   conduct that's tantamount to a refusal.

16       So, for example, if Chelsey Nelson were to say on her

17   advertisement or website, "I believe in traditional marriage.  I

18   believe only in marriage between a man or a woman, and if you

19   don't like that, don't bother showing up," or, "if you don't

20   like that, get out of here."

21       That does become a violation of the publication provision,

22   because she's essentially saying, "I won't serve you."  But the

23   ordinance doesn't -- I mean, perhaps they could have tried to

24   draft it in a way that and if you're civil to your -- all your

25   general public customers, you have to be equally civil to

1    same-sex customers.

2            THE COURT:  That's part of what you're buying --

3    maybe -- I don't want to go into it, but I think that's part of

4    what you're buying when you buy a photographer is you're buying

5    somebody who -- well, you're not buying somebody, but you're

6    buying the services of a photographer who will celebrate your

7    wedding.  Help you -- help, you know --

8            MR. KAPLAN:  That's a reasonable expectation but not

9    legally mandated by the -- by the Metro ordinance.  So people

10   should protect themselves and only hire people who vibe with

11   what they want to vibe at their wedding.

12           THE COURT:  Let me shift from weddings.  Let's say

13   that there is a freelance photographer who take pictures for

14   National Geographic, takes pictures of scenery, loves the

15   environment, and really feels called to use her photographic

16   talents to celebrate conservation.

17       And then there is a website that is a climate-change-denying

18   website, and they say, "We want to hire you.  Go take pictures

19   for us."  And do you think the government could constitutionally

20   fine that photographer if she says, "No, I won't take your

21   pictures"?

22           MR. KAPLAN:  Well, in that -- I want to respond

23   directly to your hypo, but I think in that situation, I've got

24   my Metro hat on, Metro enforcement, and we're looking at the

25   metro ordinance, there isn't any -- there seemingly is no

1    protected classification that is represented by that customer.

2    So in that case --

3         THE COURT:  Yeah, but that -- but it's a different

4    hypothetical.  I mean, that -- I'm just saying imagine --

5    imagine there was a state law that said, you know, you are --

6    let's just say you're fined if you don't take photographs for

7    all-comers, and then this situation arose.  Constitutional?

8         MR. KAPLAN:  Well, these are tough -- tough

9    hypotheticals.  I think the first thing I would say to you is

10   that that photographer has to provide the same services for that

11   request or that she's provided to any other requestor.  So if

12   she's ever done anything like that in the past, she'd have --

13   for certain, have to provide it to that customer.

14        THE COURT:  What about a freelance writer?  Same --

15   everything else is the same.

16        MR. KAPLAN:  I guess --

17        THE COURT:  Environmentalist loves conservation.

18   Climate change people -- climate-change-denying website wants to

19   hire the freelance writer to write the text of the website.

20        MR. KAPLAN:  We -- okay.  And we're stipulating that

21   climate change deniers are a protected class?

22        THE COURT:  Yeah.  There's a -- there's a state

23   statute that says, you know, freelance writers for websites have

24   to take all comers.

25        MR. KAPLAN:  You know, it reminds me of a hypo of the

1   republican campaign forcing a democratic speech writer to write

2   their speeches.  The speeches won't be very good.  So the hypos

3   are a little -- there's an element of unreality where -- that's

4   why I always want to try to stay focused on the fact that who is

5   the protected classification, and is the refusal, can we infer

6   from that --

7           THE COURT:  But can you answer my hypothetical?

8           MR. KAPLAN:  I don't -- I don't know the answer to

9   that question.  If climate change deniers were afforded

10   protected status, such that all vendors out in the world who

11   they might ask to provide services for them are required to

12   provide goods and services to them on the same services they

13   provide to other members of the general public, I guess I would

14   say, if I have to answer -- I think it's a tough hypothetical.

15      If I had to answer the question, I'd say that the speech

16   writer would have to provide that service to the climate change

17   deniers and would probably not do the best job, because when

18   you're in a creative field, and your heart's not in it, you're

19   not going to do as well as somebody who is on the same page with

20   the customer.

21           THE COURT:  And that -- but then --

22           MR. KAPLAN:  Which is why these hypotheticals don't --

23           THE COURT:  I know, but that --

24           MR. KAPLAN:  -- don't ring true.

25           THE COURT:  But that's your -- that's your -- and that

1    is a consis -- that is a consistent answer with the position on

2    photography, and I'm guessing that your answer would be the same

3    for, again, the climate-denying website.  It'd be the same for a

4    freelance illustrator, a freelance composer for, you know,

5    music, a freelance -- I don't -- I don't even know what else.

