UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:19-CV-00851-BJB-CHL

CHELSEY NELSON PHOTOGRAPHY LLC , et al.,                    Plaintiff,

v.

LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, et al.,    Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court is a motion to compel discovery filed by Plaintiff Chelsey Nelson ("Nelson") and Plaintiff Chelsey Nelson Photography LLC (collectively "Plaintiffs") on March 5, 2021. (DN 63.) On March 12, 2021 Defendants Louisville/Jefferson County Metro Government ("Metro"), Louisville Metro Human Relations Commission – Enforcement, Louisville Metro Human Relations Commission – Advocacy, Verná Goatley, in her official capacity as Executive Director of the HRC, Marie Dever, Kevin Delahanty, Charles Lanier, Sr., Leslie Faust, William Sutter, Ibrahim Syed, and Leonard Thomas, in their official capacities as members of the Louisville Metro Human Relations Commission-Enforcement (collectively, "Defendants") filed a response in opposition. (DN 66.) Plaintiffs have moved for leave to supplement their motion (DN 78, 80), which Defendants oppose (DN 83). Also before the Court is a motion for a protective order filed by Defendants on March 5, 2021. (DN 64.) On March 12, 2021, Defendants filed a response in opposition. (DN 65.) The Court addresses Plaintiffs' motion to compel (DN 63), Defendants' motion for protective order (DN 64), and Plaintiffs' motions to supplement (DN 78, 80) together in this opinion because they all concern the same discovery at issue. The matter is now ripe for review.

## I.      BACKGROUND

Plaintiff brought this action on November 19, 2019, challenging provisions of Metro's Fairness Ordinance.  (DN 1.)   In 1999 the Jefferson County Fiscal Court passed the Fairness Ordinance.   Metro Ordinance ("MO") § 92.01, *et seq*.   Its stated purpose is to "safeguard all individuals within Jefferson County from discrimination in certain contexts because of race, color, religion, national origin, familial status, age, disability, sex, gender identity, or sexual orientation." *Id.* at § 92.01.   Subsequent iterations of the Fairness Ordinance were enacted in 2001 and 2004. (DN 63-10, at PageID # 1550.)   The ordinance provides protections for individuals within these classes in employment, housing, and public accommodations and sets out mechanisms for enforcement by the Human Relations Commission ("HRC").   *Id.* at § 92.01, *et seq*.   Plaintiffs challenge the ordinance's Accommodations Provision and Publication Provision.   (DN 47, at PageID # 1222.)  The Accommodations Provision, in relevant part, prohibits denying an individual "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation" on the basis of his or her "sexual orientation or gender identity."   MO § 92.05(A).   The Publication Provision consists of the Denial Clause and the Unwelcome Clause, which respectively prohibit, in relevant part, places of public accommodation from advertising that they will deny services on the basis of sexual orientation or that an individual's presence at that business is "objectionable, unwelcome, unacceptable, or undesirable" based on the individual's sexual orientation.   *Id.* § 92.05(B).

On November 24, 2020, Plaintiffs served their first set of discovery requests, which included 105 requests for production ("RFP") and seventeen interrogatories.  (DN 63-1, at PageID # 1473; DN 63-4; DN63-5.)   On January 25, 2021, Defendants served their responses.   (DN 63-4; DN 64-5.) On January 28, Plaintiffs sent Defendants a letter requesting supplementation

of seven categories of responses.  (DN 63-6.)  On February 2, 2021, the Parties met and conferred and were able to resolve several of Plaintiffs' concerns.  (DN 63-1, at PageID # 1474.) The Parties subsequently exchanged communications in an attempt to resolve the outstanding issues, but they were unable to do so.  (DN 63-7; DN 63-8; DN 63-9.)  On February 23, 2021, the Court held a telephonic status conference during which the Court and the Parties discussed the dispute.  (DN 62, at PageID # 1448.)  Based on that discussion, the Court granted leave for the Parties to proceed to motion practice.  (*Id.*)

The Parties' motions concern: (1) case files related to public accommodations, housing, and employment complaints under the Fairness Ordinance and historic complaint predating the ordinance, which Plaintiffs allege are responsive to RFP 40-58; (2) summary spreadsheets used by HRC to track open and closed actions enforcing the Fairness Ordinance, which Plaintiffs allege are responsive to RFP 1-39; and (3) material facts and documents supporting Defendants contention that enforcing the Fairness Ordinance against Plaintiffs is the least restrictive means to achieve a government interest, which Plaintiffs allege are responsive to Interrogatories 15-17.  (DN 63, at PageID # 1453-70; DN 64, at PageID # 1622.)

## II.    LEGAL STANDARD

This Court maintains discretion over the scope of discovery.  *S.S. v. E. Ky Univ.*, 532 F.3d 445, 451 (6th Cir. 2008) (quoting *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1240 (6th Cir.1981)).  Generally speaking, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1).  Discovery responses therefore must be "complete and correct."  Fed. R. Civ. P. 26(g)(1)(A).  Objections to interrogatories "must be stated with specificity."  Fed. R. Civ. P. 33(b)(4).  Answers to requests for admission must admit the request, "specifically deny"

the request, "detail why the answering party cannot truthfully admit or deny," or object on "stated" grounds.  Fed. R. Civ. P. 36(a)(4)-(5).  Upon a motion to compel discovery, "an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond."  Fed. R. Civ. P. 37(a)(4).

Rule 26(c) allows the Court to issue protective orders for good cause shown to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including that the disclosure or discovery not be had or that the disclosure or discovery be limited to certain matters.  Fed. R. Civ. P. 26(c).  The party seeking the protective order bears the burden of showing that good cause exists for the order.  *Peterson v. Outback Steakhouse*, 2016 U.S. Dist. LEXIS 129596, *3 (E.D. Mich. Sept. 22, 2016) (citing *Nix v. Sword*, 11 F. App'x 498, 500 (6th Cir. 2001)).

### III.   DISCUSSION

Below, the Court addresses the three categories of discovery at issue.

#### a.   Case Files

Plaintiffs' requests for case files covers "all complaints of an alleged unlawful practice that the Commission has drafted, initiated, or received, after December 9, 2004, under the Metro Ordinance," as well as reasonable-cause determinations, petitions to reconsider, settlements, documents filed in circuit court, administrative records, and judicial opinions.  (DN 63-4, at PageID # 1503-06.)  This includes cases involving any of the classes of people protected by the ordinance in the areas of public accommodation, housing, and employment.  (*Id.*)  Plaintiffs also seek complaints of discrimination on the basis of sexual orientation from the years 1981-1999 that were cited in the legislative record to the Fairness Ordinance.  (DN 63, at PageID # 1454.) Plaintiffs have proposed narrowing the request with respect to housing and employment cases to

just the complaints, subject to further requests for entire case files after Plaintiffs' review. (*Id.*, at PageID # 1454.) However, Plaintiffs have not proposed any limitation to their requests for case files involving public accommodations. (*Id.*) Defendants object to any further production.

