**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| **CHELSEY NELSON PHOTOGRAPHY LLC and CHELSEY NELSON,** | |
| **Plaintiffs,** | |
| **v.** | **Case No. 3:19-cv-851-BJB-CHL** |
| **LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, et al.,** | |
| **Defendants.** | |

**DEFENDANTS' COMBINED RESPONSE TO**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**
**AND MEMORANDUM IN SUPPORT OF**
**DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................1

FACTS .................................................................................................................................2

    I.    Louisville's Prohibition of Discrimination Based on Sexual Orientation ..........................2

    II.    Plaintiffs' Attempt to Manufacture Standing....................................................................4

LEGAL STANDARD ...........................................................................................................7

ARGUMENT .......................................................................................................................7

    I.    Plaintiffs' Claims Must Be Dismissed for Lack of Standing..............................................8

    II.    There Is No Basis for Plaintiffs' Standing to Bring a Facial Challenge. .............................12

    III.    Plaintiffs' Claims Are Not Ripe........................................................................................13

    IV.    Application of the Ordinance to Chelsey Does Not Trigger Strict Scrutiny Under the First Amendment's Free Speech Clause. ....................................................14

        A.    The Ordinance Regulates Chelsey's Conduct, Not the Content of Her Speech. .....................................................................................................................14

        B.    The Ordinance is Not Content- or Viewpoint- Based............................................16

        C.    Any "Compelled Expression" Is Incidental to the Ordinance's Regulation of the Conduct of Providing Goods and Services. ...................................................18

        D.    The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination. .......................................19

    V.    The Ordinance Is Neutral and Generally Applicable........................................................20

    VI.    The Ordinance Does Not Compel Chelsey to Participate in Religious Ceremonies; Indeed, It is Chelsey's Requested Exemption That Would Violate the Establishment Clause. ..................................................................................................22

    VII.    The Ordinance Satisfies Any Level of Scrutiny. ..............................................................24

    VIII.    Plaintiffs' Kentucky RFRA Claim Fails and Is Barred by Sovereign Immunity. .............29

    IX.    All Claims Against HRC-Enforcement, HRC-Advocacy, and the Individual Defendants Must Be Dismissed. ....................................................................................30

CONCLUSION ....................................................................................................................31

Defendants Louisville/Jefferson County Metro Government ("Louisville Metro"), Louisville Metro Human Relations Commission – Enforcement ("HRC-Enforcement"), Louisville Metro Human Relations Commission – Advocacy ("HRC-Advocacy"), Verná Goatley, in her official capacity as Executive Director of the HRC, Marie Dever, Kevin Delahanty, Charles Lanier, Sr., Leslie Faust, William Sutter, Ibrahim Syed, and Leonard Thomas, in their official capacities as members of HRC-Enforcement (collectively, "Defendants"), by counsel, for their combined response to the motion for summary judgment filed by Plaintiffs Chelsey Nelson Photography and Chelsey Nelson (collectively, "Chelsey" or "Plaintiffs") and memorandum in support of their cross-motion for summary judgment, state as follows:

## INTRODUCTION

This case is not about Chelsey Nelson. Chelsey has never been asked to photograph a same-sex wedding and there is no realistic possibility that she ever would be asked to photograph a same-sex wedding. She advertised her religious beliefs in a way that did not violate Louisville's anti-discrimination law for years before being recruited to join this lawsuit. Chelsey has photographed just 11 weddings total. Indeed, Chelsey has scaled back her photography business to focus on parenting her young child. This case is not about Chelsey Nelson or her business.

This is a manufactured dispute designed to create precedent for using religion as an excuse not to provide commercial services to all members of the Louisville Metro community. Under the precedent Plaintiffs seek to create, any service provider who can claim that their product or service is creative would be entitled to a religious exemption. Such an exemption would be as unworkable as it is expansive, as courts have yet to define the scope of services and products that could be considered "creative." Despite Plaintiffs' claims, this is not a harmless exercise. Granting religious exemptions to antidiscrimination laws increases real-world discrimination. No exemption is warranted here. Chelsey has no standing and Louisville's antidiscrimination law does not abridge

Chelsey's constitutional rights.

## FACTS

Plaintiff Chelsey Nelson is a wedding photographer who filed this litigation to challenge the constitutionality of Louisville Metro's antidiscrimination law, which prohibits discrimination in employment, housing, and the provision of goods and services (public accommodations). *See* Louisville Metro Ordinance § 92.01, *et seq.* Specifically, Chelsey challenges:

> The "Accommodations Provision," which makes it "an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation . . . on the ground of . . . sexual orientation . . ."; and

> The "Publication Provision," which makes it "an unlawful practice for a person, directly or indirectly, to publish, . . . [a] communication, notice, or advertisement, which indicates that the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation . . . will be refused, withheld, or denied an individual on account of his [or her] . . . sexual orientation . . . or that patronage of, or presence at, a place of public accommodation . . . of an individual on account of his [or her] . . . sexual orientation . . . is objectionable, unwelcome, unacceptable, or undesirable."

Louisville Metro Ordinance § 92.05(A) & (B) (collectively, the "Ordinance"). A complete copy of Louisville's antidiscrimination law is attached as Exhibit 1.

## I.   Louisville's Prohibition of Discrimination Based on Sexual Orientation

Before sexual orientation was added as a protected class in Louisville's anti-discrimination law, HRC started tracking receipt of complaints of discrimination on the basis of sexual orientation. *See* Excerpts from HRC Annual Reports from 1985-1993, collectively attached as Exhibit 2. In 1999, both Louisville and Jefferson County, before merger, amended their respective anti-discrimination ordinances to include a prohibition on employment discrimination on the basis of sexual orientation. Before Jefferson County's legislators voted to add sexual orientation as a protected class, they heard testimony from numerous citizen witnesses, who testified both for and against passage of the law, including personal accounts from citizens who had experienced

2

discrimination on the basis of sexual orientation. *See*, *e.g.*, Excerpts of Citizen Testimony are attached as Exhibit 3. Later that year, the prohibition of discrimination on the basis of sexual orientation was expanded to include discrimination in housing and public accommodations. *See* Jefferson Fiscal Court Ordinance No. 36, Series 1999, attached as Exhibit 4.

In 2003, the governments of Jefferson County and the City of Louisville merged pursuant to KRS Chapter 67C. The combined city and county government ("Louisville Metro") is a political subdivision of the Commonwealth of Kentucky. In 2004, Louisville Metro, through its newly constituted Metro Council, enacted an antidiscrimination law as Metro Ordinance Chapter 92. The law begins with the following declaration of policy:

> It is the policy of the Metro Government to safeguard all individuals within Jefferson County from discrimination in certain contexts because of race, color, religion, national origin, familial status, age, disability, sex, gender identity, or sexual orientation. Certain practices must be prohibited within the areas of employment, housing, public accommodation, resort or amusement as necessary to protect individuals's [sic] personal dignity and insure [sic] freedom from humiliation; to make available to Jefferson County all full productive capacities; to secure Jefferson County against strife and unrest which would menace its democratic institutions; and to preserve the public safety, health and general welfare.

