## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| CHELSEY NELSON PHOTOGRAPHY, LLC, ET AL. | PLAINTIFFS |
| v. | No. 3:19-cv-851-BJB |
| LOUISVILLE/JEFFERSON COUNTY METRO GOV'T, ET AL. | DEFENDANTS |

* * * * *

### OPINION & ORDER

Does "applying a public-accommodation law to compel an artist to speak or stay silent violat[e] the Free Speech Clause of the First Amendment?"  The Supreme Court recently granted review of a case asking that question, *303 Creative LLC v. Elenis*, 142 S. Ct. 1106 (mem.) (Feb. 22, 2022), which mirrors the dispute here.  Chelsey Nelson is a wedding photographer opposed to same-sex marriage on moral and religious grounds.  She sued the City of Louisville under the First Amendment and Kentucky law to shield herself from enforcement of Louisville's "Fairness Ordinance," a public-accommodations law that guarantees equal access to goods and services regardless of sexual orientation.  Under that law Nelson must photograph same-sex weddings if she photographs opposite-sex ceremonies.  Metro Ord. § 92.05(A).  And she may not express her unwillingness to do so or otherwise make same-sex couples feel "unwelcome."  § 92.05(B).

Courts across the country have addressed whether bakers, florists, website designers, and other creative professionals must either provide their services for weddings that violate their beliefs or else abstain entirely from the wedding business.[1]  And those courts' disagreement on whether this amounts to prohibited discrimination or protected dissent is what the U.S. Supreme Court has set out to resolve during its upcoming term.

---

[1] The Eighth Circuit and Arizona Supreme Court have held that governments may not compel wedding-related speech in this context.  *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751–52 (8th Cir. 2019); *Brush & Nib Studio, LC v. City of Phoenix*, 448 P.3d 890, 908 (Ariz. 2019).  But the Tenth Circuit, along with the New Mexico and Washington Supreme Courts, have upheld the application of similar public-accommodations laws to similar vendors.  *See 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1180 (10th Cir. 2021); *State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 1226–28 (Wash. 2019); *Elane Photography, LLC v. Willock*, 309 P.3d 53, 63 (N.M. 2013).

This split is one result of the remarkable and rapid change in the legal treatment of same-sex relationships in this country. In 2015 the Supreme Court interpreted the Constitution to require states to authorize same-sex marriages in *Obergefell v. Hodges*, 576 U.S. 644. Even before that decision, but especially since, the nation's courts and lawmakers have struggled to reconcile the new legal orthodoxy with the dissenting views and voices of those whose religious faith leads them to maintain what was until recently the status quo. In *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, the Supreme Court approached the question, but didn't make it all the way down the aisle. 138 S. Ct. 1719 (2018). It ruled narrowly that Colorado's public-accommodations law couldn't force a particular baker to supply a custom wedding cake for a same-sex ceremony because public officials investigating that baker expressed hostility toward his position and faith. *Id.* at 1732. But the Court didn't resolve the underlying constitutional question regarding the tension between the First Amendment and Colorado's public-accommodations law.[2]

This is a real conflict between nondiscrimination and speech that cannot be wished away: compelling access for all necessarily clashes with the liberty of some. The City contends that Nelson's speech demeans same-sex couples, while Nelson says the City's Ordinance demeans her speech. How to resolve these competing considerations? As a matter of morality and philosophy, different people—operating in good faith—will surely assign different weights to the equality, dignity, and liberty interests this dilemma implicates. But as a matter of constitutional law, judges do not—or at least should not—decide cases by balancing their own personal assessments of such important and incommensurable concepts.

Instead judges must look somewhere less cosmic: the law. One of the most basic provisions of constitutional law specifies that when federal and state or municipal law conflict, federal law takes precedence. *See* U.S. CONST. art. VI, cl. 2. In general, statutes like the Fairness Ordinance don't conflict with the Constitution. Public-accommodations laws are generally permissible. *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 572 (1995). State and local governments have broad authority to regulate commercial activity and prohibit discriminatory conduct. *See, e.g.*, *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11–16 (1988). The First Amendment's protections for religious exercise, moreover, are unlikely to help those in Nelson's position: at least as currently construed, that aspect of the Constitution does not shield people whose

---

[2] *Compare* 138 S. Ct. at 1739 (Gorsuch, J., concurring) and *id.* at 1740 (Thomas, J., concurring in part and concurring in the judgment), *with id.* at 1732 (Kagan, J., concurring), and *id.* at 1748 (Ginsburg, J., dissenting).

sincerely held religious beliefs conflict with generally applicable laws. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876–77 (2021).

But the government's authority over public accommodations does not extend to "abridging the freedom of speech." U.S. CONST. amend. I. Whether a given service counts as speech will of course require courts and litigants to grapple with difficult edge cases. Yet the U.S. Supreme Court has long given "speech" a construction broad enough to include Nelson's photography and blogging, as a previous decision in this case recognized. *See Chelsey Nelson Photography v. Louisville/Jefferson County Metro Gov't*, 479 F. Supp. 3d 543, 548 (W.D. Ky. 2020). The Constitution protects this expression in both positive and negative ways: the government generally may neither muzzle citizens from expressing the content of their choice, nor compel them to express content they find objectionable. *United States v. United Foods, Inc*, 533 U.S. 405, 410 (2001). And even in service of an otherwise valid public-accommodations law, the government may not "declar[e] the sponsors' speech itself to be the public accommodation." *Hurley*, 515 U.S. at 573.

So although Louisville may require restaurants and hotels and stores to provide services regardless of the proprietors' views or their customers' legal status, the government may not force singers or writers or photographers to articulate messages they don't support. Because speech is categorically different under the federal Constitution, local laws must treat it differently, too. "[O]ne who chooses to speak may also decide what not to say," *id.* at 573 (quotation omitted), and the "choice of a speaker not to propound a particular point of view ... is presumed to lie beyond the government's power to control," *id.* at 575. However worthy and widely supported the government's commitment to equal access and respectful speech, these are concerns the First Amendment resolves in favor of the dissenting speaker. *Id.* at 572–76.

The City treats the equal status of same-sex marriages as fixed. As a matter of law, it is. *See Obergefell*, 576 U.S. at 681 (invalidating Kentucky's prohibition against same-sex marriages). But today's dispute concerns whether the government may conform speech to that development. Under the First Amendment, it may not. The freedom of speech—especially for minority views—is a core premise of our democratic republic. *See, e.g.*, *Turner*, 512 U.S. at 641. As prevailing sentiments and politics have changed over the years, robust constitutional protection for differing views has remained fixed. Few issues demonstrate that constancy as much as the legal treatment of same-sex relationships. Not so many years ago, and in some ways still today, the First Amendment was necessary to protect the discourse of same-sex couples and their supporters. *See, e.g.*, Jason M. Shepard, *The First Amendment and the Roots of LGBT Rights Law: Censorship in the Early Homophile Era, 1958–1962*, 26 WM. & MARY J. RACE, GENDER, & SOC. JUST. 599, 614–661 (2020). Speech protections undoubtedly helped overcome "the censorial efforts of the dominant

3

culture, authoritarian politicians, and aggressive law enforcement." *Id.* at 601–02. And today the First Amendment protects the old majority, newly in dissent. Then, as now, "the law [wa]s free to promote all sorts of *conduct* in place of harmful behavior"—or at least behavior the government perceived as "harmful." *Hurley*, 515 U.S. at 579 (emphasis added). But now, as then, the government is "not free to interfere with *speech* for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." *Id.* (emphasis added).

"If there is any fixed star in our constitutional constellation," the Supreme Court reminded us long ago—in another dispute over dissenting views on sensitive questions of faith and freedom—"no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943). The Supreme Court has continued to navigate by that star through changing currents of speech and conscience. And lower courts are bound to follow. Because the U.S. Constitution supersedes Louisville's Fairness Ordinance as a matter of law, this Court enjoins the City from either compelling or suppressing Nelson's photography and writing.

## I. The Evidentiary Record

Chelsey Nelson is a photographer who uses images and words to celebrate the union of marriage. Chelsey Nelson Decl. (DN 92-2) ¶¶ 75–99. She takes engagement and wedding photos, whose lighting and mood she edits to present her clients in a beautiful and celebratory manner. ¶¶ 151–272. Nelson writes a blog about each wedding to highlight her clients' marriages. ¶¶ 268–71 (describing "wedding-celebration" package). She also uses the blog to promote her services to potential clients. ¶¶ 272, 282. And she provides editing services to other photographers, so long as doing so wouldn't "require [her] to use her artistic talents" to promote anything "contrary to [her] beliefs." ¶¶ 191–207, 308, 330–36.

Nelson is also a Christian whose faith and beliefs "shape every aspect of [her] life," including the way she serves her clients and manages her photography business. ¶¶ 2–4. The photographs Nelson takes convey her view of the world, and ultimately her values and faith. ¶¶ 75–99. To Nelson, "God designed marriage as a gift to people of all faiths, races, and backgrounds" and "ordained marriage to be a covenant between one man and one woman." ¶ 83. So she will not participate in wedding ceremonies that involve a same-sex couple, portray marriage in a negative or sacrilegious light (such as cosplay weddings), or condone racism, vulgarity, or violence. ¶¶ 332–77. Nelson states that she does not discriminate based on the sexual orientation of her customers and will "happily" "provide wedding photography to LGBT clients," including "LGBT wedding planners," and "LGBT parents" on subjects other than same-sex weddings. Nelson Motion for Summary Judgment (DN

4

92-1) at 11 (citing Nelson Decl. ¶¶ 396–401).  But she says she cannot, consistent with her faith, use her creative talents to celebrate something to which she maintains a moral objection.  Nelson Decl. ¶¶ 332–76.  Nelson's website explains her faith, its impact on her photography, and how this leads her to decline same-sex wedding engagements.  ¶¶ 60–61.

The City hasn't pointed to evidence that would rebut any of these facts.  It does, however, question Nelson's fear of enforcement, given that her overall photography business is limited, and that she hasn't refused or even been asked to photograph a same-sex wedding.  MSJ Opp. 5.

## II. The Fairness Ordinance

In 1999 Louisville and Jefferson County amended their nondiscrimination laws to include sexual orientation as a protected class and later expanded the laws' reach to include public accommodations.  City Response (DN 97) at 2–3; *id.* at 3 (describing 2004 post-merger enactment of nondiscrimination law as Metro Ordinance Chapter 92).  The City and Nelson both interpret this Ordinance to require professional photographers such as Nelson to photograph same-sex weddings if they photograph opposite-sex ceremonies.  Two provisions of the Ordinance are implicated by this case.

The Accommodations Provision bars the denial of goods and services to members of protected classes, including sexual orientation:

> [I]t is an unlawful practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort or amusement as defined in § 92.02, on the ground of race, color, religion, national origin, disability, sexual orientation or gender identity.  Louisville Metro Ordinance § 92.05(A).

And the Publication Provision bars Nelson from writing and publishing any indication or explanation that she wouldn't photograph same-sex weddings, or that otherwise causes someone to feel unwelcome or undesirable based on his or her sexual orientation or gender identity:

> It is an unlawful practice for a person, directly or indirectly, to publish, circulate, issue, display, or mail … a written, printed, oral or visual communication, notice, or advertisement, which indicates that the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation … will be refused, withheld, or denied an individual on account of his … sexual orientation or gender identity, or that [the] patronage of … an individual, on account of [his or her]…

5

sexual orientation or gender identity is objectionable, unwelcome, unacceptable, or undesirable.  Metro Ord. § 92.05 (B).

The Ordinance contains enforcement provisions that could subject violators to investigation, injunctions compelling participation, and damages for humiliation, embarrassment, and costs of the refusal.  *See* Metro Ord. §§ 92.08(B)(8) (incorporating remedies of Kentucky Civil Rights Act), 92.12(B) (incorporating federal civil-rights remedies as well).

### III.  This Litigation

Nelson and her photography firm filed this lawsuit against the City of Louisville asking (among other things) to block Louisville from enforcing the Ordinance and for a declaration that the Ordinance violates the First Amendment's free-speech and free-exercise clauses, as well as the Kentucky Religious Freedom Restoration Act (KRFRA).  Complaint (DN 1) at 50–51.  After Louisville moved to dismiss the case on the grounds that Nelson lacked standing and her photography wasn't speech, this Court concluded that Nelson's photography is speech and that she was likely to succeed on the merits.  *Chelsey Nelson Photography*, 479 F. Supp. 3d at 547.  So the Court preliminarily enjoined Louisville from enforcing the Ordinance against her.  *Id.*

Since then, the City and Nelson completed discovery and filed cross-motions for summary judgment.  Summary judgment is appropriate if no genuine dispute of material fact exists and the movant is entitled to "judgment as a matter of law."  FED. R. CIV. P. 56(a).  Louisville continues to object to Nelson's standing, arguing her purported injuries are too speculative, and portrays the Ordinance as a neutral regulation of conduct that would survive strict scrutiny even if her photography is deemed speech.  City Response at 8–18.  For her part, Nelson points out the chilling effect of the Ordinance, which she contends violates the First Amendment by both compelling her speech and regulating its content.  Nelson MSJ at 6–14.  She also claims that the Ordinance is vague, overbroad, and inconsistent with state and federal protections for religious freedom.  Nelson seeks a declaration and a permanent injunction barring Louisville's Human Relations Commission and several City officials from enforcing the Ordinance against her.[3]

---

[3] In her reply brief (DN 104) at 31 n.16, Nelson abandoned her claims against all individual defendants and against the Human Relations Advocacy Commission.  She also abandoned all federal claims against the Enforcement Commission, but continues to assert the KRFRA claim against it.  The Court therefore grants summary judgment with respect to the abandoned claims in favor of the individual defendants and Commission.  FED. R. CIV. P. 56(d).

