# EXHIBIT 1

# Exhibit 1

Transcript of Oct. 16, 2024 Deposition of C. Nelson

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CASE No. 3:19-CV-851-BJB-CHL

CHELSEY NELSON
PHOTOGRAPHY, LLC and
CHELSEY NELSON                                    PLAINTIFFS

V.            DEPOSITION FOR THE DEFENDANTS

LOUISVILLE/JEFFERSON
COUNTY METRO GOVERNMENT,
et al.                                            DEFENDANTS

*    *    *

DEPONENT:  CHELSEY ANN NELSON - VOL. II

DATE:      OCTOBER 16, 2024

*    *    *

JENNA B. PARSONS
Magna Legal Services
(866) 624-6221
www.MagnaLS.com
E-MAIL: jennabparsons@gmail.com



Page 2

1                    I N D E X
2
   Examination by Ms. Hinkle.....................   5
3
   Reporter's Certificate........................  97
4
5                  E X H I B I T S
6
   Exhibit No. 1.................................  11
7      (CONFIDENTIAL - 2021 Tax Return)
8  Exhibit No. 2.................................  13
       (CONFIDENTIAL - 2023 Tax Return)
9
   Exhibit No. 3.................................  16
10     (Photo)
11 Exhibit No. 4.................................  20
       (Registered Agent Resignation)
12
   Exhibit No. 5.................................  21
13     (New Agent Registration)
14 Exhibit No. 6.................................  22
       (Profit/Loss Statements)
15
   Exhibit No. 7.................................  41
16     (Form of Wedding Celebration Services
       Agreement)
17
   Exhibit No. 9.................................  49
18     (CONFIDENTIAL - Brandon ████████ and
       Kayla █████ )
19
   Exhibit No. 10................................  55
20     (CONFIDENTIAL - Paul Mr. And Mr. Inquiry)
21 Exhibit No. 11................................  72
       (CONFIDENTIAL - Bekah Mazza Agreement)
22
   Exhibit No. 12................................  75
23     (CONFIDENTIAL - Bekah Mazza Invoice)
24 Exhibit No. 13................................  78
       (CONFIDENTIAL - Bekah Mazza Correspondence)
25



1   (*** REPORTER'S NOTE:  EXHIBIT 8 WAS NOT MARKED.)

2

                         *    *    *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

```
 1                    A P P E A R A N C E S
 2

    FOR THE PLAINTIFF:
 3
            BRYAN NEIHART, via Zoom
 4          SUZANNE E. BEECHER, via Zoom
            ALLIANCE DEFENDING FREEDOM
 5          15100 North 90th Street
            Scottsdale, AZ 85260
 6          bneihart@adflegal.org
            sbeecher@adflegal.org
 7
 8  FOR THE DEFENDANT:
 9          CASEY L. HINKLE, via Zoom
            WILLIAM R. ADAMS, via Zoom
10          KAPLAN JOHNSON ABATE & BIRD, LLP
            710 West Main Street, 4th Floor
11          Louisville, KY 40202
            chinkle@kaplanjohnsonlaw.com
12          radams@kaplanjohnsonlaw.com
13
            JASON D. FOWLER, via Zoom
14          Assistant Jefferson County Attorneys
            531 Court Place, Suite 900
15          Louisville, KY 40202
            jason.fowler@louisvilleky.gov
16
17  ALSO PRESENT:
18          MEGHAN METCALF, via Zoom
19          GRETA MAAS, via Zoom
20
21                          *    *    *
22
23
24
25
```



Page 5

1           The deposition of CHELSEY ANN NELSON, taken

2    via Zoom videoconferencing with the witness present in

3    Tallahassee, Florida, on Wednesday, the 16th day of

4    October, 2024, at approximately 12:56 p.m.; said

5    deposition being taken pursuant to Notice for use in

6    accordance with the Kentucky Rules of Civil Procedure.

7

8                              *    *    *

9

10           CHELSEY ANN NELSON, after first being duly

11    sworn, was examined and testified as follows:

12

13                         EXAMINATION

14

15    BY MS. HINKLE:

16           Q.    Good morning, or afternoon,

17    Ms. Nelson.  I -- my name is Casey Hinkle.  I'm going

18    to be asking you questions today.  I'd like to start

19    by just going over some basics about your background.

20                 You grew up in New Smyrna Beach in

21    Florida, right?

22           A.    Yes.

23           Q.    And you lived in Tallahassee, Florida

24    before you moved to Kentucky, correct?

25           A.    Yes.



Page 6

```
 1          Q.      You married your husband in December
 2  of 2014?
 3          A.      Yes.
 4          Q.      And you moved to Kentucky in 2015; is
 5  that correct?
 6          A.      Yes.
 7          Q.      And you lived in Louisville, Kentucky
 8  from 2015 to 2023, correct?
 9          A.      Yes.
10          Q.      And the reason you moved to Louisville
11  was for your husband's job, wasn't it?
12          A.      Yes.  We moved mainly because of my
13  husband's job but also to be closer to aging parents
14  with declining health.
15          Q.      Okay.  And where were those aging
16  parents living?
17          A.      New Smyrna Beach and Mobile, Alabama,
18  and Gautier, Mississippi.
19          Q.      Okay.  So Louisville was closer than
20  where you lived in Tallahassee to those locations?
21          A.      Louisville is not closer to those
22  locations than Tallahassee.
23          Q.      Okay.  Right.  I -- I may have
24  confused you.  I was asking about the reason for your
25  move to Louisville, Kentucky in 2015.  And it's my
```



1    understanding that that move was motivated by a need

2    to relocate for your husband's job.

3              A.      Ah, I understand.  I thought you were

4    asking about the -- the move back to Tallahassee.

5              Q.      That's okay.

6              A.      Could you restate your question then.

7              Q.      Yeah.  Sure.

8              A.      Thank you.

9              Q.      So you moved to Louisville, Kentucky

10   for your husband's job, correct?

11             A.      Yes.

12             Q.      And was that his job at Southern

13   Baptist Theological Seminary?

14             A.      Yes.

15             Q.      And you moved back to Tallahassee,

16   Florida in April of 2023, correct?

17             A.      Yes.

18             Q.      And is it that move that was in part

19   motivated by needing to be close to -- to parents?

20             A.      Yes.

21             Q.      Okay.  And the other reason for that

22   was your husband got a job in Tallahassee?

23             A.      Yes.

24             Q.      What job was that?

25             A.      He is the music director and



Page 8

1    instructor at ███████████████████████ .

2          Q.        And what is your current residential

3    address?

4          A.              █████████████████████       Tallahassee,

5    Florida ██████ .

6          Q.        Okay.  And you live in Tallahassee on

7    a full-time basis, correct?

8          A.        Yes.

9          Q.        You and your husband don't own a

10   second home, do you?

11         A.        We do not.

12         Q.        Okay.  And you produced certain tax

13   return information in response to Louisville Metro's

14   discovery request in this litigation, and I didn't see

15   any tax return pages for the year 2022.  Did

16   Chelsey Nelson Photography, LLC file a return in that

17   year?

18         A.        Yes.

19         Q.        And do you have a copy of that return

20   that was filed?

21         A.        I don't currently have a copy of it.

22   We have asked the CPA that we asked to file that for

23   us for a copy, and we have followed up with him, and

24   we have not heard back from him to get a copy.  I'm

25   not aware of why we didn't have one already on file,



Page 9

1    but that's what we've done so far to try to obtain a

2    copy from that year.

3            Q.        Okay.  And who would be the accountant

4    that you used to file your tax return?

5            A.        I don't recall his full name.

6            Q.        Do -- just give me whatever you recall

7    of the name.

8            A.        I -- I honestly don't recall the name

9    because it was someone my husband was familiar with

10   and knew.

11           Q.        Okay.  So did you interact with that

12   person to provide information about your photography

13   business?

14           A.        I provided that information to my

15   husband so that he could provide all of our personal

16   and business tax information to the CPA.

17           Q.        Okay.  Do you know where the CPA is

18   located?

19           A.        I believe he's located in the

20   Louisville area, but I would need to ask my husband to

21   be sure.

22                     (MR. FOWLER JOINED THE DEPOSITION)

23           Q.        And I believe what was provided to us

24   is pages from federal tax returns.  Did you also file

25   tax returns with any state for Chelsey Nelson



Page 10

1    Photography?

2            A.        If that's what was required, then I

3    believe we probably did.  I would need to reference

4    the specific documents.

5            Q.        Are you aware of whether you filed

6    returns in Florida for 2023 for the photography

7    business?

8            A.        Given there's not state tax returns,

9    we did not file like state income tax returns to

10   Florida for that year.

11           Q.        Are there any local or municipal tax

12   obligations for businesses where you live in Florida?

13           A.        Other than perhaps sales tax, not that

14   I'm aware of.

15           Q.        So the tax return pages that we

16   received -- and I can show you some as examples if

17   it -- if you need to see that -- but the business

18   address was redacted from the tax returns.  Do you

19   know if the business address that's listed on the tax

20   returns is your residential address?

21           A.        It's -- to my knowledge, it's

22   typically my Bardstown Road address in Louisville,

23   Kentucky.

24           Q.        And by that, you're referring to

25   the -- the address that's listed as the principal



Page 11

1   office with the Kentucky Secretary of State?

2        A.        Yes.  I would need to go back to

3   reference if, for some reason, the CPA that we used,

4   used our home address accidentally or whatnot, but

5   typical practice is for me to use my business address

6   for --

7        Q.        Okay.

8        A.        -- forms that are specifically related

9   to my business.

10        Q.        I'd like to show you an example, and

11   I'm going to do that by sharing my screen.  One

12   second.

13              So these are the pages of tax returns

14   from 2021 that were produced to us in discovery.

15        A.        I'm not able to see --

16        Q.        Sorry, sorry.  I just realized that.

17   Here we go.  Can you see them now?

18        A.        Yes, I can.

19   (CONFIDENTIAL DEPOSITION EXHIBIT NO. 1 MARKED)

20        Q.        Okay.  So this is -- these are 12

21   pages that all pertain to 2021, and this is -- this

22   Bates number at the bottom indicates that it's

23   something that was produced to us on -- on your behalf

24   in the litigation.  So what I'm -- what I'm asking

25   about, for example -- and this is true throughout the



Page 12

1  records -- is the business address portion on these

2  tax returns is redacted (Indicating).

3            So are you -- do you know what is

4  underneath that redaction?

5       A.      I -- I don't recall, but I would

6  assume it's likely to be my business address in

7  Louisville.

8       Q.      Okay.  I'm going to ask you about --

9  well, let me first ask:  Do you -- are you aware of

10  whether you've claimed any tax advantage or write-off

11  for using your residential home as an office?

12       A.      In previous years I believe we may

13  have.

14       Q.      Okay.  So let me go to the fourth page

15  of this Exhibit 1, which is the 2021 tax information.

16  And this is a form, 8829 worksheet.  Business name is

17  listed as "Photo editing, Chelsey's office."  And the

18  worksheet -- let me know if you need a minute to

19  review it -- but the worksheet is designed to collect

20  information about use, business use of your home.

21  That's what's reflected on this page.  Are you -- are

22  you aware that that was submitted?

23       A.      Yes.

24       Q.      Okay.  And so this return is from

25  2021.  So the information that's shown here, would



Page 13

1   this be in reference to your home when you lived in

2   Louisville, Kentucky?

3           A.      Yes.

4           Q.      Okay.  I'm going to take this exhibit

5   down and share with you another year's return.

6                   MS. HINKLE:  I'll mark this document

7   as Exhibit 2.

8       (CONFIDENTIAL DEPOSITION EXHIBIT NO. 2 MARKED)

9           Q.      This is tax return pages from 2023

10  that were produced to us in discovery.  Can you see

11  that on your screen?

12          A.      Yes, I can.

13          Q.      So again, this is -- the business

14  address has been redacted here.  In the year 2023, you

15  were living in Louisville for the first few months and

16  then you moved to Tallahassee, Florida where you lived

17  for the rest of that year, correct?

18          A.      Yes.

19          Q.      So I'm going to go down a few pages in

20  this document to this year's form, 8829.  And as you

21  can see at the top, the title of this part of the

22  return is "Expenses For Business Use of Your Home."

23  And a lot of the information on this page is -- was

24  redacted, but, you know, assuming there's something

25  underneath these redactions, it does appear to list a



Page 14

1    number of expenses, including utilities, insurance --

2    that kind of information, that would pertain to your

3    residential home, correct?

4           A.       That appears to be correct.

5           Q.       And for the year 2023, that would mean

6    your home in Tallahassee, Florida, at least for the

7    last nine months of the year, correct?

8           A.       Approximately, yes.

9           Q.       Okay.  You mentioned the -- the

10   business address that you -- you listed in Louisville,

11   Kentucky.  I just want to step back and confirm some

12   basic information about your formation of

13   Chelsey Nelson Photography, LLC.  It's my

14   understanding that you did that in 2019, correct?

15          A.       Yes.

16          Q.       And you're the only owner of that

17   entity, correct?

18          A.       Yes.

19          Q.       And you're the only person who could

20   claim to be an officer or an executive of

21   Chelsey Nelson Photography, LLC, correct?

22          A.       I would need to -- like, the only

23   person who could possibly be or the only person who

24   currently is?

25          Q.       Who currently is.  There -- there's



Page 15

```
 1   no --

 2         A.       Yes.

 3         Q.       -- one else --

 4         A.       To my understanding, yes; just me.

 5         Q.       Sorry, let me just state my question

 6   again.

 7                  There's no one else who currently

 8   could claim to be an officer or director or executive

 9   of Chelsey Nelson Photography, LLC?

10         A.       Correct, yes.

11         Q.       And you've conducted -- since you

12   formed the entity in 2019, have you conducted all of

13   your professional photography work through that

14   entity?

15         A.       To the best of my knowledge, yes.

16         Q.       So -- and it's a Kentucky limited

17   liability company, right?

18         A.       Yes.

19         Q.       Where is the principal executive

20   office of Chelsey Nelson Photography, LLC?

21         A.       What do you mean by "principal

22   executive office"?

23         Q.       Well, that's a -- that's a reference

24   in the statute.  That's what -- that's how the term

25   "principal office" is defined according to Kentucky
```



Page 16

1    law.  It means the office in or out of the

2    commonwealth, so designated in writing to the

3    secretary of state, where the principal executive

4    offices of a domestic or foreign limited liability

5    company are located.

6              So I'd like to know:  Where is the

7    principal executive office of Chelsey Nelson

8    Photography, LLC?

9         A.    I consider the principal location of

10   my business to be conducted in Louisville, Kentucky,

11   which is why I have an address in Louisville, Kentucky

12   on Bardstown Road and why that's the address that I

13   use for forms and contracts and anything pertaining

14   specifically or formally or legally to my business.

15        Q.    And that is the address at

16   3044 Bardstown Road, Number 206, Louisville, Kentucky?

17        A.    Yes, that's right.

18        (DEPOSITION EXHIBIT NO. 3 MARKED)

19        Q.    And let me show you what I will mark

20   as Exhibit 3.  Can you see that on your screen?  It

21   should be a photograph.

22        A.    Yes, I can.

23        Q.    Do you recognize this?

24        A.    Yes, I do.

25        Q.    And what is it?



Page 17

 1                    MR. NEIHART:  Well, I'm -- I'm going
 2    to object because it's hard to know how she could
 3    recognize it without any other context.
 4                    MS. HINKLE:  She'll explain how she
 5    recognizes it.
 6          Q.        What do you recognize it to be,
 7    Ms. Nelson?
 8          A.        Well, I see on the edge it says
 9    "location" and there's a "3044 Bardstown."  So that
10    lets me know it's likely the specific location where I
11    have my mailbox address.
12          Q.        So this -- this mailbox is what you
13    list as the principal office of Chelsey Nelson
14    Photography, LLC, correct?
15          A.        This is the mailbox that I use for any
16    legal documents or anything I need to receive in the
17    mail pertaining to my business.
18          Q.        And that's also the address you have
19    listed with the Kentucky Secretary of State as your
20    business's principal address, correct?
21          A.        It's what I have listed on all of my
22    legal and formal forms related to conducting business
23    in Kentucky.
24          Q.        And since you moved to Florida in
25    2023, do you pick up mail from this box?



Page 18

```
 1          A.      I have, yes.

 2          Q.      When?

 3          A.      Last month was the most recent time.

 4          Q.      How many times prior to last month?

 5          A.      In -- in person, that was the first

 6    time I needed to do it in person.

 7          Q.      Have you had anyone else pick up mail

 8    from this box?

 9          A.      The staff has a normal practice to let

10    customers know if something official comes into the

11    mailbox.  So if anything were to, they're -- they're

12    to contact me.  Or when I call about my billing or

13    just to check and see if there's anything in my

14    mailbox that would be important, that's how I would

15    gain knowledge whether or not I need to have something

16    forwarded.

17          Q.      And you're referring to the staff at

18    The UPS Store where this box is located?

19          A.      Yes, I am.

20          Q.      Why -- why didn't you change the

21    principal office to somewhere in Tallahassee, Florida?

22          A.      Well --

23          Q.      Sorry.

24          A.      Sure.  I -- I still consider

25    Louisville, Kentucky to be my main hub of my business
```



Page 19

1  because that's where the majority of my inquiries come

2  from.  It's where I have the most business presence.

3  It's where I've done the majority of my work since the

4  inception of my business, and so it just -- it makes

5  sense to continue having an official address related

6  to my business where I conduct business.

7       Q.     It would be easier to pick up mail

8  from an address in Tallahassee, Florida, wouldn't it?

9       A.     I haven't had any issues getting mail

10 with the current setup.

11      Q.     And is that because you don't receive

12 much mail?

13      A.     It's because I haven't received very

14 many official documents that I haven't either been

15 able to pick up myself or that couldn't easily be

16 forwarded by the staff that I have a relationship with

17 at the branch.

18      Q.     When you first registered your entity,

19 Chelsey Nelson Photography, LLC, with the Kentucky

20 Secretary of State, your -- the registered agent for

21 the entity was someone named Aaron Silletto, right?

22      A.     Yes.

23      Q.     And he was with a law firm, Goldberg

24 Simpson, correct?

25      A.     I would need to reference an official



Page 20

1    document to be able to confirm it, but that sounds

2    correct.

3              Q.        Okay.  And he resigned as your

4    registered agent in 2022, correct?

5              A.        I would need to reference a specific

6    document, but that sounds like an approximate -- an

7    approximately correct time.

8              (DEPOSITION EXHIBIT NO. 4 MARKED)

9              Q.        Okay.  I'll show you what I'll mark as

10   Exhibit 4.  This is from the Kentucky Secretary of

11   State's website, and this is something that reflects

12   that the entity that Mr. Silletto worked for is -- is

13   resigning as the registered agent for your entity.  Do

14   you recognize this?

15             A.        Yes.

16             Q.        Okay.  And that shows that they

17   resigned in March of 2022, right?

18             A.        Yes.

19             Q.        Why did -- why did they resign as --

20   as your registered agent?

21             MR. NEIHART:  I'll just object to the

22   extent that it calls for speculation.

23             A.        I don't specifically remember the

24   reason.

25             Q.        What was communicated to you as the



Page 21

1    reason?

2         A.      I -- I don't remember.

3         Q.      And the new registered agent that

4    you're using is something called Registered Agents

5    Incorporated, correct?

6         A.      That sounds correct, but I would need

7    to reference my documents to confirm for sure.

8              (DEPOSITION EXHIBIT NO. 5 MARKED)

9         Q.      Sure.  I'll show you what I'll mark as

10   Exhibit 5.  This is reflecting the change of

11   registered agent to Registered Agents, Inc.

12        A.      Yes.

13        Q.      And this document was submitted to the

14   Kentucky Secretary of State in March of 2022.

15              How did you find this entity to serve

16   as your registered agent?

17        A.      I don't remember specifically.

18        Q.      Were you referred to them by someone?

19        A.      It could have been a Google search or

20   it could have been a suggestion from one of my

21   attorneys; I don't remember.