6                MR. KAPLAN:  One example is that the thing about --

7                THE COURT:  Would it be the same for those two?

8                MR. KAPLAN:  Does an atheist have to -- again, I want

9    to have my Metro hat on for a second.  In all of these cases,

10   Metro would want to know all of the facts or with any government

11   authority would want to know what exactly was requested?  What

12   has the vendor provided in the past?  Was it similar?  You know,

13   so are they willing to do something for money in this case but

14   not in this case, and is that because of the protected

15   classification?  That's really the type of inquiry that the

16   government, in good faith, must do.

17       You can't make these broad-brush judgments, 'cause what

18   you're trying to find out is is invidious discrimination taking

19   place, and, oftentimes, you need the facts, but in the abstract,

20   I don't think those hypos are any different.

21       What you're talking about, yes, is somebody who is in a

22   field involving verbal skills.  Some -- some element of

23   creativity is not true, like, artistry, however you define those

24   terms, who is being asked to deploy that skill set by a member

25   of a protected classification.

1       In those cases, those are hard cases, but I would think that

2   I would err on the side of saying that the service needs to be

3   provided on an equal basis, because the government has said, for

4   whatever reason -- and in the climate change situation, I can't

5   imagine they ever would, but the Government has said we have a

6   compelling state interest in making sure this particular group

7   of people doesn't get discriminated against.

8       And so if that requires somebody to facilitate their

9   message, kind of like in Rumsfeld, they're going to have to, in

10  their view, get their hands a little dirty somehow.  That does

11  not override -- their First Amendment interest in avoiding that

12  outcome don't override the Government's compelling state

13  interest in creating a society that's free of discrimination.

14          THE COURT:  Let me turn to the plaintiffs.

15          MR. KAPLAN:  Can I ask, Your Honor, please, on the

16  race is different thing, I really do feel the need to comment on

17  that.

18          THE COURT:  Yeah.  Go ahead.

19          MR. KAPLAN:  I don't think there's any principle basis

20  to distinguish how compelling is the state interest in rooting

21  out invidious racial discrimination versus evaluating how

22  compelling is a state or local government's interest in

23  eradicating invidious discrimination against sexual orientation.

24      I think you can stipulate that slavery is probably the

25  largest blemish, moral blemish on this society, and it had to be

1    dealt with through laws that were remedial in nature and ensured

2    that black people would not be discriminated against.

3        But the evil of slavery, and the trauma that this country

4    had to go through to start to get past that, through those

5    remedial laws, it's not really evidence that other interests

6    articulated by government entities are somehow lesser than that,

7    because they don't involve race.

8        In fact, the experience with race in many ways paved the way

9    to other classifications being set up.  It became the model.  So

10   I don't think -- I think because it's tough to say that it would

11   be -- you know they don't want to say, "Well, Bob Jones

12   University should have been decided differently," or any number

13   of other cases involving race.

14       But in the end, it's up to a legislature that's

15   democratically elected to decide what is or is not a compelling

16   state interest, and the courts, including Telescope Media Group

17   and on down the line, essentially stipulate there is a

18   compelling state interest here.

19       Some of these courts, though, for whatever reason, say but

20   it automatically falls, because we have a sincere speaker or

21   sincere religious belief that's going to be, in our view, in

22   some measure of burden by that or forced to say something they

23   don't want to say.

24       If you wind up applying a test that involves an important

25   governmental interest or a compelling state interest, which I

1    don't think is warranted in this case, it should be rational

2    basis review, but if you did, I don't think there's any

3    principle basis to give any less weight to the need to avoid

4    discrimination against gays and lesbians.

5              THE COURT:  And you said the legislature gets to

6    decide what's a compelling interest, but I think that's not what

7    you meant, right?

8              MR. KAPLAN:  Well, I'm sorry.  The legislature gets to

9    make findings that Your Honor has to take at face --

10   essentially, at face value about the importance of the statutory

11   scheme.  So yes, it's the duty of the Court to decide if a

12   compelling state interest has been articulated.  And if -- but

13   perhaps I'm wrong, Your Honor, but the way I look at it, you

14   don't probe too much behind someone's sincere religious beliefs.