### i. Relevance

Plaintiffs say that the requested documents are probative of "how Louisville enforces and applies its law." (DN 63, at PageID # 1455.) Plaintiffs argue that information about past enforcement is relevant to: (1) Plaintiffs' Article III standing; (2) the merits of Plaintiffs' constitutional and statutory claims; and (3) disprove Defendants' stated interest in enforcing the Fairness Ordinance against Plaintiffs. (*Id.*, at PageID # 1455-65.)

*First*, Plaintiffs say that past enforcement information is relevant their Article III standing, particularly, whether they face a credible threat of prosecution under the ordinance. (*Id.*, at PageID # 1455-56.) Plaintiffs note that Defendants challenged Plaintiffs' standing in their motion to dismiss based in part on an argument that Plaintiffs had not shown a history of enforcement against similarly situated individuals, specifically, business owners who publish online statements against same-sex marriage. (*Id.*, at PageID # 1455-56.) (*See* DN 14-1, at PageID # 741.) Plaintiffs also cite a June 2020 HRC investigation of a business that Plaintiffs say was initiated by an aggrieved customer publishing a photo of the business's transgender bathroom policy online. (*Id.*, at PageID # 1456; DN 63-9, at PageID # 1544-1556.) Plaintiffs believe that case files concerning "[o]ther complaints would likely reveal similar enforcement ease." (*Id.*) In response, Defendants argue that past enforcement information is not necessary for Plaintiffs to establish standing. (DN 64, at PageID # 1612; DN 66, at PageID # 1813.) Defendants say that the text of the ordinance clearly describes enforcement procedure, that they have conceded that Plaintiffs' conduct violates the ordinance given that Plaintiff Chelsey Nelson drafted a statement with the assistance of counsel

designed to violate the Publication Provision, and Defendants have admitted that the ordinance is actively enforced.  (*Id.*)  In turn, Plaintiffs note that Defendants had conceded these facts at the preliminary injunction stage while still challenging Plaintiffs' standing.  (DN 65, at PageID # 1795.)  Plaintiffs argue that even if Defendants had conceded the entire issue of standing, it wouldn't preclude discovery on the issue because, as a justiciability issue, it may be raised *sua sponte* at any time.  (*Id.*)

*Second*, regarding the merits of their claims, Plaintiffs assert that, in general, "[w]hen a civil-rights plaintiff challenges a law or policy as unconstitutional, the government's past interpretation and enforcement law [sic] is relevant in countless ways."  (DN 63, at PageID # 1460.)  Plaintiffs provide a laundry list of legal theories that could invoke past enforcement of both the provisions governing public accommodations and those governing employment and housing. (*Id.*, at PageID # 1455-60.)  For example, Plaintiffs argue that past enforcement of the ordinance against other places of public accommodation is relevant to whether Defendants treat violations on religious grounds with more hostility than other violations.  (*Id.*, at PageID # 1457-58.) Plaintiffs cite to *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1730 (2018), in which the Supreme Court found that a state agency enforced an antidiscrimination law with hostility toward a baker's religious objection to providing services for a same-sex wedding in part because the agency found no violation by three other bakers that refused to create cakes conveying messages disapproving of same-sex weddings.  (*Id.*, at PageID # 1458.)  Plaintiffs also argue that the past enforcement against other places of public accommodation is relevant to their vagueness and overbreadth challenges to the Unwelcome Clause.  (DN 63, at PageID # 1460.) Plaintiffs say that past enforcement of the clause against other public accommodations "— regardless of the basis of the complaint—is therefore indicative of whether ordinary persons could

understand the law (vagueness), whether the clause has many unconstitutional applications (overbreadth), and whether Louisville officials have too much leeway (unbridled discretion)." (*Id.*)

Plaintiffs argue that past enforcement of the ordinance beyond public accommodations, in the areas of housing and employment, is relevant due to the exemptions to nondiscrimination in those areas provided by the text of the ordinance. (*Id.*, at PageID # 1457-60.) The ordinance forbids employers from publishing job listings that discriminate based on protected characteristics except when the characteristic "is a bona fide occupational qualification for employment." MO § 92.06(E). The ordinance also provides exemptions to nondiscrimination in hiring under various circumstances, such as allowing religious institutions to discriminate in hiring on the basis of religion or sexual orientation. MO § 92.07(A)-(B). In the housing context, the ordinance also provides exceptions to the prohibition on discriminatory practice under various circumstances. MO § 92.04(A). Plaintiffs argue that past applications of the employment publication exception are relevant to whether the ordinance is content and viewpoint neutral, because it may allow employers to express one discriminatory view, such as a woman's capacity to perform certain physical tasks, while prohibiting Plaintiffs from expressing their view that marriage should be between a man and a woman. (*Id.*, at PageID # 1457.) Plaintiffs argue that past applications of the employment and housing exceptions is relevant to whether the ordinance is generally applicable. (*Id.*, at PageID # 1459-60.) Plaintiffs cite to Supreme Court and Sixth Circuit cases in which laws prohibiting conduct were found not generally applicable because they provided exceptions for secular activities but not religious activities. (*Id.*)

In response, Defendants note that HRC did not initiate any enforcement action against Plaintiffs, nor did it ever investigate them, and thus argue that past enforcement information will

not show that her religious objection would be treated differently because of her religion or viewpoint.  (DN 66, at PageID #1814.)  Defendants also assert that in evaluating whether a challenged law is neutral, overbroad, underinclusive, or treats religious and nonreligious exceptions differently, courts often look to "the text of the statute being challenged, the text of other statutes that apply to any comparable conduct, and/or the absence of similar regulations." (DN 66, at PageID # 1813.)  Defendants argue that because the terms of the exemptions are clear on the face of the ordinance, discovery about past applications of the statute is not necessary.  (*Id.*, at PageID # 1813-14.)  Defendants note that *Masterpiece* is the only case that Plaintiffs cite in which past enforcement was considered in evaluating the effect of a law's exceptions, and attempt to distinguish *Masterpiece* from this case.  (*Id.*, at PageID # 1815.)  Defendants note that *Masterpiece* did not involve a pre-enforcement challenge, and that the Court's ruling relied substantially on the plaintiff's treatment during enforcement proceedings, which it compared to treatment of other bakers who objected to providing requested cakes conveying disapproval of same sex marriage.  (*Id.*)  Defendants also say that "these other applications of the law appear to have come from public hearings and/or decisions, and not from confidential case files."  (*Id.*) Defendants argue that unlike in *Masterpiece*, "because there has never been any enforcement against Plaintiffs, there is no real basis for comparison beyond what is reflected in the text of the ordinance."  (*Id.*)

*Third*, Plaintiffs argue that the past enforcement information is relevant to evaluating Defendants' asserted government interest in enforcing the statute.  (*Id.*, at PageID # 1460-62.) Plaintiffs note that Defendants have cited historical incidents of discrimination in the areas of public accommodation, employment and housing as a basis for its stated interest in ending discrimination on the basis of sexual orientation and argue that they "should have access to actual

complaints filed to refute Louisville's claimed interest." (*Id.*, at PageID # 1461.)  Plaintiffs further argue that the past enforcement information is relevant to whether the ordinance is underinclusive by providing "real examples" of discrimination that the ordinance permits.  (*Id.*, at PageID # 1462.)