Louisville Metro Ordinance § 92.01.

Louisville Metro formed a Human Relations Commission ("HRC") with two boards: Enforcement and Advocacy. Pursuant to Louisville Metro Ordinance §§ 32.760-761, members of the Enforcement and Advocacy boards are appointed by Louisville's Mayor with approval of Metro Council, and "shall include persons who are representative of the several social, economic, cultural, ethnic, and racial groups that comprise the population of Metro Louisville." The provisions in Louisville Metro Ordinance Chapter 32 relating to HRC are attached as Exhibit 5. Individuals are not compensated for service on the HRC boards. Louisville Metro Ordinance §§ 32.760(B)(3), 32.761(A)(3). Plaintiffs named as Defendants in this litigation both HRC-

Enforcement and HRC-Advocacy, as well as all individual members of the HRC-Enforcement board in their official capacities. *See* Verified Complaint.

HRC-Enforcement is responsible for enforcing Louisville Metro's antidiscrimination law. *See* Louisville Metro Ordinance §§ 32.760(C), 92.08-09. HRC-Enforcement has a statutory mandate to first seek compliance through conciliation efforts, which often involve educating the alleged offender about Louisville's antidiscrimination law. *See* Louisville Metro Ordinance § 92.09(E)(2). HRC-Advocacy is charged with promoting "mutual understanding and respect among all economic, social, religious, ethnic, and social groups in the metropolitan area," but has no enforcement role. Louisville Metro Ordinance § 32.761(B).

Since Louisville Metro's antidiscrimination law has been enacted, HRC-Enforcement has investigated numerous complaints of discrimination on the basis of sexual orientation, as reflected by publicly available statistics. *See*, *e.g.*, HRC Annual Reports from 2012-2014, collectively attached as Exhibit 6.

## II.     Plaintiffs' Attempt to Manufacture Standing

Chelsey alleges a religious objection to providing photography services for same-sex weddings. *See generally* Verified Complaint. Chelsey started her photography business in 2016 and advertised her religious beliefs for years without directly stating that she would refuse services relating to a same-sex wedding. Deposition of Chelsey Nelson (Feb. 16, 2021), excerpts and Ex. 1 collectively attached as Exhibit 7 ("Nelson Tr."), 88:17-20; 125:24-126:18 & Ex. 1, 171:15-172:3. Before receiving advice from counsel, Chelsey's website described her as having a "heart for Jesus" and under the heading "I believe" stated: "I believe God's vision for marriage is beautiful" and "I believe in spreading the truth and love of Jesus." Nelson Tr. Ex. 1.

Although Chelsey alleges that providing paid photography services at a wedding requires her to participate in a religious ceremony, that is not the service that Chelsey sells to her customers.

Chelsey's standard form contract requires her to take and edit photographs of the wedding, but does not require her to participate in the wedding ceremony in any respect. *See* Wedding Celebration Services Agreement, attached as <u>Exhibit 8</u>. Indeed, Chelsey's contract explicitly states that she "will not provide Services in a manner that communicates messages contrary to [her] religious beliefs and artistic judgment." *Id.* at CNP 00249.

Chelsey testified that she has no friends or family members who are part of the LGBTQ community. Nelson Tr. 81:6-82:21. Chelsey testified that she worked with people who she surmised were part of the LGBTQ community at one of her previous jobs, but never discussed their sexuality with those individuals directly. *Id.* Chelsey believes that premarital sex is a sin, yet takes no steps to inquire whether the couples for whom she has provided wedding photography services have engaged in premarital sex. *Id.* at 43:18-21, 183:6-184:12. Chelsey believes that legalizing same-sex marriage could lead to the sanctioning of polygamy and bestiality. *Id.* at 68:4-69:14.

Chelsey has never been asked to photograph or provide any services with respect to a same-sex wedding and therefore has never had occasion to refuse services to a same-sex couple. Nelson Tr. at 128:14-18, 151:15-20. Chelsey has only ever professionally photographed 6 weddings as primary shooter and 5 weddings as a second shooter for other photographers. *See* Plaintiffs' Response to Interrogatory No. 6, as supplemented. No discrimination complaints have ever been filed against Chelsey and she has never been investigated by Louisville Metro's Human Relations Commission. Chelsey never contacted Louisville Metro or HRC to request a religious exemption to Louisville's antidiscrimination law. Indeed, Louisville Metro had not heard of Chelsey before she filed this lawsuit. *See* Affidavit of Kendall Boyd, attached as <u>Exhibit 9</u>.

Plaintiffs' counsel, the Alliance Defending Freedom ("ADF"), recruited Chelsey to

become a plaintiff in this litigation by initiating contact with her in 2018 and providing legal advice to Chelsey regarding changes to her website marketing statement. Nelson Tr. at 149:20-150:6, 151:4-14, 166:7-167:1. It was only after ADF provided this legal advice that Chelsey's marketing statement included a direct statement that she would refuse to provide services relating to a same-sex wedding, a clear violation of the Publication Provision. *See* Verified Complaint, Ex. 1 ("I don't photograph same-sex weddings . . .").

Chelsey did not immediately post this revised marketing statement to her website. Instead, she filed it as an exhibit to the Complaint in this litigation as part of an effort to allege that Plaintiffs have standing to challenge the constitutionality of Louisville's antidiscrimination law. *See* Doc. Nos. 1-2, 1-3. Chelsey's Complaint alleges that she wanted to grow her business by more directly advertising her religious objections to providing services for same-sex weddings, but that the threat of prosecution for violations of Louisville's antidiscrimination law was preventing her from taking that step, which caused her to lose business opportunities. *See* Verified Complaint, ¶¶ 210-213, 235, 238-241, 282.

In fact, Chelsey was scaling back her photography business at the time she filed the Complaint. She admitted she no longer offered family and birth photography sessions and had chosen instead to focus exclusively on wedding photography. Nelson Tr. 130:23-131:1, 232:11-22, 236:1-21. This coincided with the birth of Chelsey's daughter on May 7, 2019 and her decision to quit her full-time job at a payment processing company to spend more time at home with her daughter. *Id.* at 16:15-16, 22:4-6, 23:12-19, 233:1-8. This downsizing of Chelsey's business occurred before she filed this litigation.