## IV. Standing

Does an actual case or controversy exist for this Court to adjudicate?  That depends on whether the Ordinance has caused a "concrete injury" that is particular to the plaintiff, traceable to the defendant, and remediable by a court.  *McKay v. Federspiel*, 823 F.3d 862, 867 (6th Cir. 2016) (citing *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560–61 (1992)).  A previous order in this case held that Nelson had suffered an injury, Preliminary Injunction Order at 3–10, but that decision rested only on the parties' allegations.  Now, after the parties have developed the factual record, the Court must revisit that question based on proof, not pleadings.  *See Sault Ste. Marie Tribe of Chippewa Indians v. United States*, 288 F.3d 910, 915 (6th Cir. 2002); *United States v. $99,500.00*, 795 F. App'x 332, 335–36 (6th Cir. 2019).  Jurisdictional issues "must be supported … with the manner and degree of evidence required at the successive stages of litigation." *Lujan*, 504 U.S. at 561.

Nelson has not been charged with violating the Ordinance, and Louisville says no evidence indicates the City is likely to charge her.  City Response at 8.  Nor has she photographed or been asked to photograph any same-sex weddings.  *Id.* at 9.  But Nelson says the likelihood that the government *will* enforce the Ordinance based on her speech suffices to injure her.  And when "threatened action by government is concerned," the Constitution "do[es] not require a plaintiff to expose h[er]self to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 128–29 (2007).  Rather, the Supreme Court has held that "a plaintiff satisfies the injury-in-fact requirement where [s]he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The record clearly indicates that Nelson's decision not to provide wedding-photography services at a same-sex wedding would violate the Ordinance, that she intends to and does photograph opposite-sex weddings, and that her photography is "affected with a constitutional interest," namely speech. *Babbitt*, 442 U.S. at 298; *see* Nelson Decl. ¶ 377.  This much of the standing inquiry is beyond dispute.  After Nelson received a preliminary injunction, she updated her website with a message explaining why she limits her services to celebration of opposite-sex weddings that align with her religious beliefs.  Nelson Decl. ¶ 60.  As construed by the City, the limitations Nelson places on her photography violate the Ordinance's Accommodations Provision, Metro Ord. § 92.05(A).  *See* City Response at 16 (The Ordinance requires Nelson to "make [her] … service equally available to all customers.").  And, as construed by the City, her statement about her beliefs conflicts with the Ordinance's Publication Provision, Metro Ord. § 92.05(B).  *Id.* at 12 ("[T]here

7

is no dispute that [Nelson's] statement on her website … violates the Ordinance.") (citing Metro Ord. § 92.05(B)).

The standing question therefore comes down to whether Nelson has shown a "credible threat of prosecution." *Susan B. Anthony List*, 573 U.S. at 159. A "subjective chill on protected speech" may qualify as a "credible threat" if it is accompanied by other indicators of imminent enforcement. *McKay*, 823 F.3d at 868. These indicators include (1) "a history of past enforcement against the plaintiffs or others," (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct," (3) "an[y] attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action," and (4) "a defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff." *Id.* at 868–69 (quotation omitted). "These *McKay* factors are not exhaustive, nor must each be established." *Online Merchants Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021).

According to these factors, the threat of enforcement facing Nelson is credible. And but for the permanent injunction issued by this Court, it would chill her speech: Nelson says she could not display the notice on her website explaining her religious beliefs and would have to choose between running her business inconsistently with her beliefs or closing the business altogether. Nelson Decl. ¶¶ 443–54, 492–503.

*First*, Louisville has a "history of past enforcement against the plaintiffs or others." *McKay*, 823 F.3d at 869. Louisville admits that it "actively enforces … [the] antidiscrimination law." City Response at 8–9. And the record supports that admission. Between 2002 and 2020, the Human Relations Commission received 173 complaints alleging discrimination on the basis of sexual orientation. Kendall Boyd Deposition (DN 92-7 at 473) Tr. 137–38; *see also* Human Relations Commission Reports (DN 92-7) at 117–72 (detailing investigations and penalties assessed for 143 complaints filed under the Ordinance). And between 2010 and 2020, Louisville investigated 100 public accommodations for alleged violations of the Ordinance. *See* Statement of Stipulated Fact (DN 104-5) at 1.

Louisville contends that the text of the Ordinance is "at odds with any suggestion that it is targeted at individuals like [Nelson]," City Response at 9, but this is a head-scratcher. Elsewhere the City concedes that the law's "clear terms" apply to "commercial photography business[es]" like Nelson's. *See* Preliminary Injunction Response (DN 15-1) at 9. Certainly nothing in the record indicates that the government will not in fact enforce a statute or ordinance on the books. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) ("no reason to assume" the "newly enacted law [would] not be enforced" against those within its reach); *Planned P'hood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987) ("the statutory language of the Ordinance evinces a credible threat of prosecution…"). Whether and when Nelson herself might actually be fined

or punished is less relevant than the threat that she could be at any time. *See Susan B. Anthony List*, 573 U.S. at 165–66 (threat of investigation created harm). And even without a ruling against her, the investigative process itself—demanding written responses, document production, witness testimony, and the like—is onerous. Metro Ord. §§ 92.08(B)(5), 92.09(D). This contributes to the chilling effect and harm of an enforcement threat, as the Supreme Court has recognized. *Susan B. Anthony List*, 573 U.S. at 165–66.

This conclusion is consistent with the rulings of other courts that have relied on past enforcement to find an injury sufficiently imminent for preenforcement review. *See, e.g., 303 Creative*, 6 F.4th at 1171–75 (single enforcement action in *Masterpiece Cakeshop* provided sufficient ground for wedding-website designer to challenge same public-accommodations law); *Telescope Media Group*, 936 F.3d at 750 (standing of wedding videographers adequately based on government announcement regarding same-sex wedding-videography services and prior enforcement of the provision against wedding venue).

*Second*, although the City has not sent "enforcement warning letters" to Nelson, this only marginally cuts against the threat of prosecution. *McKay*, 823 F.3d at 869. The City *has* said in this litigation that Nelson's limitations are "plainly discriminatory" and "impermissible" under the Ordinance. Preliminary Injunction Response at 10; *see also id.* at 11 ("On its face … Plaintiffs' … policy discriminates based on sexual orientation."). The City also admitted that it "actively enforces [the] antidiscrimination law," Response at 9, and noted that "every single instance of discrimination" creates a harm that the City has a legitimate interest in remedying, *id.* at 26. And the City has litigated this case for almost three years. As the D.C. Circuit has noted in the context of economic harm, it's "more than a little ironic that [the government] would suggest [the plaintiff] lack[s] standing and then, later in the same brief, label [the plaintiff] as a prime example of ... the very problem [its law] was intended to address." *Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 518 (D.C. Cir. 2009) (Kavanaugh, J.) (quotation omitted).

*Third*, enforcement here is made easier and more likely by "a provision allowing any member of the public to initiate an enforcement action." *McKay*, 823 F.3d at 869. Private parties outside the government may spur enforcement action in either of two ways: by filing a complaint with the Human Relations Commission that triggers public enforcement, or by directly filing a private lawsuit against the alleged offender.

As to public enforcement, "any member" of the public "with knowledge of the purported violation" may file a complaint, which creates a substantial threat of enforcement. *Susan B. Anthony*, 573 U.S. at 164; *see Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio S. Ct.*, 769 F.3d 447, 452 (6th Cir. 2014) (same). "Any person claiming to be aggrieved by an unlawful practice" in Louisville—not just a

prosecutor or public official— "may file a written complaint."  Metro Ord. § 92.09(A).
One who experiences discrimination may file a complaint, and so too may someone
who "associates" with "someone from a protected class."   Boyd Dep. Tr. 83–84.
Expanding this already expansive "universe of potential complaintants," *Susan B.
Anthony List*, 573 U.S. at 164, are the "testers" whom the Commission invites and
uses to initiate public enforcement actions, Motion for a Protective Order, Funding
Agreement (DN 64-3) (discussing use of testers); Boyd Dep. Tr. 79 ("We actually have
… part-time testers, who do discriminat[ion] testing.").  *See Telescope Media Group*,
936 F.3d at 750 (use of testers supported preenforcement standing).  A complainant
may call the Human Relations Commission, fill out an online form, or "walk in off the
street" to file a complaint.  Verna Goatley Dep. (DN 92-7 at 503) Tr. 31 (City aims to
"make it convenient for a person wanting to file a complaint to do so at [his or her]
leisure").

And as to private suits, their availability further suggests that enforcement is
"not limited to a prosecutor or an agency."  *Susan B. Anthony List*, 573 U.S. at 164.
Instead, the process is open to "any person or persons claiming to be aggrieved," who
"may file an action in Jefferson Circuit Court and obtain civil remedies."  Metro Ord.
§ 92.09(A).  Vesting authority in such a large number of potential claimants "makes
enforcement easier or more likely," *McKay*, 823 F.3d at 869, as nothing indicates
private suits displace public enforcement in this context, *see generally Platt*, 769 F.3d
at 452 (that "any person—not just a prosecutor or state agency—may initiate
enforcement" made enforcement more likely and helped establish standing).  And a
prevailing party may recoup damages, attorney fees, and court costs.  *Id.* (citing KRS
§ 344, 42 U.S.C. § 3604, and "any other federal civil rights statute that grants state
courts concurrent jurisdiction").  So the City, having empowered private parties to
initiate enforcement of its Ordinance, has only a limited ability to assuage Nelson's
fear of litigation and reduce the chilling effect on her speech.[4]

*Fourth*, Louisville apparently doesn't *want* to assuage that fear.  It has
"refus[ed] to disavow enforcement."  *McKay*, 823 F.3d at 869 (citing *Kiser v. Reitz*, 765
F.3d 601, 608–09 (6th Cir. 2014), and *Platt*, 769 F.3d at 452).  At oral argument on
the motion to dismiss, the City refused to promise it wouldn't "enforc[e] … the

---

[4] Whether a law authorizing enforcement *only* though private lawsuits would allow for
preenforcement standing against public officials is of course a separate question, raising
separate concerns, than the question whether the threat of private suits *contributes* to a
chilling effect that amounts to a constitutional injury.  *See generally Whole Women's Health
v. Jackson*, 142 S. Ct. 522, 536–37 (2022).  The Ordinance at issue here obviously invests
enforcement authority in public officials, simplifying any "whom to sue?" questions.  And the
preenforcement-injury caselaw discussed above at least implies that private enforcement
may contribute to a constitutional injury, regardless of whether it might allow for a
justiciable suit standing alone.

challenged statute against [this] particular plaintiff." *See McKay*, 823 F.3d at 869; *Chelsey Nelson Photography*, 479 F. Supp. 3d at 551 n.57. This supports the credibility of Nelson's fear of enforcement. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010); *Babbitt*, 442 U.S. at 302; *Online Merchants Guild*, 995 F.3d at 550, 551–52 ("Attorney General ha[d] not disavowed enforcement with respect to [plaintiffs]").

Cutting against the threat of enforcement, according to the City, is that it considers Nelson barely a wedding photographer at all. Since the lawsuit began, it explains, Nelson has photographed two weddings, had a baby, and quit her second job to spend more time at home with her child. City Response at 5–7 (seemingly questioning Nelson's decision to work part-time after having a child). No same-sex couple has ever asked her to photograph their wedding. *Id.* at 9. Although her website appears to directly violate the Ordinance by explaining her aversion to photographing same-sex weddings, the City notes she revised her website to this effect only on the advice of counsel before filing suit. *Id.* at 5–6.

Yet the City offers no explanation of why (contrary to its characterization of her discrimination set forth above) it believes two wedding shoots are somehow insufficient to bring her within the ambit of the Ordinance; to the contrary, it maintains "that exempting even one religious objector can" defeat the City's nondiscrimination objectives. City Response at 29. Nor does Louisville explain why Nelson's explanation of her limited services on her website is not speech that *today* violates the Publication Provision. From the City's perspective on the law, Nelson is currently violating the Ordinance by explaining that she offers photography services for opposite-sex weddings only. Nelson Decl. ¶ 60; MSJ at 1 ("Chelsey has posted statements explaining why she cannot create certain photographs or blogs and continued to operate her studio."). None of these arguments for a de minimis exception to ordinary preenforcement standing rules find a home in any of the four factors the Sixth Circuit addresses under *McKay*.

Nor do the City's objections to a "manufactured" test case add up to much. *See* Response at 4–6. Even assuming the City's lawyers have correctly characterized Nelson's motives and strategy, the law treats the injuries of private testers the same as those of enforcement targets. "It has long been settled ... that an individual does not forfeit his standing for jurisdictional purposes merely because he is a 'test' plaintiff." *See, e.g.*, *Ted Cruz for Senate v. FEC*, No. 19-cv-908, 2019 WL 8272774, at *6 (D.D.C. Dec. 24, 2019) (quotation omitted), *aff'd sub nom, FEC v. Cruz*, 142 S. Ct. 1638 (2022).[5] That Nelson never requested a religious exemption, as the City notes,

_____

[5] *See also Pierson v. Ray*, 386 U.S. 547, 558 (1967) (pastors could enter "bus terminal for the sole purpose of testing their rights to unsegregated public accommodations"); *Kuehl v. Sellner*, 887 F.3d 845, 851 (8th Cir. 2018) ("[W]hen an individual searches for and finds a

*see* Response at 5, 8, can hardly matter: the Ordinance provides exemptions only for religious, charitable, and educational organizations—which Nelson's business is not. *See* § 92.07(A)(2), (B). And in any event, the City's position that a judicial ruling "[g]ranting religious exemptions to antidiscrimination laws increases real-world discrimination" casts significant doubt on whether it would ever plausibly grant an administrative exemption of the sort it suggests Nelson should've sought. City Response at 1.