22        Q.      Are you paying anything to Registered

23   Agents, Inc. to serve as your registered agent?

24        A.      Yes.

25        Q.      Do you recall how much you're paying?



Page 22

```
 1          A.        I don't know.  I -- I would need to

 2   look at a receipt.

 3          Q.        Their website indicates that charge

 4   $49 a year to serve as a registered agent; does that

 5   sound correct?

 6          A.        That sounds approximately correct,

 7   yes.

 8          Q.        And you weren't paying anything to

 9   Mr. Silletto or his entity, GSRA, LLC, to serve as

10   your registered agent, correct?

11          A.        Not that I recall.

12          Q.        And did you try to find another

13   registered agent who would -- who would serve as your

14   agent for free?

15          A.        Not that I remember.

16          Q.        Okay.  You have also produced in

17   discovery profit and loss statements.  I would like to

18   show those to you, and I'll mark them as -- are we on

19   Exhibit 6?  I think that's right.

20              (DEPOSITION EXHIBIT NO. 6 MARKED)

21          Q.        This is -- I'm going to make this a

22   little smaller so I can page through and just show you

23   each page.  But this is -- I've collectively excerpted

24   all the profit and loss statements that were produced

25   to us.  They're all in the same format.
```



Page 23

1                     Do you recognize these documents?

2          A.        Yes, I do.

3          Q.        Okay.  I just want to make sure I

4    understand how to read these documents.  Was it your

5    intent with this profit and loss document to capture

6    all of the income related to your professional

7    photography business?

8          A.        Yes.

9          Q.        And what is the difference between --

10   right now we're looking at the 2024 P and L.  What is

11   the difference between "personal income" and "business

12   income"?

13         A.        I believe that the personal income

14   line item is essentially similar to like the owner's

15   draw, what I -- what we personally made from my work.

16   And then business income refers to money that I used

17   for business expenses or to -- as capital to

18   reintegrate back into the business to grow the

19   business.

20         Q.        So do you leave some amount of money

21   in an account for the entity that -- that you don't

22   draw as income?

23         A.        Yes, I do.

24         Q.        Okay.  So in some years -- and now

25   we're looking at the P and L for 2023.  There's a more



Page 24

1    significant amount in the personal income row versus

2    the business income.  Is it still your understanding

3    that that personal income row would be amounts that

4    you essentially paid yourself out of the entity?

5           A.      Yes.

6           Q.      Okay.  And can you give me a sense of

7    what types of things are included in the expense

8    category on these profit and loss statements?

9           A.      Sure.  It would be things such as

10   Lightroom, Adobe Lightroom packages for my editing,

11   professional editing software that I use to both edit

12   photos for editing, private editing clients and also

13   to edit my own photography work.  It would be

14   platforms that I use to both store online galleries

15   and share downloadable galleries with clients and

16   maintain it as a -- a backup of sorts from a data

17   perspective to keep the photographs that I produce in

18   multiple places.  And then also platforms like Dropbox

19   to store the images that I am sharing back and forth

20   with private editing clients; things like Instagram

21   scheduling platforms that allow me to schedule content

22   ahead of time and have it post automatically, and

23   things of that nature.

24          Q.      Would it include any expenses

25   associated with your home office?



Page 25

1          A.          It could, but I would need to

2    reference more detailed documents to be able to

3    confirm that.

4          Q.          Would it include any travel expenses?

5          A.          It likely would, yes, as long as it's

6    actually pertaining to traveling for Chelsey Nelson

7    Photography.

8          Q.          And when you travel for your business,

9    do you typically invoice your clients for the

10   travel-related expenses, or is that an expense that

11   the business just absorbs?

12         A.          I typically -- so I -- I lay out in my

13   contracts, typically like a mileage expense that I

14   would include; or depending on the situation with the

15   client, I might just discuss with them a -- a flat

16   travel type fee to bundle into the overall cost of

17   their photography package.

18         Q.          And in your discovery responses to us

19   you disclosed the customers for whom you've provided

20   paid photography services.  And I know that you, at

21   least early on in your business, worked as a second

22   shooter for some weddings, right?

23         A.          I did photograph as an assistant

24   second photographer, yes, early on.

25         Q.          And do you still do that work, or is



Page 26

1    that something that you stopped doing once you started

2    getting your own weddings that you -- that you shot as

3    a primary photographer?

4            A.        I would be open to doing it, depending

5    on the situation; but I haven't done it in a few

6    years.  Mainly because of just the demands on my time

7    of -- of growing in motherhood and needing to

8    prioritize my time wisely in my business.

9            Q.        So based on the information provided

10   to us, it looked like the last time you provided

11   services as a second or assistant photographer at a

12   wedding was in 2018; does that seem correct to you?

13           A.        I would need to reference the

14   document, but I'm -- I'm not sure if that was the last

15   time or not.  It's been -- it's been -- like I said,

16   it's been a few years, so I don't specifically

17   remember.

18           Q.        We also asked in interrogatories how

19   you met the clients that you've engaged with as -- as

20   a professional photographer, and for some clients you

21   indicated that -- that they found you or that you met

22   them through the Rising Tide Society.  Can you -- can

23   you tell us what that is?

24           A.        The Rising Tide Society -- I'm not

25   sure if they are still in existence or not, but it was



Page 27

1    created to be a professional networking group of sorts

2    for creative entrepreneurs, like calligraphers,

3    website designers, photographers, and people that are

4    in the creative industry and have businesses or are

5    interested in starting businesses and networking with

6    other professionals in the creative space.

7         Q.      Is there any affiliation with a church

8    or a religious organization in the Rising Tide

9    Society?

10        A.      Not that I'm aware of.

11        Q.      Okay.  So based on the information

12   disclosed in discovery, it looks like you photographed

13   four weddings as a primary photographer before this

14   litigation was filed in November of 2019, and I'd like

15   to ask just a little bit about those couples to -- to

16   understand how you met them or how they found you for

17   their photography services.

18             The first one was Annie and

19   Andrew ████, who -- whose wedding you photographed in

20   August of 2018.  Do you -- do you recall how that

21   client came to you?

22        A.      I -- I think I -- did I put that in

23   the interrogatory response?

24        Q.      You put in the interrogatory response

25   "website inquiry."



Page 28

```
 1            A.       Okay.  So --

 2            Q.       So would that be the extent of your

 3    recollection of how -- how they found you?

 4            A.       It is, yes.

 5            Q.       So you -- you didn't have any prior

 6    acquaintance with Annie and Andrew ████ before they

 7    contacted you about photography services?

 8            A.       No, I did not.

 9            Q.       If they -- and -- and am I right in

10    understanding that that was the first wedding you

11    photographed as a primary photographer?

12            A.       That sounds correct.  It's been so

13    long, I would need to go back and refer to my records,

14    but that sounds correct.

15            Q.       I'll represent to you that that was

16    the first one that's listed for us in the discovery

17    responses, that was in August of 2018.

18                     And then I believe the next couple's

19    wedding you photographed as primary photographer was

20    Jessica and Tim ████, and that was in December of

21    2018?

22            A.       Yes, that sounds right.

23            Q.       And you indicated in your

24    interrogatory response that you -- you met them

25    through church.  Can you tell us which church that
```



Page 29

1    was?

2        A.        Clifton Baptist Church in Louisville,

3    Kentucky.

4        Q.        So you and the █████s were congregants

5    in that church?

6        A.        We were, yes; although, I hadn't

7    met -- actually met them before until they reached out

8    to me about photography services.

9        Q.        But it's your understanding they

10   became aware of you through the church community?

11       A.        Yes, that's my understanding.

12       Q.        And the next wedding that was

13   disclosed to us was Emily and Daniel ████████ -- I

14   hope I'm pronouncing that right -- which I think you

15   photographed in October of 2019.  And this -- this

16   couple you indicated was a referral from a Louisville,

17   Kentucky photographer.  Do you recall which

18   photographer it was that provided that referral?

19       A.        I think it was Lindsay ████████, but I

20   would need to go back and see if I had any specific

21   notes that I kept on the referral, to track the

22   referral to see if I -- it was abs- -- specifically

23   absolutely certain that it was her, but it may have

24   been Lindsay ██████ of Lindsay ██████ Photography

25   who was also based in Louisville, Kentucky.



Page 30

1          Q.       And that's a photographer with whom

2    you'd worked as a second shooter and an editor, right?

3          A.       Yes, that's right.

4          Q.       Okay.  The fourth wedding that you

5    photographed as primary, at least according to your

6    discovery responses, was Kelsey and Andrew ███████,

7    and that was in October of 2019.  That wedding was in

8    Georgetown, Kentucky?

9          A.       That's right.

10         Q.       And that's another couple that you

11   listed as a referral from a Louisville, Kentucky

12   photographer.  Do you recall which photographer that

13   was?

14         A.       That also may have been from

15   Lindsay ██████ Photography, but I would need to go

16   back to be absolutely certain.

17         Q.       Okay.  And then you photographed a

18   wedding for Shelby and Brennen █████ in November of

19   2019, and you indicated in the discovery responses

20   that that was a referral from a previous client.  Do

21   you recall which client?

22         A.       Yes.  It was from the first wedding

23   that you referenced, from Annie.

24         Q.       Annie and Andrew?

25         A.       Yes.



Page 31

```
 1              Q.       Okay.  And then you also photographed
 2     a wedding for Larissa and Parker ████; is that
 3     correct?
 4              A.       Yes.
 5              Q.       And the date -- I found the date for
 6     that one on your website, and it was shown as June of
 7     2021; does that sound correct?
 8              A.       I would need to go back and look at
 9     the contract to see if that's actually when I
10     photographed it or if that's just when the blog post
11     went live.
12              Q.       What I'm referring to that had the
13     date on it was actually a picture of a -- of a board
14     at their wedding which had the date written on it.
15     That's why I assumed that was the date.
16              A.       Oh, that sounds like -- that sounds
17     like a good indicator.
18              Q.       Okay.
19              A.       Sure.
20              Q.       And I wondered -- that one was not
21     disclosed in your interrogatory responses and I just
22     wondered if you knew why that would not have been
23     included in the ones that were disclosed to us?
24              A.       I don't have any recollection of
25     excluding it.
```



Page 32

```
 1          Q.        Were they paying customers?  Like, it

 2   wasn't --

 3          A.        Yes, they were.

 4          Q.        -- professional engagement, right?

 5                    Okay.  So before you moved back to

 6   Florida in 2023, you had never traveled out of state

 7   to photograph a wedding, correct?

 8          A.        Not that I remember.

 9          Q.        So during the time you had your

10   business, you were living in Kentucky, and all the

11   weddings you photographed were also in Kentucky,

12   correct?

13          A.        To the best of my memory, yes.

14          Q.        So since the time you've moved --

15          A.        Actually, to the -- to the best of my

16   memory, yes, either in Kentucky or Southern Indiana

17   area, that I -- that I can remember, but I would need

18   to reference back to be certain.  But generally, the

19   Louisville, Kentucky or Kentucky area.

20          Q.        Do you remember a -- a wedding or

21   other professional photography shoot in Southern

22   Indiana?

23          A.        I -- I don't remember.  I just have a

24   sense that it's a possibility I could have done.  I've

25   done so many over the years that I just know it's a
```



Page 33

1  possibility, but I don't specifically remember one.

2          Q.      Okay.  The locations that were

3  disclosed to us in the interrogatory responses were

4  Frankfort, Kentucky, Louisville, Kentucky and

5  Georgetown, Kentucky.  I didn't see one for Southern

6  Indiana.  So if you don't have a specific recollection

7  of one, that's fine.  I just wanted to make sure you

8  didn't have a specific client you were thinking of.

9          A.      It wouldn't have been for a -- like a

10 lead photographer contract.  It would've been as a

11 second shooter in the very early days.  But again, I

12 don't specifically remember if I actually did.

13         Q.      I see.  Okay.  So since you've been

14 back in Tallahassee, Florida, you've photographed two

15 weddings in Tallahassee, correct?

16         A.      Yes.

17         Q.      And the first of those was in August

18 of 2023, and it's for a couple of whose last names are

19 ██████ and ██████?  I'm -- I'm sorry, that's my best

20 effort at pronouncing their names.  Do you know who

21 I'm talking about?

22         A.      I do.

23         Q.      And that's a couple that you met

24 through church?

25         A.      Yes.



Page 34

1          Q.          What church is that?

2          A.          Grace Church of Tallahassee.

3          Q.          Is that the church you attend now that

4    you live in Tallahassee?

5          A.          Yes.

6          Q.          Did you also attend that church before

7    you moved to Kentucky?

8          A.          Yes, I did.

9          Q.          And then there was another couple

10   named Jordan ██████ and Kennedy ██████ that you

11   photographed in Tallahassee, right?

12         A.          Yes.

13         Q.          And that was in -- August of 2024 was

14   their wedding.  And did you also meet that couple

15   through Grace Church of Tallahassee?

16         A.          Yes, I did.  I knew Kennedy prior to

17   even moving from Tallahassee when I first started

18   attending Grace Church.

19         Q.          And since you've lived -- since you

20   returned back to Tallahassee, Florida, I believe you

21   photographed two weddings that are out of state,

22   outside of Florida, correct?

23         A.          Yes.

24         Q.          And the first of those was

25   Rachael ██████ and Casey ██████?



Page 35

```
 1          A.       Yes.
 2          Q.       And their wedding was in Mississippi,
 3    correct?
 4          A.       Yes, it was.
 5          Q.       And the date for that wedding I
 6    believe was July of 2023?
 7          A.       Yes, that sounds right.
 8          Q.       And you indicated that they're a
 9    family member.  Can you just explain to us how you're
10    related to either Rachael ████    or Casey ████?
11          A.       Rachael is my sister-in-law.
12          Q.       So would you have attended their
13    wedding as a guest if you hadn't been professionally
14    photographing it?
15          A.       While I was there I was considered
16    both a guest and their photographer, but yes, I
17    certainly would have attended if I hadn't been the one
18    photographing their wedding.
19          Q.       And did your husband also attend that
20    wedding?
21          A.       Yes, he did.
22          Q.       And did your children attend the
23    wedding?
24          A.       Yes, they did.
25          Q.       And did this couple pay you for your
```



Page 36

1   photography services at their wedding?

2           A.      Yes.

3           Q.      Who paid your travel costs to get to

4   Mississippi for the wedding?

5           A.      Travel costs were taken out of the

6   photography package that they paid me for the

7   photography that I provided for them.

8           Q.      So when you are required to travel for

9   a wedding, do you increase the amount of the package

10  to offset the travel costs?

11          A.      Typically, yes, depending on how far I

12  would need to travel and whatever travel expenses

13  might be incurred.  Like, whether or not I would need

14  to stay at a hotel or if I could -- for instance, in

15  Louisville, I have so many close friends in

16  Louisville, I can often just stay with a friend and

17  not have to incur the cost of a hotel.

18          Q.      So you've -- since you've moved back

19  to Tallahassee in 2023, you've come back to Louisville

20  on two occasions, correct?

21          A.      Yes.

22          Q.      And where did you stay on those

23  occasions?

24          A.      I stayed with a friend in Louisville.

25          Q.      What's the name of the friend?



Page 37

```
 1              A.      Bekah Mazza.

 2              Q.      And for those two trips did you fly or

 3    drive?

 4              A.      I decided to drive for both.

 5              Q.      And you -- did you stay with Bekah the

 6    entire time that you were in Kentucky?

 7              A.      For -- for each night that we were

 8    there, yes.

 9              Q.      And does Bekah live in Jefferson

10    County, Kentucky?

11              A.      Is Shepherdsville considered Jefferson

12    County?

13              Q.      I'll have to look that up.  I'm not

14    sure actually.  So she lives in Shepherdsville?

15              A.      Yes.

16              Q.      Okay.  So you also provided

17    photography services for a couple named

18    Brandon ███████ and Kayla ██████, correct?

19              A.      Yes.

20              Q.      So they -- I have June 29th, 2024, is

21    the date when you did an engagement photo shoot for

22    them.  Does that seem right to you?

23              A.      That sounds right.

24              Q.      And was that the reason for your first

25    trip back to Kentucky?
```



Page 38

```
 1            A.        Yes, it was.

 2            Q.        And that shoot took place in

 3   Louisville?

 4            A.        Yes, it did, at Locust Grove.

 5            Q.        And so you said you drove for those

 6   trips.  Did you -- did you pay the gas expenses for

 7   that drive, or did you charge your client, so

 8   Brandon ███████ and Kayla █████, for the gas that it

 9   cost to get from Tallahassee to the Louisville area?

10            A.        I included -- I don't remember the

11   specific amount that we agreed upon, but I included a

12   flat-fee travel expense within the bundle package that

13   they purchased, and then that went to cover the

14   expenses, like gas.

15            Q.        So just so I'm clear on the -- on the

16   way you do your bundle, is that -- would that have

17   been itemized for the client before they agreed to

18   hire you?

19            A.        I don't think it would have

20   necessarily been itemized on the page of a -- the

21   proposal that I typically send out.  It just would

22   have been included in -- on the -- at the, like, very

23   bottom total number.

24                      For instance, I -- I don't say I'm

25   going to charge you this much because I need to cover
```



Page 39

1   the expenses of my editing software; that's just not

2   something that I would itemize for them even though

3   that's part of what their payment is going to.

4           Q.      Sure.  And so similarly you didn't

5   itemize the cost that it would -- that you would incur

6   to travel to Louisville for the -- for the photo

7   shoot, right?

8           A.      Correct.  Not -- not specifically on

9   the contractor proposal, no.  Just verbally over our

10  consultations on calls.

11          Q.      Okay.  And then at the time that you

12  provided discovery responses to us, you had not yet

13  photographed their wedding, but I understand that the

14  wedding was planned to occur on September 7th of 2024.

15  Did the wedding go forward on that date?

16          A.      Yes, it did.

17          Q.      And where was the venue for the

18  wedding?

19          A.      In Lexington, Kentucky.

20          Q.      And did you drive or fly to Kentucky

21  on that occasion?

22          A.      I decided to drive.

23          Q.      And is the answer as before with

24  respect to your gas costs and the costs related to

25  that drive, is that something that was included in



Page 40

1    your flat-fee proposal to the client?

2         A.        Yes, that's right.

3         Q.        And I think you've already answered

4    this, but just to confirm.  On that trip, you also

5    stayed with Bekah Mazza?

6         A.        Yes, I did.

7         Q.        Okay.  On that trip did you -- did you

8    spend any time in Louisville, Kentucky or Jefferson

9    County, Kentucky?

10        A.        Yes.

11        Q.        Where did you spend time in

12   Louisville, Kentucky?

13        A.        I went and checked my mailbox at the

14   UPS location and said hi to the staff there and talked

15   with them.  And I visited Big Rock Park in the

16   Cherokee Park area to film some specific videos and

17   content about it being one of my favorite parks in

18   Louisville.  I've done a lot of sessions, photography

19   sessions at that park.  So I filmed some Instagram

20   stories and posted them while I was there.

21                  And then I also went and said hello to

22   our former neighbors where -- at the house where we

23   used to live.  And I stopped by a specific store that

24   I frequented often when I lived there, and I also

25   stopped in my favorite Rainbow Blossom location on



Page 41

1    Bardstown Road to get my favorite snacks for the

2    wedding the next day and things of that nature.  I --

3    I may have gone to one or two more places, but that's

4    what I can remember right now specifically.

5            Q.      Okay.  How many days were you in

6    Kentucky on -- on this trip?

7            A.      I think it was four days, but whatever

8    dates I mentioned in the interrogatory response would

9    be correct.

10           Q.      So you have -- you typically enter

11   into a written contract with your photography clients,

12   correct?

13           A.      Yes.

14           (DEPOSITION EXHIBIT NO. 7 MARKED)

15           Q.      I'm going to show you the form of

16   contract that was produced to us.  And I'll represent

17   to you this was produced to us at this point years ago

18   from before the case went up on appeal.  This was the

19   form, "Wedding Celebration Services Agreement."  Does

20   this look familiar to you?