15     By the same token, if Louisville Metro has said, "We believe

16   this ordinance is necessary to avoid social strife, and to

17   preserve human dignity, and to ameliorate humiliation, and to

18   unleash everyone's productive capacities, and to -- for the

19   general welfare, that, in general, the Court's not going to

20   question the judgment of a democratically-elected body that it

21   is really that important.

22     And so what your -- what the Court ultimately does, though,

23   is decide, okay, in this case, given that we have a strong

24   interest here, and also a sincere religious belief that's

25   entitled to neutral and respectful consideration, in the case of

1    a religious belief, if you're evaluating speech, speech, does

2    one have to give weight to the other in a particular case?

3              THE COURT:  Okay.  Let's turn to Mr. Scruggs again,

4    and, I guess, responses?

5              MR. SCRUGGS:  Sure, Your Honor.  A lot of different

6    things, and quickly respond to that last point.  Under the

7    compelling interest analysis, the burden, it's a high burden on

8    the government.

9         In the Playboy case, which is United States vs. Playboy

10   Entertainment Group, the legislature put forth a 10,000-page

11   record to try to establish its compelling interest, and the

12   Court analyzed that and didn't just accept it at face value and

13   said mere anecdotes and supposition is not enough.

14        So there's a long history of the Government refusing just to

15   defer, under the compelling interest analysis, to statements

16   made by the legislative body.  I mean, these are fundamental

17   constitutional rights at stake.

18        I do want to back up.  There are a couple points.  I do

19   agree with my colleague that it is, in some sense, a Hurley

20   versus Rumsfeld.  The points that I do want to leave the Court

21   is we do think Hurley controls, and that Hurley provides the

22   right balance in this situation, and, in fact, Your Honor, I

23   encourage the Court, if you go back and read the briefs that

24   were put forth before the Supreme Court, you get a sense of deja

25   vu, in fact, because it's really the exact same arguments.

1          That in that situation, the LGBTQ group was arguing we're

2     regulating conduct and not speech.  They invoked O'Brien and

3     said it's only an incidental burden, and, in fact, that's what

4     the lower courts in Hurley adopted.  They adopted the O'Brien

5     test to say it's only incidental burden here.  You have thrown

6     yourself open to the public, and, therefore, you have to

7     serve everyone, allow access to everyone.

8          But the Supreme Court, obviously, rejected those arguments

9     and said, as you noted before, when you make speech itself the

10    public accommodation, it compels speech.

11          THE COURT:  O'Brien was burning a draft card.  Why is

12    burning a draft card not speech, but burning a flag is speech?

13          MR. SCRUGGS:  Well, Your Honor, I think that

14    situation, the analysis, in a sense, was the same in the sense

15    of it was first analyzing what was happening and said, "Is this

16    expressive conduct or not," and it views those events as a

17    whole.

18          Our argument is not whether there is expressive conduct.  We

19    kind of view photography as pure speech.  It's like a book or a

20    film that you can -- as the Eighth Circuit said, you can break

21    those up into constituent acts, you know, typing the letters on

22    the page or writing the words, but you need to focus on the

23    final product, right?  And if the final product is expressive,

24    those events leading up to the creation of the product are

25    inherently tied together.  That's what numerous court -- and --

1          THE COURT:  There's a little bit of your test that

2     sounds like the more expensive something is, the more it counts

3     as speech.  I mean, going back to all the wedding hypotheticals.

4     Like, is that unfair?

5          MR. SCRUGGS:  Well, Your Honor, I don't think it's

6     required.  I think you could argue it's illuminating, in the

7     sense of, you know, there is the kind of practical reality of

8     why does someone go to a photographer, a professional

9     photographer to photograph their wedding?  They're hiring them

10    for their skills to express their -- a message versus someone

11    just off the street doing a selfie.

12        So -- but I don't think it's necessarily required.  I mean,

13    someone can speak through photography whether they're being paid

14    a lot or a little, but I think it's just a practical reality of

15    this person is being sought out to pay for their artistic

16    capabilities and skills.  I think what that shows is precisely

17    the reason they're being sought out is because of their

18    capability to express that artistic message.

19        I do want to go back to kind of the Hurley versus Rumsfeld

20    point, Your Honor.  So Hurley, the message, in many respects,

21    walking in a parade is more like conduct than photography,

22    right?  There's a lot more con -- photography is much more

23    speechy than 20,000 people marching.

24        So in that respect, I think it's -- in this case, as has

25    been earlier, easier than Hurley, because the Supreme Court and

1    the Sixth Circuit have held numerous times that photographs are

2    speech, and they're inherently expressive.