In response, Defendants assert that they have disclosed sufficient evidence "that discrimination on the basis of sexual orientation has occurred and/or is still occurring such as would justify that ongoing enforcement of its anti-discrimination law."  (DN 83, at PageID # 2160.) Defendants state that it is unclear how information in the case files will undermine their stated interest.  (*Id.*, at PageID # 2160-61) ("Will Plaintiffs attempt to prove that Louisville is the one place in the world where individuals do not experience discrimination on the basis of sexual orientation (despite Plaintiffs' stated intention to discriminate)?").

The Court finds that the information requested is relevant for discovery purposes. Information about past enforcement of the Fairness Ordinance is relevant to the question of Plaintiffs' standing because past enforcement of a law is relevant to whether a credible threat of prosecution confers standing in a pre-enforcement First Amendment challenge.  *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016).  Past enforcement information is also relevant to the merits of Plaintiffs' free speech and free exercise claims.  Notwithstanding Defendants' contention that third-party enforcement actions are unrelated to Plaintiffs' claims, details about the nature of individual complaints and how the ordinance was applied to them can show whether enforcement is influenced by the viewpoint or identity of individual speakers.  *See City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); *Iancu v. Brunetti*, 139 S. Ct. 2294, 2300 (2019); *Masterpiece*, 138 S. Ct. at 1730.  This includes enforcement in housing and employment as well as public accommodation contexts because the ordinance's exceptions in housing and employment contexts may operate to impose a higher burden to religious conduct than is expected

of the general public.  *Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 545 (1993).  Complaints of discrimination on the basis of sexual orientation referenced in the legislative record are relevant to Plaintiffs' speech and free exercise claims because legislative motive is relevant to whether a law targets a specific viewpoint or religious practice.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, (1989); *City of Hialeah*, 508 U.S. at 543.

The Court notes that although information in the requested case files is generally relevant, considering the volume of the documents at issue and the specific nature of Plaintiffs' claims, it follows that not all of the requested documents will relevant to the same degree.  As Defendants' relevance objections discussed above highlight, much of the information is not likely to be necessary or even have any benefit to Plaintiffs' claims.  Those considerations are addressed *infra* in the Court's proportionality analysis.

### ii. Proportionality

In 2015, Rule 26 of the Federal Rules of Civil Procedure was amended to require that all discovery be "proportional" in nature. The old rule permitted discovery of any information "reasonably calculated to lead to the discovery of admissible evidence."  Fed. R. Civ. P. 26(b)(1) (2010).  The new rule permits discovery only of information "relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The change ensures that the parties and courts share the "collective responsibility to consider the proportionality of all discovery and consider it in resolving discovery disputes."  Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment.  It is now "the power—and *duty*—of the district courts actively to manage discovery and to limit discovery that exceeds its proportional and proper bounds."  *Helena Agri-Enterprises, LLC v. Great Lakes Grain, LLC*, 988 F.3d 260, 274 (6th Cir.

2021) (quoting *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 306 (S.D. Ind. 2016))

In assessing whether a discovery request is proportional, courts consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

Defendants say that "it would be unprecedented to compel a government agency defending the constitutionality of an anti-discrimination law to produce every discrimination complaint received and every investigative file relating to the agency's enforcement of the law." (DN 66, at PageID # 1810.) The scope of Plaintiffs' requests is unquestionably broad. Plaintiffs seek essentially all records for every complaint of discrimination under the Fairness Ordinance reaching the HRC dating back seventeen years. During the 2015-2017 fiscal years alone, 16 complaints were filed. (DN 64-4, at PageID # 1733.) Plaintiffs also seek about 150 complaints spanning the years 1981-1999 of discrimination on the basis of sexual orientation cited in the legislative record concerning the Fairness Ordinance. (DN 63, at PageID # 1461; DN 63-5.) Although Plaintiffs only challenge portions of the ordinance governing public accommodations, they also seek records brought under provisions governing housing and employment. Although Plaintiffs explicitly claim that they would not refuse service or advertise their unwillingness to serve any other characteristic covered by the ordinance, they seek records concerning every protected class. (*See* DN 47, at PageID # 1221 n.133.)

### 1.  Importance of Issues at Stake

It is difficult to overstate the importance of the issues at stake in this case.  On the one hand, Plaintiffs allege that they face "a credible threat of prosecution" for expressing "religious speech at the core of the First Amendment."  (DN 47, at PageID # 1208, 1220) (citations omitted.) On the other hand, Defendants are defending their "unquestionably compelling" interest in protecting individuals seeking public accommodations from discrimination on the basis of their sexual orientation.  (*Id.*, at PageID # 1220) (citations omitted).   The Sixth Circuit has acknowledged that proving claims of unconstitutional discrimination, particularly when they allege animus, can turn on whether a claimant is permitted ample discovery.  *Doe v. City of Memphis*, 928 F.3d 481, 493-94, 493 n.5 (6th Cir. 2019) (recognizing "the inherent difficulty in proving claims like these" in reversing summary judgment in the defendant's favor and remanding for further discovery.)   However, even when a plaintiff seeks to prove that a law restricts constitutionally protected speech, she is not entitled to discovery that "falls more in the category of a fishing expedition."  *Ent. Prods., Inc. v. Shelby Cty., Tenn.*, 721 F.3d 729, 744 (6th Cir. 2013) (finding that the district court did not err in denying motion to compel all records and reports relating to crimes within the city limits over a five-year time period because "a state or municipality need not rely upon this data in order to pass a valid regulation").  The Court has duly considered the importance of the issues at stake in addressing the Parties' motions and concludes that those issues militate in favor of discovery as limited herein.

### 2.  Parties' Relative Access to Relevant Information and Importance of the Information to Resolving the Issues

The Parties' relative access to relevant information and the importance of the information to resolving the issues are disputed.  There is inherently some degree of imbalance in access to

relevant information if case files, which are in Defendants' sole possession and contain *some* relevant information to which Plaintiffs do not otherwise have access.  The extent to which this imbalance is prejudicial logically depends on the importance of the discovery to resolving the issues.  Plaintiffs say that the case files will provide specific examples showing whether HRC enforced the ordinance more rigidly against violations on religious grounds compared to other violations or whether exemptions under the ordinance have the effect of singling out individuals expressing religious beliefs.  (DN 63, at PageID # 1457-62; DN 65, at PageID # 1794-95.) Plaintiffs also argue that all past complaints of discrimination on the basis of sexual orientation are at issue because Plaintiffs rely on them to support a government interest in eliminating discrimination.  (DN 63, at PageID # 1461; DN 78, at PageID # 1922-29.)  First, Plaintiffs note that in support of its interest in eliminating discrimination based on sexual orientation, Defendants produced a portion of the legislative record to the Fairness Ordinance that summarizes around 150 individual complaints of discrimination on the basis of sexual orientation from 1981-1991.  (DN 63, at PageID # 1461.)  Plaintiff suggests that the actual complaints, rather than just the summaries, could refute the information provided in the summaries.  (*Id.*)  Second, Plaintiffs note that during a May 25, 2021 Rule 30(b)(6) deposition, former Executive Director of HRC Kendall Boyd ("Boyd") testified that Metro relies in part on continuing complaints of discrimination to the HRC to support its interest in continued enforcement of the Fairness Ordinance.  (DN 78, at PageID # 1922, 1924, 1927-28.)  Plaintiffs also assert that neither Boyd nor current Executive Director of HRC Verna Goatly ("Goatly") were prepared to answer questions during their depositions  about past enforcement statistics or specific applications of the ordinance without having looked at case files  or  other  documents.   (*Id.*, at PageID # 1924.)    Plaintiffs  thus  argue  that  Defendants

substantively rely on information in the case files while denying Plaintiffs access to the information through production of the case files and Rule 30(b)(6) testimony.