Since filing the Complaint on November 19, 2019, Chelsey has photographed just two weddings, one in the same month the Complaint was filed and a second in June 2021. Since

Chelsey obtained an injunction from the District Court in August 2020 [Doc. No. 47], which allowed her to post the version of her marketing statement which directly states that she would refuse to provide services for a same-sex wedding, Chelsey has booked just one wedding client, who was married in June 2021. Apparently, Chelsey's freedom to advertise her discriminatory intent has not led to the growth in her business that she claims to have anticipated.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must assess whether the evidence presents a sufficient disagreement about the material facts so that submission to a jury is necessary, or whether the evidence is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-53 (1986). For a fact to be material, it must affect the outcome of the suit; "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

## ARGUMENT

ADF manufactured this lawsuit to create undisputed violations of Louisville Metro's antidiscrimination law: Chelsey's intent to deny services for a same-sex wedding would, if this hypothetical scenario became reality, violate the Accommodations Provision; and the part of her attorney-advised marketing statement (crafted by ADF) which states "I don't photograph same-sex weddings" violates the Publication Provision. Chelsey brings this pre-enforcement challenge before she has ever been asked to provide services for a same-sex wedding to seek a declaratory judgment that Louisville's antidiscrimination law violates: (1) her First Amendment right to freedom of speech: (2) her First Amendment right to free exercise of religion; (3) the First Amendment's establishment clause; (4) her Fourteenth Amendment right to due process; and (5)

Kentucky's Religious Freedom Restoration Act. All of Chelsey's claims should be dismissed because she lacks standing. But even if the Court reaches the merits of Chelsey's claims, Defendants are entitled to summary judgment as a matter of law.

## I.   Plaintiffs' Claims Must Be Dismissed for Lack of Standing.

"Under Article III, federal courts do not adjudicate hypothetical or abstract disputes." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). To establish standing, it is the plaintiff's burden to show (1) that she suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) that the injury was likely caused by the defendant; and (3) that the injury would likely be redressed by judicial relief. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Chelsey has not experienced any actual injury. No discrimination complaints have been filed against her. Chelsey never asked Defendants to grant her a religious exemption from compliance with the antidiscrimination law. Defendants had never even heard of Chelsey before she filed this lawsuit. This is a manufactured pre-enforcement challenge premised on speculative fears that Chelsey "might" at some hypothetical future date be subject to an enforcement action.

In such cases, plaintiffs must establish "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Chelsey's "allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes." *McKay v. Federspiel*, 823 F.3d 862, 868-69 (6th Cir. 2016). To prove a substantial threat of prosecution, Chelsey must also establish "some combination of the following factors: (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action." *Id.* at 869

(citations omitted); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164-67 (2014) (holding that pre-enforcement standing was appropriate where plaintiff had already experienced enforcement action in past election cycle and intended to engage in the same conduct in future elections).

Although HRC-Enforcement actively enforces Louisville Metro's antidiscrimination law, Chelsey has not received any warning letters or any other threat of enforcement whatsoever. And the text of the Ordinance is at odds with any suggestion that it is targeted at individuals like Chelsey, i.e. wedding photographers, creative professionals, or those with religious objections. *Plunderbund Media, L.L.C v. DeWine*, 753 Fed. Appx. 362, 371 (6th Cir. 2018) (noting that targeted laws can give rise to standing, but affirming dismissal of pre-enforcement challenge where law was not targeted and plaintiffs failed to establish a credible threat of enforcement). Louisville Metro's antidiscrimination law applies broadly to all public accommodations to ensure that community members have equal access to goods and services. An enforcement agency's intent to enforce a law *generally* does not mean that plaintiff *specifically* faces an imminent threat of enforcement. *Updegrove v. Herring*, 2021 WL 1206805, at *3 (E.D. Va. Mar. 30, 2021).

Chelsey wrongly asserts that any member of the public can file a discrimination complaint against her. Under the Ordinance, an individual must be "aggrieved by an unlawful practice" in order to file a complaint, which must be executed and verified by each complainant. *See* Louisville Metro Ordinance § 92.09.

Because Chelsey has never once in the history of her business been asked to provide services for a same-sex wedding, the likelihood that Chelsey will be presented with an opportunity to deny services for a same-sex wedding—and thereby aggrieve an individual who could file a complaint—can only be described as remote. *See Updegrove*, 2021 WL 1206805, at *3 (observing,

9

in dismissing plaintiff's claims for lack of standing, that wedding photographer challenging antidiscrimination law "has never been approached by anyone seeking his photography services for a same-sex wedding"). This possibility is even more remote considering that Chelsey downsized her business before this suit was filed and has and can continue to advertise her religious objections to same-sex marriage on her website without violating the Ordinance, as long as her statement of belief does not advertise her refusal to photograph same-sex weddings if requested to do so. *See Hyman v. City of Louisville*, 53 Fed. Appx. 740, 744 (6th Cir. 2002) (dismissing for lack of standing the only prior constitutional challenge to Louisville Metro's antidiscrimination law because plaintiff's views with respect to homosexuals were "known in the community," no homosexuals had ever applied to work for plaintiff during the history of his practice, and therefore plaintiff "did not have any real expectation" of being presented with a real-world opportunity to violate the ordinance).

Chelsey exaggerates her exposure to injury by claiming that Louisville's law threatens her with injunctions and "paying uncapped damages." The actual law limits the amount of any fines imposed for violations of the law to damages caused by the unlawful practice, including compensation for humiliation and embarrassment, and "costs actually incurred" as a "direct result" of the unlawful practice. Louisville Metro Ordinance § 92.08 (incorporating remedies from KRS 344.230). In practice, violators of the Ordinance generally pay modest sums, if they pay any monetary penalty at all. For example, from July 2015 through June 2017, the two public accommodation complaints that were conciliated by HRC were resolved with $500 in gift cards plus EEO training in one case, and10 free meals in the other case. *See* HRC Annual Report (2015-2017), pp. 7-14. Monetary payments for cases involving employment and housing discrimination ranged from $250 to $10,000. *Id.* Many cases were resolved with no monetary payment whatsoever

and instead the violator was required to attend training or update their policies or marketing materials. *Id.*

The modest civil fines available under the Ordinance plus the absence of any criminal penalties for violations of Louisville Metro's antidiscrimination law severely undermine Chelsey's argument for standing. *See Susan B. Anthony List*, 573 U.S. at 166 (declining to hold that the threat of Commission proceedings alone was a sufficient basis for pre-enforcement standing because the "additional threat of criminal prosecution" bolstered plaintiff's standing); *Updegrove*, 2021 WL 1206805, at *5 ("[T]he absence of criminal penalties decreases the severity of potential violations, which in turn decreases the potential chilling effect of the statute. In almost every case where standing was found based on a chilling effect, the plaintiff faced the threat of criminal penalty." (citing cases)).