Finally, Nelson cannot be said to have "manufactured" this case by deciding to speak in the first place. The City's briefs instruct Nelson on how to avoid enforcement: just cave. True, she could avoid the threat of enforcement by "not advertis[ing] her refusal to photograph same-sex weddings," City Response at 10, but that flips the freedom of speech on its ear. And it proves too much; asking plaintiffs to simply comply with a law to avoid the threat of enforcement would defeat speech rights and standing in any number of contexts. "The Government's argument largely misses the point," as the Supreme Court recently reminded us: "Demanding that the [plaintiff] comply with the Government's 'alternative' would … require it to forgo the exercise of a First Amendment right we must assume it has" and "subject itself to the very framework it says unconstitutionally burdens its speech." *See Cruz*, 142 S. Ct. 1647–48 (rejecting a similar "be quiet and you won't get hurt" argument).

Under the *McKay* factors, therefore, Nelson's fear of prosecution amounts to a constitutional injury chilling her speech. And aside from injury, the City doesn't seriously contest the other two prongs of the standing inquiry: traceability and redressability. And for good reason. "[S]tanding depends considerably upon whether the plaintiff is [herself] an object of the action … at issue." *Lujan*, 504 U.S. at 561. Everyone agrees the City and those acting on its behalf are empowered to enforce the Ordinance. § 92.09. "[T]he causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *303 Creative*, 6 F.4th at 1175 (quotation omitted). And it is beyond dispute that an injunction "would meaningfully redress the alleged injury" of which Nelson complains. *Id.* (quotation omitted). So Nelson has standing and this Court has jurisdiction.

## V. Ripeness

For substantially similar reasons, Nelson has also shown that her preenforcement challenge is ripe. Ripeness and standing, while once considered to be separate limitations on the exercise of the judicial power, *see Warshak v. United*

---

violation of the law, it is the violation itself—not the search—that causes the plaintiff injury."); WRIGHT & MILLER, 13 FED. PRACTICE AND PROCEDURE § 3530 (3d ed. 2022) ("If actually advers[e] interests are involved, deliberate provocation of litigation does not defeat the existence of a controversy.").

*States*, 532 F.3d 521, 525 (6th Cir. 2008) (quotation omitted), have more recently been understood to impose overlapping constraints, *see Kiser*, 765 F.3d at 607 ("address[ing] the constitutional component of ripeness in terms of standing"). In determining "whether a claim is ripe for judicial resolution," courts traditionally "ask[ed] two basic questions: (1) is the claim 'fi[t] ... for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak*, 532 F.3d at 525. In the context of "preenforcement First Amendment challenges," however, the Sixth Circuit has recognized that "[t]he line between Article III standing and ripeness ... has evaporated." *Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016). In such a case, "[w]hether the plaintiffs have standing and whether their claims are ripe come to the same question: Have they established a credible threat of enforcement?" *Id.* If so then they've satisfied both the standing *and* ripeness inquiries. *See id.*; *Susan B. Anthony List*, 573 U.S. at 157 n.5 (resolving standing and ripeness together because, in that preenforcement context, they "boil[ed] down to the same question") (quoting *MedImmune*, 549 U.S. at 128 n.8).

As explained above, the answer here is indeed yes. Nelson's concern regarding enforcement is concrete and not hypothetical. A statute prohibiting protected speech may lead to "self-censorship; a harm that can be realized even without an actual prosecution." *Virginia*, 484 U.S. at 393. Here, as in *303 Creative*, 6 F.4th at 1176, and *Telescope Media Group*, 936 F.3d at 750 (affirming district court's ripeness finding), Nelson has shown a credible fear of enforcement and this law's concomitant chill on her speech.

Nor do significant factual issues remain unaddressed in the record. While the City contends that "additional facts regarding the same-sex wedding ceremony would be relevant" to the Court's evaluation of Nelson's religion-clause claim, City Reply (DN 111) at 8, this is merely a prudential rather than a jurisdictional point. These concerns about hypothetical facts do not affect the analysis below; they do not render this an "abstract disagreement" incapable of concrete judicial resolution. *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)). And the City's efforts to downplay Nelson's business, speech, and fear fail for the same reasons discussed above in the standing context. So her challenge is ripe for adjudication.

## VI. The Freedom of Speech Under the First Amendment

"Congress shall make no law abridging the freedom of speech." U.S. CONST. amend. I. Neither may states, against whom the First Amendment was incorporated through the Fourteenth, *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.*, 978 F.3d 481, 489 (6th Cir. 2020), nor their municipalities, *see Lovell v. City of Griffin,* 303 U.S. 444, 450 (1938). "[M]unicipal ordinances adopted

under state authority constitute state action and are within the prohibition of the [First] [A]mendment." *Id.*

This protection applies to popular and unpopular speech alike—and minority views are of course the ones that most need the law's protection. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989). The alternative would risk the ossification of our national discourse and sanction political majorities to prescribe an official orthodoxy. *See Barnette*, 319 U.S. at 642. "[F]reedom to differ," after all, "is not limited to things that do not matter much." *Id.*

Whether that protection overcomes Louisville's Fairness Ordinance and shields Nelson's choice not to produce same-sex wedding photography turns on three questions: whether the photography qualifies as protected expression, whether the Ordinance either compels speech or restricts it based on its content, and whether the abridgement is nevertheless narrowly tailored to serve a compelling state interest.

## A.  Nelson's Protected Expression

The preliminary-injunction order held that Nelson's "photography is art" and "[a]rt is speech." *Chelsey Nelson Photography*, 479 F. Supp. 3d at 548. But the City continues to press the argument that the Ordinance regulates "goods or services *involving* speech," which amount to "commercial conduct" rather than pure speech. City Response at 15 (emphasis added).

The First Amendment, however, "is not limited to written or spoken words" alone. *ETW Corp. v. Jireh Publishing*, 332 F.3d 915, 924 (6th Cir. 2003). Rather, "pictures, films, paintings, drawing, … engravings, [and] oral utterance and the printed word" qualify for "First Amendment protection." *Kaplan v. California*, 413 U.S. 115, 119–20 (1973); *see also Hurley*, 515 U.S. at 569 ("[T]he Constitution looks beyond written or spoken words as mediums of expression."). And even some "conduct" that "provid[es] goods or services *involving speech*," City Response at 15, can qualify for the protections of the First Amendment, *see, e.g., Telescope Media Group*, 936 F.3d at 752.

In deciding whether conduct is sufficiently communicative to implicate the First Amendment, courts ask about two things: the (subjective) intent of the speaker and the (objective) understanding of others. Did the speaker have "[a]n intent to convey a particularized message"? *Johnson*, 491 U.S. at 404 (quotation omitted). And was "the likelihood … great that the message would be understood by those who viewed it"? *Id.*

*First*, Nelson has shown a subjective intent to promote a particular message about marriage. She uses photographs of weddings to convey her view of the world,

as shaped by her values and faith.   Nelson Decl. ¶¶ 75–99.   She takes these photographs in a manner designed to highlight the beauty and solemnity of marriage. ¶¶ 9, 83.  And she depicts marriage in a "positive and uplifting way" to celebrate what she believes to be God's design for marriage, with the hopes of convincing others that it is worthy of pursuit.  ¶¶ 84, 151.  The City hasn't offered any evidence to contradict this.

*Second*, "the likelihood [is] great" that viewers would understand Nelson's message celebrating marriage.  *Johnson*, 491 U.S. at 404.  That photographs can mean different things to different people, City Response at 19, is of course not by itself enough to remove expressive conduct from the scope of speech.   Reader-response theory has not overtaken the reasonable observer, who would likely understand that the artist's own story is bound up with the images she captures.  "*Hurley* implies that the First Amendment's coverage depends on whether observers impute 'meaning' to what they see.  Note, however, that the 'meaning' need not be univocal."  Mark Tushnet, *Art and the First Amendment*, 35 COLUM. J. L. & ARTS 169, 210 & n.166 (2012).   The City at times implies that the only expression emanates from the celebrants and officiant, not the photographer capturing them.  City Response at 14–15.  This is too narrow a conception of photography, and of art.  The Pulitzer, after all, goes to the photographer, not her subjects.  And when a composer selects a musician to bring a song to life, is either less of an artist because the other's creative expression is also involved?

Wedding photographers, like wedding singers, convey distinct messages and are hardly interchangeable—as anyone who's ever planned a wedding or watched *The Wedding Singer* surely understands.   Even if the New Mexico and Washington Supreme Courts apparently do not: "Reasonable observers," they concluded, "are unlikely to interpret Elane Photography's photographs as an endorsement of the photographed events." *Elane Photography, LLC v. Willock*, 309 P.3d 53, 69 (N.M. 2013); *see also State v. Arlene's Flowers, Inc.*, 441 P.3d 1203, 513 (Wash. 2019) ("The decision to either provide or refuse to provide flowers for a wedding does not inherently express a message about that wedding.").  This approach might be more persuasive if all Nelson did was "decide" whether to click a button on her camera. But the unrebutted record here indicates she does much more. *See* Nelson Aff. ¶ 245 (she "choreograph[s] and pose[s] the bride and groom and their family and guests"); ¶ 247 (she "use[s] [her] artistic judgment to make technical decisions" regarding exposure, aperture, light sensitivity, color temperature, white balance, camera flash, depth of field, focus, shutter speed, ambient light, perspective, composition, camera angles, empty space, background, and subject poses); ¶¶ 258–60 (she edits pictures to "emphasize a light, bright and airy image with a romantic, classic, and timeless quality"); ¶¶ 267–71 (she curates blogs for each couple to "celebrate the engagement or wedding, encourage the couple, and communicate [her] views on marriage").

So her expression, though not necessarily verbal, is nevertheless intended to and likely to in fact convey a message. *Johnson*, 491 U.S. at 404. That brings it within the scope of the freedom of speech. This conclusion is consistent with the broad construction the Supreme Court's precedents have afforded the term "speech." Under this two-pronged framework, the Court has recognized a wide variety of expressive conduct that qualifies as speech. *See, e.g., United States v. Stevens*, 559 U.S. 460, 471–72 (2010) (animal crush videos); *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565–66, 572 (1991) (nude dancing); *Johnson*, 491 U.S. at 414 (flag burning); *Hurley*, 515 U.S. at 569 (St. Patrick's Day parade); *id.* (discussing the painting of Jackson Pollock, music of Arnold Schoenberg, and *Jabberwocky* verse of Lewis Carroll); *Tinker v. Des Moines Independent Community School Dist.*, 393 U.S. 503, 505–506 (1969) (armbands); *Barnette*, 319 U.S. at 632 (not saluting the American flag); *Nat'l Socialist Party of Am. v. Skokie*, 432 U.S. 43 (1977) (neo-Nazi parade).

The Sixth Circuit has likewise recognized that photography qualifies as speech: "The protection of the First Amendment is not limited to written or spoken words, but includes other mediums of expression, including music, pictures, films, photographs, paintings, drawings, engravings, prints, and sculptures." *ETW Corp.*, 332 F.3d at 924. So too have other courts. *See, e.g., Kaplan*, 413 U.S. at 119–20 (1973) ("pictures, films, paintings, drawings, and engravings … have First Amendment protection"); *Bery v. City of New York*, 97 F.3d 689, 696 (2d Cir. 1996) ("[P]aintings, photographs, prints and sculptures … are entitled to full First Amendment protection.").

More recently, courts have repeatedly faced the question whether wedding-related services that involve expressive conduct amount to "speech" that the First Amendment protects. Most such decisions—even one upholding a public-accommodations law—have said yes. *See Telescope Media Group*, 936 F.3d at 750 (custom wedding videos are speech); *303 Creative*, 6 F.4th at 1176 (custom wedding websites are "pure speech"); *Brush & Nib Studio, LC* v. *City of Phoenix*, 448 P.3d 890, 895 (Ariz. 2019) (custom wedding invitations are speech).

The City largely ignores these decisions, resting instead on the divergent holding of the New Mexico Supreme Court in *Elane Photography*, 309 P.3d at 66. That court held that *because* a photography business "is a public accommodation, its provision of services can be regulated … even though those services include artistic and creative work." *Id.* This begs the question: can the state supersede speech rights by deeming activities a public accommodation rather than speech? *Hurley* tells us no: the government may not "declar[e] [another's] speech itself to be the public accommodation." 515 U.S. at 572–73; *see also Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("state labels cannot be dispositive of [the] degree of First Amendment protection" a person enjoys). The New Mexico Supreme Court tried to cabin this reasoning to not-for-profits, contending the "United States Supreme

16

Court has never found a compelled-speech violation arising from the application of antidiscrimination laws to a for-profit public accommodation." 309 P.3d at 65. But *Masterpiece Cakeshop* wasn't resolved on that simple basis, even though it involved a going concern. 138 S. Ct. at 1731–32. And this purported distinction ignores longstanding caselaw applying the First Amendment to the speech of businesses.[6] The Sixth Circuit could hardly have been clearer on this point: "Speech is protected even though it is carried in a form that is sold for profit," and "[t]he fact that expressive materials are sold does not diminish the degree of protection to which they are entitled under the First Amendment." *ETW Corp.*, 322 F.3d at 924–25 (distinguishing "expressive materials" that are "sold" or "disseminat[ed]" from "pure commercial speech" that "does no more than propose a commercial transaction" and may merit reduced protection).

In short, the City and the New Mexico Supreme Court recognize the conflict between the federal Constitution and state public-accommodations laws—but expect federal law to yield. That question, however, was resolved in the other direction by the Supremacy Clause, the Civil War, and the Fourteenth Amendment.

The Executive Director of the Louisville Human Relations Commission appears to agree that Nelson's photographs "communicat[e] a message of celebration." Goatley Dep. Tr. 141. But the City attempts to parse its regulation to touch only Nelson's *conduct* and not any expression bound up with it: the regulations, it contends, don't interfere with the way Nelson engages in the creative process, but only with her decision *whether* to create. City Response at 15 ("The Ordinance does not tell Chelsey how to frame her shots or edit photographs; it regulates only the sale of Chelsey's services to the public."). And it's true that courts have applied less scrutinous First Amendment review to content-neutral regulations of conduct that may incidentally burden speech. *See O'Brien*, 391 U.S. 376 ("[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.").