21           A.      It does.

22           Q.      Have you made any changes to your form

23   agreement since moving to Florida?

24           A.      Not that I recall.

25           Q.      Okay.  I'm just going to ask about a



Page 42

1    couple of things specifically.  I'm going to go to the

2    second page of this document.

3                   So this is, in the second page of your

4    form agreement, I'm looking at the paragraph that

5    starts with "Expenses."  And that paragraph reads:

6    "Any expenses incurred by photographer while providing

7    client with services will be invoiced to client in a

8    timely manner.  Such expenses include hotel stays for

9    events or ceremonies occurring" 60 more miles -- "60

10   or more miles away from zip code 40220."

11                  Is 40220 the zip code you had when you

12   lived in Louisville, Kentucky?

13            A.     Yes.

14            Q.     And so now that you're in Tallahassee,

15   have you changed this to reflect your Tallahassee zip

16   code?

17            A.     I would need to reference specifically

18   what I have either omitted or edited for my most

19   recent client.  But I would need to reference

20   specifically.  I don't recall the changes exactly, but

21   I -- I don't think I would have left it as 40220 in

22   the contract, and if I did, it would have likely been

23   an oversight.

24            Q.     Okay.  And when you say your most

25   recent client, is that Brandon ██████████ and



Page 43

1   Kayla ████?

2          A.        Yes.

3          Q.        Okay.  So you haven't been engaged to

4   provide wedding or engagement photography services to

5   any other couple at this point?

6          A.        I have active inquiries but not signed

7   contracts since their signed contract.

8          Q.        Okay.  Moving down to the "General

9   Provisions."  Again, this is the standard form of

10  contract that was provided to us years ago back when

11  you lived in Kentucky.  And this provides that the

12  agreement is governed by Kentucky law.  Is that

13  something that you would change to Florida law now

14  that you're living in Tallahassee?

15         A.        It makes sense that it says that

16  Kentucky law would govern all matters arising out of

17  whatever's relating to this agreement because I still

18  operate my business out of Kentucky, and the weddings

19  that, for instance, I'm photographing there, it makes

20  sense for Kentucky law to govern it because that's

21  where my business is based out of.

22         Q.        Do you, for the weddings that you

23  photographed in Tallahassee -- so there's been two

24  that you photographed since you moved back there; have

25  those clients also signed written contracts?



Page 44

1          A.        Yes, they have.

2          Q.        And do you recall if those contracts

3    would specify Florida or Kentucky law?

4          A.        To the best of my recollection,

5    they -- it would have said Kentucky law because that's

6    where my business is based out of.

7          Q.        And when you say your business is

8    based out of Kentucky, I mean -- you mean that it has

9    that -- that mailbox at The UPS Store, right?

10         A.        When I say my business is based out of

11   Kentucky, what I mean is the majority of my

12   professional network is in Kentucky, the majority of

13   my both active and past inquiries for both engagements

14   or, you know, wedding clients come from people who

15   live in Kentucky.  I still actively market to continue

16   doing weddings in Kentucky, and the majority of the

17   heritage and history surrounding my business and my

18   career as a creative is based from and in Kentucky, in

19   the Louisville area.

20         Q.        You offer photo editing services

21   through Chelsey Nelson Photography, LLC, right?

22         A.        Yes, I do.

23         Q.        And that's something that you've

24   offered from the beginning of your business and

25   through today, correct?



Page 45

1          A.          I don't recall specifically offering

2    that at the very beginning of my business but shortly

3    after.

4          Q.          And do you still offer editing

5    services today?

6          A.          I do, yes.

7          Q.          And that's a service that you provide

8    remotely from your home, correct?

9          A.          Yes.

10         Q.          And understanding that it might

11   fluctuate over time, can you try to give me some

12   general sense or estimate of how much of your business

13   income is from editing versus a photography

14   engagement?

15         A.          Sure.  It depends on the time of year

16   or -- but I would say that my time has been spent

17   slightly more toward editing on purpose since becoming

18   a mother so that I can have more flexibility and

19   availability to be at home to care for my children.

20         Q.          And this is probably obvious, but I

21   just want to make sure it's explicit.  So since you've

22   moved back to Tallahassee, you're providing the

23   editing services that you do from your home in

24   Tallahassee, correct?

25         A.          Yes.



Page 46

1          Q.          Can you give us a sense of how much
2     time you spend on the editing portion of your
3     business?
4          A.          In -- in terms of per month or per
5     year or...
6          Q.          In any measure you're comfortable
7     with.
8          A.          I would need to calculate around how
9     much -- how many hours it takes me per wedding and how
10    many weddings I've done in a year, and that vacillates
11    year to year.  But it feels like a lot when you have
12    two kids at home.
13         Q.          I'm sure, yeah.  Is it -- I mean, is
14    it something close to full-time hours, so 40 hours a
15    week, or is it something that's less than that?
16         A.          No, I'm -- I'm able to edit at a speed
17    that I would certainly say that it's part time for the
18    editing portion of my business.
19         Q.          So on average do you think you spend
20    more or less than, let's say, ten hours a month on the
21    editing business?
22         A.          I would say -- so editing weddings is
23    very cyclical because there's more so more -- more or
24    less a wedding season to each year.  So I would say in
25    the busy months or seasons of the wedding cycle I



Page 47

1   might spend ten to 15 hours in a single week editing

2   weddings --

3          Q.        Can you --

4          A.        -- week.

5          Q.        Okay.  Can you give us a sense of what

6   the -- what the wedding seasons are?  Like, when --

7   when are you most busy?

8          A.        It's typically in the fall time.  A

9   lot of it's dependent on if my clients have booked

10  special one-off weddings.

11                   For instance, sometimes they might

12  book a wedding for New Year's or a Christmas-themed

13  wedding very close to Christmas.  So I wouldn't

14  normally be busy right around Christmas, but if they

15  happen to accept weddings around that time, I might be

16  busier then than I normally am.  But I would say fall

17  time is a historically busy season for anyone in the

18  photography industry.

19         Q.        And so I think I understood you

20  earlier to say that you're spending more time on

21  editing work than on work where you're the primary

22  photographer, correct?

23         A.        I would say right now I'm spending

24  more time editing my own wedding photography work and

25  working with my own wedding photography clients in



Page 48

1  Louisville than I am on work for private editing

2  clients right now.

3          Q.        And that, you're referring to the

4  wedding that just took place in September?

5          A.        Correct, the wedding that just took

6  place in September and in the previous weeks also, the

7  wedding for Kennedy ███████.

8          Q.        And that was a wedding that occurred

9  in Tallahassee, right?

10          A.        Yes.

11          MR. NEIHART:  Hey, Casey, I don't want

12  to interrupt if you're -- have some additional

13  questions, but we've been going about an hour.  So if

14  this is a -- your pause indicates this may be a good

15  stopping point for a little break?

16          MS. HINKLE:  That works, yeah.

17          MR. NEIHART:  Okay.

18                  (OFF THE RECORD)

19  BY MS. HINKLE:

20          Q.        Ms. Nelson, before our break, we

21  talked a little bit about the couple that you traveled

22  back to Kentucky to photograph.  I'd like to show you

23  what I'll mark as Exhibit 9 to your deposition.  And

24  this is an exchange of communications that I think you

25  had with Kayla ███████ and Brandon ███████ that was



Page 49

1    produced to us in discovery.

2                    Does this look familiar to you?

3        A.        Yes.

4        (CONFIDENTIAL DEPOSITION EXHIBIT NO. 9 MARKED)

5        Q.        And it looks like -- are these

6    communications sent through HoneyBook?

7        A.        Yes.

8        Q.        And is that how you typically

9    communicate with your clients?

10       A.        Yes.

11       Q.        So I'm going to go to the bottom of

12   this document because I think the communications are

13   shown in reverse chronological order.  So I'd like to

14   go back to what was the first communication you

15   received from this couple.

16                  I'd like to ask you about this -- this

17   message where it looks like a subject line is "This

18   project is ready for liftoff."  Can you see that on

19   your screen?

20       A.        Yes.

21       Q.        And is this a questionnaire that

22   people can fill out when they want to submit an

23   inquiry to you?

24       A.        Yes.  This is what I receive when

25   someone fills out and submits on my inquiry form on my



Page 50

 1    website.

 2          Q.        Okay.  And so it lists the name and

 3    salutation of both people and the couple, right?

 4          A.        Yes.  It looks like she -- she filled

 5    in that space, yes.

 6          Q.        And it has a wedding date listed, you

 7    collect their email address, correct?

 8          A.        Yes.

 9          Q.        And then there's a section called

10    "Tell me about you two.  I'd love to know more about

11    your story."  And here that's -- that's populated with

12    some information about the couple that's getting

13    married.

14               And then below that there's a section

15    called "How did you hear about me"; do you see that?

16          A.        Yes, I do.

17          Q.        And here it's indicated "referral."

18    Do you know the source of referral for this couple,

19    Kayla ████     and Brandon ████      ?

20          A.        I don't.  I asked her actually, but

21    she couldn't remember the name, the full name of the

22    person that told her about me and my business.

23          Q.        Do you have any understanding of

24    whether that person was a former customer of yours or

25    maybe someone you've worked with professionally as a


MAGNA
LEGAL SERVICES

Page 51

```
 1    photographer?

 2         A.      I -- I don't know, but I would say

 3    it's likely it was not someone who I had previously

 4    worked with or a previous client, because in my

 5    experience, they're usually very vocal about having

 6    been a past client of me when they're referring me.

 7    So that probably would've been something she would

 8    have remembered.

 9         Q.      Okay.  So you don't believe it was a

10    former client?

11         A.      I don't know for sure, but my

12    assumption is that it likely wasn't, no.  I'm not sure

13    who it was.

14         Q.      And you also assume it likely wasn't a

15    photographer with whom you'd worked previously?

16         A.      That would be my assumption.

17         Q.      Did you have any discussion with

18    either Kayla ██████ or Brandon ████████ about this

19    lawsuit?

20         A.      No.

21         Q.      Do you know if they have any

22    acquaintances in common with you?  In other words, you

23    know, do you know anyone that they know?

24         A.      Not that I know of.

25         Q.      Do you know where they attend church?
```



Page 52

```
 1            A.       I do not.

 2            Q.       What was the venue for their wedding?

 3    What -- specifically where was the wedding?

 4            A.       I don't specifically remember where

 5    they ended up having it because they had to change

 6    their venue close to the wedding date.  I would need

 7    to go back and reference what I have in my records to

 8    be able to remember the specific venue's name.

 9            Q.       Was the wedding in a church?

10            A.       It didn't appear to be a church.

11            Q.       Was it inside or outside?

12            A.       The ceremony was inside.

13            Q.       Did you also photograph the reception?

14            A.       Yes, I did.

15            Q.       And where was that?

16            A.       That was also inside.

17            Q.       Was that the same venue as the

18    ceremony or a different venue?

19            A.       Yes.  The entire service duration of

20    the services I provided them for the wedding day was

21    at that same venue.

22            Q.       Do you have Kayla ██████'s phone

23    number?

24            A.       I believe I have it stored in

25    HoneyBook.
```



Page 53

1          Q.          And do you have Brandon ████████'

2     phone number?

3          A.          I likely have it stored in HoneyBook

4     since that's something that I ask for in my contracts

5     to be listed.

6          Q.          And do you know where that couple

7     resides?

8          A.          I would need to go back and look to

9     see the address that they listed when I asked what

10    their mailing address would be after they got married.

11         Q.          Okay.  Do you believe that it's in

12    Louisville, Kentucky, or is it somewhere else?

13         A.          I'm not sure.  I would need to go back

14    and look.

15         Q.          Did you know anyone at their wedding?

16         A.          No.

17         Q.          Have you ever received anything that

18    you would consider a genuine request to photograph a

19    same-sex wedding?

20         A.          I'm not sure how I would determine

21    whether or not it was genuine.

22         Q.          I -- so as part of discovery, you

23    disclosed to us some of the communications that you've

24    received through your website, and I looked at those

25    and saw that there were some that made reference to



Page 54

1    this lawsuit or articles and newspapers related to the

2    lawsuit, and they have what I would characterize as

3    not genuine requests that you photograph same-sex,

4    either weddings or other kind of celebrations.  Do you

5    know what I'm referring to?

6          A.      Yes, I do.

7          Q.      So I'd like to distinguish that kind

8    of contact from a client that at least, you know,

9    based on the information that you have, you believe is

10   someone that's genuinely trying to hire you to provide

11   professional photography services.  Do you understand

12   the distinction I'm trying to make?

13                 MR. NEIHART:  And I'll just object

14   because it calls for speculation.

15         A.      I -- I think I have an idea of what --

16   of the distinction, yes.

17         Q.      Okay.  And part of the basis that we

18   make to distinguish these things is we, as part of the

19   discovery requests in the case, asked about

20   engagement -- prospective engagements that you've

21   declined, and in particular, since you moved to

22   Florida.  We asked about that, and you disclosed that

23   there was one such inquiry from someone named Paul who

24   populated that the -- the questionnaire that we just

25   looked at with an indication that both members of the



Page 55

1  couple used a salutation of "Mr."  Do you remember

2  that?

3          A.      Can you pull up the specific document

4  just so I can see it?

5          Q.      Yeah, I will do that.  Okay.  So I

6  will mark this document as Exhibit 10.

7      (CONFIDENTIAL DEPOSITION EXHIBIT NO. 10 MARKED)

8          Q.      Do you see that now on your screen?

9          A.      Not yet.

10         Q.      Okay.  Sorry.  Do you have it now?

11         A.      Yes, I see.

12         Q.      Okay.  So this is, again, something

13  produced to us in discovery, and I'll scroll down to

14  what was I think the initial inquiry.  Is that big

15  enough?

16         A.      Yes, I can see.

17         Q.      Okay.  So this is an inquiry from

18  someone named Paul that was dated July 18th of 2023.

19         A.      Yes, I see.

20         Q.      And this is something that you

21  identified in your discovery responses and said that

22  you did not pursue this because it would have required

23  you to express messages about marriage contrary to

24  your religious beliefs?

25         A.      Yes.



Page 56

1          Q.        And is that because this would have

2    been a same-sex wedding or anniversary, I guess?

3          A.        Well, the reason was exactly what you

4    just stated from my response, which is because the

5    salutations are of the same sex, it's obvious that

6    this is a request that's asking me to take photographs

7    and promote a message about marriage that is in stark

8    contradiction with what I believe as a Christian,

9    which is that marriage is between one man and one

10   woman for one lifetime instituted by God to be

11   celebrated.  And I seek to honor God in everything in

12   my life, including, especially my business, using the

13   talents and gifts that God has given me to glorify

14   him.  So I -- no matter -- no matter where the request

15   comes from or who the request comes from, if they're

16   asking me to celebrate and portray a message that is

17   against my religious convictions and is against my

18   conscience, then I'm not going to pursue it.

19         Q.        So you receive this initial inquiry

20   through your website and then this message above here,

21   "Hi, Paul.  Thanks for reaching out.  You can expect a

22   detailed reply within two to three business days.

23   Warmly, Chelsey Nelson," is that an automated

24   response?

25         A.        That is an automated response that



Page 57

1    anyone and everyone who submits an inquiry onto my

2    website would receive.

3           Q.      And then I infer from there being no

4    communications above that, that you did not -- you did

5    not follow up with a response; is that correct?

6           A.      I did not pursue this further for the

7    reasons that I stated before.

8           Q.      Right.  So you didn't respond to the

9    inquiry from the HoneyBook website, correct?

10          A.      I did not respond and pursue the

11   inquiry further after that automated message, no.

12          Q.      Okay.  So did you consider this

13   inquiry from Paul to be a genuine request for

14   photography services?

15          A.      I -- I don't know whether or not it

16   was genuine.  My case was ongoing and is still ongoing

17   at the time, and I know of other creatives who have

18   been specifically targeted with requests simply to

19   stir up litigation apart from the fact that, because

20   of the message that I was asking -- they were asking

21   me to portray, clearly stated in their inquiry, that

22   would be against my religious convictions.  I wouldn't

23   pursue it further.

24          Q.      So is it -- were you skeptical of this

25   inquiry?



Page 58

```
 1                    MR. NEIHART:  Objection --
 2         A.      It -- it was clear to me -- sorry,
 3    Bryan?
 4                    MR. NEIHART:  Just objection; vague.
 5    But you can answer.
 6         Q.      You can answer if you understood the
 7    question, Ms. Nelson?
 8         A.      Could you repeat the question?
 9         Q.      Yeah.  Were you skeptical of this
10    inquiry from Paul?
11         A.      It was automatically a clear message
12    that I was not willing and am not willing or able to
13    communicate with my gifts.  It would be against my
14    conscience to celebrate a message that's contrary to
15    the biblical definition of marriage that I hold as a
16    Christian, and so I would not pursue it further for
17    that reason.  And there's -- there was really no need
18    to continue theorizing about it past that point.
19         Q.      You mentioned that other creatives
20    have been specifically targeted to stir up litigation.
21    Did you --
22         A.      Yes.
23         Q.      -- did you believe that this inquiry
24    from Paul might have been something like that?
25         A.      I knew it could be possible.
```



Page 59

1          Q.          What other creatives do you know of

2    that have been targeted to stir up litigation?

3          A.          Like, Jack Phillips is probably the

4    most widely known example that comes to mind.

5          Q.          Do you know Mr. Phillips personally?

6          A.          I do, yes.

7          Q.          Can you think of any other creatives

8    that you believe have been targeted to stir up

9    litigation?

10         A.          I think maybe a Brush & Nib.  Blaine

11   from the Lexington area, also in Kentucky, who I also

12   know personally, and any number of other ADF clients

13   who have been targeted because they happen to hold a

14   traditional view of marriage and want to conduct their

15   businesses in line and in sync and in harmony with

16   their conscience and their religious convictions.

17         Q.          How did you meet Jack Phillip?

18         A.          I met Jack Phillips in Washington,

19   D.C.

20         Q.          What was the occasion of that meeting;

21   do you remember?

22         A.          Yes.  We were both giving speeches in

23   front of the -- we were both in town to give speeches

24   in front of the Supreme Court Building for the oral

25   arguments for 303 Creative in front of the Supreme



Page 60

1    Court.

2         Q.        Would you consider Mr. Phillips a
3    friend?

4         A.        I hope to consider him a friend one
5    day, but I would certainly at least consider him an
6    acquaintance, a warm and friendly acquaintance.

7         Q.        Have you communicated with
8    Mr. Phillips since that occasion in Washington, D.C.,
9    during that Supreme Court argument?

10        A.        Apart from maybe sharing a photo from
11   that occasion, no, not that I remember.

12        Q.        You mentioned Brush & Nib.  How do you
13   know Brush & Nib?

14        A.        I know of Brush & Nib because of their
15   case that also was surrounding their religious
16   convictions and being able to operate their business
17   in a way that was consistent with their beliefs on
18   marriage.

19        Q.        Do you know, is -- is Brush & Nib the
20   name of the business, or is that the name of an
21   individual?

22        A.        Of the business.

23        Q.        Do you know the individual associated
24   with that business?

25        A.        I have met one of the co-owners, but



Page 61

1    her first name is escaping me right now.

2          Q.      And how did you meet her?

3          A.      It may have also been in Washington,

4    D.C., but I don't remember if that was the same

5    occasion that I met her.

6          Q.      And you mentioned someone named Blaine

7    who you said was from the Lexington area.  Do you --

8          A.      Uh-huh.

9          Q.      -- do you know Blaine's last name?

10         A.      I -- I don't remember -- I don't

11   recall it specifically.

12         Q.      Do you --

13         A.      I don't usually use it when I interact

14   with him.

15         Q.      Do you know anything about -- does he

16   have a creative business?