3              THE COURT:  Let me interrupt just while I'm on it.

4    Mr. Kaplan, what's the message of the St. Patrick's Day parade?

5              MR. KAPLAN:  Well, you know, the opinion of the Court

6    admitted of the fact that there isn't, necessarily, one distinct

7    message, it's kind of an amalgam, because a parade is made up of

8    units, but there's sort of a fundamental coherence, in theory,

9    and the parade organizers are gathering together different

10   units, that they think that the whole will be greater than the

11   sum of its parts, and it's a vision of this is what it means to

12   be Irish American in Boston.  That this is what we believe it's

13   about.  It's -- and maybe there's an element of patriotism, and

14   maybe there is an element of pride and being a part of the

15   birthplace of democrac -- or of the revolution.

16       And -- but the fundamental message is this is who we are.

17   And so you can see why if you're already engaging in that

18   conduct, and this kind of a foreign body is trying to infiltrate

19   what you're trying to do, that that does offend the First

20   Amendment, and it was a unanimous opinion that was clearly

21   correctly decided that that would alter your message.

22       That's where I have a problem understanding how it's

23   analogous to this case, because Chelsey Nelson's not being

24   forced to alter her message.  I mean, she can be out there at

25   all times before -- before and after the event, and, perhaps,

1   during, expressing her views about traditional marriage.  No

2   one's trying to highjack what she is doing and infiltrate it

3   with a gay rights or same-sex --

4           THE COURT:  Okay.

5           MR. KAPLAN:   -- marriage.

6           THE COURT:  What do you -- what do you say to that,

7   Mr. Scruggs, that -- the message of the parade, I think it was

8   well put, is this is who we are.  The wedding's message is the

9   message of the couple, and, you know, you're not -- it's not

10  Chelsey Nelson's message that day.  It's not about her.

11          MR. SCRUGGS:  Absolutely.  So I just think of

12  Tornillo.  No one thinks that, necessarily, the newspaper

13  endorses the op-ed written by someone else under someone else's

14  name, but -- well, maybe, unless --

15          THE COURT:  If you follow the news recently, but --

16          MR. SCRUGGS:  Yes, Your Honor.  There are probably

17  some rare examples --

18          THE COURT:  Sure.

19          MR. SCRUGGS:  -- or exceptions to that, but, generally

20  speaking, Tornillo, Pacific Gas & Electric, Wooley all really

21  kind of rejected this core argument that, you know, you're

22  speaking on behalf of someone else.  Even Riley.  Riley involved

23  fundraisers who are paid to speak somebody else's message.  The

24  Court there said you can't compel them to speak, in that case,

25  you know, the government's message, even though they are

1   speaking on behalf of someone else.

2       Our fundamental argument, Your Honor, is that it is Chelsey

3   Nelson's speech.  She creates it.  She makes it.  There's no

4   commission speech exception to the First Amendment, you know,

5   for -- the Government can't compel someone to ghostwrite a book

6   for someone else.

7           THE COURT:  Well, he says -- he says they can.  You

8   can compel a democratic speechwriter to write speeches for a

9   republican.

10          MR. SCRUGGS:  And I think -- I think that's absolutely

11  wrong, and I would say it's not even that far of a hypothetical.

12  There are numerous jurisdictions in the Sixth Circuit that make

13  political belief a protected class.

14      So -- and I think it -- and that's why it conflicts with

15  Hurley.  It conflicts with the Sixth Circuit cases involving

16  newspapers saying that you can't apply the 1866 Civil Rights Act

17  to compel a newspaper to publish an op-ed that the newspaper

18  disagrees with.

19      And so we think that, again, along those other lines of

20  cases that say when, you know, Michelangelo was hired to draw

21  the Sistine Chapel ceiling by the Pope, whose speech is it?

22  Well, I guess, in some sense, you can say it's the Pope's

23  speech, he paid for it, but I think we would give a little bit

24  of leeway to Michelangelo there too.  I think --

25          THE COURT:  What about the selfie of me with the

1     Eiffel Tower behind me, speech or not speech?

2              MR. SCRUGGS:  Your Honor, my lean is to create -- is

3     to say that all photographs are speech, 'cause that's what the

4     courts seem to indicate.  You know, I think we could come up

5     with some no artistic skill whatsoever done, just click the

6     button.  That might be an extreme case.

7              THE COURT:  Sounds like my photographs.

8              MR. SCRUGGS:  That -- what was that, Your Honor?  I'm

9     sorry.