Defendants have highlighted the range of evidence that is available to Plaintiffs.  (*See generally* DN 83, at PageID # 2160; DN 64, at PageID # 1619-20; DN 66, at PageID # 1823.)  For example, Defendants argue that the questions of standing, methods of enforcement, and the effect of statutory exceptions to nondiscrimination on the ordinance's constitutionality all turn on the plain text of the Fairness Ordinance.  (DN 64, at PageID # 1611-12; DN 66, at PageID # 1813-15.)  Defendants also emphasize their own concessions to facts relevant to Plaintiffs standing, namely that Plaintiffs conduct violates the ordinance and that the ordinance is actively enforced.  (DN 64 at PageID # 1611-12; DN 66, at PageID # 1813.)  Finally, Defendants argue that their discovery disclosures provide Plaintiffs with sufficient relevant information concerning the government interest in enacting and enforcing the ordinance.  (DN 66, at PageID # 1824; DN 83, at PageID # 2160.)  Defendants specifically cite a 1990-1991 annual  report in which HRC tracked reports of sexual orientation discrimination prior to the enaction of the Fairness Ordinance, a transcript of an April 15, 1999 public hearing on the proposed ordinance during which legislators heard testimony from residents that experienced discrimination on the basis of sexual orientation, and publicly available annual reports published from the HRC documenting statistics concerning complaints investigated by the HRC under the Fairness Ordinance.  (DN 83, at PageID # 2160.)  Defendants note that despite the fact that Plaintiffs previously argued to the Court that "[Plaintiffs] cannot effectively depose Louisville's witnesses until [they] receive[] the requested documents," Plaintiffs decided to move forward with the Rule 30(b)(6) depositions while the instant motions remained pending.  (*Id.*, at PageID # 2161) (quoting DN 70, at PageID # 1866.)  Defendants also dispute Plaintiffs' claim that Boyd and Goatly were unprepared to testify about relevant

information, noting that the topics listed in Plaintiffs' Rule 30(b)(6) deposition notices did not cover individual cases of discrimination, so the deponents were not obligated to testify as to individual cases.  (*Id.*, at PageID # 2161-62.)

The Court finds that Plaintiffs are somewhat disadvantaged in their relative access to relevant information, but that much of information to which they do not have access is not of significant importance to resolving the issues.

First, the Court agrees with Defendants that the claims and defenses at issue depend in large part on the text of the ordinance itself.

Second, to the extent that it is relevant to the substance of Plaintiffs' free exercise and speech claims, the discovery at issue contains some information of relative importance.  For example, information in the case files can show whether Defendants treat religious objections to the Fairness Ordinance with hostility.  The previously disclosed HRC annual reports do not reveal any information about how HRC treated objections in individual cases or even whether individuals charged raised any objection.  Obviously, HRC is unlikely to include evidence of hostility toward religious objections, if any exists,  in its annual reports.  Defendants point out that in *Masterpiece*, the Court found evidence of hostility in "public hearings and/or decisions, and not from confidential case files."  (DN 66, at PageID # 1815 n.4.)  This is a distinction without a difference. The evidence cited in *Masterpiece* was statements by state commissioners at the plaintiff's public hearing and three no probable cause determinations issued by the commission.  *Masterpiece*, 138 S. Ct. at 1729-30.  Here, documents related to public hearings and probable cause determinations are within the "confidential case files" that Defendants are withholding.  Similarly, because HRC doesn't track applications of the exceptions the only way Plaintiffs can determine how HRC applies the ordinance's exceptions is by looking at specific complaints and their outcomes.

However, resolving the issues in dispute does not require information of the massive scope of Plaintiffs' request. *See Taxpayers for Vincent*, 466 U.S. at 793 (looking to third-party enforcement over a one-week period in assessing the neutrality of an ordinance as applied to the plaintiff); *Troutman v. Louisville Metro Dep't of Corr.*, No. 3:16-CV-742-DJH, 2018 WL 3041079, at *3 (W.D. Ky. June 19, 2018) (noting in compelling production of records of third-party suicide attempts that the plaintiff "has not, for instance, requested documents from *every* suicide that has ever occurred under [the defendant]'s watch, but only those from seven individuals, including [the plaintiff-decedent], within a relevant time period"); *Lillard v. Univ. of Louisville*, No. 3:11-CV-554-JGH, 2014 WL 12725816, at *11 (W.D. Ky. Apr. 7, 2014) (collecting cases that found expansive third-party document requests to be overbroad and unduly burdensome). The Court therefore finds that the Parties' relative access to relevant information and the importance of the information to resolving the issues justifies some of the discovery Plaintiffs seek but also favors substantially narrowing the scope of the requests.

### 3.  Burden of Discovery

Defendants contend that disclosing the case files would require them to violate different confidentiality obligations, imposing different burdens as a result. Under the Fairness Ordinance, the HRC has a duty to "[p]ublish or cause to be published conciliation agreements or enforcement agreements." MO § 92.08(B)(7). However, "[a]ll other records and information shall be confidential except as reasonably necessary to conduct an investigation and proceeding." *Id.* The ordinance also requires that "[a]ll hearings held under and pursuant to this chapter shall be open to the public." MO § 92.09(I). Defendants argue that they are "prohibited from producing a vast majority of its case files" under these provisions. (DN 64, at PageID # 1619.)

Plaintiffs argue that the confidentiality provisions of the Fairness Ordinance do not shield Defendants from discovery because federal privileges law governs discovery in federal actions. (DN 63, at PageID # 1464.)  Plaintiffs say that the analysis set forth in *Farley v. Farley*, 952 F.Supp. 1232 (M.D. Tenn. 1997) should govern the extent to which a state law privilege applies in this case.  (*Id.*)  In *Farley*, a woman alleged that her ex-husband conspired with the Department of Child Services ("DCS") to remove her children from her custody based on fabricated abuse charges.  *Farley*, 952 F.Supp at 1234.  After disclosing redacted investigation records, DCS sought a protective order to prohibit the woman from sharing the records with other witnesses in preparation for trial.  *Id.*  The court opined that particularly where the state interest served by its privilege doctrine is compelling, the federal court presiding over discovery disputes is obligated to undertake a close analysis of competing state and federal law objectives "to insure vindication of the paramount federal interest with as minimal an intrusion on the state interests as is consistent with [a] federal claim."  *Id.* at 1237.  The court then weighed the federal interest in permitting discovery against the potential chilling effect on reports of child abuse and potential interference with government process found that "the statutory and administrative scheme under Tennessee law insuring only limited disclosure of child abuse files must yield to a supervening interest in their production and use in federal civil rights actions."  *Id.* at 1240.