Instead of an actual case or controversy, this litigation is part of a national strategy by Chelsey's counsel to manufacture cases to expand religious exemptions to antidiscrimination laws, not just for named plaintiffs but for all who claim their particular religious believes compel them to discriminate. Indeed, during the pendency of this litigation, ADF has filed nearly identical pre-enforcement challenges to public accommodations laws in New York and Virginia. *See Emilee Carpenter, LLC, et al. v. Letitia James, et al.*, Case No. 6:21-cv-06303 (W.D.N.Y., Judge Frank P. Geraci, Jr.); *Robert Updegrove, et al. v. Mark Herring, et al.*, Case No. 1:20-cv-1141 (E.D. Va., Judge Claude M. Hilton). A motion to dismiss is pending in the New York case, while the Virginia court dismissed ADF's claims due to plaintiffs' lack of standing. *Updegrove*, 2021 WL 1206805, at *3-5. In filing these cases, ADF's theory seems to be that any plaintiff who makes the bare allegation of an intent to violate an antidiscrimination law has standing to assert a constitutional challenge to the statute. But that "theory of standing would collapse the credible threat and

11

arguable violation prongs into one." *Id.* at \*3. *Susan B. Anthony List* and Article III's demand that federal courts decide only real cases and controversies cannot be stretched so far. This is exactly the sort of abstract and hypothetical dispute federal courts must not entertain.

## II. There Is No Basis for Plaintiffs' Standing to Bring a Facial Challenge.

Chelsey "bears the burden of showing that [s]he has standing for each type of relief sought." *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009). Chelsey's claim to standing for her as-applied challenge to the Ordinance is insufficient for the reasons discussed above. But her standing to bring a facial challenge to the Unwelcome Clause is even weaker and, indeed, entirely baseless. Chelsey argues that the prohibition on advertisements which indicate that the presence of individuals in protected classes is "objectionable, unwelcome, unacceptable, or undesirable" is overbroad and vague. But there is no dispute that Chelsey's statement on her website ("I don't photograph same-sex weddings") violates the Ordinance. *See* Metro Ordinance § 92.05(B) (prohibiting notices which indicate that the services of a public accommodation "will be refused, withheld, or denied an individual on account of" his/her sexual orientation).

As such, Chelsey lacks standing to bring a facial constitutional challenge. *See Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151-52 (2017) ("[A] plaintiff whose speech is clearly proscribed cannot raise a successful vagueness claim." (citation omitted)); *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1189-90 (10th Cir. 2021) (rejecting overbreadth and vagueness challenges to unwelcome provision in antidiscrimination law because plaintiff's intended conduct would plainly violate prohibition on statements indicating refusal of services); *United States v. Kernell*, 667 F.3d 746, 750 (6th Cir. 2012) ("Even if a statute might be vague as it relates to other, hypothetical [individuals], courts will not entertain vagueness challenges on behalf of [an individual] whose conduct clearly falls within the ambit of the statute."); *McKay*, 823 F.3d at 871

(dismissing facial challenge to order because the prohibitions in the order were not vague with respect to plaintiff's proposed conduct).

### III.    Plaintiffs' Claims Are Not Ripe.

Prudential ripeness considerations supply an additional reason the Court should dismiss Chelsey's claims. Ripeness is one of several principles of justiciability predicated on both "Article III limitations" and "prudential reasons for refusing to exercise jurisdiction." *Kentucky Press Ass'n, Inc. v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). The doctrine is "designed 'to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)). "Ripeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997). In determining whether a claim is ripe for review, courts consider three factors: "(1) the likelihood that the harm alleged by [the] plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at [this] stage in the proceedings." *Grace Community Church v. Lenox Tp.*, 544 F.3d 609, 615 (6th Cir. 2008) (citations omitted).

In light of Chelsey's decision to scale down her business and the fact that she has never before been asked to photograph a same-sex wedding, the likelihood that Chelsey would ever have an opportunity to deny services to a same-sex couple seeking wedding photography services is extremely remote. In the unlikely event Chelsey were asked to photograph a same-sex wedding, details regarding precisely what services Chelsey had been asked to provide (photography, editing, and/or blogging), the reasons Chelsey declined to provide the service, and the nature of the ceremony itself—such as whether there is any religious component—would be relevant evidence for evaluating Chelsey's claims. For example, Chelsey argues that she cannot photograph a

13

wedding without participating in a religious ceremony. But what if there is no religious component to the ceremony? Chelsey argues that when clients pay her to memorialize their wedding, they are really paying her to conjure her own creative vision for what marriage is and how it can be used to honor God. But what if the same-sex couple makes clear that Chelsey's role is simply to document the ceremony that is a product of the couple's own creative vision for their marriage? If the reason Chelsey declines to provide that service is that she insists on making the wedding photos conform to her own vision, then is that a denial of services based on the couple's homosexuality? Without an actual discrimination complaint against Chelsey, the record is devoid of facts regarding how Chelsey's denial of services impacts the same-sex couple. Did the couple search for and fail to find another photographer with Chelsey's unique skills and artistic eye? To what degree did they experience social, psychological, and physical harms as a result of Chelsey's denial of services?

Chelsey's effort to litigate this constitutional challenge in the abstract thus hinders the Court's evaluation of her arguments. The hardship to Chelsey of denying her request for pre-enforcement review is minimal. HRC-Enforcement's enforcement strategies are focused on conciliating complaints of discrimination (*see* Metro Ordinance § 92.09(E)(2)) and, as discussed above, typically result in no or very low monetary penalties. This is a case in which prudential ripeness considerations demand restraint, and not the premature adjudication of the abstract dispute manufactured by ADF, which is unlikely to ever come to pass in real life.

## IV.   Application of the Ordinance to Chelsey Does Not Trigger Strict Scrutiny Under the First Amendment's Free Speech Clause.

### A.  The Ordinance Regulates Chelsey's Conduct, Not the Content of Her Speech.

Laws prohibiting invidious discrimination by businesses open to the general public regulate commercial operations, not speech, and do not violate free speech rights—even if they require

public accommodations to provide goods or services involving speech to customers on a nondiscriminatory basis. "[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). Even businesses that deal in "expressive" goods or services can be required to comply with antidiscrimination laws. *See Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984) (dismissing law firm's First Amendment defense to Title VII claim; there is "no constitutional right . . . to discriminate"); Amicus Brief of ACLU [Doc. 35], p. 7 (collecting cases demonstrating that newspaper publishers, whose product is protected speech, can be subject to generally applicable economic regulations without implicating the First Amendment).