But the City doesn't articulate any reason why it would regulate the "conduct" of setting the focus or pushing the camera button. Rather, the City cares about whether, not how, Nelson takes photographs—conduct that wouldn't be undertaken

---

[6] *See e.g.*, *Citizens United v. Fed. Elec. Comm'n*, 558 U.S. 310, 342 (2010) (collecting cases); *Time, Inc. v. Firestone,* 424 U.S. 448 (1976); *Doran v. Salem Inn, Inc.,* 422 U.S. 922 (1975); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546 (1975); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 (1975); *Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241 (1974); *New York Times Co. v. United States,* 403 U.S. 713 (1971); *Time, Inc. v. Hill,* 385 U.S. 374 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964); *Kingsley Int'l Pictures Corp. v. Regents of Univ. of N. Y.,* 360 U.S. 684 (1959); *Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495 (1952).

but for the photographer's expressive purpose and work product.  Even if the City can say with a straight face that "pressing a button" on a camera amounts to conduct, that conduct is *expressive* both in its subjective motivation and objective effect. Requiring her to press a button when the government demands—no less than requiring a writer to press a keyboard when the state says so—compels the expression of that artist.

To recast Nelson's speech as mere conduct (or speech incidental to conduct) would undermine core First Amendment protections and subject "wide swaths of protected speech … to regulation by the government."  *Telescope Media Group*, 936 F.3d at 752.  Even the purchase of newspaper ink—conduct far more removed and less expressive than photography—has drawn First Amendment protection when its regulation could, hypothetically, affect the journalism that ink was meant to convey. *See Minneapolis Star-Tribune v. Minnesota Commissioner of Revenue*, 460 U.S. 575, 592 (1983).  The "conduct" of producing art related to weddings presents a far simpler case.  As Judge Stras recently explained:

> The government could argue, for example, that painting is not speech because it involves the physical movements of a brush.  Or it could claim that publishing a newspaper is conduct because it depends on the mechanical operation of a printing press.  It could even declare that a parade is conduct because it involves walking.  Yet there is no question that the government cannot compel an artist to paint, demand that the editors of a newspaper publish a response piece, or require the organizers of a parade to allow everyone to participate.  Speech is not conduct just because the government says it is.

*Id.* (citations omitted).  So too here.  The government may not distill a person's expression to its basest components and then siphon that essential conduct.  When speech and conduct are diffused, one cannot be controlled without also abridging the other.  By regulating an artist's choice to take a job or click a button, the government is making her produce speech she disagrees with.[7]

None of this is to denigrate legitimate debates regarding the sweep of the First Amendment, or the difficulty of drawing the line between speech and non-expressive conduct.  *See, e.g. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011) (distinguishing between constitutionally protected speech and regulatable conduct).  But that hard

---

[7] The incidental-burden doctrine does not apply to content-based regulations in any event. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 26–27 (2010).  And as discussed below (§ B.2), the Ordinance's Accommodations Provision is content-based.  So the Ordinance cannot be categorized as a regulation of conduct that only incidentally affects speech, even assuming it were possible to disentangle the conduct involved in the creative process from the creation itself.

work is what the First Amendment and Article III task judges with doing in order to resolve conflicts between speech rights and encroaching regulations. And the work may prove less challenging if courts view their job as the more mundane task of reading and interpreting law, rather than entering "the business of deciding which businesses are sufficiently artistic to warrant exemptions from antidiscrimination laws." *Arlene's Flowers*, 441 P.3d at 1228 (citing *Elane*, 309 P.3d at 71). Rebalancing legislative policy choices isn't necessary if the question remains whether the activity counts as speech. If so, federal constitutional protections supersede local antidiscrimination laws, not vice versa. As long as curious and outspoken members of our society find new and creative ways to express themselves, and as long as governments find new and creative ways to regulate those people, courts will confront hard questions. But today's inquiry is simply whether Nelson's wedding photography carries the intent and meaning necessary to render it expressive under the Supreme Court's precedents. And the unrebutted record makes clear that it does.

## B. The City's Regulation of Nelson's Speech

So Nelson's photography is covered by the First Amendment. Does the Ordinance either compel her to speak in a way she finds objectionable or suppress her speech based on its content? Yes. The Ordinance violates the Constitution in both ways: it requires Nelson to photograph same-sex weddings based on her choice to photograph opposite-sex ceremonies.

**1. Compelled Speech.** Compelled speech is antithetical to "the [f]reedom of speech," which "presupposes a willing speaker." *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 756 (1976). "[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley,* 515 U.S. at 573 (quotations omitted). Indeed, "[g]overnments must not be allowed to force persons to express a message contrary to their deepest convictions." *Nat'l Inst. of Family & Life Advocs.* v. *Becerra*, 138 S. Ct. 2361, 2379 (2018) (*NIFLA*) (Kennedy, J., concurring).

This is true even when the law in question serves important interests in avoiding offense or unfairness toward others. Indeed, a long line of authority recognizes that when public-accommodations laws and similar regulations would have the effect of compelling speech, the First Amendment bars their enforcement. *Hurley*, 515 U.S. at 572–73, is right on point. There the Supreme Court considered whether a St. Patrick's Day parade was expressive conduct that implicated the First Amendment. A local gay, lesbian, and bisexual group sought to use a public-accommodations law to compel parade organizers to allow the group's members to march and carry a banner. *Id.* The parade organizers had a different message in mind and declined to let the group march. *Id.* The Supreme Court explained that the parade was expressive speech and held that Massachusetts could not compel the group's inclusion over the sponsor's objection, because such a command would "alter

19

the expressive content of [the] parade." *Id*. The upshot? The public-accommodations law could not, consistent with the First Amendment, "declare the sponsors' speech itself to be the accommodation." *Id*. at 573. That kind of obligation would run headlong into the Constitution's prohibition on compelled speech, "however enlightened [the law's] purpose may strike the government." *Id*. at 579.

The core holding of *Hurley* does not stand in isolation. It reflects longstanding precedent prohibiting government-compelled speech. In *Barnette*, the Supreme Court barred West Virginia from forcing schoolchildren to recite the Pledge of Allegiance and salute the flag each day. 319 U.S. at 642. In *Miami Herald Publishing Company v. Tornillo*, the Supreme Court enjoined enforcement of a Florida law that required newspaper editors to use the paper's finite pages to publish the replies of political candidates the newspapers had criticized. 418 U.S. 241, 244, 258 (1974). In *Wooley v. Maynard*, the Supreme Court blocked a law requiring drivers to display the New Hampshire state motto ("Live Free or Die") on their license plates, because this forced the driver's apparent endorsement of a government-approved message. 430 U.S. 705, 707, 715–16 (1977). In *NIFLA v. Becerra*, the Supreme Court invalidated a California requirement that crisis-pregnancy centers must inform patients of the availability of abortion at other clinics, because this altered the centers' speech by injecting a government-compelled message. 138 S. Ct. at 2371. And in *Janus v. AFSCME*, the Supreme Court held that the government may not "compe[l] individuals to mouth support for views they find objectionable" by requiring union dues that fund political speech. 138 S. Ct. 2448, 2463 (2018).

These decisions are of a piece with our constitutional fabric. Because the expressive activity had "a particularized message" that the speaker intended and an audience could perceive, it was covered by the First Amendment. *Johnson*, 491 U.S. at 404. And the freedom of speech meant the speaker, not the government, got to decide whether the speaker would salute, publish, display slogans, or discuss abortion.

Courts have applied this principle to claims of discrimination based on sexual orientation, too. The *Hurley* decision addressed similar tension between a state nondiscrimination law aimed at securing equal treatment and a speaker's right to express a chosen point of view. 515 U.S. at 572–73 (rejecting "the state courts' application of the statute [to] essentially requir[e] petitioners to alter the expressive content of their parade"). The Supreme Court later held unenforceable a public-accommodations law that forbid the Boy Scouts from excluding an assistant scoutmaster based on his sexual orientation: doing so would significantly burden the organization's First Amendment "right to oppose or disfavor homosexual conduct." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000). The government lacked authority to "control" the "choice of a speaker not to propound a particular point of view." *Id*. at 654. And in *Masterpiece Cakeshop*, the Court declined Colorado's invitation to hold

that its public-accommodations law would require a baker to provide services for a same-sex ceremony despite his religious objection. 138 S. Ct. at 1731–32.

The precedents the City cites, by contrast, address the application of public-accommodations laws to *conduct*, not speech. This is how to reconcile *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984), and *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006), with the speech cases above. In *Roberts*, the Court addressed conduct that was not expressive at all: requiring an all-male social club to admit female members did not compel speech because admitting women did not "imped[e] the organization's ability to engage in … protected activities or disseminate its preferred views." 468 U.S. at 627. And in *FAIR*, the rule at issue concerned the speech of others that observers wouldn't reasonably ascribe to the schools challenging this requirement. The Supreme Court held that the federal government could require law schools to grant military recruiters access to law school facilities and student email. 547 U.S. at 62. But that was not because an accommodations law trumped the law schools' speech rights as a general matter; rather, the particular speech at issue was *not* that of the law schools. The law didn't compel any speech because a "law school's decision to allow recruiters on campus is not inherently expressive." *Id.* at 64.

Neither activity resembles Nelson's protected expression, which the Ordinance threatens to punish unless Nelson agrees to photograph, edit, and write about same-sex weddings when she otherwise wouldn't. That speech is still compelled even though Nelson, as the City emphasizes, "voluntarily formed" her business, entered "the public marketplace," and could always simply exit the field. City Response at 16–17, 26. No one forced the *Miami Herald* to put out a newspaper, *Tornillo*, 418 U.S. at 243, the Irish of Boston to throw a parade to honor St. Patrick on Evacuation Day, *Hurley*, 515 U.S. at 560, or Mark Janus to take an Illinois government job in a unionized shop, *Janus*, 138 S. Ct. at 2461. But the First Amendment recognized their right to do so, and prevented the government from conditioning that right on their willingness to communicate other messages, too. The shield against compelled speech would be flimsy indeed if the government could simply exclude a non-conforming speaker from her avocation.

In another area of the law, some courts have allowed "government mandates requiring disclosure of 'purely factual and uncontroversial information.'" *Am. Meat Inst. v. U.S.D.A.*, 760 F.3d 18, 21 (D.C. Cir. 2014) (en banc) (quoting *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 651 (1985)). The contrast between attorney advertising and country-of-origin labels, on the one hand, and parades and wedding photography, on the other, is telling. *See Nat'l Ass'n of Mfctrs. v. SEC*, 800 F.3d 518, 523 (D.C. Cir. 2015) ("[O]utside th[e] context [of] commercial advertising, the 'general rule' is 'that the speaker has the right to tailor the speech.'") (quoting *Hurley*, 515 U.S. at 574). Even in that purely commercial context, the government must still limit any compulsion to statements that are "purely factual," not "unduly burdensome,"

and "uncontroversial." *Zauderer*, 471 U.S. at 651.  Would Nelson's photography and blogging regarding her understanding of traditional marriage satisfy even one of these three prongs?  Only rarely should a commercial regulation meet this "demanding" standard, particularly its "uncontroversial" prong.  *Am. Meat Inst.*, 760 F.3d at 33–34 (Kavanaugh, J., concurring).  And in matters of conscience and faith, the chances seem practically nil.  *See NIFLA*, 138 S. Ct. at 2372.

The City's alternative version of the First Amendment would represent the flip-side of prior restraint: pre-approval of speech on pain of punishment for those who don't parrot a government-approved message.  Under such a regime, "individuals [could be] coerced into betraying their convictions." *Janus*, 138 S. Ct. at 2464.  But "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning." *Id.*  And beyond the dignity interests of the speaker, such coercion cheapens the message's value to the listener: the audience of an approved message cannot know whether the message authentically conveyed the views of the speaker, or only officially sanctioned talking points.  "Words uttered under coercion," after all, "are proof of loyalty to nothing but self-interest." *Barnette*, 319 U.S. at 644 (Black, J., concurring).  The Supreme Court, like Orwell, has long recognized the risk that compelled speech may "turn the writer, and every other kind of artist as well, into a minor official, working on themes handed down from above." George Orwell, *The Prevention of Literature* (1946).[8]  The First Amendment exists to resist that pressure and keep the artist's expression truly free.

**2. Content-Based Restriction.** It would be odd indeed if Nelson's decision to promote one message supporting opposite-sex marriage triggered an obligation to promote what she views as a conflicting message in support of same-sex marriage.  The government typically cannot "require speakers to affirm in one breath that which they deny in the next." *See Pacific Gas & Elec. Co. v. Public Util. Comm'n of Cal.*, 475 U.S. 1, 16 (1986).  Such an arrangement sounds a lot like a matrimonial version of the equal-time doctrine the Supreme Court rejected in *Tornillo,* 418 U.S. at 258.  And in this context, the regulation also amounts to an impermissible content-based restriction on Nelson's speech because it turns on her decision to speak on the subject of opposite-sex weddings.  *See Telescope Media Group*, 936 F.3d at 753.

The rule against content-based speech restrictions is a core First Amendment limitation on government authority: the state lacks "power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1973).  A content-based law is one that "target[s] speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  This can include laws that define the regulated speech by its

---

[8] Available at https://www.orwellfoundation.com/the-orwell-foundation/orwell/essays-and-other-works/the-prevention-of-literature/.

"subject matter," "topic," "message," "function[,] or purpose." *Id.* Indeed, facially content-neutral laws that "cannot be justified without reference to the content of the regulated speech," are still content based. *Id.* at 164 (quotation omitted); *see also City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1471–72 (2022) (similarly interpreting *Reed*). Such regulations are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Content-based distinctions prevent speakers from sharing messages and shield listeners from any offense or unapproved information. But the Constitution takes the opposite view: the rights of the speaker are "presumed to lie beyond the government's power to regulate," *Hurley*, 515 U.S. at 575, and generally "the right of expression prevails" over any design "to shield the sensibilities of listeners," *United States v. Playboy Entertainment Group*, 529 U.S. 803, 813 (2000).