17         A.      He does.  He has a T-shirt -- well,

18   he -- he has a T-shirt screen printing company, and

19   that's the company that was involved in the

20   litigation.

21         Q.      And how did you meet Blaine?

22         A.      I also met Blaine in Washington, D.C.

23   for the same occasion as I met Jack Phillips.

24         Q.      Did ADF pay for your trip to

25   Washington, D.C.?



Page 62

```
 1          A.        ADF reimbursed my expenses to travel

 2   and take away time from my business in order to come.

 3          Q.        So they paid your travel expenses.

 4   Did they also pay you a daily rate?

 5          A.        No, they did not.

 6          Q.        So it's just the out-of-pocket

 7   expenses you incurred --

 8          A.        Yes.

 9          Q.        -- associated with it, correct?

10          A.        Yes, the travel expenses.

11          Q.        Have you taken any other trips like

12   that that were organized by ADF?

13          A.        Yes.

14          Q.        And tell me about those.

15          A.        The one that comes to mind is the

16   anniversary occasion celebrating the ruling and when

17   the oral arguments had been made in front of the

18   Supreme Court.

19          Q.        Is that -- are you referring to the

20   oral arguments in 303 Creative?

21          A.        I am.  I'm referring to, like, an

22   anniversary occasion celebrating the occasion in the

23   past of when the oral arguments were made.

24          Q.        Do you think that was --

25          A.        And celebrating the -- the outcome of
```



Page 63

1    the case.

2          Q.        And was that like a one-year

3    anniversary of -- I'm trying to get a sense if this is

4    an annual event or --

5          A.        I'm trying to remember.  It's not an

6    annual event that I know of, but it happened to be

7    chronologically around a year later, I think.  I would

8    need to go back and look at my calendar to remember

9    specifically, but it was -- I think it was around a

10   year after.

11         Q.        And where did that event take place?

12         A.        At the ADF office in Virginia or one

13   of their offices in Virginia.

14         Q.        Is it a location in Virginia that's

15   close to Washington, D.C.?

16         A.        I don't remember specifically how

17   close, but it's -- I believe it's in like a suburb or

18   a local town somewhat close by.

19         Q.        So did you --

20         A.        It's within driving distance.

21         Q.        Did you fly to Washington, D.C. for

22   that trip?

23         A.        Yes, I did.

24         Q.        And, again, that was an event where

25   ADF paid your travel expenses?



Page 64

1          A.      Yes.

2          Q.      Have you declined a photography

3    engagement because of the location of the event; in

4    other words, because it would require you to travel to

5    the event?

6          A.      I don't remember any instances that

7    would fit that description.

8          Q.      Do you recall having any prospective

9    client for your photography services turn down your

10   services based on not wanting to pay your travel

11   expenses?

12         A.      Not that I remember.

13         Q.      Do you recall being asked to provide

14   professional photography services anywhere other than

15   Florida or Kentucky other than the family wedding

16   which we've talked about that was in Mississippi?

17         A.      I don't remember any, but I would need

18   to reference my records to know for certain because

19   I've received so many inquiries over the years.

20         Q.      And am I correct to assume that those

21   inquiries would have been what you produced to us in

22   discovery; so the website inquiries that we -- that we

23   now have?

24         A.      Yes.

25         Q.      Okay.  Have you used that website



Page 65

1    communication -- I don't know what to call it, a

2    portal or --

3            A.       HoneyBook?

4            Q.       Yeah.  You've used HoneyBook

5    throughout having your business?

6            A.       I don't remember specifically when I

7    started using it, but I know it was in the early days,

8    in the early months, maybe, of my business.  At least

9    the first year or two, I think.

10           Q.       And in your mind, when -- when you

11   think about the first year or two of your business,

12   are we talking about like 2016, 2017 time frame?

13           A.       Yes.

14           Q.       Okay.  I just wanted to clarify,

15   because I know the -- the LLC was not created until

16   some years later.  But your professional photography

17   services started, it's my understanding, back in 2016

18   or 2017, right?

19           A.       Yes.  I operated as a sole proprietor

20   in the early years, and that is also when I purchased

21   the HoneyBook platform software.

22           Q.       And to your knowledge, did the

23   communications that you exported out of HoneyBook, do

24   they go back to those early days?

25           A.       Yes, they do.



Page 66

1          Q.        Okay.  So what's been produced to us

2    should be comprehensive of the communications you've

3    received through HoneyBook?

4          A.        To my knowledge, yes.

5          (MEGHAN METCALF JOINED THE DEPOSITION)

6          Q.        Okay.  I'd like to ask you some

7    questions about Bekah Mazza, who is -- you've already

8    mentioned her today as someone that you stayed with on

9    your recent trips to Kentucky.  I understand that you

10   met Ms. Mazza at church in the summer of 2020,

11   correct?

12         A.        Yes, that's right.

13         Q.        And what church is that?

14         A.        Anchor Bible Church.

15         Q.        And is that the church you attended

16   when you lived in Louisville, Kentucky?

17         A.        We attended two different churches

18   during the time that we lived there.  We first were

19   members of Clifton Baptist Church and then

20   transitioned our membership to Anchor Bible Church.

21         Q.        Do you remember about when you started

22   attending Anchor Bible?

23         A.        I think it was the summer of 2020.

24         Q.        And was Ms. Mazza a congregant at

25   Anchor Bible when you joined that church?



Page 67

 1          A.      Yes.

 2          Q.      And is -- is Bekah Mazza someone that

 3   you would consider a friend?

 4          A.      Yes.

 5          Q.      When you lived in Louisville,

 6   Kentucky, can you give us a sense of how often you saw

 7   Bekah Mazza in person?

 8          A.      Typically, at least weekly.

 9          Q.      Would that have been in connection

10   with attending church services?

11          A.      Yes.

12          Q.      Did you spend time with Bekah Mazza

13   outside of church services?

14          A.      Yes.

15          Q.      How often?

16          A.      At other women's ministry events from

17   the church or instances like taking our children to

18   the zoo together or going to birthday parties for one

19   another's children -- things of that nature.

20          Q.      Do you know if Bekah Mazza works

21   outside the home?

22          A.      I do know that she is employed, but I

23   believe -- and she does work, but it is from home --

24          Q.      Do you know --

25          A.      -- to the best of my knowledge.



Page 68

1          Q.          Sorry.  Who is her employer?

2          A.          I know she does some work for Anchor

3    Bible Church, essentially filling the role as church

4    secretary and handling a lot of their social media and

5    graphic design work.  I don't know of everything she

6    may do for work, but I do know of that.

7          Q.          Do you know of any other clients that

8    Bekah Mazza works for in terms of social media?

9          A.          She has not shared any of that

10   information with me, so I'm not sure.

11         Q.          Do you think she has other clients?

12         A.          I don't know.

13         Q.          So Bekah Mazza is someone that you

14   entered into an agreement with in March of 2023,

15   correct?

16         A.          Yes.

17         Q.          And I believe that that agreement is

18   titled "Digital Marketing Agreement"; is that right?

19         A.          That sounds right, but I would need to

20   reference it specifically to --

21         Q.          Okay.  I'll -- I'll bring it up in a

22   minute.  Before I do that, I was just wondering if you

23   could tell me anything about Bekah Mazza's

24   qualifications as a digital marketing specialist?

25         A.          Sure.  She's very savvy with social



Page 69

1   media in general.  She handles the social media and

2   graphic design for all of Anchor Bible Church's needs

3   as far as I know, including providing things for their

4   website and social media channels, and she does it

5   quite well.

6        Q.      How many churches are -- are within

7   Anchor Bible community?

8        A.      I only know of one location.  If you

9   mean multiple campuses, there's only one congregation

10  that meets together specifically.

11       Q.      Okay.  I guess I was just trying to

12  follow up on your reference to her providing that

13  service for all of the Anchor Bible Churches.  Is

14  that -- do you mean that she's doing that for more

15  than one church, or is it just the -- the church

16  that's in Louisville, Kentucky?

17       A.      It may have come across differently in

18  the audio.  I just said "Anchor Bible Church," not

19  churches.  So not plural; just one single church.

20       Q.      Why did you -- why did you hire a

21  digital marketing specialist?

22       A.      Instagram tends to take up a lot of my

23  time when I try to create the content and try to

24  schedule it out and write the content.  The entire

25  process is -- it takes a lot of my time, and so I saw


MAGNA
LEGAL SERVICES

Page 70

1    a need to try out outsourcing that to someone who

2    could do it more efficiently to see if it would be

3    worth paying someone else to help me in that area so

4    that I could be more -- both more consistent with

5    posting and also have time freed up to either put in

6    other areas of my business or have more time with my

7    family.

8         Q.    Did it have anything to do with your

9    move to Florida?

10        A.    No.

11        Q.    So at what point did you start

12   considering hiring a digital marketing specialist?

13        A.    I considered it years before off and

14   on.  But the need became more immediate for me as I

15   had a -- recently -- somewhat recently had a second

16   child and just had more demands on my time but also

17   wanted to maintain a good presence on social media,

18   specifically Instagram, and specifically be able to

19   market more consistently to Louisville.  And I knew

20   that having someone who is able to do that really well

21   on my behalf, to be able to post it for me after I

22   wrote out all the content and did my creative work,

23   that I could just hand off the more technical side of

24   making sure that it's available to the public to see

25   and staying more in the creative space for myself.



Page 71

1          Q.          Can you tell me the month and year

2     your second child was born?

3          A.          November of 2021.

4          Q.          And I've reviewed your Facebook and

5     Instagram pages for your business, and it's my

6     impression from looking at those that you really don't

7     use Facebook any longer; is that correct?

8          A.          I still check Facebook and look for

9     possible inquiries that come in from time to time, but

10    I don't frequent Facebook nearly as often as I do on

11    Instagram.

12         Q.          From what I saw, it looked like the

13    last post on your Facebook business profile was back

14    in 2020.  Does that sound correct to you?

15         A.          That sounds right, but I -- I would

16    need to go back and see a screenshot to be able to

17    confirm it.

18         Q.          Is any of the content on your social

19    media accounts limited to followers of your account or

20    is it all public?

21         A.          To my knowledge, it should all be

22    public, publicly available.

23         Q.          So let me -- I'm going to share with

24    you now the agreement that you signed with

25    Bekah Mazza.  One second.



Page 72

```
 1              A.        Okay.

 2              Q.        Okay.  Do you recognize this as the

 3    digital marketing agreement that you entered into with

 4    Bekah Mazza back in March of 2023?

 5              A.        Yes.

 6              Q.        And we'll just scroll down.

 7                        It's a four-page document, which we'll

 8    mark as -- I think we're at Exhibit 11.  I hope that's

 9    right, Jenna.

10       (CONFIDENTIAL DEPOSITION EXHIBIT NO. 11 MARKED)

11              Q.        It looks like this document was signed

12    by both you and Ms. Mazza on March 23 of 2023; is that

13    right?

14              A.        Yes.

15              Q.        Who authored this agreement?

16              A.        I think I used the previous agreement

17    that I had on file in HoneyBook as the -- you know,

18    the bones and basis for the digital marketing

19    specialist agreement.

20              Q.        We've looked today at your form of

21    your agreement for your photography clients.  Is that

22    the one that you mean, or are you referring to a

23    different agreement in HoneyBook?

24              A.        Referring to -- to that agreement.

25    There would be some crossover with that one, but I
```



Page 73

 1    likely had it reviewed by my attorneys just as a

 2    business best practice.

 3         Q.        And when you say your attorneys, do

 4    you mean the attorneys at ADF?

 5         A.        Yes.

 6         Q.        And do they provide you with general

 7    business advice in addition to representing you in

 8    this litigation?

 9                   MR. NEIHART:  I'll object to the

10    extent it calls for attorney-client communications.

11                   MS. HINKLE:  I'm not trying to invade

12    the communication.  I'm just trying to understand the

13    scope of the representation.

14         Q.        So I know they represent you in this

15    litigation; I'm wondering if they also provide you

16    general business advice?

17         A.        I'm not sure what you mean by "general

18    business advice," but everything in the document that

19    you have on the screen here is something that I

20    reviewed and approved as what I wanted to use in this

21    agreement.  And it's normal for me to use an agreement

22    when I'm working formally with anyone within my

23    business for a service that I'm hiring out.

24         Q.        So you sent this agreement to your

25    attorneys at ADF for their review, correct?



Page 74

```
 1              A.      Yes.
 2              Q.      And they provided you with advice on
 3     this agreement -- I'm not asking you to disclose the
 4     subject matter of the advice, but they did provide
 5     advice on the agreement, correct?
 6                      MR. NEIHART:  Same objection.
 7     Attorney-client privilege.
 8              A.      I don't remember specifically what
 9     their advice was, but again, everything here is
10     something that I approved and would consider to be
11     in -- in the words that I desire to be in this
12     agreement with Bekah.
13              Q.      I understand that, and I'm not trying
14     to ask you what their advice was.  I'm just
15     wondering -- I know you sent them the document.  Did
16     you -- did they respond?  Did you have any engagement
17     with them with respect to this agreement?
18                      MR. NEIHART:  I --
19              A.      Yes.
20              Q.      And the agreement contemplates that
21     Bekha Mazza would charge you for her time at a rate of
22     $20 per hour; that's in this cost and payment
23     paragraph, correct?
24              A.      Yes.
25              Q.      And the agreement contemplates that
```



Page 75

```
 1   she would submit invoices to you on a quarterly basis
 2   starting in May of 2023, correct?
 3          A.      Yes.
 4          Q.      Did Ms. Mazza ever submit an invoice
 5   to you under this agreement?
 6          A.      She sent me an email letting me know
 7   how much time she spent on the project, and then I
 8   used that to compute roughly how much I paid her.
 9          Q.      Okay.  I'm going to bring that up.  So
10   we'll mark this as Exhibit 12.
11      (CONFIDENTIAL DEPOSITION EXHIBIT NO. 12 MARKED)
12          Q.      Can you see that, Ms. Nelson?
13          A.      Yes, I can.
14          Q.      So the first page of Exhibit 12 looks
15   like something that reflects a payment of $30 to
16   Ms. Mazza; is that correct?
17          A.      Yes.
18          Q.      And this is the -- the only amount
19   you've ever paid Ms. Mazza under the digital marketing
20   specialist agreement, correct?
21          A.      So far, yes.
22          Q.      And I'm going to scroll down.
23   Included in this exhibit is some email communications.
24   Is that big enough for you to read?
25          A.      Yes, it is.
```



Page 76

1          Q.         Okay.  And I'm going to -- I'll scroll

2     down slowly.  I think this might be the email

3     communication you were referring to when she told you

4     how much time she spent.

5                    So I'm looking at Ms. Mazza's email to

6     you that's dated August 24th, 2023, at 1:38 p.m.  Do

7     you see the one I'm referring to?

8          A.         Yes, I do.

9          Q.         And her email says:  "I just got it

10     all done if you want to look it all over.  It took me

11     about 30 minutes.  You seriously do not need to pay me

12     for this."

13                    Is that what you were referencing with

14     respect to her email to you telling you how much time

15     she spent?

16          A.         Yes.

17          Q.         And so at a rate of $20 per hour, if

18     she -- if she spent 30 minutes, that would -- that

19     would warrant compensation of about $10, right?

20          A.         Yeah, if -- if that's what I was

21     following, yes.  But I decided to pay her more than

22     that.

23          Q.         Okay.  That's all I wanted to clarify.

24     So she's -- she's telling you she spent 30 minutes,

25     but you went ahead and paid her $30 which is a little



Page 77

1    more than the hourly rate that was required under the

2    contract, correct?

3           A.       So I was compelled to pay her more,

4    certainly.  Because what would have taken me hours and

5    hours to do, to -- to -- to schedule content for a

6    quarter, for like ten weeks essentially, would have

7    taken me so much time, and it was amazing to me that

8    it only took her 30 minutes.  And it made it very

9    obvious that I hired the right person to do this for

10   me, and I -- I didn't -- it didn't feel courteous,

11   professional -- professionally to only give her $10,

12   so I --

13          Q.       So fair to --

14          A.       -- decided to give her at least 30.

15          Q.       So fair to say you paid her based on

16   the value of the service, not really the amount of

17   time that she spent?

18          A.       The value of the service would -- if

19   you're going by how much my time is worth, would've

20   been much more than $30.  But $30 is what I decided to

21   pay her in lieu of not paying her at all, certainly.

22   She deserved to be compensated for her time and how

23   much time she saved me.

24          Q.       And the work that -- the 30 minutes

25   that she's referencing in this email, that is -- that



Page 78

1    is all the work that she's done to date under that

2    digital marketing specialist agreement, correct?

3            A.        Yes.  For about a quarter's worth of

4    content.

5            Q.        I'm going to bring up some of your

6    other communications with Ms. Mazza, which we'll mark

7    as Exhibit 13.

8        (CONFIDENTIAL DEPOSITION EXHIBIT NO. 13 MARKED)

9            Q.        And it looks like these communications

10   went through HoneyBook.  Do you recognize this?

11           A.        Yes.

12           Q.        Okay.  So this was produced to us in

13   discovery and it -- the exchange seems to be the

14   communication that you had with Ms. Mazza about the

15   work that she did under the agreement; is that right?

16           A.        Yes.

17           Q.        And I wanted to ask you about this

18   part of the communication.  Do you see the page I'm

19   looking at called "Instagram content"?

20           A.        Yes.

21           Q.        Okay.  Let me just make this a little

22   bigger so we can both read it better.  Is that large

23   enough for you to see, Ms. Nelson?

24           A.        Yes, it is.

25           Q.        Okay.  So is this a document that you



Page 79

1    wrote?

2           A.      Yes.

3           Q.      And -- and as I read it, this is

4    essentially your instructions to Ms. Mazza on what she

5    was supposed to do; is that fair?

6           A.      In my business, I would more so call

7    this a "workflow," where I -- I document a process

8    that is repeatable so that whether I'm doing the

9    process or I'm hiring someone to do it, it's -- it's

10   easily understood no matter who the party is who needs

11   to carry out the task within the business.  And so

12   that -- everything that I can think of that would need

13   to be addressed in order to complete a task is

14   addressed properly and thoroughly.

15          Q.      And you created the workflow?

16          A.      Yes, I did.

17          Q.      And so if we look at paragraph six

18   under the heading "Workflow," you're saying "schedule

19   to publish on Tuesdays at 12 p.m. Eastern time"?

20          A.      Yeah, and that is --

21          Q.      Is that your communication to

22   Ms. Mazza about when you'd like her to schedule the

23   post to go live?

24          A.      Yes.  I also referenced that if the

25   platform suggested a better or a more optimized time,



Page 80

1    that she had the freedom to select that instead.

2            Q.        Okay.  And then we're continuing on to

3    the next page.  Is this content that you also wrote,

4    Ms. Nelson?

5            A.        Yes.

6            Q.        And as I understood it, these are

7    captions for posts that you're asking Ms. Mazza to

8    schedule; is that correct?

9            A.        Yes.

10           Q.        So you drafted all of these captions

11   yourself, right?

12           A.        Yes.

13           Q.        And for this first caption you've

14   selected an image.  Is that -- does that mean a

15   specific photo that you want Ms. Mazza to share along

16   with this caption?

17           A.        It's referring to the content library

18   that I have on the Instagram scheduling platform

19   called Later where I have applied tags to photos so

20   that she can filter for photos, say, of Chelsey, as

21   it's referred to here, at a specific location.  So she

22   has the freedom to select a photo, but it gives either

23   very specific parameters of exactly which photo I

24   would like to be posted or a more general filter of

25   which photos that I would approve to be posted within



Page 81

1    a certain category or categorical tags.

2         Q.        Okay.  Is it you that came up with the

3    location tag?

4         A.        Yes.

5         Q.        So -- and you proceed to do that for a

6    number of posts.  Was it your intent that this would

7    be all of the posts to your Instagram account that

8    Ms. Mazza was supposed to schedule for that quarter?

9         A.        Approximately, yes.

10        Q.        So --

11        A.        There may have been some drafts of

12   some that I didn't complete yet at that time.