10             THE COURT:  It's okay.

11             MR. SCRUGGS:  That, you know, given the record we have

12    here is all of the facts are undisputed, in the sense that

13    they're not disputed, right?  And it said -- we've articulated

14    in extreme detail.  We've provided photographs.  We've explained

15    Miss Nelson's photographic process and artistic skill.  I think

16    this falls fairly in the scope of what protected expression is.

17       I want to turn really quick to Rumsfeld.  Now, Your Honor,

18    Rumsfeld would be like this case if they applied the equal

19    access law to say, "Look, you're teaching a class criticizing

20    the don't ask, don't tell policy.  Therefore, you've got to

21    teach a class, you know, defending that policy."  Right?

22       That it would be an attempt by the government to comply --

23    to apply that equal access law to speech itself, in that case,

24    teaching, versus, as you know, the rooms are different, because

25    that's not expressive, and I think, actually, we've all agreed,

1    we've had some -- a bit of consensus to say that e-mails were

2    adjacent or incidental to the content that they can require.

3        You know, again, to make the scenario, Miss Nelson is not

4    hosting a same-sex wedding in her house or a venue.  Like, so,

5    therefore, she can't be required to photograph or send out

6    e-mails adjacent to that.

7        Again, to draw the analogy back to Hurley -- or back to

8    Rumsfeld, Rumsfeld would be like this case if the school stopped

9    hosting all recruiters, and then the Government turned around

10   and said, "You've got to send out an e-mail promoting the don't

11   ask, don't tell policy."  I think these are just separate

12   situations.

13       But, again, the two points that we just want to leave the

14   court with is Hurley controls, and Hurley is the right balance,

15   and Hurley's exactly the right balance, because, Your Honor, it

16   protects speakers, but it doesn't stop the Government from

17   stopping actual status discrimination, as all the hypos we've

18   talked to before.

19       And one issue that we have not addressed is I think any

20   argument the Government has about its interest in compelling

21   Chelsey can't succeed when they have an exception regarding sex

22   discrimination, allowing most businesses to engage in sex

23   discrimination.

24       Well, if that's true, what basis can the Court -- or can

25   Louisville have to say that -- to force Miss Nelson just to

1    convey a message she disagrees with?  So I think that exception

2    in the law undermines any interest that the city puts forth.

3       So that's really the major things that I want to leave the

4    Court with is those two points about Hurley's importance and

5    Hurley's balance.

6         THE COURT:  We haven't -- we haven't -- it's hard to

7    imagine there is anything we haven't talked about yet, but there

8    is at least one thing that comes to mind.  You have an

9    establishment clause claim.

10      I would think if you get a preliminary injunction on

11   Louisville can't fine -- Louisville can't -- Louisville can't

12   make Chelsey Nelson photograph a gay wedding, then you don't

13   need an injunction that says Louisville can't make her attend a

14   gay wedding.  Because she is a wedding photographer, there's no

15   reason for her to be at a wedding other than to photograph it.

16   I mean, weddings are private events.

17        MR. SCRUGGS:  That's correct, Your Honor.  They're

18   alternative arguments.

19        THE COURT:  Okay.  I don't know that I think just

20   attending something while -- being present while something is

21   said means you're endorsing it.

22        MR. SCRUGGS:  Well, Your Honor, I think there are a

23   few situations come to mind.  Obviously, Lee versus Weisman, but

24   there is actually a fair amount --

25        THE COURT:  You're defending -- you're -- ADF is using

1    the majority opinion in Lee v. Weisman as part of its argument?

2            MR. SCRUGGS:  Well, Your Honor, always -- I think the

3    situation is easier than Lee versus Weisman, because in Lee,

4    they were not actually required to be there.

5        So what -- this case is similar, I think, if you look at the

6    caselaw, is you could imagine scenarios in government employees

7    required to attend events where there's proselytization, and

8    courts have said no, you can't compel someone to do that.  That

9    would be our primary argument with that.

10       And that actually fits with the original meaning of the

11   establishment clause.  Michael McConnell's done a lot of work

12   and has said that one of the original points and original

13   meanings is you can't force someone to attend a religious event.

14   A church ceremony, for example.  So I think that that original

15   meaning of the establishment clause is relevant in that sense.

16           THE COURT:  The distinction you draw between status

17   and -- status and message, I think, is a sometimes hard one.  I

18   think your -- I think the defendants would say -- they would

19   criticize it more harshly.  The status versus message line is

20   impossible to draw.  Can you defend it?