Here, Plaintiffs argue that the federal interest in permitting relevant discovery is strong in cases like this, "federal civil rights actions where the vindication of constitutional rights is . . . at stake."  (DN 63, at PageID # 1464) (quoting *Farley*, 952 F.Supp at 1239).  On the other hand, Plaintiffs argue that "disclosure would not disrupt Louisville's ability to receive complaints because individuals who file complaints do not have an expectation of privacy."  (*Id.*)  Plaintiffs note that HRC publishes conciliatory and settlement agreements with the names of complainants

17

in its annual reports and that hearings are open to the public.  (*Id.*, at PageID # 1416-17.)  Plaintiffs also cite to a 1985 opinion of the Kentucky Attorney General addressing a confidentiality provision in the state Civil Rights Act, which found that the state open records law required that dismissal orders and conciliation agreements are subject to public inspection when a case does not proceed to hearing and a broader range of case records are subject to inspection once a hearing has commenced.  (*Id.*, at PageID # 1417) (citing 1985-1987 Ky. Op. Att'y Gen. 2-8 (1985)).  Given how many records that will be made public under state and local law, Plaintiffs argue that confidentiality is not integral to HRC's function.  (*Id.*)

In response, Defendants argue that the cases Plaintiffs cite—in which courts found that the need for discovery outweighed the interest in applying a state law privilege—are distinguishable from this case because "they all involved discovery of information about a specific wrong or investigation involving the plaintiff and/or defendant in the litigation."  (DN 66, at PageID # 1819.)  Defendants also argue that the 1985 opinion of the Kentucky Attorney General supports their position because the opinion found that the Lexington Fayette Urban County Human Rights Commission had properly withheld complaints and other documents because none of the cases "progressed to the point where an order of dismissal or a conciliation agreement has been entered or a hearing has been held."  (*Id.*, at PageID # 1821) (quoting 1985-1987 Ky. Op. Att'y Gen. 2-8).  Here, Defendants note that a vast number of its cases never progress to hearing.  (*Id.*)

Federal Rule of Evidence 501 states that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rules of decision."  F.R.E. 501.  Thus, in cases brought in this Court on diversity grounds, state law will generally govern privilege issues.  On the other hand, where jurisdiction is grounded exclusively on the existence of a federal question, federal privilege law governs.  In cases like this one, where both federal law and state

law claims are present, the Federal Rules dictate that federal privilege law applies to all claims, in order to avoid conflicting application in the same case.  *See* F.R.E. 501 advisory committee note to 1974 enactment ("Federal law of privileges should be applied with respect to pendent State law claims when they arise in a Federal question case").  *See also Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir.1992) (holding that "in federal question cases where pendent state claims are raised the federal common law of privileges should govern all claims of privilege raised in the litigation").  Although federal and not Kentucky law controls, "the privilege as developed by the states is [not] irrelevant."  *United States v. Gillock*, 445 U.S. 360, 368 n. 8 (1980).  The Supreme Court "has taken note of state privilege laws in determining whether to retain them in the federal system."  *Id.*  Here, Defendants argue that the Fairness Ordinance's confidentiality provision "cannot be ignored and illustrate[s] important privacy interests that principles of comity may require federal courts to recognize."  (DN 66, at PageID # 1819.)  However, even if the Court were to apply the ordinance's confidentiality provision, it would not fully shield Defendants from any disclosure.  Indeed, Defendants themselves recognize that they are withholding a not-insignificant number of documents that are presumed public under the ordinance.  For example, Defendants say that just two case files contained 127 pages of documents associated with the public hearing.  (DN 83, at PageID # 2165.)  Moreover, under the Kentucky Open Records Law, even records excluded from the right of public inspection can be compelled "upon order of a court of competent jurisdiction, except that no court shall authorize the inspection by any party of any materials pertaining to civil litigation beyond that which is provided by the Rules of Civil Procedure governing pretrial discovery."  Ky. Rev. Stat. Ann. § 61.878 (2021).  The Court therefore finds that the confidentiality provision does not foreclose disclosure of the case files.   However, the Court considers

Defendants' interest in protecting the identity of claimants in prehearing proceedings, so the Court will provide for appropriate redactions to reduce the risk of an undue burden.

Defendants also contend that Metro's contracts with federal agencies preclude disclosure of the case files.  (DN 64, at PageID # 1614-18.)  Metro contracts with the Equal Employment Opportunity Commission ("EEOC") through which HRC and the EEOC work together to investigate alleged instances of employment discrimination.  (*Id.*, at PageID # 1615.)  Defendants filed an example of such a contract for the years 2017-2018.  (*See* DN 64-3, at PageID # 1656-1711.)  The contract provides that Metro "shall not make public in any manner whatever the following information if said information was obtained from the EEOC": (1) the existence of a charge filed by a specific party against a specific party; (2) information obtained by the EEOC pursuant to its investigative authority; (3) anything said or done by the parties during negotiations to settle a charge or conciliation.  (*Id.*, at PageID # 1670.)  These nondisclosure clauses apply "unless a Title VII, ADA and/or GINA lawsuit has been instituted."  (*Id.*)  The contract also requires Metro "to abide by the confidentiality provisions of Title VII, ADA and the GINA as those provisions are interpreted by the EEOC."  (*Id.*)  Defendants believe that "the funding received by [Metro] pursuant to its contract with EEOC would be threatened if HRC disclosed information in violation of these confidentiality and privacy obligations."  (DN 64, at PageID # 1617.)  Defendants also cite to several federal regulations prohibiting the EEOC from disclosing information about charges prior to the commencement of a lawsuit on the charge, anything said or done during settlement discussions without written consent of the parties concerned, or any record without written consent of the individual to whom the record pertains.  (*Id.*, at PageID # 1615-16.)  Defendants believe that they are subject to these regulations and that failure to comply could subject its employees to criminal penalties.  (*Id.*, at PageID # 1617) (citing 42 U.S.C. § 2000e-8

(1972) ("Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year.").)

In response, Plaintiffs observe that neither Metro's contract with the EEOC nor the cited statutes and regulations prevent Defendants from producing public hearing documents, which Defendants have conceded.  (DN 65, at PageID # 1796; DN  63-8, at PageID # 1534.)  Plaintiffs thus argue that "at the very least, Louisville should produce all employment case files for complaints that progressed to a hearing.  (*Id.*)  Plaintiffs also note that the contract with the EEOC only prohibits the disclosure of information "if said information was obtained from the EEOC." (*Id.*, at PageID # 1796-97.)  Plaintiffs reason that complaints initially filed with HRC, prior to any involvement by the EEOC, cannot constitute information obtained by the EEOC.  (*Id.*)  Plaintiffs thus argue that Defendants should produce all employment complaints initially field with HRC. (*Id.*, at PageID # 1797.)  Plaintiffs also note that the EEOC contract charges HRC with initially processing complaints based on grounds covered by the Fairness Ordinance but not covered by federal laws.  (*Id.*)  These include complaints against employers with fewer than fifteen employees (the Fairness Ordinance covers employers of at least two employees) and complaints alleging sexual orientation and gender identity discrimination (over which the EEOC lacked jurisdiction prior to 2020).  (*Id.*)  Finally, Plaintiffs argue that the cited statues and regulations only apply to the EEOC's disclosure of information, and do not extend to disclosures by Defendants.  (*Id.*, at PageID # 1797-98.)