Louisville Metro's antidiscrimination law does not regulate the content of Chelsey's speech. The Ordinance does not tell Chelsey how to frame her shots or edit photographs; it regulates only the sale of Chelsey's services to the public. Businesses that provide photography services to the public at large are just as subject to generally applicable regulations of their commercial conduct as newspapers and law firms. As the Supreme Court of New Mexico held: where "[a photography business] is a public accommodation, its provision of services can be regulated" consistent with the First Amendment, "even though those services include artistic and creative work." *Elane Photography, LLC v. Willock*, 309 P.3d 53, 66 (N.M. 2013); *see also id.* at 71 ("[T]here is no precedent to suggest that First Amendment protections allow such individuals or businesses to violate antidiscrimination laws."). A video-game business cannot claim an exemption from the Fair Labor Standards Act to allow it to hire child laborers, and a tattoo parlor cannot claim an exemption from a general health code regulation governing the disposal of

15

needles, simply because video games and tattoos are artistic expression protected by the First Amendment. Such businesses are likewise not exempt from anti-discrimination laws. Thus, even though Chelsey's work product involves creative decisions, that "hardly means" that any regulation of its business operations "should be analyzed as one regulating [Chelsey's] speech rather than conduct." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.* ("*FAIR*"), 547 U.S. 47, 62 (2006).

### B. The Ordinance is Not Content- or Viewpoint- Based.

Chelsey argues that strict scrutiny should apply because the Ordinance is content- and viewpoint-based. However, "federal and state anti-discrimination laws" are "an example of a permissible content-neutral regulation of conduct." *Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993); *see also Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Com'n*, 138 S. Ct. 1719, 1727 (2018); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (public accommodations laws "make[] no distinctions on the basis of [an] organization's viewpoint").

The relevant inquiry is not whether application of the law would result in businesses having to create products reflecting content to which they object. The question is whether the *law* draws distinctions based on content. The Ordinance does not. It is an example of a public accommodations law that does not "target speech or discriminate on the basis of its content," but rather has as its "focal point" a "prohibition . . . on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds." *Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 572 (1995). The Ordinance does not require Chelsey to photograph weddings or capture them in any particular way. But once Chelsey creates a business to offer a service to the public, she must make that service equally available to all customers.

The Ordinance does not compel a "celebratory viewpoint" of same-sex marriage. It prohibits businesses from refusing to provide goods and services on grounds of customers' sexual orientation, regardless of a business's views on marriage or any other subject. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 623 (1984) ("On its face, the . . . Act . . . does not distinguish between prohibited and permitted activity on the basis of viewpoint . . . ."). Under the Ordinance, it is just as unlawful to refuse to provide photographs because a couple is heterosexual as it is to refuse to do so because the couple is gay. Chelsey's argument would invalidate not only Louisville's Ordinance, but all such laws as "viewpoint-based": a law prohibiting race discrimination could be said to favor businesses that support integration, while a law prohibiting sex discrimination could be said to favor businesses that support women's work outside the home. The Supreme Court has rightly rejected that position. *See, e.g.*, *Mitchell*, 508 U.S. at 487; *see also Madsen v. Women's Health Ctr.*, 512 U.S. 753, 763 (1994) (holding that an injunction prohibiting abortion protesters from picketing outside a clinic was not viewpoint discriminatory because "the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based"); *see also Elane Photography*, 309 P.3d at 64 (reasoning that nondiscrimination in public accommodations law does not compel speech because it does not require photography business to "recite any message" or indeed to "take photographs" at all but only to serve customers on an equal basis).

The Court in *Hurley* emphasized that "[p]rovisions" like the Ordinance mandating nondiscrimination in public accommodations are "well within the [government's] usual power to enact" and "do not . . . violate" the First Amendment because they "do[] not . . . target speech" but "foc[us]" instead on prohibiting discrimination in the provision of goods and services. 515 U.S. at 568, 572. Chelsey relies extensively on the "peculiar" (*id.*) holding in *Hurley*, but a same-sex

17

couple's wedding is not Chelsey's parade. To expand *Hurley*'s holding beyond its application to a private association that wants to control its own message on a parade route would put courts in the impossible "business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws." *Elane Photography*, 309 P.3d at 71. Not only would such a result be contrary to Supreme Court precedent, it would create a standard that could not withstand long term application.

The decisions cited by Chelsey in *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), and *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890 (Ariz. 2019), mistakenly invite courts to apply different First Amendment standards based not on the conduct prohibited by the law at issue, but rather based on the nature of the product sold by the public accommodation. However, such a standard is neither consistent with First Amendment precedents, nor is it susceptible to clear or uniform application.

### C. Any "Compelled Expression" Is Incidental to the Ordinance's Regulation of the Conduct of Providing Goods and Services.

Even where, unlike here, a content- and viewpoint-neutral law requires entities to speak particular words or to provide access for third-party speakers, the Supreme Court has rejected First Amendment challenges where the law regulates conduct and any compulsion to speak is incidental. In *FAIR*, for example, the Court rejected a First Amendment challenge to the Solomon Amendment, which required law schools to provide equal access both to military and non-military recruiters on campus. 547 U.S. at 54. A coalition of law schools argued that the Solomon Amendment compelled the schools to endorse the military recruiters' message of discrimination embodied in the Don't Ask, Don't Tell policy. *Id.* at 52-53. The schools specifically objected that they would be required to engage in speech by sending e-mail messages and posting notices on a bulletin board on behalf of the military. *Id.* at 61-62. The Supreme Court rejected the law schools'

claim, reasoning that "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must *do*—afford equal access to military recruiters—not what they may or may not *say*," *id.* at 60, and concluded that "[t]he compelled speech . . . is plainly incidental to the Solomon Amendment's regulation of conduct." *Id.* at 62.

Moreover, because the Ordinance is content- and viewpoint-neutral, this is not like cases in which the Supreme Court struck down content-based laws that required businesses to publish particular messages of others with whom they disagreed. In *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974), a right-of-reply statute required newspapers that published articles attacking the character of a political candidate to afford the candidate free space for a written reply. And in *Pacific Gas & Electric Co. v. Public Utilities Commission of California* ("*PG&E*"), 475 U.S. 1 (1986), a state agency ordered a utility company to include in its billing envelope the newsletter of an environmental group with which the utility disagreed. In both instances, the state regulation favored opposing speech in a content-based way: The right of reply was triggered by certain content (editorials critical of political candidates in *Tornillo*; utility's newsletters in *PG&E*), and the regulation imposed a content-based penalty (replies to the criticism in *Tornillo*; environmental newsletters in *PG&E*). Here, the Ordinance has merely told all Louisville businesses open to the public that whatever goods and services they offer to heterosexual couples they must also offer to lesbian and gay customers and vice versa. The obligation to serve customers equally is determined by the identity of the customer, not the content of the product. Any effect on speech is entirely incidental.

### D.  The Free Speech Clause Does Not Protect a Public Accommodation's Right to Publish Its Unlawful Policy of Discrimination.