This Ordinance, however well-intentioned, carries with it a "substantial risk of excising certain ideas or viewpoints from the public dialogue." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994). In fact, "protecting individuals['] personal dignity" and "[e]nsur[ing] freedom from humiliation" in the form of speech, no less, are the declared policies of the Fairness Ordinance. § 92.01. But the Constitution does not permit governments to promote their perceptions of fairness by extinguishing or conditioning the free expression of opposing perceptions of the common good. Even regarding the most extreme and offensive subjects, "the government may n[ot] prohibit the expression of an idea simply because society finds that idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quotation omitted). And in terms of offensiveness, it's hard to top what the Court confronted—and protected—in *Snyder*: protestors who disrupted the funerals of military veterans to ascribe their deaths to God's wrath for the United States' tolerance of homosexuality. *Id.* at 457–58 (shielding protestors from tort liability because "any distress occasioned by Westboro's picketing turned on the content and viewpoint of the message conveyed").

This Ordinance likewise "target[s] speech based on its communicative content." *Reed*, 576 U.S. at 163. It eliminates Nelson's ability to express herself freely on the subject of marriage because if she photographs one type of marriage she must photograph others, even those to which she objects. Even a law that is content-neutral on its face is treated as content-based if its application "require[s] speakers to modify the content of their expression." *Hurley*, 515 U.S. at 578; *Holder*, 561 U.S. at 27–28 (similar).

That is what a public-accommodations law such as this does when it "compel[s] individuals to speak a particular message"—it "alte[rs] the content of [their] speech." *NIFLA*, 138 S. Ct. at 2371 (quotation omitted). The Accommodation Provision, however, requires Nelson to provide her services "full[y] and equal[ly]" to same-sex

couples, § 92.05(A), which would compel Nelson to "celebrat[e]" those weddings through her artistic choices, ¶¶ 75–99; ¶¶ 151–272; ¶¶ 268–71. *See also* City Response at 16 (construing Ordinance to require Nelson to "make [her] ... service equally available to all customers"). To determine whether Nelson is treating same-sex couples equally, the City must necessarily consider her choices about which weddings to photograph and how. *See 303 Creative*, 6 F.4th at 1202 (Tymkovich, C.J., dissenting) (public-accommodations law was content-based because "determining whether a person has been denied accommodation because of a protected class status requires ... an inquiry into the motivation behind the denial"). "By treating [Nelson's] choice to talk about one topic—opposite-sex marriages—as a trigger for compelling [her] to talk about a topic [she] would rather avoid—same-sex marriages—" the ordinance imposes a content-based restriction. *Telescope Media Group*, 936 F.3d at 753; *see also Brush & Nib Studio*, 448 P.3d. at 914 ("compel[ling] [defendants] to write celebratory messages with which they disagree" is content based).

The record bears out why the Ordinance regulates Nelson's expression based on its content, not her conduct toward others belonging to a protected class. Unrebutted evidence shows Nelson *will* serve LGBT customers so long as the photographs she produces wouldn't carry a message that contradicts her beliefs.[9] For example, she would take and edit the photos a lesbian wedding photographer took at an opposite-sex wedding, or work for a same-sex couple whose son marries a woman. Nelson Aff. ¶ 399. Not doing so would amount to discriminatory *conduct* not shielded by the First Amendment, as she acknowledges. *See* ¶¶ 396–404; *Chelsey Nelson Photography*, 479 F. Supp. 3d at 564 n.165 ("most applications of an anti-discrimination law are constitutional"); *id.* at 560 n.133 (distinguishing discrimination based on skin color, as opposed to message). Nelson doesn't contend, for good reason, that the First Amendment would apply to a Louisville business that denied goods or services based on the customer's protected status. *Contra* City Response at 16–17. But discrimination based on status is not the same as disagreement with a message. Nelson won't create photography in support of a "same-sex wedding, polyamorous wedding, or an open marriage wedding," Nelson Aff. ¶ 191, which she believes "contradict biblical principles," ¶ 188. So the Ordinance's

---

[9] *See* Nelson Aff. ¶ 395 ("My policy of offering and providing wedding-celebration and boutique-editing services celebrating weddings only between a man and a woman and of declining requests for services is never about the person requesting these services."); ¶ 396 ("I am willing to work with all people regardless of classifications such as race, sexual orientation, national origin, or any other characteristic."); Motion at 11 ("she will provide wedding photography to LGBT clients ... whether that be LGBT wedding planners or LGBT parents requesting photographs celebrating their child's opposite-sex wedding." (citations omitted)).

application to wedding photography turns on the content of the photographer's expression regarding the celebration of marriage.

## C. Strict Scrutiny

Because the Accommodation Provision both compels and restricts Nelson's speech based on content, the City may enforce it only if the law survives strict scrutiny. *See Reed*, 576 U.S. at 163 (such restrictions "are presumptively unconstitutional"); *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). This "requires the [g]overnment to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Az. Free Entp. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quotation omitted).

The City asserts a compelling interest in "eliminating discrimination and assuring its citizens equal access to publicly available goods and services." Response at 24–25. The Supreme Court has blessed this goal as a compelling state interest. *See Roberts* 468 U.S. at 624 (1984); *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 252–53 (1964). So too have recent appellate decisions addressing wedding-related speech restrictions. *See, e.g., Telescope Media Group*, 936 F.3d at 754 (the non-discrimination "interest has a substantial constitutional pedigree and, generally speaking, we have no doubt that it is compelling"); *Brush & Nib*, 448 P.3d at 914. The Court has no reason to doubt the sincerity or legitimacy of the government's interest in equal treatment.

But is the Ordinance narrowly tailored to that end? To answer that question, courts ask "whether the challenged regulation is the least restrictive means among available, effective alternatives." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). In other words, the law must "avoid unnecessarily abridging speech." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). To meet this standard, the law must avoid being either "overinclusive," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 804 (2011), or "underinclusive," *Reed*, 576 U.S. at 171.

This is not easy, nor should it be when speech restrictions are at issue. Strict scrutiny doesn't allow for half measures (which could allow for subtle forms of government preferences): either an interest is so compelling that it can be achieved only by regulations with few or no exceptions, or else the law must make room for as much speech as possible, including by extending any exceptions to similarly situated speech. *See Riley*, 487 U.S. at 790 ("[G]overnment regulation of speech must be measured in minimums, not maximums."). It is no wonder that "it is the rare case in which a State demonstrates" that a speech-restrictive provision passes strict scrutiny. *Williams-Yulee*, 575 at 444 (2015) (quotation omitted).

These considerations apply with even more force when the regulation compels rather than restricts speech. "One of our landmark free speech cases," the Supreme Court recently recalled, "said that a law commanding 'involuntary affirmation' of

25

objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus*, 138 S. Ct. at 2464 (quoting *Barnette*, 319 U.S. at 633). Indeed, compelled-speech decisions regularly speak in terms of absolutes. As *Tornillo* explained, "[t]he clear implication" of prior Supreme Court decisions "has been that … a compulsion to publish" content that speakers' "reason tells them should not be published is unconstitutional." 418 U.S. at 256 (quotation omitted). And *Hurley* emphasized that the government may not compel a speaker to promote another's message, no matter "ho[w] enlightened [its] purpose may strike" the regulator in question. 515 U.S. at 579. It is difficult to imagine a case where a regulation compelling speech would pass strict scrutiny, at least outside the realm of commercial speech.[10]

This Ordinance is not that unicorn. The City takes a broad position that appears to eschew any tailoring. "Uniform enforcement of the Accommodations Provision," it maintains, "is the least restrictive means for furthering Metro's interest in ensuring equal access to goods and services, because every single instance of discrimination renders access unequal, inflicts humiliation, and creates stigma." City Response at 26. But the City's pursuit of its equality goal is hardly "uniform": its

---

[10] The Supreme Court's compelled-speech precedents tempt one to conclude that a per se rule prohibits government-compelled speech, at least outside the commercial context. *See, e.g., Dale*, 530 U.S. at 654 ("[T]he choice of a speaker not to propound a particular point of view … is presumed to lie beyond the government's power to control." (citation omitted)); *Hurley*, 515 U.S. at 573 ("[T]he fundamental rule of protection under the First Amendment [is] that a speaker has the autonomy to choose the content of his own message."). The Supreme Court's opinions in *Barnette*, 319 U.S. at 642, *Wooley*, 430 U.S. at 715, *Tornillo*, 418 U.S. at 243, *Dale*, 530 U.S. at 643, and *Hurley*, 515 U.S. at 559, seem to speak in absolutes, without reference to tiers of scrutiny. The Eighth Circuit and Arizona Supreme Court similarly suggest that even an otherwise compelling interest in nondiscrimination might not exist when compelled speech is at issue. *See Telescope Media Group*, 936 F.3d at 755; *Brush & Nib*, 448 P.3d at 914–15. Especially in light of recent decisions such as *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129 (2022), which eschew tiers of scrutiny in favor of attention to "text and history," one is left to wonder why the same approach wouldn't apply to the First Amendment, *see Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1261 (11th Cir. 2022) (Newsom, J., concurring) (questioning tiers of scrutiny in First Amendment context).

Why would lower-court judges consider afresh evidence and arguments purporting to justify speech restrictions or compulsions in cases like this when the Supreme Court appears *never* to have found strict scrutiny satisfied in the compelled-speech context? (And indeed to have questioned whether it ever could.) That said, the Supreme Court has considered strict-scrutiny arguments in compelled-speech cases, even if it hasn't said they are required. *See NIFLA*, 138 S. Ct. at 2375 ("licensed notice cannot survive even intermediate scrutiny"); *Janus*, 138 S. Ct. at 2465 ("we will apply [exacting scrutiny] to the justifications"). So a lower court lacks any basis to throw over that approach in this case, particularly since the Ordinance cannot survive strict scrutiny in any event.

nondiscrimination ordinances, like those of other jurisdictions, exempt many other people, institutions, and services. And the City never addresses why such exemptions would fail here. Therefore the Accommodation Provision is both over- and under-inclusive, fails to "restric[t] no further than necessary to achieve the [government's] goal," and ultimately fails strict scrutiny. *See ACLU*, 542 U.S. at 666.

**1. The Accommodation Provision is overinclusive.** The Ordinance proscribes more speech than necessary to serve the government's stated interest. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121 (1991). A court considering whether a regulation is overinclusive must consider less-restrictive alternatives. *See, e.g.*, *Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 74 (1990) (hypothesizing other less-restrictive means of accomplishing the government's stated objective). Here, no conjecture is necessary: the approach of Louisville itself and other jurisdictions offers a contrast with the Fairness Ordinance establishing that less-restrictive means are available to accomplish the government's stated interest.

Louisville's own "Discriminatory Practices" laws (of which the Ordinance is a part, *see* Chapter 92) show the City perceives it can further the goal of equal access while respecting other protected interests. As to housing, for example, the City excludes single-room and small-housing rentals, family groups, and private clubs from its anti-discrimination housing ordinances. § 92.04(A)(1)–(3). Those ordinances exempt a "private sale" of a home "without the aid of any real estate operator, broker, or salesperson and without advertising or public display." § 92.04(A)(4). This would seemingly preclude a gay person, refused a private sale by owner because of his sexual orientation, from availing himself of a Commission complaint or private suit. Louisville also exempts some facilities from its sex-discrimination provisions and the definition of public accommodations. *See* § 92.05(C) (banning sex-discrimination in only some facilities); § 92.02 (defining "place of public accommodation" not to include private clubs "available only to its members and their bona fide guests"). If this can be tolerated without undermining the City's professed goal of preventing discrimination, then it is hard to see why a wedding photographer (whose business after all is speech, not property) couldn't be exempted as well.

Louisville has provided similar exceptions to other constitutionally protected interests, such as religion. The City allows a "religious organization, association, or society, or any nonprofit" run by such a religious group to limit some sales and leases to "persons of the same religion" so long as membership isn't restricted by "race, color, or national origin." § 92.04(A)(3). Its nondiscrimination law also exempts "religious institution[s]" or their charitable and educational organizations from employment anti-discrimination regulations "in regard to sexual orientation or gender identity." § 92.07(B). While some exceptions for religious organizations would be required under the Establishment Clause, current doctrine wouldn't appear to require such

broad housing and employment exemptions for charitable and educational organizations. *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 190–91 (2012) ("ministerial exception" from employment laws for religious institutions). Nothing explains why Louisville has apparently adopted a greater sensitivity to Establishment Clause than Free Speech interests.

The City doesn't seriously confront these broad exemptions for religious and other organizations, or the questions they raise regarding the lack of corresponding exemptions for expressive activity. Specifically, Louisville doesn't say whether it considered a narrower public-accommodations law that exempted expressive activity—and if not, why not.[11] Other judges have noted the First Amendment problems such unbalanced laws can create: Colorado similarly exempted from public-accommodations laws "places principally used for religious purposes," without explaining why it couldn't do the same for artists or expressive activity. *See 303 Creative*, 6 F.4th at 1203–04 (Tymkovich, C.J., dissenting). Why wouldn't a similar exemption work here?

Louisville's only response is that distinguishing expression and conduct is "difficult" and potentially "unworkable." Response at 27. But how much easier is applying the religious exemptions on the books? And the record indicates that the City is required to make First Amendment judgment calls to comply with restrictions on housing funding that prevent "investigat[ing] or prosecut[ing] any activity engaged in by one or more persons that may be protected by the First Amendment…." Motion for a Protective Order, Funding Agreement (DN 64-3) at 75. More fundamentally, as noted above, hard cases on the margins are a natural byproduct of the First Amendment's capacious definition of "speech." That doesn't stop courts from asking whether the Constitution applies and whether a regulation is narrowly tailored: a "difficult" answer to the first question doesn't excuse the government from answering the second. So Louisville "has not shown that it seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 573 U.S. 464, 494 (2014).