13        Q.        Okay.  But is it fair for me to assume

14   that Ms. Mazza was not supposed to be the original

15   author of any captions that she would post to your

16   Instagram account?

17        A.        Correct.

18        Q.        Okay.  Anything that she posted

19   would -- would've come from this document that you

20   created?

21        A.        Yes.

22        Q.        And I am not an Instagram savvy

23   person.  So help me understand what Bekah would then

24   have to do with this content in order to get it posted

25   on your Instagram page?



Page 82

1          A.          Yeah.  Could you scroll up to the top

2     of -- to the top of the document?

3          Q.          Sure.  I'm sorry, do you mean the

4     workflow document?

5          A.          Yes, I mean the Instagram content

6     document.

7          Q.          Okay.

8          A.          Yeah.  So basically all of the steps

9     listed here would be how it would go from this

10    document to -- on Instagram, following a lot of steps

11    on the Later platform to integrate geo tags, regular

12    hashtags, and the caption; any necessary cropping of

13    photos so that it fits the specific measurements on

14    the plat -- Instagram platform -- because every

15    platform has their own sizes and, you know, portions

16    of images that can be posted there and how they

17    appear.

18              So things like cropping as needed,

19    making sure that the caption is correctly added and

20    that the spacing looks clean and correct, and then

21    scheduling them at -- at the proper time and making

22    sure that they actually, like, go through.  Those are

23    some examples.

24          Q.          Okay.  So other than Bekha Mazza, have

25    you paid anyone else to provide marketing services to



Page 83

1    your photography business?

2         A.        I have purchased online courses that

3    have included marketing strategy.

4         Q.        So that's like instructional content

5    that you paid for?

6         A.        Right.

7         Q.        And then did you implement that to the

8    extent, you know -- if anyone did anything with that

9    information, that was you; not -- not another

10   individual?

11        A.        Right.  That would've either been me

12   or -- or using that information to then effect my

13   instructions in the Instagram content document that we

14   just referenced.

15        Q.        Okay.  And I think this is clear, I

16   just want to make sure.  That's the only quarter of

17   content that you provided to Bekah to do something

18   with, correct?

19        A.        So far, yes.

20        Q.        And so when you say "so far," you mean

21   that the contract -- you consider the contract to

22   still be in effect; you just haven't asked Bekha Mazza

23   to do anything subsequent to the content we just

24   looked at?

25        A.        I don't think the contract is still in



Page 84

1  effect, but I would need to check.  From verbal

2  communications that I've -- just conversations that

3  I've had with her, the door is still open to use her

4  at another time to focus on Instagram content.

5        Q.     Okay.  Have you paid anyone to provide

6  search engine optimization services to you?

7        A.        I would consider the hashtags that are

8  being loaded into the Later platform and connecting

9  that properly with my account on that platform to be

10 search engine optimization in that it makes it easier

11 for people to find me, specifically in the ways that I

12 would like on the Instagram platform, and that was

13 achieved through the work that Bekah did for me that

14 was referenced in that agreement.

15       Q.     Okay.  I should have been more

16 specific.  Did -- have you had anyone provide search

17 engine optimization services for your website?

18       A.        No, not at this time.  Not that I

19 remember.

20       Q.     Ms. Nelson, do you know if Tallahassee

21 or -- well, is Tallahassee in Leon County?

22       A.     Yes.

23       Q.     Okay.  Do you know if Tallahassee or

24 Leon County have any nondiscrimination laws that might

25 apply to your business?



Page 85

```
 1                    MR. NEIHART:  Object to the extent it
 2    calls for a legal conclusion, but you can answer.
 3            A.        I'm not aware of specific ordinances.
 4            Q.        Have you done any research about that?
 5            A.        Not actively, no.
 6            Q.        Have you sought advice from any
 7    attorney about the applicability of nondiscrimination
 8    laws in Florida?
 9                    MR. NEIHART:  Object to the extent it
10    calls for attorney-client privilege, but you can
11    answer to the extent you don't reference those
12    conversations.
13            A.        I don't remember specifics of
14    conversations that would fit that description.
15            Q.        Have you been the subject of any
16    investigations or complaints that you're aware of in
17    Florida that relate to an alleged violation of a
18    nondiscrimination law?
19            A.        No.
20            Q.        Have you initiated contact with any
21    enforcement authorities in Florida regarding
22    nondiscrimination laws?
23            A.        I don't know of any, so no, I have
24    not.
25            Q.        And I think the answer -- I think I
```



Page 86

 1    know the answer, but I just want to make it explicit.

 2    So you haven't filed any lawsuits in Florida seeking

 3    injunctive relief against the enforcement of

 4    nondiscrimination laws, correct?

 5         A.      No.

 6         Q.      Do you anticipate filing such a

 7    lawsuit in the future?

 8              MR. NEIHART:  Objection to the extent

 9    it calls for speculation.

10         Q.      Do you presently anticipate filing

11    such a lawsuit?

12         A.      I do not presently have that

13    intention, no.

14         Q.      Do you have any fear since you've been

15    living and working in Tallahassee, Florida for the

16    last year and a half that nondiscriminate --

17    nondiscrimination laws would be enforced against you?

18         A.      I have the same fear that those laws

19    would be enforced against me in Louisville, Kentucky

20    because my business is still based out of Louisville,

21    I still take inquiries from Louisville, I still

22    photograph weddings in the Louisville area and

23    surrounding market and was just there last month doing

24    so.  And so not much about how I consider my business

25    being based in Louisville has changed even though I



Page 87

1    currently live in a house in Tallahassee, Florida.

2          Q.      And you also do provide professional

3    photography services in Tallahassee, right?  You

4    photographed two weddings there?

5          A.      I did, yes.

6          Q.      And your website states that you're

7    serving Tallahassee and Louisville, correct?

8          A.      Yes.

9          Q.      So you're very open to new business in

10   Tallahassee, Florida, correct?

11         A.      If it fits what I'm hoping to do

12   within my business and my time constraints, sure, I'm

13   open to it.

14         Q.      Are you doing anything to advertise

15   for potential clients in Tallahassee, Florida?

16         A.      I would consider my posts of weddings

17   that I have photographed here to be an advertisement

18   to both those in Tallahassee and anyone looking to

19   research what my general style is for wedding

20   photography services from wherever they're viewing it.

21         Q.      Do you have or are you trying to

22   develop a professional network in Tallahassee, Florida

23   for your photography services?

24         A.      I have not reached out to other

25   professionals in my industry here since moving to do



Page 88

1    that.

2            Q.        Why not?

3            A.        Because I have gotten the inquiries

4    that fulfilled the time that I have to give to them in

5    this area and also with the work that I have going on

6    in Louisville, there hasn't been a need to do that.

7            Q.        So is it fair for me to interpret that

8    answer as saying you've got as much work as you want

9    right now?

10           A.        For right now, yes.

11           Q.        So you don't -- you don't currently

12   need additional work?

13           A.        Well, I'm actively advertising to gain

14   more clients, so I -- I wouldn't be in business if I

15   didn't want any additional work.  Yes, I am

16   advertising in Louisville, and I am open also to

17   clients in Tallahassee, in both locations, and

18   looking -- and I also have active inquiries even right

19   now.

20           Q.        Do you have active inquiries in

21   Tallahassee?

22           A.        No.

23           Q.        Where are your active inquiries?

24           A.        Louisville, Kentucky.

25           Q.        You testified that one of the reasons



Page 89

1    that you spend more time on the editing business is to

2    limit the amount of time that you're away from your

3    family, right?

4          A.     Yes.

5          Q.     Because you can do editing business

6    from your home office, correct?

7          A.     I can do it from anywhere that I have

8    access to my computer even when I'm traveling.

9          Q.     And it's fair to say that

10   photographing a wedding in Tallahassee, Florida would

11   require less time away from your family than

12   photographing a wedding in Louisville, Kentucky,

13   wouldn't it?

14         A.     It would, yes.  Depending on whether

15   or not I took my family with me.

16         Q.     Have you ever taken your family with

17   you other than the wedding we spoke about in

18   Mississippi?

19         A.     I took my family with me when I

20   traveled back to Louisville in June and July -- the

21   June and July trip roughly this past summer for the

22   Brandon and Kayla engagement session that I

23   photographed at Locust Grove in Louisville.

24         Q.     Okay.  How many days were you here on

25   that trip?



Page 90

1          A.          I would need to go back to my calendar

2     and look, but it was a longer trip than the trip for

3     the wedding.  I think it may have been approximately

4     five or six days, but I would need to look at my

5     calendar to confirm that.

6          Q.          And on that trip you also stayed with

7     Bekha Mazza, correct?

8          A.          Yes.

9          Q.          And did your whole family stay at

10    Bekha Mazza's house?

11         A.          Yes.

12         Q.          And her home is in Shepherdsville; we

13    established that.  Other than the engagement session

14    in Locust Grove, do you recall spending any time in

15    Louisville or Jefferson County on that trip?

16         A.          Yes.

17         Q.          Can you just tell me what you recall

18    of the -- of what you did in Louisville, Kentucky on

19    that trip?

20         A.          I also photographed a family session

21    for Bekha Mazza's family earlier in the day, the same

22    date that I did the Locust Grove engagement session.

23    I did both of those at Locust Grove.  That's my

24    favorite venue.

25                      We also went to our favorite



Page 91

1   Louisville bakery where we have lots of family

2   memories, which is Blue Dog Bakery on Frankfort

3   Avenue.  And we took our children back to the

4   neighborhood, the home where my son was -- both my son

5   and my daughter joined our family and were born, and

6   to some of our favorite family locations all around

7   town to remind them of our roots and where our family

8   really got its beginnings.

9        Q.      And in your discovery responses you

10  said that the family photography session that you did

11  for Bekha Mazza's family, it's not a service that you

12  would offer to the general public; that was something

13  you --

14       A.      No --

15       Q.      -- did more as a friend, right?

16       A.      That's not something that I currently

17  offer to the public, no.

18       Q.      I asked you about Tallahassee and Leon

19  County.  Have you researched the public accommodation

20  laws in any other cities or states?

21       A.      Not that I recall.

22       Q.      Do you recall looking into the laws in

23  Mississippi before you went there to photograph that

24  wedding?

25       A.      No.



Page 92

1          Q.       If a potential customer asks you to

2    photograph a wedding somewhere other than Tallahassee

3    or Louisville, Kentucky, would you consider doing it?

4          A.       I would need to know all -- all the

5    information about the inquiry, but just the fact that

6    it's somewhere other than those two locations would

7    not rule it out for me, no.

8                   MS. HINKLE:  Bryan, I am at another

9    pausing point.  I would love to take another quick

10   break, if that's all right with everybody?

11                  MR. NEIHART:  Yeah, that's fine.

12                      (OFF THE RECORD)

13   BY MS. HINKLE:

14         Q.       Ms. Nelson, I'd like to ask you a

15   little follow-up about just the last year and a half

16   since you've been back in Tallahassee, Florida, and

17   the amount of editing work that you've done in that

18   period of time.

19                  Have you still done some -- some

20   editing work during that period?

21         A.       Yes.

22         Q.       And who are the editing clients you've

23   worked for in the last year and a half?

24         A.       I think mainly the weddings that I've

25   done would be for Amanda ██████, my longstanding



Page 93

 1  client.

 2        Q.        And you told us before that you've

 3  done -- you spent more time on editing than primary

 4  photography work.  Is that also true for this last

 5  year and a half since you've been in Tallahassee,

 6  Florida?

 7                  MR. NEIHART:  I object.  That's

 8  mischaracterization of what she testified, I think.

 9  Go ahead.

10        Q.        Ms. Nelson, did -- did you understand

11  the question?

12        A.        I did.  I'm not sure.  I would need to

13  go back and review my records to be able to give a

14  comprehensive opinion on that.

15        Q.        Okay.  I'm just asking for an

16  estimate, if you could give one.  Have you -- have you

17  done --

18        A.        I'm not able to without looking at my

19  records for the last year and a half.

20        Q.        Okay.  How do -- how are you

21  compensated for the editing work that you do for

22  Amanda ████████?

23        A.        The payment is processed through the

24  HoneyBook platform.

25        Q.        And how is the amount of the payment



Page 94

1   established?

2          A.          It is in the contract that I have with

3   my client, and then that rate is what is computed in

4   the invoice that I send to my client.

5          Q.          Do you do editing work on an

6   hourly-rate basis, or is it a flat rate?

7          A.          I do it on a per-image basis.

8          Q.          And do you recall what the per-image

9   fee is?

10         A.          I would need to look at my contract to

11  be sure.  It may -- the most recent rate might be

12  $0.37 per image, but I would need to reference one of

13  my most recent invoices to be absolutely certain.

14         Q.          I was just checking, I have a form of

15  agreement for your editing services but the -- the

16  rate per image is blank, so that won't hep us.

17                     So your -- your best recollection is

18  $0.37 per image on your latest invoices?

19         A.          That sounds correct, but I would need

20  to check just to be absolutely certain.  I haven't

21  changed it in a while.

22         Q.          And before the break I asked you if

23  you'd be willing to consider photography engagements

24  and locations other than Tallahassee and Louisville

25  and you said you would be, right?



Page 95

1          A.       Yes.

2          Q.       And I wondered if the

3    nondiscrimination laws, or lack thereof, in -- in the

4    jurisdiction where the event would occur would play

5    any -- would be a consideration for you in deciding

6    whether to accept that work?

7          A.       It hasn't --

8                   MR. NEIHART:  Objection -- objection

9    to the extent it calls for speculation and a legal

10   conclusion, but you can answer.

11         A.       It hasn't been up to this point, and

12   I -- I would just need to know more about the general

13   inquiry to know whether that would be something that I

14   would consider pursuing as far as looking into the

15   ordinances and laws and if that were something that

16   would be wise or applicable to that specific inquiry.

17         Q.       Okay.  So you haven't considered that

18   as a -- as a factor up to this point?

19         A.       Not actively, no.

20         Q.       Ms. Nelson, why didn't you come to

21   Louisville for your deposition today?

22         A.       Because I was told that it could be

23   done remotely.

24         Q.       And you prefer that it be done

25   remotely, right?



Page 96

```
 1          A.       I prefer that it be done remotely,
 2  yes.
 3          Q.       And that would be to avoid the -- the
 4  time and travel that it would take to get to
 5  Louisville?
 6          A.       No.  I actually love going to
 7  Louisville when I have a reason to go, but it is
 8  convenient for me to be able to do it from my home
 9  office.
10          Q.       And we've had a couple of court
11  proceedings that have taken place in person, one in
12  Louisville and one in Cincinnati in this case, and am
13  I correct that you haven't attended those in person?
14          A.       I was told that that was not needed
15  typically for a client to attend those proceedings
16  now, so I did not.
17                   MS. HINKLE:  Okay.  I think those are
18  all of my questions for today, Ms. Nelson.  Thank you
19  for your time.
20                   THE WITNESS:  Thank you.
21                   MR. NEIHART:  I have no further
22  questions.
23                   (DEPOSITION CONCLUDED AT 3:22 P.M.)
24
25                           *  *  *  *  *
```



1   STATE OF KENTUCKY          )(

2   COUNTY OF MADISON          )(

3             I, JENNA B. PARSONS, Notary Public, State of

4   Kentucky at Large, hereby certify that the foregoing

5   deposition was taken at the time and place stated in

6   the caption; that the appearances were as set forth in

7   the caption; that prior to giving testimony the

8   witness was first duly sworn by me; that said

9   testimony was taken down by me in stenographic notes

10  and thereafter reduced under my supervision to the

11  foregoing typewritten pages and that said typewritten

12  transcript is a true, accurate and complete record of

13  my stenographic notes so taken.

14            I further certify that I am not related by

15  blood or marriage to any of the parties hereto and

16  that I have no interest in the outcome of captioned

17  case.

18            My commission as Notary Public expires

19  April 24, 2027.

20            Given under my hand this the _____ day of

21  _____, 2024, at Richmond, Kentucky.

22

23  _____
                                    *Jenna B. Parsons*

24  JENNA B. PARSONS

    NOTARY PUBLIC KYNP69884

25



# Exhibit 2

Nelson's Fourth Supplemental Responses to Interrogatory No. 6
and Nelson's Responses to Interrogatories 1-2 Following Remand

FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | |
|---|---|
| **CHELSEY NELSON PHOTOGRAPHY LLC and CHELSEY NELSON,**<br><br>                    **Plaintiffs,**<br><br>**v.**<br><br>**LOUISVILLE/JEFFERSON COUNTY METRO GOVERNMENT, et al.,**<br><br>                    **Defendants.** | **Case No. 3:19-cv-00851-BJB-CHL**<br><br>**Plaintiffs' Fourth Supplemental Response to Defendants' First Set of Discovery Requests to Plaintiffs** |

Under Rules 33 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Chelsey Nelson Photography LLC and Chelsey Nelson supplement their responses as follows to Defendants' First Set of Discovery Requests to Plaintiffs.

## **Definitions**

Plaintiffs incorporate their previous objections to "Definitions" identified in Plaintiffs' Response to Defendants' First Set of Discovery Requests to Plaintiffs by reference.

## **Instructions**

Plaintiffs incorporate their previous objections to "Instructions" identified in Plaintiffs' Response to Defendants' First Set of Discovery Requests to Plaintiffs by reference.

**Interrogatories**

Interrogatory No. 6: Identify all persons for whom you have provided professional (i.e. paid/compensated) photography services, state the approximate date(s) the services were provided, and describe the services provided to each client (e.g., wedding, family portraits, commercial editing, etc.).

Response: Ms. Nelson has been hired as a second shooter by other wedding photographers. In her role as a second shooter, Ms. Nelson exercised her editorial discretion to create photographs on behalf of the primary wedding shooter. In this role, Ms. Nelson photographed the pre-wedding stage, the wedding ceremony, and/or the wedding reception. Ms. Nelson has worked as a second shooter for the following wedding photographers:

1. Danelle ███████
   Contact information: https://www.███████.com/.
   Approximate date: November 2016

2. Shaelynne ███████
   Contact information: https://www.███████photography.com/.
   Approximate date: October 2016 and August 2017

3. Cheryl ███████
   Contact information: https://www.linkedin.com/in/███████-7042ba112/.
   Approximate date: June 2017

4. Haley ███████
   ███████ New Albany, IN 47150
   ███████@gmail.com
   Approximate date: January 2018 and June 2018

5. Lauren ███████
   ███████ Fort Thomas, KY 41075
   ███████@███████photography.com
   Approximate date: November 2017

Plaintiffs provided wedding celebration services for the following clients:

1. Annie and Andrew ███████

3

CONFIDENTIAL



███ : ███, Louisville, KY 40245; ███████, Lexington, KY 40502 ███@gmail.com; ███@uky.edu

Approximate date: August 4, 2018 and May 20, 2018

2. <u>Jessica and Tim</u> ███ ███ Jeffersonville, IN 47130; ██████, Louisville, KY 40220 ███@yahoo.com; ███@gmail.com

Approximate date: December 1, 2018 and June 18, 2018

3. <u>Emily and Daniel</u> ██████e : ███, Louisville, KY 40217 ███@gmail.com; ████@gmail.com

Approximate date: October 5, 2019 and October 18, 2018

4. <u>Kelsey and Andrew</u> ████ : ███ Fort Thomas, KY 41075; ██████, Lexington, KY 40509 ███@gmail.com; █████@gmail.com

Approximate date: October 26, 2019 and November 4, 2018

5. <u>Shelby and Brennen</u> ███ ███, Brentwood, TN 37027 ███@gmail.com; ████@gmail.com

Approximate date: November 30, 2019 and June 5, 2019

Plaintiffs provided boutique editing services for the following clients:

1. <u>Lindsey</u> ███
Wedding editing.
April 2017 - January 2018
██████, Louisville, KY 40299
hello███ photography.com

2. <u>Jodie</u> ██
Wedding and branding/commercial editing.
September 2018 - May 2019
██████, Kernersville, NC 27284
info@███.com

4

3. <u>Laura</u> ▮▮▮▮
   Wedding and family portrait editing.
   September 2018 - December 2018
   ▮▮▮▮▮▮▮▮, Louisville, KY 40220
   hello@▮▮▮▮▮.com

4. <u>Amanda</u> ▮▮▮▮
   Wedding editing.
   December 2018 - present (current client)
   ▮▮▮▮▮▮▮, Raleigh NC 27613
   amanda@▮▮▮▮▮.com



   Plaintiffs also provided family and birth photography to the following persons, but does not provide this service to the general public and does not solicit or accept the patronage of this service from the general public:

1. <u>Caleb</u> ▮▮▮▮.
   <u>August 3, 2017</u>
   ▮▮▮▮@gmail.com
   ▮▮▮▮, Louisville, KY 40206

2. <u>Megan</u> ▮▮▮▮
   Birth photography.
   <u>March 27, 2019</u>
   ▮▮▮▮@gmail.com
   ▮▮▮▮, Salem, IN 47167

3. <u>Donna</u> ▮▮▮▮
   Family photography.
   11/18/18 and 11/27/20
   <u>Unknown address.</u>
   ▮▮▮▮@gmail.com

4. <u>Shrea</u> ▮▮▮▮
   Family photography.
   11/18/18
   ▮▮▮▮@gmail.com



5

CONFIDENTIAL

, Jeffersonville, IN

5. <u>Victoria</u> 
   Family photography.
   2016
   Unknown address, email address, and telephone number.