21           MR. SCRUGGS:  I think -- sure.  Absolutely.  And,

22   obviously, I think it's a line that might be hard in certain

23   situations, but it's a vital line, because it does allow that

24   balance, and I think it is possible to draw it, because courts

25   have drawn it repeatedly.

1        We'd note the Brush & Nib decision.  I'd also point the

2    Court, a mutually interesting case even pre Hurley, was that

3    World Peace Movement case from the Utah Supreme Court involving

4    the religious newspaper who didn't want to publish this

5    religious ad from a group, because it violated the

6    newspaper's -- I think the newspaper's owned by a Mormon group.

7    Even, maybe, the Mormon church, I think.

8        And they didn't want to publish this ad, and there they were

9    sued under the public accommodation law, and in that situation,

10   the Court -- the Utah Supreme Court said this law doesn't even

11   apply.  Kind of -- it's not a status-based denial, but it's

12   based on the message conveyed in the advertisement.  That they

13   would serve other people from that religious group, they would

14   publish other advertisements and hotbeds from that religious

15   group, but not just this particular one because of the message

16   it conveyed.

17       So I think we have to hold that distinction.  Otherwise,

18   you're going to get into some very difficult scenarios, I think,

19   really both ways.  Some of the scenar -- some of the hypos we've

20   put forth already, I think we've described already.

21       In many ways, I'd point the Court to Justice's Gorsuch --

22   his concurring opinion in Masterpiece.  I think our message

23   status distinction is somewhat similar to his distinction that

24   he draws between kind of foreseeable consequences and

25   unforeseeable cause versus consequence, and he notes that that's

1    a line the law often draws.

2        And, in fact, I'd say, Your Honor, that that's a line that I

3    think the statutes require to be drawn on a statutory level.

4    We're just asking the Court to also make sure to draw it on the

5    constitutional level, much as, again, the Court did in Hurley.

6    It drew that distinction there too.

7            THE COURT:  Would you agree -- sorry.  Would you agree

8    with some of the -- I don't know if I want to call it

9    conventional wisdom, but frequently-expressed analysis, in the

10   wake of the last Supreme Court term, that the Court, over the

11   course of a decade, and maybe this term more than ever, has made

12   clear that same-sex marriage, yes; accommodations, yes; Windsor,

13   yes; Obergefell, yes; Bostock, yes; and at the same time, we're

14   carving out a robust protection for religious liberty?

15       Justice Ginsburg this term, in dissent, accused the majority

16   of protecting a religious liberty to the nth degree.  Is that --

17   and I'm a lower court judge who goes where the Supreme Court

18   precedence lead.  Is that where I am to be led?

19           MR. SCRUGGS:  Well, Your Honor, I'm always a bit

20   hesitant to give broad pronouncements.  I think there is that

21   trend that you're seeing in the sense of is the Government

22   infringing on somebody?  Is the Government acting -- you know,

23   this is not a situation where Miss Nelson is preventing someone

24   from getting married, in the sense of they're not -- she's not

25   acting like the government, right?  She's not the withholder or

1    determiner of who can marry and who can't.

2        I think the trend that I would point the Court to is not

3    just a religious liberty trend, but it's a trend that

4    commentaries have noted on, it's the trend to protect free

5    speech.  That the Roberts court has been quite protective of

6    free speech, not just in the religious liberty context, but also

7    not being able to -- just look at the NIFLA decision.  Look at

8    the Janus decision.  That it's quite concerned when the

9    Government comes in and says, "You've got to speak a particular

10   message."

11       I think that's one of the primary trends we want to focus

12   the Court on, because it makes this case, I think, fall -- fall

13   into the -- fall into place.

14            THE COURT:  Okay.  I'm going to ask a last question or

15   two and give the -- of the city and give the city the last word.

16   Anything else before I do?

17            MR. SCRUGGS:  My last word, Your Honor, is just it is

18   a controversial topic, we fully admit that, and there are people

19   of good faith on both sides, we admit that, but, Your Honor, we

20   think that the freedom to speak -- control what you say

21   transcends this particular case and this particular debate, and

22   that freedom should stick with the speakers and not government

23   officials.

24            THE COURT:  Okay.  Thanks, Mr. Scruggs.  Mr. Kaplan,

25   I'm going to read an Obergefell quote, and you tell me what I'm

1   supposed to do with it, and then I'll give you a chance to add

2   anything else that you want before we adjourn.