The Court agrees that Defendants can produce a range of documents concerning employment complaints without implicating the EEOC contract or the cited statutes and regulations.   The clearest example is cases in which the EEOC was not involved.   Since

information for each case is kept in its own separate file, (DN 64, at PageID # 1613), there is no reason why information shared by the EEOC should be intermixed within those files.  Also unprotected are cases that resulted in a lawsuit and documents related to any public hearing.  The Court finds that disclosure of these documents does not impose an undue burden to Defendants' relationship with the EEOC.  A closer question is whether the terms of the EEOC contract set an expectation that Metro to abide by the same confidentiality policies that are imposed on the EEOC. That is, whether in agreeing to "abide by the confidentiality provisions of Title VII, ADA and the GINA as those provisions are interpreted by the EEOC," Metro agreed to maintain the same level of confidentiality those provisions require of "the Commission."  (DN 64-3, at PageID # 1656-85.) The terms of the contract leave some ambiguity as to the question.  To be clear, even if it is the case, the terms of the EEOC contract are not binding on the scope of discovery in federal court. However, to the extent that the contract might obligate Defendants to refrain from making pre-hearing charges public, the burden of forcing Defendants to violate that obligation favors limiting discovery.

Metro also contracts with the Department of Housing and Urban development ("HUD"), through which HRC and HUD work together to investigate alleged instances of discrimination in housing.  (DN 64, at PageID # 1617.)  Defendants provide an example of a HUD contract from 2017, which provides that, "[a]s a general rule, the [Metro] will not release information collected during the course of the investigation while the complaint is open."  (DN 64-3, at PageID # 1723.) Defendants also cite to several federal regulations providing that nothing said or done in the course of conciliation shall be made public without the parties' written consent, that conciliation agreements be made public except at the request of the parties and with the consent of the Assistant Secretary of HUD, and that HUD will take steps to protect the confidentiality of complainants in

sharing information with other state and federal agencies.  (DN 64, at PageID # 1617-18.) Defendants say that in the course of briefing their motion for a protective order, HRC Executive Director Goatley contacted her counterparts at HUD.  (*Id.*, at PageID # 1618.)  Defendants say that "[t]hese HUD agents vehemently objected to public disclosure of files relating to housing discrimination complaints and indicated that they considered the files to be confidential.  (*Id.*) Defendants argue that its funding from HUD would be jeopardized "if HRC disclosed information in violation of its obligations under the HUD contract."  (*Id.*)

In response, Plaintiffs say that Defendants waived their argument concerning the HUD regulations and contract by failing to raise it in their initial response to Plaintiffs' RFP.  (DN 65, at PageID # 1799.)  In the alternative, Plaintiffs argue that the HUD contract and cited regulations do not prohibit disclosure.  (*Id.*, at PageID # 1799-1800.)  Plaintiffs say they seek only the conciliation agreements, not what was said or done in the course of reaching those agreements. (*Id.*, at PageID # 1799.)  Plaintiffs note that the conciliation agreements are generally made public, and that Defendants have not identified any request from a party that an agreement not be made public.  (*Id.*)  Plaintiffs note that the HUD contract only precludes disclosure of information related to open cases.  (*Id.*, at PageID # 1800.)  Plaintiffs thus argue that Defendants should produce all closed housing files or at least all closed housing complaints.  (*Id.*)

The Court agrees that Defendants can produce the vast majority of requested documents in the housing case files without implicating the HUD contract or the cited regulations.  This includes complaints, reasonable-cause determinations, petitions to reconsider, documents filed in court, administrative records, and judicial opinions for any closed housing case.  The Court also agrees that the cited regulations do not preclude disclosure of conciliation agreements, and in fact, Defendants already publicize conciliation agreements.  The Court affords little weight to the HUD

agents' position on the confidentiality of case files; as nonparties that are not being asked to disclose anything, they have no standing to object the requested discovery.  However, the Court considers that, to some extent, disclosure may impose a burden on Defendants in their relationship with HUD.

Defendants also argue that the time and effort that would be required to locate and review the case files impose an undue burden.  (DN 63, at PageID #1613-14.)  Defendants note that Plaintiffs seek files for hundreds of cases.  (*Id.*, at PageID # 1613.)  Defendants say that HRC does not keep electronic copies of its case files, which are stored in paper format in off-site storage. (*Id.*)  To retrieve a case file from storage, Defendants must submit a request through Metro's Archives Department using the case number; it takes between two and four weeks to process a single request.  (*Id.*, at PageID # 1614.)  After retrieving the files, Defendants say they would have to conduct a manual review of the files to weed out documents protected by their confidentiality obligations.  (*Id.*)  As a part of the meet and confer process, counsel for Defendants retrieved two case files from storage and reviewed them for documents that are subject to public disclosure.  (DN 83, at PageID # 2165.)  Counsel states that the files consisted of nearly 1,000 pages of which only 127 pages were subject to public disclosure, and the review process for the two files took between three and four hours.  (*Id.*)  Defendants say that Plaintiffs' proposed limitations do not effectively reduce the burden.  For example, even if the requests for housing and employment case documents was limited to complaints or if the requests only covered documents related to public hearings, Defendants say they would still have to review each individual file to retrieve those documents. (DN 64, at PageID # 1614.)  Similarly, Defendants say that limiting discovery to the specific information that Plaintiffs cite as relevant would not reduce the burden.  (DN 66, at PageID # 1815.)  For example, if Plaintiffs had only requested information about past applications of the

exceptions in the Fairness Ordinance, Defendants say they would still have to review each case file because HRC does not separately check applications of the exemptions.  (*Id.*)  Defendants argue that this burden is unjustified given the "marginal-at-best relevance of the discovery sought." (*Id.*)

In response, Plaintiffs argue that Defendants waived their objection due to the "boilerplate" form of the objections in their initial responses to RFP 40-58.  (DN 63, at PageID # 1466.)  In the alternative, Plaintiffs argue that Defendants have not met their burden of showing that Plaintiffs' discovery requests are disproportionate.  (*Id.*, at PageID # 1466-67.)  Plaintiffs say that Defendants cannot rely on bad recordkeeping practices in asserting undue burden.  (DN 65, at PageID # 1802.) Plaintiffs also argue that requesting the relevant case files should not be difficult because HRC's internal spreadsheets open and closed case numbers.  (*Id.*)  Plaintiffs argue that Defendants cannot rely on the two to four weeks it takes to process requests in asserting undue burden because several months have passed since Defendant requested production of the case files.  (*Id.*)  Plaintiffs also argue that Defendants cannot rely on extensive document review in asserting undue burden, citing Defendants' resources in the form of information technology budget and staffing.  (*Id.*, at PageID # 1802-03.)  Finally, Plaintiffs propose different conditions of disclosure that could limit the need for manual review, including disclosure of all case files under a confidentiality agreement or limiting its disclosure of case files related to housing and employment.  (*Id.*, at PageID # 1803-04.)