The Ordinance does not prohibit Chelsey from advertising her religious beliefs; only that portion of Chelsey's marketing statement which states "I don't photograph same-sex weddings"

violates the Publication Provision. Just as there is no constitutional right to discriminate, there is no concomitant right to advertise an illegal policy of discrimination. The U.S. Supreme Court has explicitly disapproved of businesses posting signs saying "no goods or services will be sold if they will be used for gay marriages," as such signs would "impose a serious stigma on gay persons." *Masterpiece Cakeshop*, 138 S. Ct. at 1728-29. In *FAIR*, the Court explained that the government "can prohibit employers from discriminating in hiring on the basis of race. The fact that this will require an employer to take down a sign reading 'White Applicants Only' hardly means that the law should be analyzed as one regulating the employer's speech rather than conduct." 547 U.S. at 62. Were it otherwise, longstanding bans on discriminatory advertisements in employment, housing, and public accommodations throughout the country would have to be struck down on free speech grounds. *See, e.g.*, 42 U.S.C. § 3604(c). No court has countenanced such a result.

## V.    The Ordinance Is Neutral and Generally Applicable.

Laws that are neutral and generally applicable need satisfy only rational-basis review, even if they "ha[ve] the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993). In contrast, laws lacking neutrality or general applicability—i.e., ones that intentionally discriminate against religion— receive strict scrutiny. *Id.* at 531-32. Chelsey admits that the Ordinance is facially neutral and generally applicable, but argues that it violates her free exercise rights because it is not neutral or generally applicable *as applied* to her. Chelsey has not carried her burden to show that the law "disclose[s] animosity to" her or was "gerrymandered with care to proscribe" her religious conduct. *See id.* at 542.

The Ordinance's purpose is to eliminate discrimination in public accommodations based on certain protected characteristics, including sexual orientation. It achieves that end by prohibiting all public accommodations from discriminating against customers on those grounds.

The Ordinance is thus generally applicable because it applies uniformly, regardless of any business-owner's beliefs, motivations, or religious (or nonreligious) affiliations.

Chelsey argues that the Accommodations Provision is not generally applicable because it does not include age or familial status as protected characteristics, whereas those characteristics are protected against discrimination in employment and housing, respectively. First, the lack of coverage for a protected characteristic is not the same as an exemption—indeed, there are no exemptions in the Accommodations Provision. *See Kissinger v. Bd. of Trs. of Ohio State Univ.*, 5 F.3d 177, 179 (6th Cir. 1993) (curriculum requirement was generally applicable because it applied to all students). Moreover, as reflected by the data Chelsey cites, the difference in protected characteristics for the different prohibitions on discrimination is reasonably related to the inherent differences in housing, employment, and public accommodations and the historical discrimination sought to be eradicated in those different areas. *See* Chelsey's App. 883 (reflecting that community members filed complaints of age discrimination in employment and familial status discrimination in housing). Chelsey has not identified any authority for the notion that differences in protected characteristics across different categories of an antidiscrimination law mean the challenged section of the law is not generally applicable.

Chelsey's attempt to invoke *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868 (2021), by arguing that Metro has "an unwritten 'formal mechanism' for granting exemptions" is entirely baseless. The law challenged in *Fulton* was held not to be generally applicable because it authorized exceptions granted in the Commissioner's "sole discretion." *Id.* at 1878. Chelsey has not identified any evidence that HRC-Enforcement grants discretionary exemptions. Rather Chelsey attempts to assert that denials of service based on reasons other than the protected characteristics set forth in the Ordinance constitute exemptions from the law, when, in fact, they

were never violations in the first place. It does not violate the Ordinance to refuse services due to inadequate staffing or because the public accommodation does not provide the requested good or service to any customer. As such, these are not discretionary exemptions, but straightforward applications of the law.

There is simply no evidence that Metro has singled out for regulation only those public accommodations that discriminate for religious reasons while ignoring those that discriminate for secular ones, or that Metro has otherwise treated Chelsey differently from other covered entities. Thus, Plaintiffs have failed to articulate a basis under the free exercise clause to apply strict scrutiny to the challenged Ordinance.

## VI.   The Ordinance Does Not Compel Chelsey to Participate in Religious Ceremonies; Indeed, It is Chelsey's Requested Exemption That Would Violate the Establishment Clause.

The religion clauses "mandate[] governmental neutrality between religion and religion, and between religion and nonreligion." *McCreary County v. ACLU of Ky.*, 545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968)). That neutrality requirement forbids the government both to "coerce anyone to support or participate in religion or its exercise" (*Lee v. Weisman*, 505 U.S. 577, 587 (1992)), and to impose the costs or burdens of one person's religious exercise on others (*see Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985)). In keeping with constitutional requirements, the challenged Ordinance neither requires participation in religious exercise nor favors some religions over others. But granting Chelsey's requested exemption—when doing so would harm nonbeneficiaries—*would* violate the Establishment Clause.

Chelsey argues that the Accommodations Provision compels her to participate in religious ceremonies she disagrees with because she considers all weddings to be religious and because, when she attends Christian weddings, she participates in the service by bowing her head in prayer.

22

Whether a law coerces religious exercise, however, is an objective question for the courts. *See, e.g.*, *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 588-89 (2014) (rejecting plaintiffs' argument that official prayers were coercive based on Court's interpretation of factual record); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 788 F.3d 580, 589 (6th Cir. 2015). Participation in religious services is not part of the service Chelsey sells to her customers, which is merely to be physically present to take photographs of the wedding ceremony and edit them afterwards. *See* Wedding Celebration Services Agreement, attached as Exhibit 8.

Merely being present while others engage in religious activity does not constitute legal coercion to join the religious practice. *See Fields v. City of Tulsa*, 753 F.3d 1000, 1010-12 (10th Cir. 2014) (no Establishment Clause violation where police officer was ordered to attend an event hosted by an Islamic community center when attending such events, hosted by both secular and religious organizations, was a regular aspect of his duties). There is simply no equivalence between Chelsey's role as a photographer and forcing clergy to officiate wedding ceremonies. From an objective viewpoint, Chelsey is no more being hired to participate in prayers or religious activity with which she disagrees if/when she is hired for a same-sex wedding than if she is hired for a Jewish or Muslim wedding. To state the obvious: a photographer is being hired to take pictures— not to join in the couple's faith practice.

Indeed, it is Chelsey's requested exemption, and not the challenged Ordinance that would violate the Establishment Clause. If religious exemptions from general laws detrimentally affect nonbeneficiaries, they amount to unconstitutional preferences for the benefited religious beliefs and their adherents. In *Estate of Thornton v. Caldor,* the Supreme Court invalidated a law requiring employers to accommodate Sabbatarians in all instances, because "the statute t[ook] no account of the convenience or interests of the employer or those of other employees who do not observe a

Sabbath." 472 U.S. at 709. The "unyielding weighting in favor of Sabbath observers over all other interests" had a "primary effect that impermissibly advance[d] a particular religious practice." *Id.* at 710; *see also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (invalidating sales-tax exemption for religious periodicals because it "burden[ed] nonbeneficiaries by increasing their tax bills").