Moreover, Louisville hasn't "shown that it considered different methods that other jurisdictions have found effective." *Id.* at 491–94 (reviewing other state's less restrictive laws to protect abortion access and prevent harassment). Utah's Anti-Discrimination Act, for instance, "may not be interpreted to infringe upon the freedom of expressive association or the free exercise of religion protected by the First Amendment." Utah Code Ann. § 34A-5-111. And Mississippi more directly addressed the dilemma facing those in Nelson's position. It exempted from its public-accommodations laws businesses related to "marriage," such as "[p]hotography,"

---

[11] Louisville admits that it "do[es] not currently possess any information regarding what alternative measures … legislators may have considered." Appendix (DN 92-7) at 950.

based on "sincerely held religious belief[s] or moral conviction[s]"). Miss. Code. Ann. § 11-62-5(5). Federal law and other jurisdictions, meanwhile, differ by defining public accommodations more narrowly than Louisville does. *See* 42 U.S.C. § 2000a(b) (defining public accommodations as hotels, restaurants, entertainment venues, and gas stations); Fla. Stat. § 760.02(11) (same); *Freedom Watch, Inc. v. Google Inc.*, 816 F. App'x 497, 501 (D.C. Cir. 2020) (interpreting ADA to exclude online businesses from antidiscrimination provision).

Louisville's lawyers offered two unconvincing arguments why narrower alternatives wouldn't work.

*First*, Louisville argues that providing exceptions like the one in Mississippi would violate the Establishment Clause. City Response at 22–24, 27 (citing *Barber v. Bryant*, 193 F. Supp. 3d 677, 688 (S.D. Miss. 2016) (holding the Mississippi wedding exemption violated the Establishment Clause)). But why would an exception for *expression*, which would include both religious or non-religious expression, unconstitutionally establish religion? Do the City's preexisting religious exceptions, *see* §§ 92.04(A)(3), 92.07(B), likewise offend the First Amendment? And if providing exceptions for religion violated the Establishment Clause, then why wouldn't the Religious Freedom Restoration Act or tax exemptions for houses of worship? *See, e.g., Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014) (RFRA required religious exemption from ACA contraception mandate); *Walz v. Tax Comm'n*, 397 U.S. 664 (1970) (property-tax exemption). Surely they wouldn't—and nothing indicates a City exception along those lines would, either.[12]

*Second*, Louisville argues that equal access to Nelson's "unique" services is particularly important. City Reply at 21 (citing *303 Creative*, 6 F.4th at 1181). This renders equal access crucial, according to the City, despite its admission that other photographers serve same-sex weddings. Appendix at 363, 585, 531–727. The same photography that the City denigrates in its standing analysis is, for tailoring purposes, "her singular artistic expression and view of the world" over which she has a monopoly. *Id.* In other words, the more expressive the service is, the more scarce it is, and thus the more valuable equal access is. This flips free speech on its head.

---

[12] The Establishment Clause, after all, was originally designed to protect religion from government meddling and individuals from coercion. *See* Douglas Laycock, *Regulatory Exemptions of Religious Behavior and the Original Understanding of the Establishment Clause*, 81 NOTRE DAME L. REV. 1793 (2002) (religious exemptions were not regarded as religious establishment); Stephanie H. Barclay et. al., *Original Meaning and the Establishment Clause: A Corpus Linguistics Analysis*, 61 ARIZ. L. REV. 505, 555–60 (2019) (finding no corpus linguistics evidence indicating that religious exemptions were considered as religious establishment); Stephanie H. Barclay, *The Historical Origins of Judicial Religious Exemptions*, 96 NOTRE DAME L. REV. 55, 122–24 (2020) (describing history of equitable judicial exceptions for religion notwithstanding Establishment Clause).

Why would more expressive activities receive *less* protection?  "Taken to its logical end," this monopoly-of-one position would mean "the government could regulate the messages communicated by all artists, forcing them to promote messages approved by the government in the name of 'ensuring access to the commercial marketplace.'" *303 Creative*, 6 F.4th at 1204–05 (Tymkovich, C.J., dissenting).  Such an argument is anathema to free speech.

**2. The Accommodation Provision is underinclusive.**  If Louisville's compelling interest is truly so broad that it cannot permit exceptions because "every single instance of discrimination renders access unequal, inflicts humiliation, and creates stigma," City Response at 26–27, then its anti-discrimination regime is woefully underinclusive.  A law is underinclusive "when it leaves appreciable damage to that supposedly vital interest unprohibited."  *Reed*, 576 U.S. at 172 (banning some but not all signs for aesthetics and traffic safety was underinclusive).  Sometimes, a narrow statutory scheme burdens rights without meaningfully furthering the government's interest, making a broader and "more coherent" policy more viable. *Sorrell*, 564 U.S. at 572–73 (restriction on information-sharing was too narrow to further government's expressed interest in confidentiality).

Louisville's existing anti-discrimination exceptions make it hard for the City to say the lack of an exemption for Nelson is necessary to stamp out "every single instance of discrimination."  City Response at 26–27; *see L.D. Mgmt. Co. v. Gray*, 988 F.3d 836, 840 (6th Cir. 2021) (billboard regulation was "fatally underinclusive" because "on-site exception" undermined broad "interests in safety and aesthetics"). As Nelson explains in her combined Reply/Response (DN 104 at 33), Louisville's anti-discrimination code has broad exceptions for small landlords, private sales, private clubs, and religious organizations when it comes to housing.  *See* § 92.04(A)(1)–(4).  If Louisville's goal was truly to stamp out as much discrimination as possible, it is hard to see why it would allow what it perceives as discrimination on the basis of sexual orientation in housing but not photography.  *See Brown*, 564 U.S. at 801–02 (targeting only a particular type of violent depiction is an underinclusive attempt to protect children from violent depictions).   Similarly, Louisville exempts even religiously affiliated charities and educational institutions from employment and housing nondiscrimination laws.  *See* § 92.07(B).  And it exempts some facilities from the sex-discrimination provisions.  *See* § 92.05(C).  The City offers no way to reconcile these exemptions with its professed goal of prohibiting all discrimination.  *See City of Ladue v. Gilleo*, 512 U.S. 43, 52–53 (1994) (insufficiently justified exemptions undermine city's justification for speech restriction).

The point is not to criticize the wisdom of those policy decisions.  Rather, under binding precedent, these related exemptions raise unanswered and damning questions about the City's reliance on a goal of maximum anti-discrimination in the wedding context.  *See NIFLA*, 138 S. Ct. at 2375–76 (broad public-information goal

impermissibly pursued by targeting small number of clinics).  So it is hard to see how impinging Nelson's speech rights furthers an interest in stamping out "every single instance of discrimination" that "renders access unequal, inflicts humiliation, and creates stigma."  City Response at 26–27.

**3.  An expert report's assessment of the impact of this Court's decision doesn't change the narrow-tailoring analysis.**  Louisville's final argument that the Ordinance survives strict scrutiny requires separate treatment.  The City argues that an "exemption" for Nelson "could lead to an increase in real-world discrimination that would harm same-sex couples" by reducing the willingness of vendors "to serve same-sex couples … even among previously willing vendors." *Id.* at 28.  This Court's ruling, in other words, could *itself* amount to harm justifying the abridgement of speech by "embolden[ing] even previously willing vendors to refuse services to same-sex couples." *Id.* at 29.  Although styled as an argument against overinclusivity (even a single excused refusal is intolerable) this position highlights the underinclusivity of the City's position (what about the refusals excused by existing public-accommodation exceptions?).

In support, the City relies on the expert report of Professor Barak-Corren, a law professor and social scientist who "conducted a field experiment" that purported to measure the effects of the Supreme Court's decision in *Masterpiece Cakeshop* on vendor willingness to serve same-sex weddings.  Expert Report (DN 99-3) at ¶¶ 6, 12–13.  Extrapolating from that study's results to her predictions regarding the consequences of an injunction in this case, Barak-Corren opines that a decision by this Court in Nelson's favor could or would similarly increase disparities in treatment between opposite and same-sex couples who seek services for wedding ceremonies in and around Louisville.  However flattering a trial judge might find this elevation of his work product to the level of the Supreme Court (a difference the City doesn't address, *see Daubert* Reply at 11–12), this assessment doesn't reliably indicate that effect is likely.  Nor does it bear on the strict-scrutiny analysis—and is therefore irrelevant and excludable for that additional reason.

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise…" so long as the testimony satisfies four requirements: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.  Rule 702 requires the trial judge to ensure that the proponent of such opinion testimony carries its burden of establishing by a preponderance that the expert witness is qualified and that her testimony is relevant and reliable. *In re Scrap Metal Antitrust Litig.*, 527

F.3d 517, 528–29 (6th Cir. 2008); *Pride v. BIC Corporation*, 218 F.3d 566, 578 (6th Cir. 2000).

**a) Factual unreliability.**   Barak-Corren's conclusions are not reliable support for the City's argument that allowing Nelson's speech to go unpunished will increase discrimination.  The study assumes that the wedding vendors she surveyed knew about the reasoning and outcome in *Masterpiece Cakeshop*.  The study purports to "measure the impact of *Masterpiece* on sexual orientation discrimination in the wedding services market."   Expert Report at 3.   But she "concedes" that her experiment ultimately "prevents the evaluation of the existence and extent of sexual orientation discrimination before *Masterpiece Cakeshop*."   *Id*. at 37.   And Barak-Corren didn't ask or evaluate whether the vendors she contacted had "knowledge of, appreciation for, or understanding of the *Masterpiece* decision after it was rendered."   Barak-Corren Deposition Transcript (DN 99-2) at 94:1–5.   Instead, she assumed knowledge based on media reporting, though the reporting admittedly differed considerably by source.  *See id.* at 89:4–22; Expert Report at 61 ("[A]fter a decision is handed down by the Court, it takes on a life of its own, and much of its effects depend on how it is communicated by mass media.").

*Masterpiece*, of course, was an unusual (*i.e.*, fractured, narrow, record-specific, eye-of-the-beholder) decision—making it an odd incident around which to build a regression.  Contrary to Barak-Corren's description, it didn't authorize "religious exemptions," *id*. at 11, but rather rejected hostility toward religion, 138 S. Ct. at 1731.  It also addressed the Free Exercise rather than the Free Speech Clause.  Even if Barak-Corren's descriptive account of a "*Masterpiece* effect" were sound, moreover, that predicts very little about whether a years-later decision from this Court would receive remotely comparable media attention and public reaction.

The report also struggles to explain the extent of discrimination detected in her surveys.  Before *Masterpiece*, Barak-Corren emailed 906 wedding vendors from accounts purportedly belonging to same-sex couples.  *See* Expert Report at 17–20.  Initially, more vendors responded to the same-sex couples (70.8%) than to opposite-sex couples (58.7%).  *Id*. at 21.  This "large attrition" in the number of opposite-sex relative to same-sex responses "hindered the ability to detect discrimination in the pre-*Masterpiece* period."  *Id*. at 21–22; *see* Barak-Corren Depo. at 147:12–21 ("I'm not able to know what is the extent of discrimination towards same-sex couples if there is any before *Masterpiece*.").

Barak-Corren admits she can't explain why her survey suggests many more vendors would've been willing to serve same-sex couples than opposite-sex couples before *Masterpiece*, and what that means for the level of "discrimination" she infers before and after the Supreme Court's decision.  *See* Expert Report at 22 n.28.  Were opposite-sex couples experiencing *more* discrimination than same-sex couples in the wedding marketplace before 2018?  Surely not.  The City takes the opposite position.

City *Daubert* Response at 13.  Yet the study suggests as much.  At least some of that disparity can be chalked up to its treatment of pre-*Masterpiece* non-responses as neutral but post-*Masterpiece* non-responses as discriminatory rejection.  Post-*Masterpiece*, more vendors (75.5%) responded to opposite-sex requests than to inquiries from the fictitious same-sex couples (63.3%).  So the study cannot reliably indicate whether, and how severely, *Masterpiece* changed vendors' willingness to serve same-sex couples.[13]

    **b) Legal irrelevance.**  Equally important, Barak-Corren's opinion regarding public or industry reaction to a hypothetical decision and opinion is irrelevant to the legal question: whether the First Amendment protects Nelson's decision not to speak.  *Daubert*, 509 U.S. at 595.  Expert opinion testimony must help the factfinder to "understand the evidence or to determine a fact in issue."  *Id.* at 591 (quoting FED. R. EVID. 702).  And if "[e]xpert testimony … does not relate to any issue in the case," it is "not relevant, and ergo, non-helpful."  *Id.* (quotation omitted); *see also Jahn v. Equine Services, PSC*, 233 F.3d 382, 389 (6th Cir. 2000).