**Second Supplemental Response:** Ms. Nelson has been hired as a second shooter by other wedding photographers. In her role as a second shooter, Ms. Nelson exercised her editorial discretion to create photographs on behalf of the primary wedding shooter. In this role, Ms. Nelson photographed the pre-wedding stage, the wedding ceremony, and/or the wedding reception. Ms. Nelson has worked as a second shooter for the additional following wedding photographers:

1. <u>Laura</u>
   , Louisville, KY 40220
   hello@         photo.com
   Approximate dates: 2016, 2017, 2018

2. <u>Lindsay</u>
   , Louisville, KY 40299
   hello@         photography.com
   Approximate dates: 2017

**Fourth Supplemental Response:** Ms. Nelson has been hired as a second shooter by other wedding photographers. In her role as a second shooter, Ms. Nelson exercised her editorial discretion to create photographs on behalf of the primary wedding shooter. In this role, Ms. Nelson photographed the pre-wedding stage, the wedding ceremony, and/or the wedding reception. Ms. Nelson has worked as a second shooter for the additional following wedding photographers:

1. <u>Gary and Melissa</u> 
   https://www.         .com/
   Approximate dates: 2017

6

2. <u>Alicia</u> .com
Approximate dates: 2017

## **Document Requests**

<u>Request No. 16</u>: All documents relating to your allegations in Paragraph 231 of the Complaint ("If Chelsey stopped providing wedding celebration and boutique editing services for weddings, she would lose eighty-nine percent of Chelsey Nelson Photography's income.").

<u>Response</u>: Plaintiffs produce responsive documents CNP 00399-00453.

**Fourth Supplemental Response:** Plaintiffs produce responsive documents CNP 00669-00675.

7

Respectfully submitted this 16th day of March, 2021.


By:  s/ Bryan D. Neihart

Jonathan A. Scruggs
AZ Bar No. 030505*
Katherine L. Anderson
AZ Bar No. 033104*
Bryan Neihart
AZ Bar No. 035937*
**Alliance Defending Freedom**
15100 N. 90th Street
Scottsdale, AZ  85260
Telephone: (480) 444-0020
jscruggs@adflegal.org
kanderson@adflegal.org
bneihart@adflegal.org

David A. Cortman
GA Bar No. 188810*
**Alliance Defending Freedom**
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
Telephone: (770) 339-0774
dcortman@adflegal.org

* Admission *Pro Hac Vice*

Joshua D. Hershberger
KY Bar No. 94421
**Hershberger Law Office**
P.O. Box 233
Hanover, IN 47243
Telephone: (812) 274-0441
josh@hlo.legal

*Attorneys for Plaintiffs*

8

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2021, a copy of the foregoing was served by email on the following:

John F. Carroll
Jason D. Fowler
Assistant Jefferson County Attorneys
531 Court Place, Ste. 900
Louisville, Kentucky 40202
(502) 574-6321
john.carroll2@louisvilleky.gov
jason.fowler@louisvilleky.gov

David S. Kaplan
Casey L. Hinkle
Kaplan Johnson Abate & Bird LLP
710 W. Main Street, 4th Floor
Louisville, KY 40202
(502)-416-1630
dkaplan@Kaplanjohnsonlaw.com
chinkle@Kaplanjohnsonlaw.com

*Attorneys for Defendants*

By: s/ Bryan D. Neihart

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

| | |
|---|---|
| **Chelsey Nelson Photography LLC,** and **Chelsey Nelson,**<br><br>Plaintiffs,<br><br>v.<br><br>**Louisville/Jefferson County Metro Government** and **Louisville Metro Human Relations Commission Enforcement**,<br><br>Defendants. | **Case No. 3:19-cv-00851-BJB-CHL**<br><br>**Plaintiffs' Response to Defendants' First Set of Discovery Requests to Plaintiffs Following Remand from the Sixth Circuit** |

Under Rules 33 and 34 of the Federal Rules of Civil Procedure, Plaintiffs Chelsey Nelson Photography LLC and Chelsey Nelson respond as follows to Defendants' First Set of Discovery Requests to Plaintiffs.

1

## **Definitions**

Plaintiffs incorporate their previous objections to "Definitions" identified in Plaintiffs' Response to Defendants' First Set of Discovery Requests to Plaintiffs by reference. Those previous objections apply to Definition numbers 1, 4, and 5 of Defendants' First Set of Discovery Requests to Plaintiffs Following Remand from the Sixth Circuit.

## **Instructions**

Plaintiffs incorporate their previous objections to "Definitions" identified in Plaintiffs' Response to Defendants' First Set of Discovery Requests to Plaintiffs by reference. Those previous objections apply to Definition numbers 1, 4, and 5 of Defendants' First Set of Discovery Requests to Plaintiffs Following Remand from the Sixth Circuit.

## **Interrogatories**

Interrogatory No. 1: Supplement your responses to Defendants' Interrogatory No. 6 by identifying all previously undisclosed persons for whom you have provided professional (i.e. paid/compensated) photography services, state the approximate date(s) the services were provided, and describe the services provided to each client (e.g., wedding, family portraits, commercial editing, etc.).

Response: Plaintiffs object to the terms "client" and "persons" in the phrase "persons for whom you have provided professional (i.e. paid/compensated) photography services" because it is vague as applied to Plaintiffs' business in that Plaintiffs' "client" and "persons" could mean the person paying for Plaintiffs' services, the person, couple, or family getting photographed, or the primary photographer who hires Plaintiffs as a boutique editor or second shooter. Plaintiffs interpret "persons" and "client" to mean the person(s) paying for the photography services or otherwise compensating Plaintiffs for those services. Plaintiffs further object to "identifying" persons as that requests overly broad, unduly burdensome, and irrelevant and confidential information related to third-parties' personal information and interprets this phrase to require the names, city, and state of the persons or client. Subject to these limitations and objections and without waiving them, Plaintiffs provide the following supplemental list of responses to the best of their recollection to the extent the information is available to them:

Plaintiffs provided wedding celebration services for the following clients:

1. Rachael ███████ and Casey ███████

   Engagement and wedding photography on July 7, 2023 and July 9, 2023.

   Gautier, Mississippi

2. Abiokpoyanam ███████ and Damilola ███████

   Wedding photography on August 5, 2023

   Tallahassee, Florida

3. Brandon ███████ and Kayla ███████

3

Engagement photography on June 29, 2024 and anticipated wedding photography on September 7, 2024.

Louisville, Kentucky and Nicholasville, Kentucky

4. Jordan ████████ and Kennedy ████████

Engagement photography on April 13, 2024 and wedding photography on August 3, 2024.

Tallahassee, Florida

Plaintiffs provided boutique editing services for the following clients:

1. Amanda ████████

Contact information previously provided.

Provided wedding boutique editing services on May 17, 2021; June 3, 2021; June 29, 2021; July 7, 2021 (represents two edited weddings submitted the same day); August 2, 2021; August 9, 2021; August 23, 2021; October 1, 2021; October 5, 2021; October 12, 2021; November 5, 2021; November 15, 2021 (represents two edited weddings submitted the same day); June 5, 2022; June 13, 2022; May 9, 2023; June 1, 2023; October 7, 2023; October 13, 2023; December 21, 2023; January 3, 2024; and January 29, 2024.

Plaintiffs also provided non-wedding photography to the following persons, but do not provide this service to the general public and do not solicit or accept the patronage of this service from the general public:

1. Dan ██████ and Bekah Mazza

Family photography on June 29, 2024.

Louisville, Kentucky

Interrogatory No. 2: For each wedding or engagement photography session for which you provided services in-person (as opposed to remote editing services), state the location of the wedding or engagement photography session.

Response: Plaintiffs object to the term "location" because it is vague and

4

overbroad. Plaintiffs interpret "location" to mean the city and state where the in-person photography sessions took place and respond to the best of their recollection. Subject to that limitation, Plaintiffs provide the following response:

1. Danelle ███████: Louisville, Kentucky
2. Shaelynne ███████: Kentucky
3. Cherly ███████: Louisville, Kentucky
4. Haley ███████: Louisville, Kentucky and Lexington, Kentucky
5. Lauren ███████: Louisville, Kentucky
6. Laura ██████: Louisville, Kentucky
7. Lindsay ███████: Louisville, Kentucky
8. Gary and Melissa ███████: Louisville, Kentucky
9. Alicia ███████ Louisville, Kentucky
10. Annie and Andrew ███████: Frankfort, Kentucky
11. Jessica and Tim ███████: Louisville, Kentucky
12. Emily and Daniel ███████: Louisville, Kentucky
13. Kelsey and Andrew ███████: Georgetown, Kentucky
14. Shelby and Brennen ███████: Louisville, Kentucky
15. Larissa and Parker ███████: Louisville, Kentucky
16. Rachael and Casey ███████: Ocean Springs, Mississippi and Christian Pass, Mississippi
17. Abiokpoyanam ███████ and Damilola ███████: Tallahassee, Florida
18. Brandon ███████ and Kayla ███████: Louisville, Kentucky and Lansdowne, Kentucky (anticipated)
19. Jordan ███████ and Kennedy ███████: Tallahassee, Florida

<u>Interrogatory No. 3</u>: For each client for whom you provided boutique editing services, state the location from which you provided those services.

<u>Response</u>: Plaintiffs object to the term "location" because it is vague and

5

overbroad. Plaintiffs interpret "location" to mean the city and state where Plaintiffs were situated at the time they provided the boutique editing services. Plaintiffs also interpret "client" to mean the person(s) paying for the photography services or otherwise compensating Plaintiffs for those services. Subject to these objections and limitations and without waiving them, Plaintiffs respond that they have provided boutique editing services from either Louisville, Kentucky or Tallahassee, Florida.

Interrogatory No. 4: For each client for whom you have provided professional (i.e. paid/compensated) photography services, describe how you first met or were contacted by such client (e.g., family member, met through church, met through a friend, contacted through your website, etc.).

Response: Plaintiffs interpret the phrase "professional (i.e. paid/compensated) photography services" to refer to the services that she offers to the public—i.e., wedding celebration services (including as a second shooter), and boutique editing services. Plaintiffs also interpret "client" to mean the person(s) paying for the photography services or otherwise compensating Plaintiffs for those services. Subject to that limitation, and to the best of Plaintiffs' recollection and a reasonable degree of inquiry, Plaintiffs provide the following response:

1.   Danelle ███: Does not recall

2.   Shaelynne ████: Rising Tide Society

3.   Cherly ███: Does not recall

4.   Haley ████: Instagram

5.   Lauren ███: Honeybook

6.   Laura ██: Rising Tide Society

7.   Lindsay ████: Rising Tide Society

8.   Gary and Melissa ███: Does not recall

9.   Alicia ███: Facebook

10.  Annie and Andrew ███: Website inquiry

6

CONFIDENTIAL

11.     Jessica and Tim ███: Church

12.     Emily and Daniel ████e: Referral from photographer in Louisville, Kentucky

13.     Kelsey and Andrew █████: Referral from photographer in Louisville, Kentucky

14.     Shelby and Brennen ███: Referral from previous client

15.     Larissa and Parker ███: Website inquiry

16.     Rachael and Casey ████: Family member

17.     Abiokpoyanam ████ and Damilola ████: Church

18.     Brandon ████ and Kayla ███: Website inquiry

19.     Jordan ████ and Kennedy ████: Church

<u>Interrogatory No. 5</u>: Describe how and when you first met the person with first name "Bekah" who is party to the Agreement with Bekah.

<u>Response</u>: Chelsey Nelson met Bekah Mazza at church in the summer of 2020.

<u>Interrogatory No. 6</u>: State the date on which the Agreement with Bekah was drafted and identify all persons involved in drafting, reviewing, or editing the Agreement with Bekah and separately describe the involvement of each such person.

<u>Response</u>: Plaintiffs object to describing "the involvement of each such person" in drafting, reviewing, or editing the Agreement with Bekah because this seeks information covered by the attorney-client privilege, including written and oral communications between Plaintiffs and their attorneys. Plaintiffs also object to describing "the involvement of each such person" because this seeks information covered by the attorney work product doctrine, including information prepared in anticipation of and/or during litigation and the mental impressions, conclusions, or opinions of Plaintiffs' counsel. Subject to these objections and without waiving them, the Agreement with Bekah was drafted, reviewed, and edited by Chelsey Nelson as well as Plaintiffs' counsel for the purpose of giving legal advice about this document. Chelsey

7

**CONFIDENTIAL**

Nelson sent a draft unsigned agreement to Bekah Mazza through Honeybook on March 22, 2023. The agreement was finalized on or around March 23, 2023.

Interrogatory No. 7: State whether you currently have any agreement with a marketing consultant, social media consultant, employee, contractor, or other consultant whose services relate in any way to developing or identifying customers in the Louisville Metro area, including by stating whether the Agreement with Bekah is still in effect.

Response: The Agreement with Bekah is available to be renewed on an as-needed basis. Plaintiffs do not currently have any other such formal agreements in place, but use their professional and personal network in Louisville, Kentucky to identify clients.

Interrogatory No. 8: Describe any and all efforts you have made since your move to Florida to market your services to customers residing in the Louisville Metro area and state the approximate date of those efforts.

Response: Plaintiffs object to describing "any and all efforts" because it is overly broad and unduly burdensome in that it conceivably seeks every email, text message, social media message, letter, and every other form of written or verbal communication Plaintiffs have ever had with anyone about their services during the time period requested. Subject to these objections and without waiving them, Plaintiffs have used Louisville specific keywords on their website for SEO (ongoing); updated their website including its contact page to target couples in the Louisville Metro area who are interested in wedding photography (July 2024); posted content on Instagram and Plaintiffs' blog specifically marketed to Louisville and targeting prospective clients in Louisville, i.e. engagement sessions and weddings Plaintiffs photographed in Louisville (ongoing); used specific hashtags on Instagram that target prospective clients in Louisville, i.e. #louisvilleweddingphotographer (ongoing); used geo-tags on Instagram posts related to where the photos were taken in Louisville so that when people search for photos of that location they are able to view Plaintiffs' photographs and social-media

8

profile (ongoing); communicate with friends, former clients, and other persons in Louisville when Plaintiffs return to Kentucky about interest in providing wedding celebration services in Louisville and ability to return for possible services (ongoing); communicate with friends and other persons in Louisville about intent and desire to return to Louisville to provide wedding celebration services (ongoing); contracted with digital marketing specialist to schedule Instagram content, including specific marketing to the Louisville Metro area (March 2023); network with local Louisville Metro for second shooting needs and wedding referrals (ongoing); and filmed video content in Louisville at engagement session locations to use for specific marketing to Louisville brides in content such as Instagram Reels and Instagram posts with specific Louisville geo-tags and hashtags (June 2024 and ongoing).

Interrogatory No. 9: Describe all occasions on which you have returned to the Louisville Metro area since you moved to Florida by stating the date of your trip, the number of days you were in the Louisville Metro area on each trip, and the purpose of the trip.

Response: Plaintiffs returned to Louisville Metro from June 26, 2024 to July 1, 2024 (6 days) for the purpose of photographing an engagement session and photography a family session at Locust Grove in Louisville Metro. Plaintiffs anticipate returning to Louisville Metro from September 6, 2024 to September 8, 2024 (3 days) for the purpose of photographing a wedding in Kentucky and creating social-media and/or blog content to market to and target prospective clients in Louisville Metro.

Interrogatory No. 10: Identify all persons who have contacted you through the "Contact" page of your website (https://www.chelseynelson.com/contact) and, for each such person, state the approximate date of the contact, the purpose of the contact, what (if any) professional services the person inquired about, and (if you know) the location from which the person was contacting you and the location at which they were seeking photography services.

9

Response: On August, 27, 2024, the parties conferred and Defendants granted Plaintiffs' request for an extension to respond to this interrogatory through Friday, September 6, 2024. Plaintiffs reserved the right to raise objections to this interrogatory.

Interrogatory No. 11: Identify all persons to whom you have declined to provide photography or editing services since your move to Florida and, for each such person, state the approximate date the services were requested, describe the services requested, and describe the reason(s) you declined to provide the services.

Response: Plaintiffs object to this to interrogatory because it requests information outside of Plaintiffs' knowledge in that Plaintiffs are only aware of the information requested by this interrogatory to the extent a person disclosed the information to Plaintiffs. Plaintiffs further object to "identifying" persons as that requests overly broad, unduly burdensome, and irrelevant and confidential information related to third-parties personal information. Subject to these objections and limitations and without waiving them, Plaintiffs direct Defendants to responsive documents CNP 1006–1028. Plaintiffs further state that the requests from persons who identified themselves as Abigail, Elizabeth ██████, Danielle ████████ Joeyy ███, and Sarah ███████ were not pursued further by Plaintiffs because of their lack of responsiveness. The request from the person who identified himself as Paul was not pursued by Plaintiffs because it appeared from the face of the inquiry that it requested wedding celebration services that would have required Plaintiffs to express messages about marriage contrary to their religious beliefs in that "Mr." was the marked salutation for both individuals requesting photography. The request from the person who identified himself as Jackson was denied as requesting services outside of the scope of services that Plaintiffs provide.

## Document Requests

Request No. 1: Produce an unredacted copy of the Agreement with Bekah.

Response: Plaintiffs produce responsive documents CNP 918–921.

10

Request No. 2: Produce all drafts of the Agreement with Bekah.

Response: Plaintiffs object to this request because it seeks "drafts" of documents covered by the attorney-client privilege and attorney work product doctrine, including written communications between Plaintiffs and Plaintiffs' counsel and documents containing Plaintiffs' counsel's mental impressions, conclusions, opinions, or legal theories and documents prepared in anticipation of and/or during litigation. Subject to these objections and without waiving them, Plaintiffs produce responsive documents CNP 918–921, CNP 923–925. Plaintiffs are withholding responsive documents based on the attorney-privilege and the attorney work product doctrine. Plaintiffs' privilege log does not identify specific drafts being withheld based on the attorney-client privilege or attorney work product doctrine because such a log would be disproportionate to the needs of this case.

Request No. 3: Produce all invoices submitted in connection with the Agreement with Bekah.

Response: Plaintiffs produce responsive documents CNP 922, 931–933.

Request No. 4: Produce documents sufficient to establish the date and amount of all payments made pursuant to the Agreement with Bekah.

Response: Plaintiffs produce responsive documents CNP 922.

Request No. 5: Produce all marketing materials, social media content, schedules, analysis, or other documents created pursuant to the Agreement with Bekah.