3        So this was in the majority opinion by Justice Kennedy

4   joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan.  And

5   the Court said, "It must be emphasized that religions, and those

6   who adhere to religious doctrines, may continue to advocate with

7   utmost, sincere conviction that, by divine precepts, same-sex

8   marriage should not be condoned.

9        The First Amendment ensures that religious organizations and

10  persons are given proper protection as they seek to teach the

11  principles that are so fulfilling and central to their lives and

12  faiths and to their own deep aspirations to continue the family

13  structure they have long revered.  The same is true for those

14  who oppose same-sex marriage for other reasons.

15       In turn, those who believe allowing same-sex marriage is

16  proper or, indeed, essential, whether as a matter of religious

17  conviction or secular belief, may engage those who disagree with

18  their view in an open and searching debate."

19       Over to you.

20            MR. KAPLAN:  That's well said.  I don't see anything

21  to disagree with.  My response to that would be that --

22            THE COURT:  I mean, maybe I'll ask a more pointed

23  question.  That's not the way the Court talks about opponents of

24  interracial marriage.

25            MR. KAPLAN:  Well, the Court hasn't had to talk about

1    opponents of that for some long period of time.  We are in a

2    different era now.  The, you know, folks who didn't believe in

3    mixed-race marriages are much quieter now than they used to be.

4        It would be erroneous to suggest that somebody like Miss

5    Nelson, who has the views that she has, should be viewed in the

6    same way as somebody who opposed mixed-race marriage.

7        So the position of Metro is not to build up any type of

8    equivalence there or to cast aspersions and say that you're as

9    bad as a racist if you believe in traditional marriage.  That's

10   not a position that we need to endorse here.

11       Miss Nelson, as I started from the get-go, and it's Justice

12   Kennedy's formulation, she is entitled to neutral and respectful

13   consideration of her opinions, and I am not a constitutional law

14   expert.  My reading of the case is that what's being carved out

15   or at least what I expect to be carved out, at a minimum, is a

16   place for free speech and -- by people with sincere religious

17   beliefs.  We haven't talked much about free exercise today, but

18   there is similarity there.

19       Folks have to be able to live according to their religious

20   beliefs and not be subject to undue interference or coercion

21   from the government or not be able to communicate their views to

22   society.  But on the flip side of that -- so, at a minimum, what

23   you see in the cases right now is an absolute rule against

24   targeting.

25       Starting with Lukumi Babalu and going up to the present,

1    it's absolutely inappropriate to -- and unlawful, under the

2    constitution, to target a person because of what they believe,

3    because of what they say or to require them to state any message

4    with which they disagree.  So -- particularly if it's the

5    Government, like in the Barnette case and Wooley vs. Maynard.

6        So that's really where I would like to plant my flag is, for

7    starters, no one's being singled out.  The purpose of the

8    ordinance, on its face, is not to oppress anybody.  The effect

9    of it, though, however, is to inconvenience somebody who

10   disagrees with same-sex marriage but is asked -- and I think

11   this is unlikely, but asked to take pictures at one.

12       She's got to do it, because as the Court said in Masterpiece

13   Theater, if it comes down to it, I think the counterpart that --

14   the quote you read, our society has come to the recognition that

15   gay persons and gay couples cannot be treated as social outcasts

16   or as inferior in dignity and worth.

17       For that reason, the laws in the constitution can and, in

18   some instances, must protect them in the exercise of their civil

19   rights.  The exercise of their freedom on terms equal to others

20   must be given great weight and respect by the courts.

21       So how do we reconcile these two things?  In this instance,

22   all that Metro is asking is that any merchant who offers their

23   goods and services to the general public has to offer their

24   package of services to these various protected classifications

25   on the same terms that they would offer to someone who doesn't

 1   belong to one of those classifications.

 2        We could take about hypos all day long, and they're perilous

 3   to talk about, because they're stripped-down models that don't

 4   reflect reality, but here what we've got is a mandate that she

 5   engage in conduct.  She is not told how to do the conduct.  She

 6   is not in any way prohibited from saying or doing anything in

 7   conjunction with performing the service, except she can't say

 8   after the wedding is over, "I'm never going to do this again."

 9   That's the one thing that she's prohibited from saying, and it's

10   entirely lawful if the accommodations provision's itself lawful.