The difficulty obtaining case files and the effort required to review them favors tailoring the scope of production as narrowly as possible to what is relevant and proportional to the needs of the case.  However, Defendants cannot deny access to all documents in the case files based solely on the effort that is required to obtain the documents, especially when the effort appears to

be caused by how the Defendants have chosen to organize and store the documents.  After all, the text of the ordinance requires that HRC make some of the information in the case files public.  *See* MO § 92.08(B)(7) (requiring conciliation and enforcement agreements under the Fairness Ordinance be made public); MO § 92.09 (I) (requiring that hearings for enforcing the Fairness Ordinance are open to the public).  Defendants alone chose to store public information in files intermixed with information they hoped to remain confidential.  Thus, while the Court is cautious not to require Defendants to expend more resources than necessary, it does not hold convenience to Defendants in higher regard than Plaintiffs' need for relevant discovery.

### 4.   Amount in Controversy and Parties' Resources

Turning to the remaining proportionality considerations, the amount in controversy bears little weight on the propriety of the discovery at issue.  The Court notes that Plaintiffs' complaint claimed nominal and compensatory damages, (DN 1, at PageID # 51), and that claim was dismissed without prejudice.  (DN 47, at PageID # 1202.)  Additionally, the Parties' comparative resources are not meaningfully unequal.  Defendants are local government entities and their past and current employees.  Although Plaintiffs are an individual and her company of which she is the sole employee, her counsel and the *amicus curiae* supporting her are highly sophisticated.  (*See* DN 36, at PageID # 1070; DN 66, at PageID # 1810.)

### iii.   Conclusion

With the forgoing in mind, the Court finds the following discovery is appropriate:

- All case files for complaints of discrimination on the basis of sexual orientation filed with the HRC since 2010.
- Documents related to every public hearing under the applicable ordinance since 2010.
- A randomly selected representative sample of public accommodation case files comprising 20% of complaints received since 2004.

Plaintiffs' motion to compel will be granted with respect to the above documents and denied with respect to all other documents sought by their motion to compel. As to the first category, Defendants should be able to produce these case files without running afoul of its contracts with federal agencies because neither agency regulated sexual orientation discrimination during the relevant time period. For the same reason, Defendants' burden in reviewing these documents before disclosure is minimized. Limiting the time period to 2010 to present substantially reduces the burden in obtaining the case files, both by decreasing the volume and narrowing the case files to those that are tracked in HRC's summary spreadsheets. As to the second category, there is a strong interest in disclosing records of public hearings, and doing so is not unduly burdensome given that, as Defendants' emphasize, a very limited number of cases proceed to public hearing. As to the third category, a random sample of case files will allow Plaintiffs to explore their theories of liability without subjecting Defendants to an invasive and unnecessary fishing expedition. Limiting this category to the area of public accommodation also reduces Defendants' burden in reviewing the files because these complaints are not covered by Metro's contracts with federal agencies. Production of these categories of documents will be subject to a protective order precluding Plaintiffs from disclosing any document or information included in the production in any way outside this litigation pending further order of the Court. Additionally, Defendants will be permitted to redact from their production personal identifying information, information about pending complaints, and information HRC received from the EEOC.

The Court will not require Defendants to produce documents related to historical complaints of discrimination. These complaints date back forty years and Plaintiffs have not offered any reason to doubt their authenticity. Moreover, to the extent that they may be relevant to assess the government interest in eliminating sexual orientation discrimination motivating the

legislators who enacted the ordinance, scrutinizing every complaint is not necessary. The Supreme Court has consistently recognized that states have a compelling interest in eliminating such discrimination in enacting laws like the Fairness Ordinance. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Bos.*, 515 U.S. 557, 572 (1995) (Public accommodation laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination . . . ."); *see also Bd. of Dirs. of Rotary Int'l v. Rotary Club*, 481 U.S. 537, 549 (1987) (government had a compelling interest in eliminating discrimination against women in places of public accommodation); *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) (same); *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983) (government had a compelling interest in eliminating racial discrimination in private education).  In none of those cases did the Supreme Court rely on fact discovery at the trial court level nor did it impose a litmus test measuring the level of discrimination in a particular community to determine whether an interest in eliminating discrimination is triggered.  The Court also notes that the Defendants are not the legislators that enacted the ordinance and to the extent that they have cited the historic complaints to support their interest in continued enforcement of the ordinance, Defendants rely on the same documents that have been disclosed to Plaintiffs.  Therefore, Defendants' motion for a protective order will be granted with respect to historic complaints of discrimination predating the Fairness Ordinance.

### b.  Summary Spreadsheets

Plaintiffs seek production of internal spreadsheets that HRC uses to track open and closed cases from the years 2010-2020, which they say are responsive to RFP 1-39.  (DN 63, at PageID # 1468.)  The Court has not seen any of the spreadsheets; Defendants description is as follows:

> These spreadsheets list individual cases. The format of these spreadsheets has changed slightly over the years. Each spreadsheet

> contains some or all of the following columns: EEOC; Intake;
> Investigator; Complaint No.; EEOC No.; Complainant; Respondent;
> Closure; Amt Rec'd/Reason; Code; Date Opened; Date Closed;
> Days Open; TER; HRC; No Credit; Hearing Date/Outcome of
> Hearing; Basis; Action.

(DN 64, at PageID # 1621.)  Plaintiffs argue that the information in the spreadsheets is relevant

for the same reasons that it argued that the case files are relevant.  (DN 63, at PageID # 1468.)

Defendants argue "that they are prohibited from producing these withheld spreadsheets pursuant

to the confidentiality laws and contractual requirements discussed" in the context of the case files.

(DN 64, at PageID # 1621.)  Defendants say that they have already provided responsive

information, including HRC annual reports, compliance activity reports, and an anonymized

EEOC resolutions report.  (DN 66, at PageID # 1823.)

Plaintiffs say that the internal spreadsheets contain information not covered by Defendants

prior disclosures, including hearing outcomes, bases for hearings, and later actions.  (DN 63, at

PageID # 1468.)  Plaintiffs further argue that Defendants' confidentiality concerns can be

addressed by a protective order or through Defendants' redacting sensitive information.  (*Id.*)

The Court finds that the spreadsheets are relevant because they contain information about

applications and past enforcement of the Fairness Ordinance.  *See supra* Part III.A.i.  Defendants

do not raise any relevance objections in their briefs.  (*See* DN 64, at PageID # 1619-21; DN 66, at

PageID # 1822-23.)  The Court agrees with Plaintiffs that information in the spreadsheets is not

duplicative of previous discovery because the spreadsheets track specific metrics that are not

included in previously disclosed reports.  The Court appreciates Defendants' confidentiality

concerns but sees no reason why the redactions that Plaintiffs have suggested will be insufficient

to address those concerns.  The fact that "anonymized data has already been made available to

Plaintiffs," (DN 66, at PageID # 1823), does not mean that Plaintiffs are not entitled to additional

anonymized data contained in the spreadsheets. Accordingly, the Court will order Defendants to produce the spreadsheets but will permit appropriate redactions, including personal identifying information, information about pending complaints, and information HRC received from the EEOC. Production of these spreadsheets will also be subject to a protective order precluding Plaintiffs from disclosing any document or information included in the production in any way outside this litigation pending further order of the Court.