Free-exercise jurisprudence reflects this same principle. *See, e.g.*, *United States v. Lee*, 455 U.S. 252, 261 (1982) (rejecting an Amish employer's request for an exemption from social-security taxes because it would "operate[ ] to impose the employer's religious faith on the employees"); *Braunfeld v. Brown*, 366 U.S. 599, 608-09 (1961) (rejecting exemption from Sunday-closing laws because it would have provided Jewish businesses with "an economic advantage over their competitors who must remain closed on that day"). Hence, a religious accommodation "must be measured so that it does not override other significant interests" (*Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)), and must not "impose substantial burdens on nonbeneficiaries" (*Texas Monthly*, 489 U.S. at 18 n.8). The religious exemption requested here would allow Chelsey—and by extension, all other public accommodations with religious motivations—to discriminatorily refuse service to customers because of their sexual orientation or any other protected characteristics. This would violate the Establishment Clause.

## VII.     The Ordinance Satisfies Any Level of Scrutiny.

The Ordinance fails to trigger strict scrutiny under the free speech or religion clauses. But even if strict scrutiny applied, application of the law to Chelsey is constitutional.

As recognized by Judge John G. Heyburn II, "[h]istorical discrimination against homosexual persons is readily apparent and cannot reasonably be disputed." *Love v. Beshear*, 989 F. Supp. 2d 536, 545 (W.D. Ky. 2014). The Supreme Court has repeatedly held that the government has a compelling interest in "eliminating discrimination and assuring its citizens equal

24

access to publicly available goods and services." *See, e.g., Roberts*, 468 U.S. at 624; *see also id.* at 628 (discrimination "cause[s] unique evils that government has a compelling interest to prevent"). No court considering the issue has concluded otherwise. *See, e.g.*, *Telescope Media*, 936 F.3d at 777 ("[P]ublic accommodations laws further compelling state interests of eradicating discrimination and ensuring residents have equal access to publicly available goods and services."); *Brush & Nib*, 448 P.3d at 914 (reasoning that "ensuring equal access to publicly available goods and services for all citizens, regardless of their status" is a "compelling interest").[1]

Public accommodations laws "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley*, 515 U.S. at 572. In *Masterpiece Cakeshop*, the U.S. Supreme Court affirmed that such laws are a "valid exercise of state power," and that it is "unexceptional" that the "law can protect gay persons, just as it can protect other classes of individuals, in acquiring whatever products and services they choose on the same terms and conditions as are offered to other members of the public." 138 S. Ct. at 1724, 1728.

Chelsey argues that Metro has no compelling interest in applying the law to her because there are other Louisville photographers willing to photograph same-sex weddings. But the availability of services from other vendors does not eliminate the dignitary harms associated with being denied services. *Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984) ("[D]iscrimination itself,

---

[1] Although *Telescope Media* and *Brush & Nib* recognize the eradication of discrimination as a compelling government interest, both err in conflating the compelled speech analysis with the compelling interest analysis by suggesting that no compelling interest is present where a business's product involves speech. *See Telescope Media*, 936 F.3d at 755; *Brush & Nib*, 448 P.3d at 914-15. The compelling interest in ending discrimination, however, remains, even if the product at issue is expressive. Otherwise, a court conducting strict scrutiny analysis would never find a compelling interest once it determined that strict scrutiny applied.

. . . by stigmatizing members of the disfavored group[,] . . . can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group."); *Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (describing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks omitted)). And forcing a same-sex couple to endure denials of services in the search for a willing vendor would defeat one of the benefits of public accommodations laws, which is to "help ensure a free and open economy." *303 Creative*, 6 F.4th at 1179; *see also id.* at 1181 (noting the problems that would occur if a disfavored group is relegated to a narrower selection of even generic services, and finding that "unique goods and services [such as wedding website services] are where public accommodation laws are most necessary to ensuring equal access").

That Chelsey's religious beliefs are in tension with an anti-discrimination law that governs the business she voluntarily formed to participate in the public marketplace undoubtedly creates difficulty. That is the case whenever people hold religious objections to complying with anti-discrimination laws or any other generally applicable business regulations. *See Bob Jones University v. United States*, 461 U.S. 574 (1983) (religious objection to racial integration); *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402 n.5 (1968) (same). But that does not negate in any way Louisville Metro's compelling interest in eradicating discrimination and furthering equal treatment in the commercial marketplace.

Uniform enforcement of the Accommodations Provision is the least restrictive means for furthering Metro's interest in ensuring equal access to goods and services, because every single instance of discrimination renders access unequal, inflicts humiliation, and creates stigma. As the Supreme Court recognized, prohibiting exclusion on the basis of protected classifications

26

"responds precisely to the substantive problem" that anti-discrimination laws seek to address—the denial of equal access to public accommodations—and thus burdens First Amendment rights no more "than is necessary to accomplish that purpose." *Roberts*, 468 U.S. at 629.

By their nature, laws prohibiting discrimination in public accommodations require businesses to spend time and energy serving customers whom they might prefer not to serve. *See Elane Photography*, 309 P.3d at 69. There is no principled distinction between Chelsey's request for an exemption that would allow her to refuse service to same-sex couples and allowing a Klan member to refuse to photograph an African American customer's wedding, graduation, or newborn child, if the photographer felt that the photographs would cast African Americans in a positive light. *See id.* at 72. "Such a holding would undermine all of the protections provided by antidiscrimination laws." *Id.*; *see also Telescope Media*, 936 F.3d at 780 (Kelly, concurring in part and dissenting in part) ("What may start in the wedding business – 'we don't do interracial wedding,' 'we don't film Jewish ceremonies' and so on – likely will not end there. Nothing stops a business owner from using today's decision to justify new forms of discrimination tomorrow."). *Id.* at 780. The exception granted by the majority opinion in *Telescope Media* represents a major step backward that this Court should not join.

None of Chelsey's proposed less restrictive means would accomplish Metro's compelling interest. Most are also unworkable, as Plaintiffs have themselves acknowledged how difficult it is to define what constitutes an "expressive" businesses. *See* Excerpts from Transcript of Preliminary Injunction Hearing (Aug. 7, 2020), attached as <u>Exhibit 10</u>, pp. 28-32. Plaintiffs cite, as a viable alternative measure, a Mississippi statute which exempts wedding businesses from antidiscrimination laws, but the only court to evaluate the constitutionality of that statute concluded that it violates the establishment clause. *See Barber v. Bryant*, 193 F. Supp. 3d 677, 688

(S.D. Miss. 2016) ("the State has put its thumb on the scale to favor some religious beliefs over others"), rev'd, 860 F.3d 345 (5th Cir. 2017) (due to lack of standing). Plaintiffs' shocking suggestion that Metro create a "voluntary certification system" for businesses willing to provide services to same-sex couples—a state-sanctioned "Green Book"—would authorize wide-spread discrimination against same-sex couples. Fortunately, Chelsey is not able to dictate Louisville Metro's public policy choices.