    Are the "anticipated effects of granting Chelsey Nelson the relief sought by her Complaint on the willingness of other wedding vendors to provide services to same-sex couples" relevant to the scope of the First Amendment's protections?  Expert Report Summary (DN 90-2) ¶ 4.  "The Court can properly consider Professor Barak-Corren's opinion and the *Masterpiece* experiment," according to the City, because they "sho[w] that even an individual exemption can have a significant and robust impact on a market and its customers."  *Daubert* Response at 20.  Is the premise of Louisville's and Barak-Corren's argument that the U.S. Supreme Court got *Masterpiece* wrong because we now believe, with the benefit of hindsight, that it had a negative effect on vendor receptiveness to same-sex ceremonies?  Or that this

---

    [13] Changes in methodology may have contributed to the different response rates.  Before *Masterpiece*, she asked about vendor availability over the course of a month and didn't specify the number of potential dates.  After *Masterpiece*, she asked about availability only on two specific dates—Friday and Saturday.  Appendix (DN 90-5) at 1–10.  The nature of the request changed too: pre-*Masterpiece* no in-person meetings were requested, while post-*Masterpiece* the emails requested in-person meetings.  *Compare id.* at 1–4 *with id.* at 4–5, 7–9.  The more general and open-ended request pre-*Masterpiece* certainly could have led to more affirmative responses—for reasons that had to do with scheduling availability and nothing to do with *Masterpiece*.  And Barak-Corren changed how she coded responses: pre-*Masterpiece*, referrals to alternative vendors or suggestions of alternative dates were treated as positive responses, while after the Supreme Court decision she coded such responses as negative.  *Id.* at 29 n.16.  Any of these significant methodical changes could account for the changes to the post-*Masterpiece* data.  But the study didn't control for this.  This failure to "account for explanatory variables" warrants exclusion of the expert report.  *Davis v. Landscape Forms, Inc.*, 640 F. App'x 445, 455 (6th Cir. 2016); *see also Jack Henry & Assocs., Inc. v. BSC, Inc.*, 487 Fed. Appx. 246, 256–57 (6th Cir. 2012) (affirming district court's exclusion of expert witness report for failing to consider alternative explanations).

inferior court should alter its analysis based on public perceptions of Supreme Court precedent that hasn't been overruled?  These questions go to the very core of this country's long debate over the counter-majoritarian role of the courts.  *Compare, e.g.,* Alexander Bickel, THE LEAST DANGEROUS BRANCH 16 (1962), *with* Larry D. Kramer, THE PEOPLE THEMSELVES: POPULAR CONSTITUTIONALISM AND JUDICIAL REVIEW 7–8 (2004).  Is this task really "law all the way down"?  S*ee* Frederick Schauer, *A Frame Without a Picture: On the Relevance of Law to the Decision of Hard Cases* 5 (Va. L. and Legal Theory Research Paper No. 2022-39, 2022) (quoting Elena Kagan).  Or should judges—perhaps relying on the studies of Barak-Corren and other social scientists—attempt to anticipate whether subsets of the population will approve of its ruling in what measures?

The City isn't clear regarding which aspect of the First Amendment analysis Barak-Corren has "special insight into."  *Hustler Cincinnati, Inc. v. Cambria*, 625 Fed. App'x 712, 717 (6th Cir. 2015).  To the extent her opinion addresses the substantiality of the City's interest in nondiscrimination, the point is moot: this Court, like others, has accepted the legitimacy of that interest regardless of opinion testimony.  To the extent it addresses narrow tailoring, that would seem to highlight the Ordinance's underinclusivity.  Given the harm Barak-Corren ascribes to even one exemption or refusal by a vendor, how could the City justify the other exemptions discussed above?[14]

In any event, binding caselaw makes clear that public acceptance is not a proper barometer for First Amendment protections.  To the contrary, free-speech doctrine has consistently emphasized the Amendment's role in protecting speech and views that otherwise could be stifled by the majority.  *See Johnson*, 491 U.S. at 414.  After all, the "very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts.  One's right to life, liberty, and property, to free speech, a free press, freedom of

---

[14] Both parties saw fit to proffer expert testimony asserting that its side of the liberty/equality divide would suffer most from the Court's decision.  *See* Expert Report Summary ¶ 12; Rebuttal Expert Report (DN 90-6) ¶¶ 34–45.  And both ascribed the legal relevance of that contention to the Court's role in "balancing" these incommensurable interests.  Response to Rebuttal *Daubert* Motion (DN 100) at 12; Nelson MSJ Reply (DN 104) at 34 (inviting Court to reject Ordinance based on "harm to religious communities and persons in refusing to grant any religious exemptions"); City *Daubert* Response (DN 99) at 19–20.  This exercise casts further doubt on the appropriateness of the discretion-maximizing tiers-of-scrutiny judicial methodology in contexts like this.  *See* § V.C above.  In *Stevens*, the Supreme Court rejected a similar invitation to determine "[w]hether a given category of speech enjoys First Amendment protection" based "upon a categorical balancing of the value of the speech against its societal costs."  559 U.S. at 470 (quoting U.S. Brief at 8).  "As a free-floating test for First Amendment coverage," the Court properly recognized, that "is startling and dangerous."  *Id.*

worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections." *Barnette*, 319 U.S. at 638.

Because the City hasn't cited any authority regarding the appropriateness of opinion testimony in this context, the Court grants the motion to exclude (DN 90) and rejects the City's argument that this contributes to application of strict scrutiny to the Ordinance. And without that "evidence," the City can only speculate that a decision by this Court or exceptions for speech would "embolden" a wave of new discrimination. City Response at 29. This argument for narrow tailoring likewise fails.

* * *

So either Louisville's anti-discrimination scheme is too underinclusive to address "every single instance of discrimination," or it is overinclusive because it compels the speech of expressive businesses like Nelson's while offering exceptions to other groups. Both are a problem. And both are fatal, especially since the law compels speech. *See Janus*, 138 S. Ct. at 2464. As a result, the Accommodation Provision cannot pass strict scrutiny.

### D. Denial Clause

The Ordinance also contains a "Denial Clause" that forbids Nelson from informing customers that she will not provide photography at same-sex weddings. *See* Metro Ord. § 92.05(B) ("It is an unlawful practice" to "publish" or "display" a "communication" which "indicates" that "services … and accommodations … will be … denied an individual on account of his … sexual orientation"). This is plainly a restriction on speech based on its content and viewpoint. A person who shares the City's view regarding same-sex marriages may say, announce, publish, etc. that he or she will *not* refuse to provide goods or services on account of the customer's sexual identity. But another person with dissenting views may not state that he or she will refuse to provide goods or services on that basis.

This sort of content- and viewpoint-based restriction is presumptively unconstitutional. *See Reed*, 576 U.S. at 163. Nelson seeks to inform potential customers that while she would gladly serve same-sex clients and create photography for them regarding some messages, she would refuse to create custom photography in celebration of a same-sex-wedding. Motion at 4–5. But such a restriction may be valid if the speech concerns underlying conduct that is illegal. As Louisville points out, the Supreme Court has long held that jurisdictions may prohibit speech that encourages or promotes illegal activity. For example, in *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations*, 413 U.S. 376, 388 (1973), the Supreme Court explained that the First Amendment did not permit a newspaper to publish "sex-designated columns" in violation of a local ordinance prohibiting discrimination on the basis of sex. The "proposed speech" promoted "illegal commercial activity" and

35

thus fell outside the scope of the First Amendment. *Id.*[15] By contrast, the Supreme Court has explained that a medical clinic's ability to publicize abortion services was protected by the First Amendment so long as the underlying procedure was lawful. *See Bigelow v. Virginia*, 421 U.S. 809, 822–24 (1975).

The distinction is clear: those governed by *lawful* public-accommodations laws may not advertise activities that would violate such laws, but may promote any speech that the Constitution protects. *See Campbell v. Robb*, 162 F. App'x 460, 469 (6th Cir. 2006) (A "discriminatory statement to [plaintiff] was 'related to illegal activity,' and therefore receives no First Amendment protection whatsoever.") (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980)). So the constitutionality of the Denial Clause rises or falls with the constitutionality of the Accommodations Provision.

For the reasons explained above, Nelson's decisionmaking about her photography is not "illegal commercial activity." Rather, it is speech protected by the First Amendment. It is protected speech that may not be abridged absent narrow tailoring to serve a compelling state interest. And the City's suppression of Nelson's statement (currently displayed on her website pursuant to the preliminary injunction) could not survive strict scrutiny. The government has no permissible interest in suppressing even offensive views merely from being uttered. *See, e.g.*, *Masterpiece Cakeshop*, 138 S. Ct. at 1731 ("[I]t is not ... the role of the State or its officials to prescribe what shall be offensive."). This is pure speech that the government may not penalize or suppress. Because Nelson's underlying photography is protected, her speech about limitations on that photography is protected too. *See Bigelow*, 421 U.S. at 828–29.

### E. Unwelcome Clause

Perhaps even more troubling is the Unwelcome Clause, which snuffs out speech that causes consumers to feel that a person's presence at a public accommodation is "objectionable, unwelcome, unacceptable, or undesirable." § 92.05(B). The briefest glance at the provision reveals its incompatibility with the First Amendment: the speaker's rights are conditioned on the listener's feelings. *Contra, e.g., Playboy Entertainment Group*, 529 U.S. at 811–13 (content-based suppression of speech between 6 a.m. and 10 p.m. not justified by "sexually explicit" and "highly offensive" nature of programming). Offend someone—make him or her feel "unwelcome" or "undesirable"—and you may be subject to official sanction,

---

[15] *See United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection." (citing *Pittsburgh Press Co.*, 413 U.S. at 388)); *Central Hudson Gas & Elec. Corp. v. Pub. Service Comm'n of N.Y.*, 447 U.S. 557, 563–64 (1980) ("The government may ban ... commercial speech related to illegal activity." (internal citations omitted)).

punishment, and reeducation.  § 92.08 (detailing remedies); Verna Goatley Decl. (DN 64-3) at 4 (remedial measures include "anti-discrimination training").  So this provision fails First Amendment scrutiny.  Just as the Denial Clause would prohibit pure speech based on its content and viewpoint, the Unwelcome Clause would too.  And it has no better claim to surviving strict scrutiny.

Nelson advances a second argument against the constitutionality of the Unwelcome Clause: vagueness.  The "[v]agueness doctrine is an outgrowth … of the Due Process Clause." *United States v. Williams*, 553 U.S. 285, 304304 (2008).  The "basic principle of due process" is "that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  And as the Supreme Court has explained, a statute may violate this principle by authorizing an impermissible degree of enforcement discretion if it does not "set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent 'arbitrary and discriminatory enforcement.'" *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (quotation omitted).  Moreover, "when a statute 'interferes with the right of free speech … a more stringent vagueness test should apply.'" *Holder*, 561 U.S. at 19 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982)).

At least one other judge has concluded that a provision similar to the Unwelcome Clause was unconstitutionally vague.  *See 303 Creative*, 6 F.4th at 1214–15 (Tymkovich, C.J., dissenting).  And it's easy to see why: the "Unwelcome Provision" under Colorado law, he observed, was too "flexible in meaning to give proper notice to any reasonable person" and allowed "officials and courts [to] arbitrarily interpret the provision." *Id.*  Although Nelson echoes this critique of Louisville's own provision, the City offers *no* reason why its law isn't similarly vague.

Its only response is that, because Nelson's own speech is "clearly proscribed" by the Ordinance, she lacks standing to raise a facial vagueness challenge under the Due Process Clause.  City Response at 12 (citing *Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151–52 (2017) (quoting *Holder*, 561 U.S. at 20)).  Some courts, however, have distinguished *Holder* and allowed vagueness challenges to proceed, regardless of whether this plaintiff's speech is clearly proscribed, based on arbitrary enforcement discretion.  *See Act Now to Stop War & End Racism Coal. & Muslim Am. Soc'y Freedom Found. v. District of Columbia*, 846 F.3d 391, 410–11 (D.C. Cir. 2017) (distinguishing "arbitrary enforcement" and "fair notice" vagueness challenges).  Even if a plaintiff knows that his or her conduct falls within the scope of the statute, according to the D.C. Circuit, a statute may be void for vagueness because the speaker has "no way to discern in advance whether the exercise of unbridled enforcement discretion will spare the plaintiff's constitutionally protected expression from prosecution." *Id.*

The Court needn't address that distinction here because Nelson also brings an as-applied vagueness challenge.  Compl. ¶ 334 & Relief ¶ 1.  She does not, however, cite any caselaw approving the elusive concept of a preenforcement as-applied vagueness challenge resting on arbitrary enforcement discretion.  On the other hand, the City doesn't even defend the scope of its discretion.  And at least some of the wedding-related speech and blogging her Declaration describes could plausibly subject her to the prospect of enforcement action based on the "objectionable" response her marriage-related speech may cause others to experience.

The Ordinance vests the Commission with authority to determine whether an investigation should be launched in response to a complaint, based on the Commission's determination whether there's "reason to believe an unlawful practice has occurred," and whether an investigation should be launched.  § 92.09.  Louisville admits that it has no written policy or guidance constraining this enforcement power.  Boyd Dep. Tr. 100–01.  Instead, its enforcement requires "facts and evidence," *id.* at 105–08, and case-by-case determinations, *id.* at 101.  *Contra Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 558–59 (6th Cir. 1999) (the term "reasonable" is vague when enforcement officials could not define it).  Such standardless discretion can easily serve as a "convenient tool for harsh and discriminatory enforcement against particular groups deemed to merit th[e] displeasure" of the government.  *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972).  That threat of enforcement could easily chill a great amount of speech—including Nelson's speech regarding her stance on same-sex weddings.  *See Speet*, 726 F.3d at 873.

Without clear language guiding the discretion of the enforcement official, therefore, this amounts to largely unrestrained authority to police speech based on subjective listener reactions.  Again, the Court has no reason to doubt the sincerity of the City's desired end.  The problem is its means—suppressing speech based on its content—which is foreign to our Constitution.  "[A] speech burden based on audience reactions is simply government hostility ... in a different guise."  *Matal v. Tam*, 137 S. Ct. 1744, 1767 (2017) (Kennedy, J., concurring in part and concurring in the judgment).  Given the serious (yet largely unbriefed) questions raised by a facial or as-applied vagueness challenge in this preenforcement context, however, the Court doesn't have to decide the question in order to grant Nelson the relief she seeks.

## VII.  The Free Exercise Clause of the First Amendment and the Kentucky Religious Freedom Restoration Act

Does Nelson's photography merit additional or independent protection based on her sincerely held religious beliefs?  Probably not under federal law, but under state law it does.

Nelson argues that the Accommodation Provision infringes her free exercise of religion in addition to her right to free speech.  She asserts twin claims under the

federal Constitution and the Kentucky Restoration of Religious Freedom Act, KRS § 446.350, but no claim under the Kentucky Constitution.  Because Nelson's claim succeeds under state statutory law, the Court need not consider her federal Free Exercise claim under principles of constitutional avoidance.  *See Bond v. United States*, 572 U.S. 844, 855 (2014).