Response: Plaintiffs object to this request because the term "marketing materials" is vague in that it is unclear whether the term only includes material intended for the public or whether it also includes private communications. The term "marketing materials" is also overly broad and unduly burdensome in that the term could conceivably include every text message, email, or any other form of communication, and drafts of those communications, that Plaintiffs intended to or

11

actually did market or develop for Chelsey Nelson Photography LLC. Because the term "marketing material" is vague, Plaintiffs object to this request to the extent that it seeks documents covered by the attorney-client privilege and attorney work product and interpret the request not to be requesting documents subject to those privileges. Subject to these objections and without waiving them, Plaintiffs produce responsive documents CNP 926–933. Plaintiffs further produce publicly available documents on https://www.instagram.com/mrs.chelseynelson.

      <u>Request No. 6</u>: Produce all agreements with a marketing consultant, social media consultant, employee, contractor, or other consultant whose services relate in any way to developing or identifying customers in the Louisville Metro area.

      <u>Response</u>: Plaintiffs produce responsive documents CNP 918–921.

      <u>Request No. 7</u>: Produce all marketing materials, social media content or other documents related to marketing your services to potential customers in the Louisville Metro area since your move to Florida.

      <u>Response</u>: Plaintiffs object to this request because the term "marketing materials" is vague in that it is unclear whether the term only includes material intended for the public or whether it also includes private communications. The term "marketing materials" is also overly broad and unduly burdensome in that the term could conceivably include every text message, email, or any other form of communication, and drafts of those communications, that Plaintiffs intended to or actually did market or develop for Chelsey Nelson Photography LLC. Because the term "marketing material" is vague, Plaintiffs object to this request to the extent that it seeks documents covered by the attorney-client privilege and attorney work product and interpret the request not to be requesting documents subject to those privileges. Subject to these objections and without waiving them, Plaintiffs produce responsive documents CNP 926–933. Plaintiffs further produce publicly available documents on

12

https://www.chelseynelson.com, https://www.instagram.com/mrs.chelseynelson, and https://www.facebook.com/chelseynelsonphotography/.

Request No. 8: Produce all messages received through the "Contact" page of your website (https://www.chelseynelson.com/contact).

Response: On August, 27, 2024, the parties conferred and Defendants granted Plaintiffs' request for an extension to respond to this request through Friday, September 6, 2024. Plaintiffs reserved the right to raise objections to this request.

Request No. 9: Produce all responses to messages received through the "Contact" page of your website (https://www.chelseynelson.com/contact).

Response: On August, 27, 2024, the parties conferred and Defendants granted Plaintiffs' request for an extension to respond to this request through Friday, September 6, 2024. Plaintiffs reserved the right to raise objections to this request.

Request No. 10: Produce any amendments to the Operating Agreement for Chelsey Nelson Photography LLC, which was previously filed with the Court as pages 3-9 of the Appendix [ECF No. 3-4].

Response: No responsive documents exist.

Request No. 11: Produce any statements or summaries of income, revenue, and/or profits and losses for Chelsey Nelson Photography LLC.

Response: Plaintiffs produce responsive documents CNP 934–941.

Request No. 12: Produce all tax returns filed by or on behalf of Chelsey Nelson Photography LLC.

Response: Plaintiffs object to this request to the extent it requests personal tax returns as opposed to tax returns filed by Chelsey Nelson Photography LLC and to the extent that it seeks confidential or irrelevant information. Subject to these objections and without waiving them, plaintiffs produce responsive documents CNP 942–1005.

Request No. 13: Produce all documents you may attach as an exhibit to your motion for summary judgment and/or response to Defendants' motion to dissolve the

13

permanent injunction, contemplated by the Agreed Scheduling Order filed with the Court as Document 149.

Response: Plaintiffs object to this request because discovery is ongoing. Plaintiffs therefore cannot identify "all documents" which may be used as evidence in any future motion or predict which documents may be relied on. Subject to Plaintiffs' objections and without waiving them, Plaintiffs identify previously produced documents, documents produced by Defendants, and documents that are publicly available on www.chelseynelson.com, https://www.instagram.com/mrs.chelseynelson, and https://www.facebook.com/chelseynelsonphotography/. Plaintiffs have no additional responsive documents other than those previously produced in these responses and/or identified and those that will be produced and/or identified by Defendants.

## PLAINTIFFS' SIGNATURE PURSUANT TO FED. R. CIV. P. 33

Plaintiffs Chelsey Nelson Photography LLC and Chelsey Nelson declare that

the answers to the interrogatories above are true and correct to the best of their

knowledge.

_Chelsey Nelson_
Chelsey Nelson
On behalf of herself and Chelsey Nelson
Photography LLC

15

# Exhibit 3

Excerpts from 2023 Tax Return

FILED UNDER SEAL

# SCHEDULE C
## (Form 1040)

Department of the Treasury
Internal Revenue Service

# Profit or Loss From Business
## (Sole Proprietorship)

Attach to Form 1040, 1040-SR, 1040-SS, 1040-NR, or 1041; partnerships must generally file Form 1065.

Go to *www.irs.gov/ScheduleC* for instructions and the latest information.

OMB No. 1545-0074

**2023**

Attachment
Sequence No. **09**

| Name of proprietor | Social security number (SSN) |
|---|---|
| Chelsey A Nelson | |

**A** Principal business or profession, including product or service (see instructions)

Photo Editing

**B** Enter code from instructions ▶ ▮▮▮▮▮▮

**C** Business name. If no separate business name, leave blank.

**D** Employer ID number (EIN) (see instr.)

**E** Business address (including suite or room no.) ▶ ████████████

City, town or post office, state, and ZIP code    Tallahassee, FL ████████

**F** Accounting method: **(1)** ☒ Cash    **(2)** ☐ Accrual    **(3)** ☐ Other (specify) ▶

**G** Did you "materially participate" in the operation of this business during 2023? If "No," see instructions for limit on losses  ☒ Yes  ☐ No

**H** If you started or acquired this business during 2023, check here . . . . . . . . . . . . . . ▶ ☐

**I** Did you make any payments in 2023 that would require you to file Form(s) 1099? See instructions . . . . ☐ Yes  ☒ No

**J** If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . . ☐ Yes  ☐ No

## Part I    Income

| | | | | |
|---|---|---|---|---:|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . . . . ▶ ☐ | **1** | | 1,479. |
| 2 | Returns and allowances . . . . . . . . . . . . . . . . . . . . . . . . | **2** | | |
| 3 | Subtract line 2 from line 1 . . . . . . . . . . . . . . . . . . . . . . | **3** | | 1,479. |
| 4 | Cost of goods sold (from line 42) . . . . . . . . . . . . . . . . . . . | **4** | | |
| 5 | **Gross profit.** Subtract line 4 from line 3 . . . . . . . . . . . . . . . . . | **5** | | 1,479. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . | **6** | | |
| 7 | **Gross income.** Add lines 5 and 6 . . . . . . . . . . . . . . . . . . ▶ | **7** | | 1,479. |

## Part II    Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | | | |
|---|---|---|---:|---|---|---|---|---:|
| 8 | Advertising . . . . . | **8** | | 18 | Office expense (see instructions) . | **18** | | |
| 9 | Car and truck expenses (see instructions) . . . | **9** | | 19 | Pension and profit-sharing plans . | **19** | | |
| 10 | Commissions and fees . . | **10** | | 20 | Rent or lease (see instructions): | | | |
| 11 | Contract labor (see instructions) | **11** | | a | Vehicles, machinery, and equipment | **20a** | | |
| 12 | Depletion . . . . . . | **12** | | b | Other business property . . . | **20b** | | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) . . . . . | **13** | 44. | 21 | Repairs and maintenance . . . | **21** | | |
| | | | | 22 | Supplies (not included in Part III) . | **22** | | |
| | | | | 23 | Taxes and licenses . . . . . | **23** | | |
| | | | | 24 | Travel and meals: | | | |
| 14 | Employee benefit programs (other than on line 19) . . | **14** | | a | Travel . . . . . . . . | **24a** | | |
| 15 | Insurance (other than health) | **15** | | b | Deductible meals (see instructions) | **24b** | | |
| 16 | Interest (see instructions): | | | 25 | Utilities . . . . . . . . | **25** | | |
| a | Mortgage (paid to banks, etc.) | **16a** | | 26 | Wages (less employment credits) . | **26** | | |
| b | Other . . . . . . | **16b** | | 27a | Other expenses (from line 48) . . | **27a** | | 0. |
| 17 | Legal and professional services | **17** | | b | Energy efficient commercial bldgs deduction (attach Form 7205) . . | **27b** | | |

| | | | | |
|---|---|---|---|---:|
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27b . . . . . . . ▶ | **28** | | 44. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . . . | **29** | | 1,435. |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method. See instructions. | | | |
| | **Simplified method filers only:** Enter the total square footage of (a) your home: _____ | | | |
| | and (b) the part of your home used for business: _____. Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30 . . . . . . | **30** | | |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29. | | | |
| | • If a profit, enter on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see instructions). Estates and trusts, enter on **Form 1041, line 3.** | **31** | | 1,435. |
| | • If a loss, you **must** go to line 32. | | | |
| 32 | If you have a loss, check the box that describes your investment in this activity. See instructions. | | | |
| | • If you checked 32a, enter the loss on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on **Form 1041, line 3.** | | 32a ☒ | All investment is at risk. |
| | • If you checked 32b, you **must** attach **Form 6198.** Your loss may be limited. | | 32b ☐ | Some investment is not at risk. |

**For Paperwork Reduction Act Notice, see the separate instructions.**    BAA    REV 03/07/24 Intuit.cg.cfp.sp    Schedule C (Form 1040) 2023

CONFIDENTIAL

CNP 01815

| SCHEDULE C | **Profit or Loss From Business** | | OMB No. 1545-0074 |
|---|---|---|---|
| **(Form 1040)** | **(Sole Proprietorship)** | | **2023** |
| Department of the Treasury Internal Revenue Service | Attach to Form 1040, 1040-SR, 1040-SS, 1040-NR, or 1041; partnerships must generally file Form 1065.<br>Go to *www.irs.gov/ScheduleC* for instructions and the latest information. | | Attachment Sequence No. **09** |

| Name of proprietor | Social security number (SSN) |
|---|---|
| Chelsey A Nelson | |

**A** Principal business or profession, including product or service (see instructions)
CNP Photography

**B** Enter code from instructions

**C** Business name. If no separate business name, leave blank.

**D** Employer ID number (EIN) (see instr.)

**E** Business address (including suite or room no.) ▮▮▮▮▮▮
City, town or post office, state, and ZIP code    Tallahassee, FL ▮▮▮▮▮

**F** Accounting method: **(1)** ☒ Cash    **(2)** ☐ Accrual    **(3)** ☐ Other (specify)

**G** Did you "materially participate" in the operation of this business during 2023? If "No," see instructions for limit on losses . . . ☒ Yes ☐ No

**H** If you started or acquired this business during 2023, check here . . . . . . . . . . . . . . ☐

**I** Did you make any payments in 2023 that would require you to file Form(s) 1099? See instructions . . . . . ☐ Yes ☒ No

**J** If "Yes," did you or will you file required Form(s) 1099? . . . . . . . . . . . . . . . ☐ Yes ☐ No

### Part I  Income

| | | | |
|---|---|---|---|
| 1 | Gross receipts or sales. See instructions for line 1 and check the box if this income was reported to you on Form W-2 and the "Statutory employee" box on that form was checked . . . . . . . . . ☐ | 1 | 2,600. |
| 2 | Returns and allowances | 2 | |
| 3 | Subtract line 2 from line 1 | 3 | 2,600. |
| 4 | Cost of goods sold (from line 42) | 4 | |
| 5 | **Gross profit.** Subtract line 4 from line 3 | 5 | 2,600. |
| 6 | Other income, including federal and state gasoline or fuel tax credit or refund (see instructions) . . . | 6 | |
| 7 | **Gross income.** Add lines 5 and 6 . . . . . . . . . . . . . . . . . . . ▶ | 7 | 2,600. |

### Part II  Expenses. Enter expenses for business use of your home **only** on line 30.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 8 | Advertising . . . . . | 8 | 96. | 18 | Office expense (see instructions) . | 18 | |
| 9 | Car and truck expenses (see instructions) . . . | 9 | 436. | 19 | Pension and profit-sharing plans . | 19 | |
| 10 | Commissions and fees . | 10 | | 20 | Rent or lease (see instructions): | | |
| 11 | Contract labor (see instructions) | 11 | | a | Vehicles, machinery, and equipment | 20a | 154. |
| 12 | Depletion . . . . . | 12 | | b | Other business property . . . | 20b | |
| 13 | Depreciation and section 179 expense deduction (not included in Part III) (see instructions) | 13 | 537. | 21 | Repairs and maintenance . . . | 21 | |
| | | | | 22 | Supplies (not included in Part III) . | 22 | |
| | | | | 23 | Taxes and licenses . . . . . | 23 | 643. |
| | | | | 24 | Travel and meals: | | |
| 14 | Employee benefit programs (other than on line 19) . | 14 | | a | Travel . . . . . . . . | 24a | |
| 15 | Insurance (other than health) | 15 | | b | Deductible meals (see instructions) | 24b | |
| 16 | Interest (see instructions): | | | 25 | Utilities . . . . . . . | 25 | |
| a | Mortgage (paid to banks, etc.) | 16a | | 26 | Wages (less employment credits) . | 26 | |
| b | Other . . . . . . | 16b | | 27a | Other expenses (from line 48) . . | 27a | 1,033. |
| 17 | Legal and professional services | 17 | | b | Energy efficient commercial bldgs deduction (attach Form 7205) . . | 27b | |
| 28 | **Total expenses** before expenses for business use of home. Add lines 8 through 27b . . . . . . ▶ | | | | | 28 | 2,899. |
| 29 | Tentative profit or (loss). Subtract line 28 from line 7 . . . . . . . . . . . . . . | | | | | 29 | −299. |
| 30 | Expenses for business use of your home. Do not report these expenses elsewhere. Attach Form 8829 unless using the simplified method. See instructions.<br>**Simplified method filers only:** Enter the total square footage of (a) your home: _____<br>and (b) the part of your home used for business: _____. Use the Simplified Method Worksheet in the instructions to figure the amount to enter on line 30 | | | | | 30 | 1,247. |
| 31 | **Net profit or (loss).** Subtract line 30 from line 29.<br>• If a profit, enter on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see instructions). Estates and trusts, enter on **Form 1041, line 3.**<br>• If a loss, you **must** go to line 32. | | | | | 31 | −1,546. |
| 32 | If you have a loss, check the box that describes your investment in this activity. See instructions.<br>• If you checked 32a, enter the loss on both **Schedule 1 (Form 1040), line 3,** and on **Schedule SE, line 2.** (If you checked the box on line 1, see the line 31 instructions.) Estates and trusts, enter on **Form 1041, line 3.**<br>• If you checked 32b, you **must** attach **Form 6198.** Your loss may be limited. | | | | | 32a ☒ All investment is at risk.<br>32b ☐ Some investment is not at risk. | |

For Paperwork Reduction Act Notice, see the separate instructions.    BAA    REV 03/07/24 Intuit.cg.cfp.sp    Schedule C (Form 1040) 2023

CONFIDENTIAL

CNP 01817

| Form **8829** | **Expenses for Business Use of Your Home** | OMB No. 1545-0074 |
|---|---|---|
| Department of the Treasury Internal Revenue Service | File only with Schedule C (Form 1040). Use a separate Form 8829 for each home you used for business during the year. Go to *www.irs.gov/Form8829* for instructions and the latest information. | **2023** Attachment Sequence No. **176** |

Name(s) of proprietor(s)
Chelsey A Nelson

Your social security number

### Part I   Part of Your Home Used for Business    CNP Photography

| | | | |
|---|---|---|---|
| 1 | Area used regularly and exclusively for business, regularly for daycare, or for storage of inventory or product samples (see instructions) | 1 | ▮ |
| 2 | Total area of home | 2 | |
| 3 | Divide line 1 by line 2. Enter the result as a percentage | 3 | 8.59 % |
| | **For daycare facilities not used exclusively for business, go to line 4. All others, go to line 7.** | | |
| 4 | Multiply days used for daycare during year by hours used per day | 4 | hr. |
| 5 | If you started or stopped using your home for daycare during the year, see instructions; otherwise, enter 8,760 | 5 | ▮ hr. |
| 6 | Divide line 4 by line 5. Enter the result as a decimal amount | 6 | |
| 7 | Business percentage. For daycare facilities not used exclusively for business, multiply line 6 by line 3 (enter the result as a percentage). All others, enter the amount from line 3 | 7 | 8.59 % |

### Part II   Figure Your Allowable Deduction

| | | (a) Direct expenses | (b) Indirect expenses | | |
|---|---|---|---|---|---|
| 8 | Enter the amount from Schedule C, line 29, **plus** any gain derived from the business use of your home, **minus** any loss from the trade or business not derived from the business use of your home. See instructions. | | | 8 | ▮ |
| | See instructions for columns (a) and (b) before completing lines 9–22. | | | | |
| 9 | Casualty losses (see instructions) | | | | |
| 10 | Deductible mortgage interest (see instructions) | | ▮. | | |
| 11 | Real estate taxes (see instructions) | | | | |
| 12 | Add lines 9, 10, and 11 | | ▮ | | |
| 13 | Multiply line 12, column (b), by line 7 | 13 | ▮ | | |
| 14 | Add line 12, column (a), and line 13 | | | 14 | ▮ |
| 15 | Subtract line 14 from line 8. If zero or less, enter -0- | | | 15 | ▮. |
| 16 | Excess mortgage interest (see instructions) | | | | |
| 17 | Excess real estate taxes (see instructions) | | | | |
| 18 | Insurance | | ▮ | | |
| 19 | Rent | | | | |
| 20 | Repairs and maintenance | | | | |
| 21 | Utilities | | ▮ | | |
| 22 | Other expenses (see instructions) | | ▮ | | |
| 23 | Add lines 16 through 22 | | ▮ | | |
| 24 | Multiply line 23, column (b), by line 7 | 24 | | | |
| 25 | Carryover of prior year operating expenses (see instructions) | 25 | | | |
| 26 | Add line 23, column (a), line 24, and line 25 | | | 26 | ▮ |
| 27 | Allowable operating expenses. Enter the **smaller** of line 15 or line 26 | | | 27 | ▮. |
| 28 | Limit on excess casualty losses and depreciation. Subtract line 27 from line 15 | | | 28 | |
| 29 | Excess casualty losses (see instructions) | 29 | | | |
| 30 | Depreciation of your home from line 42 below | 30 | ▮. | | |
| 31 | Carryover of prior year excess casualty losses and depreciation (see instructions) | 31 | | | |
| 32 | Add lines 29 through 31 | | | 32 | ▮ |
| 33 | Allowable excess casualty losses and depreciation. Enter the **smaller** of line 28 or line 32 | | | 33 | ▮ |
| 34 | Add lines 14, 27, and 33 | | | 34 | ▮ |
| 35 | Casualty loss portion, if any, from lines 14 and 33. Carry amount to **Form 4684**. See instructions | | | 35 | |
| 36 | **Allowable expenses for business use of your home.** Subtract line 35 from line 34. Enter here and on Schedule C, line 30. If your home was used for more than one business, see instructions | | | 36 | ▮ |

### Part III   Depreciation of Your Home

| | | | |
|---|---|---|---|
| 37 | Enter the **smaller** of your home's adjusted basis or its fair market value. See instructions | 37 | |
| 38 | Value of land included on line 37 | 38 | |
| 39 | Basis of building. Subtract line 38 from line 37 | 39 | |
| 40 | Business basis of building. Multiply line 39 by line 7 | 40 | |
| 41 | Depreciation percentage (see instructions) | 41 | ▮ |
| 42 | Depreciation allowable (see instructions). Multiply line 40 by line 41. Enter here and on line 30 above | 42 | ▮ |

### Part IV   Carryover of Unallowed Expenses to 2024

| | | | |
|---|---|---|---|
| 43 | Operating expenses. Subtract line 27 from line 26. If less than zero, enter -0- | 43 | ▮. |
| 44 | Excess casualty losses and depreciation. Subtract line 33 from line 32. If less than zero, enter -0- | 44 | |

CONFIDENTIAL    CNP 01820

For Paperwork Reduction Act Notice, see your tax return instructions.    BAA    REV 03/07/24 Intuit.cg.cfp.sp    Form **8829** (2023)

# Exhibit 4

Digital Marketing Agreement

FILED UNDER SEAL



**Chelsey Nelson Photography**

Chelsey Nelson Photography, LLC

# Digital Marketing Agreement

Entered into on   Mar 22, 2023   .