11        So we would suggest to Your Honor that after reading

12   Rumsfeld and Hurley and the other related precedence, that the

13   Court should come to the conclusion that Louisville/Jefferson

14   County is within its power to regulate the conduct of an

15   individual working for hire to take pictures, even at an event

16   that might make her uncomfortable, should she be asked to do

17   that, and that -- that that should not be treated as equivalent

18   to the situation in Barnette, Wooley vs. Maynard or even

19   Tornillo or Pacific Gas, which didn't involve direct

20   government-mandated messages be mouthed, but did require someone

21   who is in the process of speaking to basically host a

22   contradictory message.

23        What Miss Nelson is being asked to do is just to take

24   pictures at the wedding.  Is it -- does it have creative

25   elements?  Does it require technical skill?  Sure.  But it's not

1   inherently expressive.  And none of these pictures that I have,

2   and I printed out many, many yesterday, nobody would look at

3   these and say, if they had two people of the same gender in them

4   instead of opposite sex, that this photographer really must

5   support same-sex marriage.

6       I gather from the plaintiff that's what she feels like she's

7   being required to do, but I think the Court can look behind that

8   and ask what's objectively reasonable.

9       What's objectively reasonable for someone to infer from a

10  picture, when a picture is subject to so many, many different

11  interpretations, is she really being asked by being asked to

12  attend, not participate in, attend a gay wedding and take

13  pictures, is the government really compelling her to express

14  support for that?

15      I don't believe the factual record or common sense supports

16  that conclusion, and it would be a change in the law or at least

17  new -- a new -- new precedent were the Supreme Court ever to say

18  that nondiscrimination laws should be evaluated in that fashion.

19  When they're not targeting speech, when they're not targeting

20  religion, when, simply, they're effect is to require people,

21  from time to time, who are selling their goods and services to

22  the general public, to sell services in a context that makes

23  them feel uncomfortable.

24      Because even if that's required by the constitution, and the

25  compelling state interest or important governmental interest if

1    you're applying O'Brien or just rational basis review, which we

2    think is what applies here under Rumsfeld, Chelsey Nelson

3    absolutely remains free and unfettered to express her views of

4    traditional marriage at any other point in time, and the

5    government cannot make her host anybody's message.

6        They cannot make her put up signs at her home or on her

7    business that support pride or say that opposite-sex marria --

8    or I'm sorry.  Same-sex marriage is ordained by God.  She

9    maintains absolute freedom in every other part of her life to

10   speak the message that she believes in her own in her office.

11       And so, in the end, this encroachment on her rights, if it

12   even is that, encroachment of expression is not something that

13   the Court should find outweighs what is an absolutely compelling

14   state interest in continuing the march toward equality that this

15   country has been on in making sure that everybody has equal

16   access to goods and services and doesn't have to suffer the

17   humiliation of being turned down simply because of the

18   classification they belong to.

19       And I would just suggest, as a final statement, this is a

20   collateral point, but on the status versus class -- class versus

21   message distinction that is sometimes difficult, I think

22   Lawrence v. Texas provides as good of a way of dealing with that

23   as any other opinion, which just simply looks at the

24   correlation.

25       If everybody who's asking for same-sex wedding services, you

1    know, they're all going to be gay, with very rare exceptions.

2    So if you are saying no to a gay wedding because you object to

3    same-sex marriages, you are actually discriminating on the basis

4    of sexual orientation, simply because no one else is going to be

5    asking for the service to any reasonable degree.

6        Correlation is going to be very, very tight, and that's a

7    good way to evaluate some of these hypotheticals is to ask

8    yourself, okay, and we could take real protected

9    classifications.  Who's asking for the service?  What class do

10   they belong to, and is the message that they are promoting or

11   asking the service provider to promote, is that highly

12   correlated with a protected classification?

13       I think a lot of those hypos start to fall away once you

14   start viewing it through that lens, and you realize that this

15   isn't really as hard in the real world as we might think.

16       So Metro appreciates Your Honor's consideration.  If you

17   have any questions about the free exercise part of their

18   argument, we'd be happy to address those, but it sounded like

19   Your Honor was more focused on the speech issues, which we did

20   view as the more -- more difficult issues than as compared with

21   the establishment clause for free exercise arguments that were

22   made.

23           THE COURT:  Very good.  Mr. Kaplan, Mr. Scruggs,

24   Mr. -- Mr. Scruggs, Mr. Neihart, thank you all for the briefing,

25   the arguments, and I appreciate it.  All right.  We're

1    adjourned.

2        (Proceedings concluded at 12:36 p.m.)

3

4                        C E R T I F I C A T E

5        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

6    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8    _____          9-21-2020_____
          s/Rebecca S. Boyd                     Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25