### c. Interrogatories 15-17

Plaintiffs seek further responses to Interrogatories 15-17, which ask:

> 15. Do you contend that the least restrictive means to achieve any government interest is to require Chelsey Nelson Photography LLC and Chelsey Nelson to provide paid photography services for same-sex weddings when she already provides paid photography services for opposite-sex weddings? If so, identify all material facts that support your contention, including all other alternative means you considered, when you considered those alternative means, and why you concluded those alternative means were ineffective.
> . . .
> 16. Do you contend that the least restrictive means to achieve any government interest is to require Chelsey Nelson Photography LLC and Chelsey Nelson to provide paid editing services for photographers photographing same-sex weddings when she already provides paid editing services for photographers photographing opposite-sex weddings? If so, identify all material facts that support your contention, including all other alternative means you considered, when you considered those alternative means, and why you concluded those alternative means were ineffective.
> . . .
> 17. Do you contend that the least restrictive means to achieve any government interest is to require Chelsey Nelson Photography LLC and Chelsey Nelson to write blogs celebrating same-sex weddings as part of her paid photography services when she already writes blogs celebrating opposite-sex weddings as part of her paid photography services? If so, identify all material facts that support your contention, including all other alternative means you considered, when you considered those alternative means, and why you concluded those alternative means were ineffective.

(DN 63-5, at PageID # 1518-19.)

Directly, and through incorporation, Defendants provided the following answer: "Yes. The Metro Ordinance cannot accomplish its important and compelling purpose of preventing discrimination if a significant segment of the population is permitted to discriminate on grounds of a sincere religious belief." (*Id.*)

Plaintiffs note that under strict scrutiny review, Louisville has a burden of showing that the Fairness Ordinance is the least restrictive means to accomplish its interest in enacting and enforcing the ordinance. (DN 63, at PageID # 1469.) Plaintiffs also note that in defending Plaintiffs' motion for preliminary injunction, both Defendants and an *amicus curia* claimed that the ordinance is the least restrictive means of achieving the government interest. (*Id.*) Plaintiffs argue that a "full answer" to the interrogatories is necessary in order to determine "whether Louisville considered and rejected less restrictive alternatives besides applying its law to businesses like [Plaintiffs']." (*Id.*) Plaintiffs further argue that "[i]f Louisville did not consider other alternatives, then it should be compelled to say so." (*Id.*, at PageID # 1470.) Plaintiffs also believe that Defendants did not sufficiently identify the requested facts and materials supporting their interrogatory responses. (DN 65, at PageID # 1805-06.) Plaintiffs note that Defendants' production of documents supporting its government interest includes hundreds of pages from the legislative record. (DN 65, at PageID # 1805.) Plaintiffs argue that given the volume of the production, Louisville should be required to specify which documents and facts support their contention. (*Id.*) Plaintiffs say that Metro, as the government entity that passed the ordinance, is "in a much better position than [Plaintiffs] to answer these interrogatories because the information relates to Louisville's strict-scrutiny defense." (*Id.*, at PageID # 1806.)

In response, Defendants note that Plaintiffs' requests are contention interrogatories, which the Court can defer until discovery is completed under Rule 33(a)(2) of the Federal Rules of Civil

Procedure.  (DN 64, at PageID # 1621; DN 66, at PageID # 1823-24.)  Defendants assert that they "were not legislators at the time the Fairness Ordinance was considered and passed and do not currently possess any information regarding what alternative measures those legislators considered, other than the transcripts and minutes of those legislative sessions, which have been produced to Plaintiffs."  (DN 66, at PageID # 1824.)  Defendants say that they have produced responsive documents that are reasonably available to them and will continue to produce responsive documents when they are discovered.  (*Id.*)

Because Interrogatories 15-17 seek the complete factual basis for certain defenses claimed by Defendants, they are in fact contention interrogatories.  "The general view is that contention interrogatories are a perfectly permissible form of discovery, to which a response ordinarily would be required."  *Starcher v. Corr. Med. Sys., Inc.*, 144 F.3d 418, 421 n.2 (6th Cir. 1998), *aff'd sub nom. Cunningham v. Hamilton Cty., Ohio*, 527 U.S. 198, 119 S. Ct. 1915, 144 L. Ed. 2d 184 (1999).  While recognizing the impossibility of fully answering contention interrogatories at the outset of discovery, courts rely on compliance with the 26(e) duty to supplement to inform opposing counsel of the allegations they face.  *United States ex rel. Nat. Res. Def. Council v. Lockheed Martin Corp.*, No. 5:99-CV-170, 2014 WL 6909652, at *4-5 (W.D. Ky. Dec. 8, 2014).  "Given the well-recognized problems parties face giving complete answers to contention interrogatories early in the litigation process, litigants are well-advised to anticipate changes."  *Id.*  Additionally, a court may postpone a response to contention interrogatories until discovery is closer to completion.  Fed. R. Civ. P. 33(a)(2).

The Court finds that Defendants' responses to Interrogatories 15-17 do not satisfy their burden under Rule 33(b)(3).  Notwithstanding Defendants' production of documents contained in the legislative record that contain responsive information, Defendants are obligated to "specifically

respond with facts to each of the contention interrogatories and provide to the full extent possible the known facts that underlie each of [their contentions]." *Brown v. Tax Ease Lien Servicing, LLC*, No. 3:15-CV-208-CRS, 2017 WL 6939338, at \*24 (W.D. Ky. Feb. 16, 2017) (citation omitted). A "mere general reference to a mass of documents . . . without more are [sic] not sufficient to satisfy the dictates of Rule 33." *Id.* at \*23.  Moreover, Defendants' responses do not even reference responsive documents.   (*See* DN 63-5, at PageID # 1518-19.)   The Court declines to defer Defendants' response as they propose because "[t]he parties are no longer in the nascent discovery stages." *Davis v. Am. Highwall Mining, LLC*, No. 6:19-CV-00096-MAS, 2020 WL 5494520, at \*3 (E.D. Ky. Sept. 11, 2020).  To the extent that the Defendants have yet to discover all of the facts that relate to the contentions, they will remain able pursuant to Rule 26(e) to supplement their responses to the interrogatories.

## IV.    ORDER

For the foregoing reasons,

IT IS HEREBY ORDERED as follows:

1.  Plaintiffs' motion to compel (DN 63) is **GRANTED in part and DENIED in part**.

2.  Defendants' motion for a protective order (DN 64) is **GRANTED in part and DENIED in part**.

3.  Defendants shall serve complete responses to Defendants' Interrogatories 15-17 on or before **October 8, 2021**.

4.  Defendants shall produce the redacted summary spreadsheets on or before **October 8, 2021**.

5.  Defendants shall produce case file documents consistent with this order on or before **November 12, 2021**.

6.  The parties and their counsel shall refrain from disclosing any information produced under Parts III(a)-(b) of this order in any manner outside this litigation pending further order of the Court.

7.  On or before **October 29, 2021**, the Parties shall jointly file a report informing the Court of the status of compliance with this order, including any proposed extensions and proposed dispositive motion deadline.

Colin H Lindsay, Magistrate Judge
United States District Court

August 25, 2021

cc:  Counsel of record