Chelsey does not need an exemption because she has never been and likely never will be asked to provide services for a same sex wedding. But another reason to deny Chelsey a religious exemption from Metro's antidiscrimination law is that such an exemption could lead to an increase in real-world discrimination that would harm same-sex couples in Louisville Metro. Professor Netta Barak-Corren, an accomplished legal scholar and cognitive scientist focused on empirical and behavioral analysis of constitutional and public law, conducted a field experiment during the pendency of the U.S. Supreme Court's decision in *Masterpiece Cakeshop,* which was designed to measure the impact of the Court's decision on wedding vendors' willingness to provide services to same-sex couples (the "*Masterpiece* experiment"). Professor Barak-Corren's Expert Report, attached as <u>Exhibit 11</u>, at ¶ 13. Professor Barak-Corren found that the *Masterpiece* ruling, which was decided in favor of a baker that refused to create a wedding cake for a same-sex couple, significantly reduced the agreement to serve same-sex couples as compared with opposite-sex couples, even among previously willing vendors. *Id.* at ¶ 14. The *Masterpiece* effect was equally strong in urban areas, which are often assumed to be particularly inclusive of same-sex couples, and did not vary with the political conservativeness of the county. *Id.* However, the effect varies with the religiosity of the environment, such that businesses in areas dense with religious congregations, and particularly Evangelical congregations, like Louisville, Kentucky, were more

likely to change their behavior to same-sex couples post-*Masterpiece. Id.* Contrary to Chelsey's suggestion that there is no harm in granting her a religious exemption, Professor Barak-Corren's expert opinion suggests that exempting even one religious objector can embolden even previously willing vendors to refuse services to same-sex couples.

## VIII.   Plaintiffs' Kentucky RFRA Claim Fails and Is Barred by Sovereign Immunity.

The entirety of Kentucky's Religious Freedom Restoration Act ("KRFRA") is just three sentences:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

KRS 446.350. By its plain terms, KRFRA provides a defense to government enforcement activity, not a pre-enforcement cause of action to challenge a generally applicable antidiscrimination law. Chelsey's religious beliefs have not been substantially burdened because she has not faced any enforcement action and, indeed, has never even been asked by a customer to provide services for a same-sex wedding. Louisville Metro's antidiscrimination law does not restrict Chelsey's religious practices, as was the case in the spate of recent cases challenging Governor Andy Beshear's executive orders restricting church services due to the Covid-19 pandemic. Chelsey's claim under KRFRA therefore fails because she cannot establish that her freedom of religion has been substantially burdened, which is required to trigger the application of KRFRA.

Moreover, Chelsey's KRFRA claim is barred by the Eleventh Amendment doctrine of sovereign immunity. *Danville Christian Academy, Inc. v. Beshear*, 503 F. Supp. 3d 516, 530 (E.D. Ky. 2020) (citing *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 97-98 (1984)). Although the Supreme Court has established exceptions to a state's sovereign immunity, none of

these exceptions apply to a KRFRA claim brought in federal court. *Id.* "[T]he States' constitutional immunity from suit prohibits all state-law claims filed against a State in federal court, whether those claims are monetary or injunctive in nature." *Ernst v. Rising*, 427 F.3d 351, 368 (6th Cir. 2005); *see also Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341, 345 (7th Cir. 2020), cert. denied, 141 S. Ct. 1753 (2021) (holding that the doctrine of sovereign immunity barred enforcement of Illinois RFRA in federal court).

Defendants enjoy the Commonwealth of Kentucky's sovereign immunity because Louisville Metro is a political subdivision of the Commonwealth. *Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 844 (Ky. 2019); *Louisville/Jefferson County Metro Government v. Cowan*, 508 S.W.3d 107, 109 (Ky. App. 2016); KRS 67C.101(2)(e) ("A consolidated local government shall be accorded the same sovereign immunity granted counties, their agencies, officers, and employees."). Chelsey's claims against HRC's Executive Director and members of the boards of HRC-Enforcement are official capacity claims that fail along with Chelsey's KRFRA claim against Louisville Metro. *Scott v. Louisville/Jefferson County Metro Gov't*, 503 F. Supp. 3d 532, 541 (W.D. Ky. 2020).

**IX.   All Claims Against HRC-Enforcement, HRC-Advocacy, and the Individual Defendants Must Be Dismissed.**

The Louisville Metro Human Relations Commission is an agency of Louisville Metro's urban county government. HRC and its sub-agencies (HRC-Enforcement and HRC-Advocacy) have no independent authority and are not separate legal entities capable of being sued pursuant to 42 U.S.C. § 1983. The proper defendant for Chelsey's claims is Louisville Metro. *See Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994); *Carver v. Louisville/Jefferson County Metro Gov't*, 2014 WL 2805539, at *4 (W.D. Ky. June 20, 2014).

Chelsey's claims against HRC-Advocacy must also be dismissed because, as previously

recognized by this Court [Doc. 47, p. 23], HRC-Advocacy has no enforcement role. *See* Louisville Metro Ordinance § 32.761(B).

Chelsey's official capacity claims against the individual Defendants must also be dismissed as duplicative of her claims against Louisville Metro. *See Scott*, 503 F. Supp. 3d at 541.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that the Court deny the motion for summary judgment filed by Plaintiffs, grant Defendants' motion for summary judgment, and dismiss all of Plaintiffs' claims with prejudice.

Respectfully submitted,

/s/ Casey L. Hinkle

David S. Kaplan
Casey L. Hinkle
KAPLAN JOHNSON ABATE & BIRD LLP
710 W. Main Street, 4th Floor
Louisville, KY 40202
(502)-416-1630
dkaplan@kaplanjohnsonlaw.com
chinkle@kaplanjohnsonlaw.com

MIKE O'CONNELL
JEFFERSON COUNTY ATTORNEY

John F. Carroll
Jason D. Fowler
Assistant Jefferson County Attorneys
531 Court Place, Ste. 900
Louisville, Kentucky 40202
(502) 574-6321
john.carroll2@louisvilleky.gov
jason.fowler@louisvilleky.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on September 22, 2021, the foregoing was filed via the Court's electronic filing system, which will automatically send notice of such filing to all counsel of record.

/s/ Casey L. Hinkle
*Counsel for Defendants*