That claim would likely be foreclosed under binding Supreme Court precedent in any event.  Before 1990, Free Exercise claims were subject to strict scrutiny under *Sherbert v. Verner*, 374 U.S. 398, 406–07 (1963), which held that government regulations substantially burdening religious exercise could not survive unless the burden was narrowly tailored to serve a compelling governmental interest (that is, strict scrutiny).  But in *Employment Division v. Smith*, 494 U.S. 872, 878 (1990), the Supreme Court reversed course and decided that restrictions on religious exercise or belief that are "merely the incidental effect of a generally applicable and otherwise valid provision" are subject only to rational-basis review.[16]

In the aftermath of *Smith*, Congress and many states (including Kentucky) enacted "religious freedom restoration acts," designed to subject some or all government action to *Sherbert*-style scrutiny as a matter of statutory law, notwithstanding *Smith*'s narrower interpretation of the Free Exercise Clause.  *See* KRS § 446.350; Douglas Laycock, *Religious Liberty and the Culture Wars*, 2014 U. Ill. L. Rev. 839, 845 & n.26 (2014) (collecting state RFRAs).  Ironically, some critics have since described these RFRA statutes as easier than *Smith* to reconcile with the original public meaning of the First Amendment.  *See, e.g.*, Michael W. McConnell, *Free Exercise Revisionism and the* Smith *Decision*, 57 U. Chi. L. Rev. 1109 (1990); Douglas Laycock, *The Supreme Court's Assault on Free Exercise, and the Amicus Brief That Was Never Filed*, 8 J. L. & Religion 99 (1990).  These critiques have led some to question *Smith*'s continuing legitimacy.  *See, e.g.*, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1883 (2021) (Alito, J., joined by Thomas, J., and Gorsuch, J., concurring in the judgment) (criticizing *Smith* as "fundamentally wrong"); Amul R. Thapar, Smith, *Scalia, and Originalism*, 68 Cath. U. L. Rev. 687, 695–96 (2019) (surveying criticism of *Smith*).

The Fairness Ordinance would almost certainly survive rational-basis review under *Smith*, given its widely accepted nondiscrimination goals.  *See Seger v. Ky.*

---

[16] Nelson also amalgamates her religion and speech arguments in a strange form known as a "hybrid-rights claim." Compl. ¶ 353.  That is, an argument that wouldn't necessarily carry the day under the speech or religion clauses alone, but that might implicate enough of commingled constitutional interests to shield the activity in question.  *See, e.g.*, *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1295 (10th Cir. 2004).  She admits this variety of claim is squarely foreclosed by Sixth Circuit precedent, *Prater v. City of Burnside*, 289 F.3d 417, 430 (6th Cir. 2002), but deems it worth preserving because other jurisdictions recognize it.  Nelson Motion at 18.

*High Sch. Athletic Ass'n*, 453 F. App'x 630, 634 (6th Cir. 2011) (facially "neutral law of general applicability" is "analyzed under a standard similar to rational basis review"); *Telescope Media Group*, 936 F.3d at 754 ("[The non-discrimination] interest has a substantial constitutional pedigree and, generally speaking, we have no doubt that it is compelling.").

Regardless of federal Free Exercise protections, however, Kentucky statutory law applies strict scrutiny based on Nelson's religious-freedom claim. KRFRA protects a wide swath of religious practice and precludes the government from burdening the freedom of religion. The provision, in full, provides that:

> Government shall not substantially burden a person's freedom of religion. The right to act or refuse to act in a manner motivated by a sincerely held religious belief may not be substantially burdened unless the government proves by clear and convincing evidence that it has a compelling governmental interest in infringing the specific act or refusal to act and has used the least restrictive means to further that interest. A "burden" shall include indirect burdens such as withholding benefits, assessing penalties, or an exclusion from programs or access to facilities.

KRS § 446.350. As the Sixth Circuit recently explained, the "point of the law is to exercise an authority every State has: to provide more protection for religious liberties at the state level than the U.S. Constitution provides at the national level [through] the free-exercise guarantee of the First Amendment, as interpreted by *Employment Division v. Smith*, 494 U.S. 872 (1990)." *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020).

To prevail, Nelson must demonstrate (1) the "right to act or refuse to act" on a "sincerely held religious belief" that would be (2) "substantially burdened" by the restriction unless (3) the government can show the burden passes strict scrutiny. KRS § 446.350; *Maryville Baptist*, 957 F.3d at 612–13 (KRFRA "impos[es] strict scrutiny"). Nelson has established her right to relief under this test.

*First*, her refusal to photograph same-sex weddings rests on a sincerely held religious belief. As discussed above, the unrebutted record indicates Nelson is a sincere Christian motivated by her faith to celebrate marriage as the union of only opposite-sex couples. *See* Nelson Decl. ¶ 306. Her faith motivates her to write blog posts regarding marriage and why her beliefs preclude her from promoting or celebrating same-sex unions through her photography. *Id.* ¶¶ 441–45. Louisville does not call into question the sincerity of Nelson's faith. *See* City Response at 26 ("That Chelsey's religious beliefs are in tension with an anti-discrimination law … is the case whenever people hold religious objections to complying with anti-discrimination laws or any other generally applicable business regulations.").

*Second*, the penalties imposed by the Fairness Ordinance and enforced by the Human Relations Commission impose a substantial burden. The Kentucky Court of Appeals has explained that "for a governmental regulation to substantially burden religious activity, it must have a tendency to coerce individuals into acting contrary to their religious beliefs." *Lyster v. Woodford Cnty. Bd. of Adjustment Members*, No. 2005-CA-1336, 2007 WL 542719 (Ky. Ct. App. Feb. 23, 2007) (discussing *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450–51 (1988)). And the Sixth Circuit, in the related RLUIPA context, has described this burden as "substantial pressure on a religious institution [or person] to violate its religious beliefs or effectively bar a religious institution from using its property in the exercise of its religion." *Livingston Christian Schools v. Genoa Charter Township*, 858 F.3d 996, 1002 (6th Cir. 2017) (quoting *Living Water Church of God v. Charter Township of Meridian*, 258 Fed. App'x 729 (6th Cir. 2007)). The Court has further held—in the federal RFRA context—that threats of disciplinary action and penalties placed substantial burdens on plaintiffs' sincere religious beliefs. *See Holt v. Hobbs*, 574 U.S. 352, 361 (2015) (threat of "disciplinary action" by prison authorities posed substantial burden under RLUIPA's parallel provision); *Hobby Lobby*, 573 U.S. at 720 (threatened penalties and fines for failure of large corporation to pay for employees' contraception "substantially burdened" sincere religious beliefs under RFRA).

The potential fines and penalties Nelson faces for following her sincere religious beliefs are quite substantial. If she declines to photograph a same-sex wedding and is prosecuted, she faces fines, monetary penalties, and investigations. *See* Metro Ord. § 92.08. In addition to statutory penalties, Nelson would be liable to pay civil damages for any "injury" she may cause by denying her photography to a same-sex couple or other "aggrieved" person. § 92.09(A); *see* KRS § 344.450 (authorizing damages, court costs, and attorneys' fees to any person allegedly injured by any unlawful act). And in response to a successful complaint at the Commission, Nelson could face uncapped damages for any injury, including "humiliation and embarrassment," and liability for "any expense incurred by the complainant." § 92.08(B)(8) (incorporating KRS § 344.230(3) and other remedies provided under federal and state civil-rights laws). Further still, violators may be compelled to participate in "anti-discrimination training." *See* Verna Goatley Affidavit ¶ 20 (negotiated resolution short of a hearing "often involves the respondent engaging in anti-discrimination training or other remedial measures").

*Third*, the question of strict scrutiny is by now academic. Strict scrutiny at the state level tracks that applied in the federal courts. *See Moorish Science Temple of Am., Inc. v. Thompson*, No. 2014-CA-1080, 2016 WL 1403495, at *3–5 (Ky. Ct. App. April 8, 2016) (applying strict scrutiny to both First Amendment and KRFRA claim). For the same reasons explained above, the Ordinance fails strict scrutiny.

The City raises two defenses to the KRFRA claim: the statute may only be raised as an affirmative *defense*, not an affirmative claim, and relief is barred by the Eleventh Amendment in any event.  City Response at 29.  Both arguments fail.

Nelson may assert a KRFRA claim in a preenforcement posture, as courts (including this one) have previously recognized.  The same standard that governs other preenforcement challenges applies here.  *See, e.g.*, *Maryville Baptist*, 957 F.3d at 616 (granting preenforcement KRFRA injunction); *On Fire Christian Ctr., Inc. v. Fischer*, 453 F. Supp. 3d 901, 913 (W.D. Ky. 2020) (same).  And other courts have permitted preenforcement review of laws burdening religious practice under similar RFRA regimes.  *See, e.g.*, *Adam v. Barr*, No. 18-cv-2106, 2019 WL 1426991, at *3 (S.D.N.Y. Mar. 29, 2019) (plaintiff must have credible fear of prosecution to obtain preenforcement RFRA injunction); *see also Hobby Lobby*, 573 U.S. at 703–04 (permitting preenforcement review of HHS mandate).  As a textual matter, the Kentucky General Assembly did not designate the statute to operate only as a defense, as it did in plenty of other contexts.[17]  In arguing otherwise, Louisville ignores the extensive caselaw surrounding preenforcement review and simply rehashes its no-injury argument rejected above: "KRFRA provides a defense to government enforcement activity, not a preenforcement cause of action to challenge a generally applicable antidiscrimination law."  City Response at 29.  But the same, however, can be said of the First Amendment, yet it undoubtedly may support preenforcement review.  The City offers no precedent or statutory language cabining KRFRA to an affirmative defense.

Nor does the Eleventh Amendment have anything to say about Nelson's ability to assert this claim.  The United States Supreme Court has repeatedly refused to extend sovereign immunity to counties.  *See Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979); *Jinks v. Richland County*, 538 U.S. 456, 466 (2003) ("[M]unicipalities, unlike States, do not enjoy a constitutionally protected immunity from suit."); *see also Hall v. Med. Coll. of Ohio*, 742 F.2d 299, 301 (6th Cir. 1984) ("Municipalities, counties and other political subdivisions (e.g., public school districts) do not partake of the state's Eleventh Amendment immunity.").  And because Nelson's requested relief does not "ru[n] against the State," but instead implicates only the county's interest in local enforcement, the Eleventh Amendment and the "principles of federalism that inform" it do not apply.  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100, 123 n.34 (1984) (quotation omitted).

---

[17] *E.g.*, KRS § 311.782(2) ("It shall be an *affirmative defense* to a charge under subsection (1) of this section…."); KRS § 244.080 ("[I]n any prosecution for selling alcoholic beverages to a minor it shall be an *affirmative defense* that the sale was induced by the use of false, fraudulent, or altered identification papers…."); KRS § 434.155 ("It shall be an *affirmative defense* [to a charge of filing an illegal lien] that any material misstatement was not intentional.") (all emphases added).

What about immunity under state law? "Federal courts must apply state substantive law, including immunities, when dealing with supplemental state law claims in federal court." *Shepherd v. Floyd County*, 128 F. Supp. 3d 976, 980 (E.D. Ky. 2015) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938)). And although the federal Constitution doesn't extend sovereign immunity to counties, Kentucky law does. *See* KRS § 67C.101(2)(e) (Consolidated local governments "shall be accorded the same sovereign immunity granted counties, their agencies, officers, and employees."); *Jewish Hosp. Healthcare Servs., Inc. v. Louisville/Jefferson Cty. Metro Gov't*, 270 S.W.3d 905, 907 (Ky. App. 2008) ("[Louisville] Metro Government is entitled to sovereign immunity."). Under Kentucky law, "sovereign immunity … prohibits claims against the government treasury absent the consent of the sovereign." *Univ. of Ky. v. Moore*, 599 S.W.3d 798, 810 (Ky. 2019).

But does this immunity "bar [a] declaratory judgment action," as opposed to a damages action? *Id.* That depends on whether the Kentucky legislature waived Louisville Metro's immunity in KRFRA. The state supreme court recently answered this very question: KRFRA "includes no express waiver of sovereign immunity" with respect to monetary damages against a county. *Ruplinger v. Louisville/Jefferson County Metro Gov't*, 607 S.W.3d 583, 586 (Ky. 2020). On the other hand, a plaintiff *may* obtain "a potential declaratory judgment enjoining Louisville/Jefferson County Metro Government ('Metro') if she can prove a violation of KRFRA." *Id.* at 585. So this Court may consider Nelson's request for a declaration of her rights under KRFRA. And because state law protects her photography and associated blogging from the burdens the City seeks to impose, she is entitled to that declaration.

## ORDER

The Court grants Nelson's motion for summary judgment (DN 92), denies in part and grants in part the City's cross-motion for summary judgment (DN 96), grants Nelson's motion to exclude the expert testimony of Prof. Barak-Corren (DN 90), and denies as moot the City's motion to exclude the testimony of Nelson's own expert offered in rebuttal (DN 91). The Court grants Nelson's request for an injunction against the City's enforcement of the Ordinance against her and converts the preliminary injunction entered against the City (DN 47 at 2) into a permanent injunction and declaration as set out below. *See* FED. R. CIV. P. 65(d); *Saieg v. City of Dearborn*, 641 F.3d 727, 733 (6th Cir. 2011) (injunction); *Grand Trunk W. R.R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984) (declaration).

1. The City and those acting on its behalf may not invoke Metro Ordinance § 92.05(A) to compel Nelson to provide her wedding photography services for same-sex wedding ceremonies or otherwise express messages inconsistent with Nelson's beliefs.

2. The City and those acting on its behalf may not invoke Metro Ordinance § 92.05(B) to prohibit Nelson from posting statements (*see* DN 1-2, 1-3) on her website or making similar statements on her studio's website, on her studio's social-media sites, or to prospective clients.

3. The Accommodations and Publication Provisions of the Fairness Ordinance, § 92.05, violate Nelson's freedom of religion under KRFRA.

Benjamin Beaton, District Judge
United States District Court

August 30, 2022

44