Parties:

Chelsey Nelson Photography LLC

Known as "Photographer"

and

Bekah Mazza

Known as "Digital Marketing Specialist"

Collectively, all of the above people or businesses entering this Agreement will be referred to as the "Parties."

## Purpose of the Agreement

Photographer wishes to hire Digital Marketing Specialist to provide services relating to social media marketing targeting the Louisville, Kentucky area. The purpose of this service is to attract Louisville-based leads that Photographer can convert into wedding celebration or boutique editing services clients. All work performed by Digital Marketing Specialist for the Photographer shall be governed by this Agreement. In exchange for adequate and valuable consideration, the Parties agree to this Agreement as follows:

## Services

Digital Marketing Specialist shall provide Photographer with the following services ("Services"): content marketing strategies, including but not limited to strategies on generating active audience participation from the Louisville area, attracting leads and requests for wedding celebration or boutique editing services that ultimately convert to customers from the Louisville area, tailoring marketing to Louisville-based clients, creating high-quality and engaging content, creating a social media posting schedule; implementation of said strategies, analysis of effectiveness of said strategies, social media marketing, and, social media management. Services shall be provided with the specific intent that Photographer's marketing will be directed to attract and generate requests and ultimately clients for wedding celebration or boutique editing services for Louisville-based clients.

**CONFIDENTIAL**          **CNP 00918**

Digital Marketing Specialist agrees to work with the Photographer to ensure that all Services are consistent with the Photographer's editorial judgment. Digital Marketing Specialist also agrees to not post or create any Services on behalf of the Photographer which are inconsistent with or conflict with the Photographer's editorial judgment. Digital Marketing Specialist further agrees to immediately cure any Services created or posted which conflict with the Photographer's editorial judgment upon written notice from the Photographer and at no cost to the Photographer.

## Delivery and Duration of Services

**Delivery of Services.** Digital Marketing Specialist has provided an initial consultation with Photographer to review Services. Digital Marketing Specialist will then provide Services on a quarterly basis (i.e., every 3 months) beginning May 1, 2023.

**Duration of Services.** This Agreement is effective for one year from the date entered into, at which time it may be renewed by agreement of the Parties.

## Cost and Payment

As consideration for Digital Marketing Specialist's time, experience, and skill, Photographer agrees to pay Digital Marketing Specialist an hourly rate of $20.00 per hour for Services. Digital Marketing Specialist shall submit invoices to Photographer on a quarterly basis (i.e., every 3 months) beginning May 1, 2023.

## Intellectual Property

Digital Marketing Specialist agrees that all content created by Digital Marketing Specialist pursuant to this Agreement are owned by Photographer as a work-made-for-hire. To the extent any content created by Digital Marketing Specialist is not deemed a work made for hire, Digital Marketing Specialist agrees to assign Photographer all rights to such content.

## No Guarantee of Work

Photographer does not guarantee for Digital Marketing Specialist. This Agreement shall only state the Services to be provided by Digital Marketing Specialist as requested by Photographer.

## Independent Contractor Status, Benefits, and Taxes

**Independent Contractor Status.** Digital Marketing Specialist is an "Independent Contractor" and not an employee of Photographer.

**Benefits.** Digital Marketing Specialist understands that it is not eligible to participate in any of Photographer's employee benefit programs, including pension, profit sharing, health care, vacation pay, sick pay, or other fringe benefit plan. Digital Marketing Specialist acknowledges and agrees that Photographer is not responsible for payment of workers' compensation insurance since the relationship is that of an independent contractor.

**Taxes.** Digital Marketing Specialist shall pay all taxes incurred while performing Services under this Agreement, including all applicable income taxes, and self-employment taxes. Photographer will not withhold FICA (Social Security and Medicare taxes) from Digital Marketing Specialist's payments or make FICA payments on Digital Marketing Specialist's behalf.

**Non-Exclusive Agreement**

CNP 00919

This Agreement is non-exclusive. Digital Marketing Specialist may provide services to third parties as well.

## Termination Before Expiration or Completion

**By Photographer.** Photographer may terminate this Agreement at any time by giving written notice to Digital Marketing Specialist.  Upon termination, Photographer shall be responsible for compensation to Digital Marketing Specialist for Services rendered prior to Digital Marketing Specialist's notice of termination.

**By Digital Marketing Specialist.** With reasonable cause, such as Photographer's failure to comply with the terms of this Agreement, Digital Marketing Specialist may terminate this Agreement effective immediately upon giving written notice to Photographer. Digital Marketing Specialist may terminate this Agreement for any reason by giving thirty (30) days' written notice to Photographer.

## Confidentiality

Digital Marketing Specialist agrees that she will not, at any time, use or disclose any of Photographer's Confidential Information or any materials or information which Digital Marketing Specialist should reasonably expect to be confidential, including personal information related to Photographer's clients, operation methods, or policies. Digital Marketing Specialist agrees that all Confidential Information is, and shall remain, the sole property of Photographer. Upon request, Digital Marketing Specialist shall promptly return to Photographer all materials containing or otherwise pertaining to Confidential Information. Digital Marketing Specialist agrees to not disclose business practices, policies techniques used by Photographer or Confidential Information to any third parties.

## Limit of Liability

**Maximum Damages.** Digital Marketing Specialist agrees that the maximum amount of damages she is entitled to in any claim relating to this Agreement or Services provided in this Agreement are not to exceed the Total Cost of Services provided by Digital Marketing Specialist.

**Indemnification.** The Parties agree to indemnify, defend and hold harmless each other and their affiliates, employees, agents and independent contractors if any, for any injury, property damage, liability, claim or other cause of action arising out of or related to Services or this Agreement.

## Impossibility

**Force Majeure.** Notwithstanding the above, either Party may choose to be excused of any further performance obligations in the event of a disastrous occurrence outside the control of either party

**Failure to Perform Services.** If Digital Marketing Specialist cannot or will not perform its obligations in any or all parts of this Agreement, it (or a responsible party) will immediately give notice to Photographer and excuse Photographer of any further performance and/or payment obligations in this Agreement.

## General Provisions

**Governing Law.** Kentucky law governs all matters arising out of or relating to this Agreement, including torts. If any dispute arises out of or related to this Agreement, then Photographer and Digital Marketing Specialist agree that the proper jurisdiction shall be the courts located in Louisville, Kentucky and Photographer and Digital Marketing Specialist waive any defense of personal jurisdiction or lack of venue.

**Severability.** If any portion of this Agreement is deemed to be illegal or unenforceable, the remaining provisions of this Agreement remain in full force.

CNP 00920

**Notice.** Parties shall provide effective notice ("Notice") to each other via email, effective as of date and time which the Notice is sent:

1.   Photographer's Email:

2.   Digital Marketing Specialist Email:

**Merger.** This Agreement constitutes the final, exclusive agreement between the Parties relating to the Editing and Services contained in this Agreement. All earlier and contemporaneous negotiations and agreements between the Parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement.

**Amendment.** The Parties may amend this Agreement only by their written consent via proper Notice.

## Signatures

*Chelsey Nelson*

Chelsey Nelson Photography, LLC                    Signed:
                                                    Mar 23, 2023

██ @ ██████████ com

*Bekah Mazza*

Bekah Mazza                                         Signed:
                                                    Mar 23, 2023

██████████ @gmail.com

**CONFIDENTIAL**                    **CNP 00921**

# Exhibit 5

Instagram Content Drafted by Nelson

FILED UNDER SEAL

# Instagram Content

Thank you for your help, Bekah! Below is the workflow for scheduling all of the posts for the next few months.

Workflow:

1. On the "Calendar" tab of Later, select "Draft" to drag "media" (a photo) over and write a post (photos are shown here or you're free to choose from photos filtering with the label indicated, i.e. "Wedding" or "Engagement" if a specific photo doesn't need to be used)
2. Copy/paste caption
3. Select "Saved Captions" to add the saved caption "Wedding Captions" which will just insert pre-saved hashtags at the bottom
4. Add location tag (indicated here). It may take a search or two
5. If a venue is indicated, let's check to see if they have an Instagram account so we can tag them in the post under "Tag People"
6. Schedule to publish on Tuesdays at 12pm ET (if Later suggests a better time, feel free to go with it!). I upgraded the account so we can use the Auto Publish feature. Here's the Later pop up screen you'll see for reference when scheduling a post:



7. Email to let me know they've all been scheduled (i.e. I may need to tweak something if a blog post isn't going live yet to coordinate with an Instagram post announcing it). Please feel free to make a Loom video if you have any questions beyond what makes sense for an email. I'm happy to help work out the kinks!

## Ready to Schedule

- 1 per week on Tuesdays at 12pm ET

**Caption:**
One of the best things I've done the past few months is replace tv time most weeknights with reading. My reading life has had a recent infusion of inspiration. I'm so enjoying my new rhythms of winding down at night with a good book.

The first series I remember devouring was about the character Molly from American Girl, then came Little House on the Prairie by Laura Ingalls Wilder. I can still remember the smell of the pages when I opened it in bed as a little girl happily snuggled up under my purple and lime green butterfly comforter (#90s).

My favorite reading moment the last few years was laying on a blanket with my husband at Cherokee Park on a cool fall day full of golden light. Finding time to read looks a little different these days, but it's always worth it even if it's just for 10 minutes. I'm a better me when my reading life is thriving.

These days, I'm reading through The Unselected Journals of Emma M. Lion by @bethbrower and re-reading The Awakening of Miss Prim by Natalia Sanmartin Fenollera. My friend @truthinlovewithwords has wonderful book recommendations and thoughtful reviews.

**Image:** filter "Chelsey" for a photo at Big Rock Park :)
**Location tag:** Big Rock Park

**Caption:**
Locust Grove is my favorite venue in Louisville. Photographing a wedding there on a cool, crisp October day is one of my best memories in the city. It's also one of my favorite places to go with my family for holidays (especially around the 4th of July for Independence Day).
**Image:** filter for "Locust Grove" photos
**Location tag:** Locust Grove

**Caption:**
I'm always honored when friends and family ask me to be their photographer. It never gets old (and we have a lot of fun along the way)!

Rachael and Casey's engagement session is up on the blog 💻
**Image:** (filter "engagement" to find this photo)

**CONFIDENTIAL**



**Caption:**
When I asked Dami how he was doing when I arrived to start photographing their wedding day, he said "I feel alive!" It was such a sweet, unfiltered moment. I most definitely utilized my travel kleenex pack (a must-have in my gear) when they exchanged their vows and testified to God's goodness in bringing them together.
**Image:** filter for "Abby & Dami"

**Caption:**
Who could ever get tired being around this kind of joy? Rachael and Casey's beautiful wedding at @oakcrestmansioninn is live on the blog today 💻
**Image:** filter "bridal details" to find
Location tag: Oak Crest Mansion (in Pass Christian, MS)



**Caption:**
Sometimes I just can't help but smile right along as I'm photographing a couple that is absolutely giddy with excitement to get married. I smile because I know that by God's kindness,

CNP 00928

a deeper love awaits for the couple whose eyes are fixed on Christ and choose to surrender to the sanctifying process of marriage.
**Image:** filter for "wedding" with an image of a bride smiling :)

**Caption:**

We spend so much time planning a wedding, but are we planning a marriage? The best piece of marriage advice I could probably give before a wedding is to go through premarital counseling together at a solid church (solid = teaches the Bible without bending to shifting cultural winds). That was one of the best things I did with my fiance before we got married!
**Image:** filter for "engagement session"

**Caption:**

"A wife, if she is very generous, may allow that her husband lives up to perhaps eighty percent of her expectations. There is always the other twenty percent that she would like to change, and she may chip away at it for the whole of their married life without reducing it by very much. She may, on the other hand, simply decide to enjoy the eighty percent, and both of them will be happy."

- Love Has a Price Tag by Elisabeth Elliot
**Image:** (filter "wedding" to find it)



**Caption:**

Spring is a close second, but fall is a very cozy favorite. One of my favorite fall traditions is to watch You've Got Mail when the weather starts to turn cool and crisp. I pop on a sweater, make a hot cup of whatever fits my mood, and let the nostalgia wash over me. Highly recommend



**Image:** filter "fall" to find a photo of a stack of sweaters on a bed

**Caption:**

CNP 00929

I personally think Red River Gorge is one of the most beautiful places in Kentucky when the leaves start to change. I remember photographing this session with a little one in my womb, thinking I couldn't wait to show them the magic of fall.

**Image:** "Red River Gorge" to pick a photo
**Location tag:** Red River Gorge

## Drafts and ideas in progress (not ready to schedule yet)

Abby and Dami's wedding

Thanksgiving

Christmas traditions

Motherhood for God's glory

CNP 00930

# Exhibit 6

Payment Confirmation and Emails between Nelson and Digital Marketing Specialist

FILED UNDER SEAL



**CONFIDENTIAL**                    **CNP 00922**

M Gmail

Chelsey Nelson <chelsey@chelseynelson.com>

## Instagram :)
8 messages

**Chelsey Nelson** <████████████.com>                                    Thu, Jul 27, 2023 at 4:42 PM
To: Bekah Mazza ████████.com>

Hi Bekah!

I hope you guys are enjoying that green grassy backyard! I saw Summer Sessions kicked off so I also hope that went well!

I'm getting myself in gear and have been writing captions, organizing photos, and all the things so I can send over more info soon! My plan is to get enough content ready to schedule 1-2 posts per week for the rest of this quarter.

For now, I plan to keep using Later (quick video here on it) but may eventually switch providers as I reevaluate how easy it is to work with this platform. I just shared the account login info with you through the website I use to save/share passwords (LastPass - you probably received an email from them).

My approach has been to write out the entire caption with hashtags, then specify whether there will be a specific photo to pair with it or whether it's up to you to choose from a specific category (I'll have photos tagged so you can easily filter what to choose from, i.e. photos taken at Locust Grove for a post about that venue).

That's all for now, but I'll be in touch!

Warmly,

Chelsey

*Chelsey Nelson*

Photography
www.chelseynelson.com
@mrs.chelseynelson

**Bekah Mazza** ████████@gmail.com>                                    Mon, Aug 7, 2023 at 2:45 PM
To: Chelsey Nelson <████████n.com>

CHELSEY!

I am so sorry it took me forever to respond to you! After Summer Sessions was over, I was working to coordinate Patrick and Michaela's wedding. Now that all of that is behind me, I'm good to go. I watched the video and had success logging into Later so I think we're all set once you give me instructions when you're ready! Will you just be emailing me instructions/what days to schedule or is there a way for you to make comments like that on the Later website? Just want to make sure I'm familiar and don't mess anything up, haha.

We miss y'all so much! Hope you're doing well :)
[Quoted text hidden]

**Chelsey Nelson** <████████.com>                                    Mon, Aug 7, 2023 at 3:08 PM
To: Bekah Mazza <████████@gmail.com>

Hi Bekah!

I'm sure the wedding was awesome! We were sad to miss it. It's sweet how everything worked out for those two. Absolutely no worries on timing.

I've actually been chugging away writing captions today. I'm planning for us to work from a Google document that will serve as our content hub with more instructions/thoughts. My brain likes working from a Google doc so I can see everything in one place (I just shared it with you - it's a work in progress).

Please definitely feel free to log any time you spend watching Later videos I send so I can be sure to pay you for your time! My goal is to have everything ready so we can get started next week.

Warmly,

Chelsey

**CONFIDENTIAL**                    **CNP 00931**



Photography
www.chelseynelson.com
@mrs.chelseynelson

[Quoted text hidden]

---

**Chelsey Nelson** < ███████████ .com>                                              Wed, Aug 23, 2023 at 2:56 PM
To: Bekah Mazza ██████████ @gmail.com>

Hi Bekah!

Drumroll...I think everything is ready for you! There should be 10 posts to schedule (every Tuesday for the next 10 weeks). I figure this is probably a good amount to start with so we can work out any kinks as we go along.

Instagram Content Google Doc

Let me know if you have any questions! I hope you guys are having a great week :)

Warmly,

Chelsey

*Chelsey Nelson*

Photography
www.chelseynelson.com
@mrs.chelseynelson

[Quoted text hidden]

---

**Bekah Mazza** ████████ @gmail.com>                                               Thu, Aug 24, 2023 at 1:15 PM
To: Chelsey Nelson < ████████ .com>

Yay! I'm chugging along getting started. A few questions have come up as I'm working on it:

1. The portrait images are popping up as too large for Instagram and it wants me to crop them. I felt funny cropping them, but went ahead and did so. If you want to check to make sure they still look the way you want them to, I'm happy to change the crop! I just used my personal aesthetic judgment, ha!
2. For posts that don't have a specific photo requirement, do you want to stick to only posting one photo or do 2-3?
3. In your workflow lineup you have listed posting the hashtags for "Wedding Captions" but is that just for the wedding posts or all of them? I wondered if any hashtags needed to be added for the non-wedding posts.

This is so fun! I'm looking forward to being able to help you out :) Hope you're having a great Thursday!
[Quoted text hidden]

---

**Bekah Mazza** ████████ @gmail.com>                                               Thu, Aug 24, 2023 at 1:38 PM
To: Chelsey Nelson ████████ .com>

I just got it all done if you want to look it all over! Took me about 30 minutes.. you seriously do not need to pay me for this!
[Quoted text hidden]

---

**Chelsey Nelson** < ███████████ .com>                                              Thu, Aug 24, 2023 at 5:05 PM
To: Bekah Mazza < ████████ @gmail.com>

You are amazing! That would've taken me so much longer...I'm slightly techy but for some reason scheduling Instagram posts takes me foreverrrrr. There's a quote that says something along the lines of "what's duh to you is magic to someone else" and that seems to fit here.

That said, I absolutely insist on paying you something because of how much this helps me! Seriously, it may just be 30 minutes but it lifts something off my shoulders that feels heavy for some reason (and would take me longer to do).

Great questions. I'll do my best to answer them:

1. The portrait images are popping up as too large for Instagram and it wants me to crop them. I felt funny cropping them, but went ahead and did so. If you want to check to make sure they still look the way you want them to, I'm happy to change the crop! I just used my personal aesthetic judgment, ha! Feel free to continue cropping using your personal aesthetic judgement :) I'll take a peek and work and make changing as needed.
2. For posts that don't have a specific photo requirement, do you want to stick to only posting one photo or do 2-3?  Let's stick to one photo unless noted otherwise.

CONFIDENTIAL          CNP 00932

3. In your workflow, have you created posting/hashtags for "Wedding Options" Here is that/my/our the wedding posts or all of them? I wondered if any hashtags needed to be added for the non-wedding posts. Great point/question. Let's just use those for wedding-specific posts. For anything specifically located in Louisville with a location tag, let's at least use #louisville and #louisvillephotographer (you should be able to add those in as saved hashtags so you can just click to add them) Everything else can be hashtag-less while I mull this over some more.

Separately, if you have any ideas on how to implement reels or ideas for specific reels, feel free to share because I am lost on how to implement them...

Let me know if I missed anything! Thanks again :)

Warmly,

Chelsey

*Chelsey Nelson*

Photography
www.chelseynelson.com
@mrs.chelseynelson

[Quoted text hidden]

CONFIDENTIAL                     CNP 00933